**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| JUMIO INC.,[1] | Case No. 16-_____  (_____) |
| Debtor. | |

**DECLARATION OF STEPHEN STUUT IN SUPPORT OF
CHAPTER 11 PETITION AND FIRST DAY PLEADINGS**

I, Stephen Stuut, hereby declare as follows:

1.      I am the Chief Executive Officer of Jumio Inc. ("Jumio"), the above-captioned debtor and debtor-in-possession (the "Debtor").  I joined Jumio's management team as its Chief Executive Officer on May 18, 2015.  In this capacity, I am familiar with the Debtor's business, day-to-day operations, and financial affairs.

2.      On the date hereof (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 (the "Chapter 11 Case") of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended or modified, the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court"), and filed various motions described herein requesting certain relief (collectively, the "First Day Pleadings").  1 submit this declaration (the "Declaration") in support of the Debtor's Chapter 11 Case and the First Day Pleadings.

3.      Except as otherwise indicated herein, all statements set forth in this Declaration are based upon (i) my personal knowledge as the Chief Executive Officer, (ii) information supplied to me by other members of Jumio's management or the Debtor's professionals, (iii) my

---

[1] The last four digits of the Debtor's tax identification number are 6822.  The Debtor's corporate headquarters and the mailing address is 268 Lambert Avenue, Palo Alto, California 94306.

review of relevant documents, and/or (iv) my experience and knowledge of the Debtor's operations and financial affairs. If called upon to testify, I could and would testify to the facts set forth in this Declaration. I am authorized by the Debtor to submit this Declaration.

4.    Part I of this Declaration describes the Debtor's business, Part II describes the circumstances giving rise to the commencement of this Chapter 11 Case, Part III describes the Debtor's proposed course for this Chapter 11 Case, and Part IV sets forth certain facts in support of the First Day Pleadings.

I.

**OVERVIEW OF THE DEBTOR'S BUSINESS**

**Business Operations**

5.    Jumio is a leading online and mobile identity management and credentials authentication company. Through its innovative verification products and revolutionary technology, Jumio assists its customers in reducing fraud, meeting regulatory requirements and increasing revenue, all while providing a fast, seamless customer experience. Jumio utilizes proprietary computer vision technology and analysis and highly-trained identity experts to reduce user sign-up and checkout friction and verify credentials (such as passports, driver licenses and government issued IDs (each an "ID")) issued by over one hundred and thirty (130) countries in real-time online and mobile transactions. Jumio has received numerous domestic and international awards for innovation from leading industry associations.

*Jumio's Products*

6.    Jumio's products are utilized across the globe by a wide range of customers, including start-ups, leading internet companies and Fortune 500 and FTSE 350 organizations in the financial services, sharing economy, retail, travel, and online gaming industries. Its products are used by some of the most recognizable brands and companies in the world including, among

others, Airbnb, United Airlines, WorldRemit, EasyJet, and Duolingo. Specifically, Jumio offers three (3) primary products – Fastfill, BAM Checkout and Netverify. Fastfill and BAM Checkout are available for integration into mobile applications running on iOS or Android. Netverify can be integrated into a customer's online website and work on any computer with a webcam and into mobile applications running on iOS or Android. Jumio sells its products and services to its customers through negotiated, term contracts and provides around-the-clock customer service and data verification services, seven (7) days a week in order to meet the demands of the global internet marketplace.

7.      Fastfill enables Jumio's customers to dramatically improve their new account sign-up and shopping cart completion rates with fast user onboarding and near-instant population of personal data – once Fastfill is installed on a mobile application, users can scan their own IDs to extract and automatically populate personal data fields on the customer's sign-up or checkout pages a process that takes seconds rather than minutes.

8.      BAM Checkout enables Jumio's customers to give their users an easy and friction-free way to make purchases on mobile applications. Similar to Fastfill, during checkout users tap a scan button integrated into the customer's electronic checkout form and hold up a credit card or ID to their mobile camera. Jumio's technology scans the credit card or ID and automatically populates the information thereon into the customer's checkout fields. BAM Checkout significantly cuts average checkout time, which dramatically increases transaction completion rates (and corresponding revenue) and eliminates user data entry errors. BAM Checkout is also an anti-fraud tool as it (i) ensures users have their actual credit cards in-hand at transaction time and (ii) crosschecks the names on the credit cards and IDs to flag any inconsistencies.

9.    The Netverify technology helps Jumio's customers to meet KYC (know your customer) and ID verification requirements and reduce fraud by authenticating and extracting data from IDs.  Netverify combines an automated analysis of the data on an ID (looking for inconsistencies between the printed data and the data encoded in the bar code) along with other document elements and a manual evaluation by a Jumio document examiner.  The document authentication process takes place quickly and seamlessly in the background of the website or mobile application so that users are not inconvenienced and the momentum of the remote transaction is maintained.  Netverify also provides the option to capture an image of the user's face and match it against the picture on the ID to ensure that the individual presenting the ID is the person featured on it.  Netverify also supports the ability to capture data from other documents like utility bills or bank statements.  With Netverify, customers can improve user transaction experiences by providing an in-app or online, real-time authentication process for transactions such as international mobile boarding pass issuances, new bank account openings, money transfers and more.  Through Netverify, customers also can verify documents and IDs faster and in a secure manner to meet industry regulations and internal authentication policies.

### *Operational Footprint*

10.    Headquartered in Palo Alto, California, Jumio has operations in the United States, Europe and India.  Jumio employs forty-three (43) individuals, thirty-two (27) of which work in Jumio's Palo Alto office and fourteen (14) of which work in Jumio's London office.  Jumio's research and development is sourced from its wholly-owned, Austrian non-debtor subsidiary, Jumio Software Development GmbH ("JSD"), which employs approximately fifty (50) employees.  JSD provides services at Jumio's direction on a cost-plus basis.  All intellectual property developed or produced by JSD is owned by Jumio.  Jumio's round-the-clock customer

service and data verification operations are provided by Jumio India (defined below); an Indian joint venture that is majority owned by Jumio and has over five hundred (500) employees.

**Corporate Structure**

11.     Jumio is a privately-held corporation formed under the laws of Delaware in 2010. In addition to JSD, Jumio directly owns Jumio Holdings,[2] an entity organized under the laws of Ireland, which directly owns Jumio Ireland, an entity organized under the laws of Ireland, neither of which have any offices, operations, assets, or liabilities. Jumio also owns Jumio India Private Limited ("Jumio India"), a privately held corporation organized under the laws of India. Jumio has no domestic subsidiaries or interests in any joint ventures or other enterprises.

12.     While Jumio directly owns the majority of its assets, including its intellectual property, some important assets are held by its wholly-owned subsidiary JSD. Specifically, Jumio's engineering, research and development teams and certain other employees with institutional knowledge of Jumio's products are employed by JSD. JSD also is the signatory on certain contracts for Jumio's products with foreign customers, whose internal policies prohibit them from contracting directly with a US entity. As set forth below, for these reasons, the assets of JSD are also an integral part of the Sale (defined below).

**Capital Structure**

13.     As an emerging technology company, Jumio has been reliant on continued cash infusions from investors as it has grown its business. Jumio historically has not been, and is not today, able to finance itself solely from its operational cash flows.

---

[2] For Irish law reasons, one share of each Irish entity is owned by Jumio's then current President, Chief Executive Officer and Chairman of the Board - Daniel Mattes. Mr. Mattes has transferred his rights to Jumio. Jumio owns the other share of each entity and is the controlling shareholder of each of these entities.

***Secured Debt***

14.     Pursuant to that certain Note Purchase Agreement dated as of August 28, 2015 (as amended, the "<u>NPA</u>"), Jumio was authorized to issue from time to time senior secured convertible promissory notes (the "<u>Prepetition Secured Notes</u>" and the holders thereof from time to time, the "<u>Prepetition Secured Noteholders</u>"), and Eduardo Saverin ("<u>Mr. Saverin</u>") and Andreessen Horowitz Fund, II, L.P.  ("<u>AH</u>") purchased the following Prepetition Secured Notes in the aggregate original principal amount of $15,493,727.74:

- ▪ Note No.: CPN-1 dated August 28, 2015 in the original principal amount of $4,000,000.00 owed to Mr. Saverin;

- ▪ Note No.: CPN-2 dated August 28, 2015 in the original principal amount of $1,509,780.82 owed to Mr. Saverin;

- ▪ Note No.: CPN-3 dated August 28, 2015 in the original principal amount of $2,005,041.10 owed to Mr. Saverin;

- ▪ Note No.: CPN-4 dated August 28, 2015 in the original principal amount of $1,509,780.82 owed to AH, which was transferred to Mr. Saverin on or about March 18, 2016;

- ▪ Note No.: CPN-5 dated October 23, 2015 in the original principal amount of $4,000,000.00 owed to Mr. Saverin; and

- ▪ Note No.: CPN-6 dated February 26, 2016 in the original principal amount of $2,469,125.00 owed to Mr. Saverin.

15.     Pursuant to, among other things, that certain Security Agreement dated as of August 28, 2015 (as amended, the "<u>Security Agreement</u>") by and between Jumio, as borrower, and Christopher Joseph Clower, as security agent pursuant to the NPA and under the Prepetition Secured Notes (the "<u>Prepetition Agent</u>") and the other Security Perfection Documents (as defined in the NPA), the Prepetition Secured Notes are secured by liens on and security interests in substantially all of Jumio's assets, including its cash (the "<u>Cash Collateral</u>").

16.     The Prepetition Secured Notes bear interest at four percent (4%) per annum and are due and payable six (6) months after the issuance of the applicable Prepetition Secured Note (or before upon a Change of Control or Event of Default (each as defined in the Prepetition Secured Notes)).   As of the Petition Date, $15,765,819 in principal and accrued interest is outstanding under the Prepetition Secured Notes.

17.     In accordance with the terms of the NPA, Jumio also notified all holders of Jumio's capital stock that were accredited investors that they could also purchase Prepetition Secured Notes on the same terms offered to Mr. Saverin and AH.   No other equity holders elected to purchase any such Prepetition Secured Notes.

***Unsecured Debt***

18.     As of the Petition Date, Jumio estimates that its unsecured debt aggregates approximately $440,000, consisting primarily of accounts payable to trade vendors.

***Equity***

19.     Jumio has twenty-eight (28) preferred equity holders and sixty-six (66) common equity holders.   As of the Petition Date, Jumio had 44,075,498 of preferred stock and 43,533,609 of common stock issued and outstanding.   Mr. Saverin is a substantial equity holder, having invested at least $23 million in the preferred and common equity of the Debtor, representing approximately 16% of the fully diluted voting equity.

**II.**

**EVENTS LEADING TO THIS CHAPTER 11 CASE**

20.     While Jumio is thriving from an operational standpoint, certain legacy issues combined with related government investigations and proceedings have made it difficult for Jumio to secure necessary funding for its operations.   Following a rigorous evaluation of all available options, Jumio determined that filing for Chapter 11 protection and pursuing an orderly

sale of its assets in a controlled, court-supervised environment would be the best available option for it and its stakeholders.  Jumio believes that the Chapter 11 process, including the proposed sale of its assets pursuant to the highest and otherwise best bid (as described below), will be seamless for its customers, result in minimal disruption to its operations, allow the company to strengthen its financial structure, and position it for significant future growth.

### Legacy Issues

21.    In 2015, Jumio restated its financial statements for the years of 2013 and 2014 (the "Restated Periods").  The determination to restate the financial statements for the Restated Periods was made after consulting with a third-party consulting firm and Jumio's legal advisors following the identification of errors related to primarily revenue recognition policies adopted by Jumio.

22.    In addition, in March 2015, the Board of Directors engaged special counsel to investigate, among other things, issues related to secondary sales of Jumio's common stock by certain (now former) executives of Jumio, including Mr. Mattes.  On April 30, 2015, Mr. Mattes resigned from Jumio and its Board of Directors.

23.    On September 2, 2015, Jumio advised its shareholders it had recently restated its unaudited financial statements for the Restated Period during which prior management had been in place.

24.    As a result of these events, Jumio was subject to a number of additional costs and risks, including unanticipated costs for accounting and legal fees in connection with or related to the restatement, as well as the costs and expenses that could arise in connection with any investor litigation relating to the restatement – thereby making it essentially impossible to secure additional funding as needed.

*Government Investigations*

25.     In addition, Jumio is subject to recent ongoing government investigations related to the restated financials and certain sales of securities to purchasers that may have relied on the original financials, as described above.  Jumio has been cooperating fully with the government investigations.

26.     As noted above, historically, Jumio has been reliant on cash infusions from investors to fund its operations and grow its business.  In light of the government investigations and restatement of financials, Jumio has been unable to raise additional funds through either equity or third-party debt raises.   This has left Jumio with few alternatives.   Jumio could liquidate its assets on a piecemeal basis.  However, after analysis of this option, Jumio does not believe that a piecemeal liquidation will provide any meaningful recovery to its secured creditors, let alone its unsecured creditors and other stakeholders.  Likewise, its customers will be left without a trading partner and will face significant interruption in their use of Jumio's technology.   Finally, Jumio would be forced to cease operations resulting in the loss of approximately one hundred (100) jobs in the US, UK and Austria, as well as hundreds of jobs in India.  Jumio's other option was to pursue a sale of substantially all of its assets that would preserve its ongoing business.  After extensive negotiation, the Debtor was able to enter into the Asset Purchase Agreement and Postpetition Facility (each as defined below) which provides the Debtor with an opportunity to further market its assets and maximize value.  The Asset Purchase Agreement and Postpetition Facility provide Jumio the necessary runway to continue its marketing efforts, satisfy its post-petition obligations, and assuming no higher or otherwise better offers are received, consummate a sale process that satisfies all of Jumio's secured debt,

preserves jobs for Jumio's employees, gives Jumio's current customers an on-going trading partner and provides cash for the estate's winddown and potential distribution to creditors.

### Postpetition Facility and 363 Sale

27.     In light of the foregoing, the continuing deterioration of its cash position and its present lack of realistic stand-alone restructuring options, Jumio, in the exercise of its reasonable business judgment, determined that the most effective way to maximize value of its estate for the benefit of all of its constituents was to seek bankruptcy protection in order to sell substantially all of its assets (the "Assets") through a sale pursuant to Bankruptcy Code section 363 (the "Sale").

28.     In order to ensure that it has sufficient funds to maintain the stability of its business and its going concern value, Jumio has obtained authority to utilize cash collateral from the Prepetition Secured Noteholders and to borrow $3.7 million (the "Postpetition Facility") from Mr. Saverin or his designee(s) (the "Postpetition Lender") as set forth in the DIP Motion (as defined below).  In the exercise of its business judgment, Jumio has determined that the Postpetition Facility is the best, if not only, financing available to it and that the Postpetition Facility will provide it with the liquidity it requires to operate in this Chapter 11 Case.

29.     In addition to providing the Postpetition Facility, an entity formed by Mr. Saverin, Jumio Acquisition, LLC, has agreed to serve as Jumio's stalking horse purchaser (the "Stalking Horse Bidder") in connection with the Sale.  In connection therewith, Jumio and Jumio Austria, on the one hand, and the Stalking Horse Bidder, on the other hand, entered into that certain Asset Purchase Agreement, dated March 20, 2016 (as amended, supplemented, or modified from time to time, the "Asset Purchase Agreement")[3], a true copy of which is attached the Debtor's Sale

---

[3] The Asset Purchase Agreement filed on the Petition Date does not contain the schedules thereto.  The Debtor expects the schedules to be filed shortly after the Petition Date, and, in any event, will deliver the schedules to the Stalking Horse Bidder prior to the March 25, 2016 deadline for doing so, as set forth in Section 9(d)(xx) of the Asset Purchase Agreement, and file the schedules as soon as practicable after the Stalking Horse Bidder's acceptance

Motion (as defined below).  The Stalking Horse Bidder has agreed to purchase substantially all of the Debtor's assets, subject to higher or otherwise better bids, for an aggregate purchase price valued at approximately $22.6 million consisting of (a) a credit bid of the Prepetition Secured Notes and Postpetition Facility;  (b) the assumption of certain liabilities, including certain liabilities related to assumed and assigned executory contracts and unexpired leases, certain ordinary course of business liabilities and tax obligations; and (c) $3.2 million in cash (inclusive of certain funds dedicated to conduct dissolution proceedings of JSD, Jumio Ireland Holdings and Jumio Ireland and the $1.3 million fee to Sagent).  Additionally, the Stalking Horse Bidder intends to offer employment to substantially all of Jumio's current employees with employment commencing as of, and only upon, the closing of the Sale.  The Sale is contingent upon a contemporaneous sale by JSD of its assets, which will allow a solvent dissolution of JSD.

30.    In addition, because Jumio is pursuing a competitive auction for its assets, the sale process will seek additional bids that will ensure the highest and best value for Jumio's stakeholders.  In order to encourage competitive bidding for the Debtor's assets and maximize value for all stakeholders, Mr. Saverin agreed to offer terms in connection with the Postpetition Facility and the Stalking Horse Bidder's Asset Purchase Agreement that the Debtor believes are below "market," and were designed to reduce barriers to the entry for competitive bids being submitted in the sale process, including: (i) the Postpetition Facility bears interest at four percent (4%) (the same as non-default rate on the Prepetition Secured Notes), it does not include any closing, exit or prepayment fees, and only modest $20,000 fee for the Postpetition Agent, (ii) the Stalking Horse Bidder has not sought any break-up fee, and an expense reimbursement equal to less than 1.4% of the value of the purchase price; (iii) in connection with the credit bid or a sale

---

thereof, which the Debtor expects will occur prior to the April 1, 2016 deadline for doing so.  In the meantime, information regarding the Purchased Assets, including constituent information for the schedules, is available in the Debtor's sale data room for potential bidders who have executed confidentiality agreements with the Debtor.

to a higher bidder pursuant to the Bidding Procedures, the Prepetition Secured Noteholders have agreed to waive the change of control premium required by the Prepetition Secured Notes. In addition, the Postpetition Lender has agreed that any creditor or equity holder of the Debtor may purchase non-voting participations in the Postpetition Facility up to 49% of the amounts outstanding under the facility.

31.    Jumio believes, in the exercise of its business judgment, that the Sale structure will foster an open and competitive process and provide the best option to maximize value for all of Jumio's stakeholders. Indeed, given that Jumio has limited cash and no realistic financing option other than the Postpetition Facility, which itself depends on the Sale process moving forward as proposed, the only alternative to the Sale would be a conversion of this Chapter 11 Case to Chapter 7, the immediate loss of any going concern value and jobs, and the piecemeal liquidation of Jumio's assets.

### *Prepetition Marketing Efforts*

32.    Prior to the Petition Date, the Debtor retained an investment bank, Sagent Advisors, LLC ("Sagent"), to market the Selling Entities' assets for sale to potential purchasers other than the Stalking Horse Bidder. Sagent began contacting potential purchasers on February 29, 2016, and prior to the Petition Date had contacted a total of one hundred and four (104) potential purchasers. Of those potential purchasers, thirty-two (32) have demonstrated initial interest in the Selling Entities' assets and have executed confidentiality agreements with the Debtor. In addition, Sagent and the Debtor have populated an online data room to assisted in interested parties due diligence and have begun to field inquiries regarding diligence requests.

The Debtor expects that Sagent will continue its marketing process as the Chapter 11 Case continues, and the Debtor is hopeful that competing bids will be submitted by the

proposed April 26, 2016 Bid Deadline. The Debtor believes, based on consultations with Sagent, that the marketing period, which will have spanned approximately three (3) weeks prior to the Petition Date and approximately five (5) weeks during the Chapter 11 Case, is a reasonable and sufficient period to solicit bids on the Selling Entities' assets. Although a truncated schedule, the Debtor believes that the market efforts will be sufficient to ensure the highest and best offer, particularly in light of the Debtor's limited financing options and ongoing cash needs. Further, the Debtor believes that a delayed process likely would lead to the deterioration of the operating performance of the business and the value of its assets.

## III.

### PROPOSED COURSE OF THE CHAPTER 11 CASE

33.    Jumio intends to pursue the Sale in Chapter 11 in order to avoid deterioration of its business and obtain maximum value for its assets for the benefit of all of its stakeholders. The Postpetition Facility will provide Jumio with sufficient liquidity to operate during the Sale process and the Stalking Horse Bid sets a floor price for what Jumio anticipates will be an open, competitive and ultimately successful auction.

34.    In order to achieve its goals in Chapter 11, Jumio seeks the relief set forth in the First Day Motions, as summarized below.

## IV.

### FACTS IN SUPPORT OF FIRST DAY PLEADINGS[4]

35.    To minimize the adverse effects of the commencement of this Chapter 11 Case on the Debtor's ability to effectuate a timely and efficient restructuring process that will preserve and maximize the value of the Debtor's estate, the Debtor has filed the following First Day

---

[4] Capitalized terms not defined within this Section IV shall have the meaning ascribed to such terms in the respective First Day Motions.

Motions:

- Application of the Debtor for Entry of an Order Appointing Rust Consulting/Omni Bankruptcy as Claims and Noticing Agent Nunc Pro Tunc to the Petition Date;

- Motion of the Debtor for Entry of an Order Authorizing the Debtor to Pay Prepetition Wages, Compensation, Employee Benefits and Other Associated Obligations;

- Motion of the Debtor for Entry of Interim and Final Orders (a) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service, (b) Deeming Utilities Adequately Assured of Future Performance, and (c) Establishing Procedures for Determining Adequate Assurance of Payment;

- Motion of the Debtor for Entry of an Order Authorizing the Debtor to Honor Its Obligations Under Prepaid Contracts in the Ordinary Course of Business;

- Motion of the Debtor for Entry of an Order Authorizing the Debtor to Maintain Existing Insurance Policies, Pay All Policy Premiums Arising Thereunder, and Renew or Enter Into New Policies;

- Motion of Debtor for Interim and Final Orders Authorizing the Debtor to (A) Incur Postpetition Debt; (B) Provide Adequate Protection; (C) Use Cash Collateral; and (D) Grant Certain Liens and Provide Security and Other Related Relief to Prepetition Secured Noteholders (the "DIP Motion");

- Debtor's Motion for Entry of an Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals and Official Committee Members;

- Application of the Debtor to Approve the Employment and Retention of Landis Rath & Cobb LLP as its Bankruptcy Counsel, Nunc Pro Tunc to the Petition Date, Pursuant to Bankruptcy Code Section 327(a), Bankruptcy Rule 2014 and Local Rule 2014-1

- Application of the Debtor and Debtor-In-Possession to Approve the Employment and Retention of Wilmer Cutler Pickering Hale and Dorr LLP as Special Corporate Counsel Nunc Pro Tunc to the Petition Date Pursuant to Bankruptcy Code Sections 327(e) and 328(a), Bankruptcy Rule 2014(a) and Local Rule 2014-1;

- Application for Entry of an Order Approving the Employment and Retention of Rust Consulting/Omni Bankruptcy as Administrative Agent for the Debtor Nunc Pro Tunc to the Petition Date;

- Debtor's Motion for Entry of Orders (A)(I) Approving Bid Procedures Relating to the Sale of Substantially all of the Debtor's Assets; (II) Approving Certain Bid Protections; (III) Scheduling a Hearing to Consider the Sale; (IV) Approving the Form and Manner of Notice of Sale by Auction; (V) Establishing Notice and Contract Procedures for the Assumption and Assignment of Contracts and Leases; and(VI) Granting Related Relief; and (B)(I) Approving Asset Purchase Agreement And Authorizing the Sale of Certain Assets of the Debtor Outside the Ordinary Course of Business; (II) Authorizing the Sale of Assets Free and Clear of all Liens, Claims, Encumbrances and Interests; (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (IV) Granting Related Relief (the "Sale Motion").

36.    I have reviewed each of the First Day Motions, including any exhibits thereto, and incorporate by reference each of the factual statements set forth in the First Day Motions.  I believe that the relief requested by the First Day Motions is necessary to enable to the Debtor to preserve and maximize value and efficiently implement their restructuring efforts with minimal disruption and delay.

## Declaration

37.    Pursuant to section 1746 of title 28 of the United States Code, I declare under penalty of perjury that the foregoing is true and correct.

## Relief Requested

38.    I respectfully request that the Court grant all relief requested in the First Day Pleadings and such other and further relief as may be just and proper.


Dated: March 21, 2016                           JUMIO INC.


                                                /s/ Stephen Stuut_____
                                                Stephen Stuut
                                                Chief Executive Officer