## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| JUMIO INC.,[1] | Case No. 16-10682 (BLS) |
| Debtor. | |

**DEBTOR'S MOTION FOR ENTRY OF ORDERS: (A)(I) APPROVING BID PROCEDURES RELATING TO SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS; (II) APPROVING CERTAIN BID PROTECTIONS; (III) SCHEDULING A HEARING TO CONSIDER THE SALE; (IV) APPROVING THE FORM AND MANNER OF NOTICE OF SALE BY AUCTION; (V) ESTABLISHING NOTICE AND CONTRACT PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES; AND (VI) GRANTING RELATED RELIEF; AND (B)(I) APPROVING ASSET PURCHASE AGREEMENT AND AUTHORIZING THE SALE OF CERTAIN ASSETS OF DEBTOR OUTSIDE THE ORDINARY COURSE OF BUSINESS; (II) AUTHORIZING THE SALE OF ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (III) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (IV) GRANTING RELATED RELIEF**

The above-captioned debtor and debtor-in-possession (the "Debtor" or the "Seller") hereby moves the Court (the "Motion"), pursuant to sections 105(a), 363, 365, 503 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), and Rules 2002, 6003, 6004, 6006, 9007 and 9008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 6004-1 of the Local Rules (the "Local Rules") of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Court" or the "Bankruptcy Court"), for entry of two orders: (a) one, substantially in the form annexed hereto as "**Exhibit A**" (the "Bid Procedures Order"), (i) approving the procedures in connection with the solicitation and acceptance of higher and better bids (the "Bid Procedures")

---

[1] The last four digits of the Debtor's tax identification number are 6822.  The Debtor's corporate headquarters and the mailing address is 268 Lambert Avenue, Palo Alto, California 94306.

substantially in the form annexed hereto as "**Exhibit 1**" a to the Bid Procedures Order, including the expense reimbursement as set forth in the asset purchase agreement, a copy of which is attached hereto as "**Exhibit B**" (the "Asset Purchase Agreement")[2] between the Seller, Jumio Software Development GmbH, a company organized under the laws of Austria ("Jumio Austria" and, together with the Seller, the "Selling Entities"), and Jumio Acquisition, LLC, a Delaware limited liability company (together with one or more Buyer Designees[3], the "Stalking Horse Bidder") with respect to the proposed sale (the "Sale") of substantially all of the Selling Entities' assets (the "Purchased Assets"), (ii) scheduling a hearing for the approval of the Sale (the "Sale Hearing") and setting objection deadlines with respect to the Sale, (iii) approving the form and manner of notice of the Sale and related auction  (the "Auction") for the Purchased Assets, substantially in the form annexed hereto as "**Exhibit 2**" to the Bid Procedures Order (the "Sale Notice"), (iv) establishing procedures to determine Cure Payments and deadlines for objections to the potential assumption and assignment of executory contracts and unexpired leases; and (v) granting related relief; and (b) a second order, substantially in the form annexed hereto as "**Exhibit C**" (the "Sale Order"), (i) authorizing and approving the Asset Purchase Agreement; (ii) authorizing the sale free and clear of liens, claims, Encumbrances, and Interests, pursuant to the Asset Purchase Agreement; (iii) authorizing the assumption and assignment of

---

[2] The Asset Purchase Agreement filed on the Petition Date does not contain the schedules thereto.  The Debtor expects the schedules to be filed shortly after the Petition Date, and, in any event, will deliver the schedules to the Stalking Horse Bidder prior to the March 25, 2016 deadline for doing so, as set forth in Section 9(d)(xx) of the Asset Purchase Agreement, and file the schedules (except schedules containing confidential or sensitive information) as soon as practicable after the Stalking Horse Bidder's acceptance thereof, which the Debtor expects will occur prior to the April 1, 2016 deadline for doing so.  In the meantime, information regarding the Purchased Assets, including constituent information for the schedules, is available in the Debtor's sale data room for potential bidders who have executed confidentiality agreements with the Debtor.

[3] As used herein, "Buyer Designee" means one or more Person(s) designated by the Buyer in writing to the Seller prior to the Closing.  Additionally and for purposes of full disclosure, certain provisions of the Asset Purchase Agreement (as discussed in section B below), refer to "Buyer Parties," which means: "(i) the Stalking Horse Bidder, (ii) the Prepetition Lenders and the Prepetition Agent (as those terms are defined in the DIP Facility) (the "Investors"), (iii) Peng T. Ong and any designee of the Investors that is or was a current or former officer or director of the Debtor or any subsidiary of the Debtor, and (iv) in the case of the foregoing (i)-(iii), each of their respective owners, shareholders, partners, subsidiaries, affiliates, agents, employees, attorneys, advisors, insurers, or other representatives (in their capacities as such)."  Asset Purchase Agreement, Section 1.1.

certain executory contracts and unexpired leases, and (iv) granting related relief.  In support of this Motion, the Debtor respectfully states as follows:[4]

## JURISDICTION, VENUE, AND STATUTORY PREDICATES

1.       The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference from the United States District Court for the District of Delaware dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution.[5]  Venue is proper in this district pursuant to 28 U.S.C. § 1408.

2.       The statutory predicates for the relief sought herein are Bankruptcy Code sections 105(a), 363, 365, 503 and 507, Bankruptcy Rules 2002, 6003, 6004, 6006, 9007 and 9008, and Local Rule 6004-1.

## BACKGROUND

3.       On the date hereof (the "Petition Date"), the Debtor commenced the above captioned case (the "Chapter 11 Case") by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code  in the Court.

4.       The Debtor continues to operate its business and manage its properties as a debtor-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

5.       As of the date of this Motion, no trustee, examiner, or statutory committee (a "Committee") has been appointed in this Chapter 11 Case.

---

[4] Capitalized terms used but not defined herein, have the meanings ascribed to them in the Asset Purchase Agreement, the Bid Procedures, and the First Day Declaration.

[5] Pursuant to Local Rule of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware 9013-1(f), the Debtor hereby confirms its consent to entry of a final order by this Court in connection with this Motion if it is later determined that this Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

6.     The Debtor's corporate family consists of five entities including the Debtor.  The Debtor has (1) a wholly-owned Austrian subsidiary, Jumio Austria; (2) a wholly-owned direct Irish subsidiary, Jumio Holdings ("Jumio Ireland Holdings"), a company organized under the laws of Ireland, which is dormant; (3) Jumio Ireland ("Jumio Ireland"), which is wholly owned by Jumio Holdings, a company organized under the laws of Ireland,[6] and which is also dormant; and (4) a 51% interest in an Indian joint venture, Jumio India Private Limited, a company organized under the laws of India ("Jumio India").

7.     The Debtor has determined to sell substantially all of its assets to the Stalking Horse Bidder or another higher and better bidder (the "Buyer"), on the terms described further herein.  The assets of the Debtor to be sold will (a) *exclude* the Debtor's equity interests in Jumio Austria, Jumio Ireland Holdings, and Jumio Ireland, but (b) *include* the Debtor's equity interest in Jumio India, provided, that at any time prior to the Closing Date, the Buyer has the right to elect not to acquire the assets or equity interests of Jumio India.  In connection with the Debtor's sale of its assets, Jumio Austria will also sell substantially all of its assets, which are an integrated part of the Debtor's overall business, to the same buyer.  For this reason, the Debtor and Jumio Austria are described herein and in the Asset Purchase Agreement as the "Selling Entities."[7]  Following the proposed sale to the Buyer, Jumio Austria, Jumio Ireland Holdings, and Jumio Ireland will conduct Dissolution Proceedings[8] under the laws of their respective countries.

---

[6] For Irish law reasons, one share of each Irish entity is owned by Jumio's then current President, Chief Executive Officer and Chairman of the Board - Daniel Mattes.  Mr. Mattes has transferred his rights to Jumio.  Jumio owns the other share of each entity and is the controlling shareholder of each of these entities.

[7] The Debtor is hereby requesting that the Court approve the sale of its assets pursuant to Bankruptcy Code section 363, but is not requesting that the Court approve the sale of Jumio Austria's assets by Jumio Austria, a nondebtor, under Bankruptcy Code section 363.

[8] Dissolution Proceedings" means processes or proceedings under the applicable laws of the respective jurisdictions of formation Jumio Austria, Jumio Ireland Holdings, and Jumio Ireland (and any other subsidiaries of the Debtor other than Jumio India) dissolving or otherwise winding up the affairs of such entities in accordance with

8.      Accordingly, the purchase price will be allocated between the Selling Entities, with $870,000 of the cash portion of the purchase price being paid by the Buyer to Jumio Austria in exchange for the transfer by Jumio Austria of substantially all of its assets (the "Jumio Austria Purchase Price"), and with the balance of the purchase price being paid by the Buyer to the Debtor in exchange for the transfer by the Debtor of substantially all of its assets (the "Debtor Purchase Price").  Pursuant to the Asset Purchase Agreement, certain portions of the Purchase Price are reserved for specific purposes and are subject to return obligations to the extent not required for the designated purposes.

9.      Additional    information    regarding    the    circumstances    leading    to    the commencement of this Chapter 11 Case and information regarding the Debtor's business and capital structure is set forth in detail in the First Day Declaration filed contemporaneously with this Motion and incorporated herein by reference.

A.      **The Debtor's Liquidity Constraints and Lack of Alternatives to a Sale**

10.     In light of the continued deterioration of the Debtor's cash position and present lack of realistic stand-alone restructuring options, the Debtor, in the exercise of its reasonable business judgment, has determined that the most effective way to maximize the value of the Debtor's estate for the benefit of its constituents was to seek bankruptcy protection and to sell its business and assets through a Sale pursuant to Bankruptcy Code section 363.  The Sale is supported by the Debtor's Prepetition Secured Noteholders (as defined in First Day Declaration), who is also the Debtor's proposed postpetition lender under the financing described in the First Day Declaration (the "Postpetition Facility"), and also the sponsor of the Stalking Horse Bidder.

applicable law and satisfying the liabilities of such entities to the extent required under such laws to conduct non-insolvent dissolution processes or proceedings.

11.    The Stalking Horse Bidder has agreed to purchase the Purchased Assets through a "combination" credit bid and cash bid, subject to higher or otherwise better offers.    The Debtor believes, in the exercise of its business judgment, that such Sale provides the best restructuring alternative for all of its creditor constituencies and stakeholders.    Indeed, given that the Debtor has limited cash and no realistic financing option other than the Postpetition Facility, which itself depends on the Sale process moving forward as proposed, the only alternative to the Sale would be a conversion of this case to Chapter 7 and a piecemeal liquidation of the Debtor's assets—which would surely result in less value to the Debtor's stakeholders, in addition to a loss of its operating business and a termination of its employees' jobs.

12.    In order to satisfy the requirements of the Postpetition Facility, maintain the support of the Debtor's customers and vendors, and maintain the Debtor's employee base, it is in the best interests of the Debtor and its estate to move expeditiously with a sale process, as discussed herein. The Debtor's business is a customer service business, and maintaining customer confidence is crucial for its viability.

**B.    The Stalking Horse Asset Purchase Agreement**

13.    The following chart summarizes key provisions of the Asset Purchase Agreement and highlights those provisions necessary as required by Local Rule 6004-1(b)(iv), but are qualified in their entirety by reference to the actual Asset Purchase Agreement:

| **Purchase Price** <br> **(Asset Purchase Agreement, Section 3.1)** <br><br> **Local Rule 6004-1(b)(iv)(N)** | The aggregate purchase price (the "Purchase Price") for the Purchased Assets shall be comprised of the following: (1) a credit bid of the Prepetition Secured Notes in the original principal amount of $15,493,727, (together with interest (including accrued and capitalized interest), fees, and other amounts owing in respect thereof, the "Prepetition Secured Obligations")) and which are estimated to total approximately $15,838,831 as of the projected May 2, 2016 sale closing date; (2) a credit bid of all obligations under the Postpetition Facility, which include, as of the projected May 2, 2016 |

| | |
|---|---|
| | closing date, estimated loans under the Postpetition Facility of $3,616,689 in original principal amount (together with interest (including accrued and capitalized interest), fees, and other amounts owing in respect thereof, the "Postpetition Obligations")), and which are estimated to total approximately $3,623,458; (3) the amount of Assumed Liabilities (as described and as limited below), which, because of the structure of the sale, are estimated to have *de minimis* independent value as of the Closing; and (4) $3,200,000 paid in cash.   The total deemed value of the Purchase Price, therefore, is estimated to be $22,662,288 (the "Total Deemed Value").[9]  To encourage competitive bidding, no breakup fee is being paid to the Stalking Horse Bidder. |
| | • The sale structure requires that the Seller pay its ongoing obligations with the proceeds of the Postpetition Facility, to make any required Cure Payments, and to satisfy certain tax and intercompany obligations (each of which are expected to be minimal) from the cash portion of the Purchase Price, the Asset Purchase Agreement provides the option of Buyer to pay such amounts on behalf of the Seller and reduce the Purchase Price dollar for dollar. |
| **Purchase Price Allocation (Asset Purchase Agreement, Sections 2.7 and 3.1)** <br><br> **Local Rule 6004-1(b)(iv)(H)** | $870,000 of the cash portion of the Purchase Price will be paid to Jumio Austria as the Jumio Austria Purchase Price. Jumio Austria will have the obligation to repay to the Buyer any excess of the Jumio Austria Purchase Price that may exist after the payment of all liabilities and dissolution costs of Jumio Austria, on a date no later than six months following the Closing.  The balance of the cash portion of the Purchase Price, $2,330,000, will be paid to the Debtor as part of the Debtor Purchase Price.  Of that cash portion of the Debtor Purchase Price, (a) $1.3 million will be paid to Sagent in connection with its fee on the Sale and (b) $30,000 will be designated for the payment of liabilities and dissolution costs of Jumio Ireland Holdings and Jumio Ireland (the "Ireland Dissolution Funds"), and the Debtor will have the obligation to repay to the Buyer any excess of the Ireland Dissolution Funds that may exist after the payment of all liabilities and dissolution costs of Jumio Ireland Holdings and Jumio Ireland, |

---

[9] The Stalking Horse Bidder, in proposing a credit bid of the amounts owing to the Prepetition Secured Noteholders, would be entitled to include in its credit bid a 35% Change of Control premium amount, pursuant to the Prepetition Secured Notes Documents. However, the Prepetition Secured Noteholders have agreed, as a part of the overall terms and conditions of the sale process, to waive this premium in connection with any credit bid and in connection with any satisfaction of the Prepetition Secured Obligations from the proceeds of any sale of the Debtor's assets to a higher and better bidder (the "Premium Waiver").  This waiver provides substantial value to the Debtor and other creditors, but is not included in the Total Deemed Value.

<table>
<tr><td></td><td>on a date no later than six months following the Closing.

In the event the Stalking Horse Bidder is not the Successful Bidder, upon the Closing of the Sale, the Debtor is authorized and directed to pay, with the cash proceeds of the Sale, the Prepetition Secured Obligations and all obligations under the Postpetition Facility indefeasibly in full, in cash, subject to certain challenge rights with respect to the Prepetition Secured Obligations that are preserved under the Interim DIP Order and the Final DIP Order (together, the "<u>DIP Orders</u>").</td></tr>
</table>

| Purchased Assets[10] (Asset Purchase Agreement, Section 2.1) | The Purchased Assets constitute substantially all of the Selling Entities' assets, including, without limitation: (1) all real and personal property; (2) all tangible or intangible assets; (3) all accounts receivable; (4) all inter-company receivables; (5) all cash (excluding, for avoidance of doubt, the Purchase Price and, as to Jumio Austria, any residual cash held by Jumio Austria as of the Closing Date), cash equivalents and readily-marketable securities and other investments; (6) all deposits and prepaid expenses relating to Purchased Assets or Assumed Agreements (as defined below); (7) all inventory; (8) all rights in patents, trademarks, copyrights and all other intellectual property and intellectual property rights, including all licenses of intellectual property; (9) all computer software or systems; (10) all rights to payment from the licensees of intellectual property; (11) all domain names, websites, customer and other data related to Seller's business or the Purchased Assets; (12) all business records relating to Purchased Assets or Assumed Agreements; (13) all assets used in the operation of the business including assets under lease; (14) all rights under Assumed Agreements (as defined below); and (15) all such other assets that are not Excluded Assets.

• The Purchased Assets expressly include (a) all claims and causes of action (i) relating to Purchased Assets or the Assumed Agreements, or (ii) against the Buyer Parties (as defined below) or the current (but not former) directors and officers of the Debtor or any subsidiary of the Debtor, including, without limitation, any and all claims and causes of action (including derivative claims and causes of action) for breach of fiduciary duty or similar or related claims; and (b) all avoidance actions arising under chapter 5 of the Bankruptcy Code (i) relating to Purchased Assets or the Assumed Agreements, or (ii) against the Buyer Parties or the current (but not former) directors and officers of the Debtor or any subsidiary of the Debtor

• As described above, the Purchased Assets expressly include the Debtor's 51% equity interest in Jumio India, provided, that at any time prior to the Closing Date, the Buyer has the right to elect not to acquire the assets or equity of Jumio India. |
|---|---|

---

[10] The Asset Purchase Agreement filed on the Petition Date does not contain the schedules thereto. The Debtor expects the schedules to be filed shortly after the Petition Date, and, in any event, will deliver the schedules to the Stalking Horse Bidder prior to the March 25, 2016 deadline for doing so, as set forth in Section 9(d)(xx) of the

| | |
|---|---|
| **Assumed Liabilities**<br>**(Asset Purchase Agreement, Section 2.3)** | The Assumed Liabilities include (i) the Selling Entities' liabilities arising under the Assigned Contracts (defined below); *provided, however,* that the Buyer is not assuming any Liabilities of any Selling Entities under or with respect to any Assumed Agreements and Assumed Real Property Leases, including Liabilities arising out of any breach, misfeasance or under any other theory to the extent relating to Selling Entities' conduct prior to the Closing; (ii) the Liabilities of the Selling Entities arising in the Ordinary Course of Business under all open purchase orders and similar customer agreements arising in the Ordinary Course of Business to the extent constituting Purchased Assets; and (iii) certain Taxes. |
| **Excluded Assets**<br>**(Asset Purchase Agreement, Section 2.2)** | Excluded Assets are defined as those items specifically enumerated in the Asset Purchase Agreement, including, but not limited to, the Debtor's equity interests in Jumio Austria, Jumio Ireland Holdings, and Jumio Ireland, unless Buyer elects, at its sole option, to acquire such equity interests in lieu of the assets of such Subsidiaries as provided in the Asset Purchase Agreement.  Excluded Assets also include any claims or Causes of Action against the Debtor's former (as of March 1, 2016) officers and directors. |
| **Excluded Liabilities**<br>**(Asset Purchase Agreement, Section 2.4)** | The Debtor shall retain all liabilities and obligations that are not Assumed Liabilities and the Sale Order shall include express findings of no successor liability and shall enjoin any person or entity from asserting any claim based on any liabilities or obligations of the Debtor against the Buyer. |
| **Cure Payments**<br>**(Asset Purchase Agreement, Section 7.19)** | Prior to the Bid Deadline, Buyer shall determine which executory contracts and unexpired leases from the Contracts Schedule will constitute Assumed Agreements and Assumed Real Property Leases and assigned to Buyer (the agreements so assumed and assigned, the "<u>Assigned Contracts</u>"), subject to removal of Assigned Contracts by Buyer up to the Closing. Seller shall be solely responsible for payment of all amounts necessary to cure any and all defaults under the Assigned Contracts as required under Section 365 of the Bankruptcy Code ("<u>Cure Payments</u>"). Following Closing, to the extent the Buyer identifies additional Assigned Contracts, all such Cure Payments shall be borne by the Buyer. |

Asset Purchase Agreement, and file the schedules as soon as practicable after the Stalking Horse Bidder's acceptance thereof, which the Debtor expects will occur prior to the April 1, 2016 deadline for doing so.  In the meantime, information regarding the Purchased Assets, including constituent information for the schedules, is available in the Debtor's sale data room for potential bidders who have executed confidentiality agreements with the Debtor.

| | |
|---|---|
| **Closing**<br>**(Asset Purchase Agreement,**<br>**Section 4.1)**<br><br>**Local Rule 6004-1(b)(iv)(E)** | The Closing shall occur no later than the second (2nd) Business Day following the date on which the conditions set forth in Article VIII of the Asset Purchase Agreement have been satisfied, or to the extent permitted, waived by the applicable Party in writing (other than conditions which by their nature are to be satisfied at the Closing, but subject to the satisfaction or, to the extent permitted, waiver of such conditions at or prior to the Closing), and in no event later than May 2, 2016. |
| **Termination**<br>**(Asset Purchase Agreement,**<br>**Section 9.1)** | The Stalking Horse Bidder may terminate the Asset Purchase Agreement, among other bases, (i) on ten (10) days written notice of the occurrence of any material breach of the terms or conditions thereof that would render any of the closing conditions incapable of being satisfied unless such material breach is cured or waived during such ten (10) day period (except in the case of the failure to meet any of the procedural milestones set forth above, in which case no cure period shall apply); (ii) if the Debtor or any subsidiary of the Debtor ceases to pursue the sale process contemplated in the Asset Purchase Agreement, or enters into any definitive agreement or commitment to sell any material portion of the Purchased Assets to a person or entity other than the Stalking Horse Bidder, (iii) facts or circumstances exist that would be reasonably likely to prevent satisfaction of certain conditions precedent to the Stalking Horse Bidder's obligation to close; or (iv) the failure to meet the milestones described herein. |
| **Cooperation**<br>**(Asset Purchase Agreement,**<br>**Section 7.6)** | The Asset Purchase Agreement provides that the Debtor shall, without payment of funds to counterparties, use commercially reasonable efforts up to the Closing to obtain, and assist the Buyer in obtaining, at no cost to the Buyer, such consents, waivers or approvals of any third party, regulatory or governmental authority required for the consummation of the transactions contemplated by the Asset Purchase Agreement, including the sale and assignment of the Purchased Assets. The Asset Purchase Agreement also provides that the Debtor shall take, or cause to be taken, all commercially reasonable actions and do, or cause to be done, all things necessary or proper, consistent with applicable law, to consummate and make effective as soon as possible the transactions contemplated by the Asset Purchase Agreement. In addition, except as contemplated by the Asset Purchase Agreement or with the prior written consent of the Buyer, the Debtor has agreed, among other things, that, between the date of the Asset Purchase Agreement and the Closing Date, the Debtor and its subsidiaries will operate their businesses in the ordinary course in a manner consistent with past practice in all material respects, shall comply in all material respects with the Budget |

| | |
|---|---|
| | approved by the Bankruptcy Court in connection with the Postpetition Facility, and shall confer with the Buyer and its representatives, as reasonably requested, to report on operational matters and the general status of ongoing operations. |
| **Tax Exemption** (**Asset Purchase Agreement, Section 7.8(a)** <br><br> **Local Rule 6004-1(b)(iv)(I)** | The Sale Order provides that no bulk sale laws apply to the transaction. |
| **Access to Records** (**Asset Purchase Agreement, Section 7.2(c)** <br><br> **Local Rule 6004-1(b)(iv)(J)** | The Asset Purchase Agreement permits the Selling Entities and their representatives reasonable access to all of the books and records of the Selling Entities sold pursuant to the transaction. |
| **Good Faith Deposit** (Bid Procedures, p. 5, ¶(vi)) <br><br> **Local Rule 6004-1(b)(iv)(F)** | No deposit is required of the Buyer, as the overwhelming portion of the Purchase Price is a credit bid and as one of the principals of the Buyer is also the postpetition lender (in such capacity, the "Postpetition Lender"). However, a good faith deposit equal to $1,000,000 is required for all other Qualified Bidders. |
| **Sale to Insider** <br><br> **Local Rule 6004-1(b)(iv)(A)** | As set forth in the First Day Declaration and herein, the owner of the Stalking Horse Bidder is also the holder of the Debtor's Prepetition Secured Notes and the Postpetition Lender. In addition, Mr. Saverin is a substantial equity holder of the Debtors outstanding common and preferred equity. Mr. Saverin resigned from the Debtor's board of directors on March 18, 2016. Mr. Saverin has never been an officer or person in control of the Debtor. The Stalking Horse Bidder is owned by Mr. Saverin, but has not itself been a director, officer or person in control of the Debtor. The Stalking Horse Bidder is requesting a finding that it is not an "insider" within the meaning of Bankruptcy Code section 101(31). <br><br> However, even if the Court were to find that the Stalking Horse Bidder is an insider, the Debtor asserts that the Bidding Procedures are fair and do not give the Stalking Horse Bidder an unfair advantage. As set forth herein, the Stalking Horse Bid shall be subject to higher or otherwise better offers, and the Stalking Horse Bidder has agreed to forgo customary stalking horse bidder protections in the interest of creating as competitive and robust a bidding process as possible (for example, the Stalking Horse Bidder has not requested any |

| | |
|---|---|
| | break-up fee). |
| **Agreements with Management**<br><br>**Local Rule 6004(iv)(B)** | The Buyer anticipates hiring the existing management team of the Debtor, on terms to be agreed by the Buyer and each member of the management team. Such terms will be disclosed as and when agreed, but are anticipated to be similar to the terms of employment of the members of the management team by the Debtor prior to the Petition Date. |
| **Sale of Avoidance Actions**<br>**(Asset Purchase Agreement, Sections 2.1(t) and 2.1(u))**<br><br>**Local Rule 6004-1(b)(iv)(K)** | The Purchased Assets include: all avoidance actions arising under chapter 5 of the Bankruptcy Code (i) relating to Purchased Assets, or (ii) against the Buyer Parties or the current (but not former) directors and officers of Debtor or any subsidiary of the Debtor. |
| **Releases**<br>**(Asset Purchase Agreement, Sections 2.1(t) and 2.1(u))** | The Asset Purchase Agreement does not include an express release of claims but pursuant to Sections 2.1(t) and (u) of the Asset Purchase Agreement, the Debtor is transferring to the Buyer "any rights, claims or Actions as of Closing, including any Avoidance Actions, of any Selling Entity relating to, or arising against (i) the Buyer, any Buyer Designee, or any of their respective Affiliates, Subsidiaries, or Representatives, against any such Person, or (ii) against the Buyer Parties or the current (as of March 1, 2016 or thereafter) but not former directors and officers of any of the Selling Entities or any of their Subsidiaries, including any and all claims and Actions (including derivative claims and Actions) for breach of fiduciary duty or similar or related Actions or claims." |
| **Successor Liability**<br>**(Asset Purchase Agreement, Section 2.4;**<br>**Local Rule 6004-1(b)(iv)(L)** | The Asset Purchase Agreement and proposed Sale Order contain limitations on successor liability, and Buyer will require that the order approving the Sale contain such limits. |
| **Interim Arrangements with Buyer**<br>**(Asset Purchase Agreement, Sections 4.2 and 7.7)**<br><br>**Local Rule 6004-1(b)(iv)(G)** | The Asset Purchase Agreement may require, at the Buyers' option, that the Debtor enter into a Transition Services Agreement – all costs of which will borne by the Stalking Horse Bidder. To the extent applicable, the Debtor will file a copy of any such agreement and notice it for the Sale Hearing. |

| | |
|---|---|
| **Provisions Requested in the Bid Procedure Order** | The form of the proposed Bid Procedures Order approved by the Stalking Horse Bidder is attached hereto as "**Exhibit A**" and certain key provisions requested therein are further described below. |
| **Relief from Bankruptcy Rule 6004** | The form of the proposed Sale Order approved by the Stalking Horse Bidder is attached hereto as "**Exhibit C**" and provides, among other things, that the ten (10) day stay of Bankruptcy Rule 6004(h) is waived. |

C.    **Marketing of the Debtor's Assets**

14.    Prior to the Petition Date, the Debtor retained an investment bank, Sagent Advisors, LLC ("Sagent"), to market the Selling Entities' assets for sale to potential purchasers other than the Stalking Horse Bidder. Sagent began contacting potential purchasers on February 29, 2016, and prior to the Petition Date had contacted a total of one hundred and four (104) potential purchasers. Of those potential purchasers, thirty-two (32) have demonstrated initial interest in the Selling Entities' assets and have executed confidentiality agreements with the Debtor. In addition, Sagent and the Debtor have populated an online data room to assisted in interested parties due diligence and have begun to field inquiries regarding diligence requests.

15.    The Debtor expects that Sagent will continue its marketing process as the Chapter 11 Case continues, and the Debtor is hopeful that competing bids will be submitted by the proposed April 26, 2016 Bid Deadline. The Debtor believes, based on consultations with Sagent, that the marketing period, which will have spanned approximately three (3) weeks prior to the Petition Date and approximately five (5) weeks during the Chapter 11 Case, is a reasonable and sufficient period to solicit bids on the Selling Entities' assets. Although a truncated schedule, the Debtor believes that the market efforts will be sufficient to ensure the highest and best offer, particularly in light of the Debtor's limited financing options and

ongoing cash needs.  Further, the Debtor believes that a delayed process likely would lead to the deterioration of the operating performance of the business and the value of its assets.

16.      The Debtor also believes, based on consultations with Sagent, that the bidding procedures negotiated with the Stalking Horse Bidder will solicit the highest or otherwise best offer for the Selling Entities assets under the circumstances of the Chapter 11 Case.

**D.      Proposed Bid Procedures**

17.      The Debtor seeks to conduct an open and transparent sale process pursuant to which the winning bidder will enter into an asset purchase agreement, substantially in the form of the Asset Purchase Agreement, for the purchase of substantially all of the Selling Entities' assets, free and clear of liens, claims and encumbrances, with such liens, claims and encumbrances attaching to the sale proceeds.

18.      The Bid Procedures (as summarized below) were developed consistent with the Debtor's need to proceed with an expedited sale process to preserve the going-concern value of the Selling Entities' assets, but with the objective of promoting active bidding that will result in the highest or otherwise best offer for the Purchased Assets.  Moreover, the Bid Procedures reflect the Debtor's objective of conducting the Auction in a controlled, but fair and open, fashion that promotes interest in the Purchased Assets by financially-capable, motivated bidders who are likely to close the Sale.

19.      The following paragraphs in this section summarize key provisions of the Bid Procedures, and are qualified in their entirety by reference to the actual Bid Procedures.

     a.  Credit Bid Authorization. The Debtor is requesting, and the Stalking Horse Bidder and the Postpetition Lender have conditioned the Stalking Horse Bid and the Postpetition Facility, respectively, on, the Bankruptcy Court (i) entering an order, on or before March 22, 2016, authorizing the Stalking Horse Bidder to credit bid all Postpetition Obligations and providing that all obligations under the Postpetition Facility shall be paid in full at closing directly out of the cash proceeds of any sale of substantially all assets to a buyer other than the Stalking Horse Bidder (the "Interim Order"), and (ii) entering an order, on or before April

12, 2016, authorizing the Stalking Horse Bidder to credit bid all Postpetition Obligations and all Prepetition Secured Obligations and providing that all obligations under the Postpetition Facility and Prepetition Secured Obligations shall be paid in full at closing directly out of the cash proceeds of any sale of substantially all assets to a buyer other than the Stalking Horse Bidder, subject, as to the Prepetition Secured Obligations only, to any challenge filed on or before April 26, 2016  pursuant to the DIP Orders.  If such a Final Order is entered by the Bankruptcy Court (x) and no challenges to the Prepetition Secured Obligations are filed on or before such date, the terms of such order shall prevent any later challenge to such credit bid or such payment, and (y) any such challenge is filed on or before such date, the Stalking Horse Bidder may, at its option and in its sole discretion, withdraw the Stalking Horse Bid (and the Postpetition Lender may, at its option, terminate the Postpetition Facility).

b.   Participation Requirements.  Unless otherwise ordered by the Bankruptcy Court, in order to participate in the bidding process, each person (a "Potential Bidder") must deliver (unless previously delivered) to the Debtor's investment banker and counsel (as identified below) prior to the Bid Deadline, the following items (collectively, the "Participation Requirements"):

     i.     Confidentiality Agreement.  An executed confidentiality agreement in form and substance reasonably acceptable to the Debtor (each, a "Confidentiality Agreement");

     ii.     Identification of Potential Bidder.  Identification of the Potential Bidder and any principals and representatives thereof who are authorized to appear and act on their behalf for all purposes regarding the contemplated Sale, including a representation that (a) such Potential Bidder is not affiliated with any other Potential Bidder (or, in the case of any affiliation, disclosing such affiliation and describing the basis upon which each such Potential Bidder is expected to participate in the Sale process independent of one another), and (b) it has not engaged in any collusion with respect to the bidding or the Sale or any other conduct that would form a basis for the Sale to be avoided pursuant to 11 U.S.C. § 363(n) (together, a "Non-Collusion Representation"); and

     iii.     Proof of Financial Wherewithal and Ability to Close.  Written evidence that enables the Debtor and its representatives to determine, in their sole discretion (in consultation with the Committee, if any), whether the Potential Bidder has the financial wherewithal and ability to close the contemplated Sale and provide adequate assurance of future performance under all contracts to be assumed in such contemplated Sale.

c.   Qualified Bidder.  A "Qualified Bidder" is a Potential Bidder (or a combination of Potential Bidders whose Bids for the assets of the Debtor do not overlap and who agree to have their Bids combined for the purposes of the determination of

whether such Potential Bidders together constitute a Qualified Bidder, and who shall also be referred to herein as a single Qualified Bidder) that delivers the documents satisfying the Participation Requirements described in subparagraphs (a)(i)-(iii) above prior to the Participation Requirements Deadline, and that the Debtor determines, in its sole discretion (in consultation with the Committee, if any), is reasonably likely to submit a *bona fide* offer and to be able to consummate a sale if selected as a Successful Bidder (defined below).

d.   Qualified Bid. To be eligible to participate in the bidding process, each Qualified Bidder, other than the Stalking Horse Bidder, must deliver to the Debtor a written, irrevocable offer to be received by the Bid Deadline and compliant with each of the following conditions (a bid meeting the conditions below, a "Qualified Bid"):

   i.   The Same or Better Terms. A Bid must be on terms that, in the Debtor's business judgment, are substantially the same or better than the terms of the Asset Purchase Agreement, including a purchase price that includes a minimum of $22,962,288 in cash (plus any additional cash as may be required to satisfy any cash payments required to be made by the Debtor as a condition of such bid, to the extent such payments are not required by the Stalking Horse Bid) and that has a total deemed value that otherwise exceeds the sum of (a) the Total Deemed Value of the Stalking Horse Bidder's Purchase Price, and (b) the amount of the Expense Reimbursement ($300,000), by at least $200,000 (a "Minimum Initial Bid").

   ii.   Executed and Marked Asset Purchase Agreement. A Bid must include fully executed Sale documents, pursuant to which the Qualified Bidder proposes to effectuate the contemplated Sale. A Bid shall include a black-lined copy of the Asset Purchase Agreement (the "Modified Agreement") to show all changes requested by the Qualified Bidder, including those related to the Purchase Price, and identify each and every executory contract and unexpired lease, the assumption and assignment of which is a condition to closing.

   iii.   Scope of Purchased Assets. A Bid should propose a contemplated transaction involving all of the Purchased Assets, but the Debtor will consider proposals for less than substantially all of the Purchased Assets, provided that the Debtor may evaluate each Bid, in its sole discretion (in consultation with the Committee, if any), to determine whether such Bid maximizes the value of the Debtor's estate as a whole.

   iv.   No Contingencies. A Bid may not be conditioned on obtaining internal approval, obtaining financing or on the outcome or review of due diligence, but it may be subject to the accuracy in all material respects at the Closing of specified representations

and warranties or the satisfaction in all material respects at the closing of specified conditions, none of which shall be more burdensome than those set forth in the Asset Purchase Agreement.

v.  <u>Authorization to Bid</u>.  Each Bid must include evidence of authorization and approval from such Qualified Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Modified Agreement.

vi.  <u>Good Faith Deposit</u>.  Each Bid, with the exception of the Bid by the Stalking Horse Bidder, must be accompanied by a cash deposit in an amount equal to $1,000,000 (the "<u>Good Faith Deposit</u>").

vii.  <u>Back-Up Bidder</u>.  Each Bid, other than any Bid made by the Stalking Horse Bidder, must contain an agreement for the Bidder to be a Back-Up Bidder (as defined below).

viii.  <u>No Fees Payable to Qualified Bidder</u>.  A Bid may not request or entitle the Qualified Bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment.

ix.  <u>Financing Sources</u>.  A Bid must contain evidence of the ability to consummate the Sale satisfactory to the Debtor with appropriate contact information for all such financing sources (whether cash or borrowings) and may not contain any financing contingency (or conditions to borrowings).

x.  <u>Other Evidence</u>. Each Bid must contain evidence satisfactory to the Debtor that the Qualified Bidder (based on availability of financing, experience and other considerations or conditions) will be able to timely consummate the Sale to purchase the Purchased Assets if selected as the Successful Bidder (as defined below).

xi.  <u>Representation of Non-Collusion</u>.  Pursuant to Local Rule 6004-1, each bidder participating at the Auction must confirm its Non-Collusion Representation.

e.  <u>Bid Deadline</u>. The deadline for submitting bids by a Qualified Bidder, other than the Stalking Horse Bidder, shall be at 4:00 p.m. (Prevailing Eastern Time) on Tuesday, April 26, 2016 (the "<u>Bid Deadline</u>").  A bid received after the Bid Deadline shall not constitute a Qualified Bid. The Stalking Horse Bidder has the right under the Agreement to be provided with all Qualified Bids.

f.  <u>Auction</u>. Only in the event that the Debtor receives at least one (1) Qualified Bid (other than that of the Stalking Horse Bidder) by the Bid Deadline, the Debtor shall conduct an auction (the "<u>Auction</u>") of the Purchased Assets to determine the highest or otherwise best bid with respect to the Purchased Assets.  No later

than 4:00 p.m. (Prevailing Eastern Time) on Wednesday, April 27, 2016, the Debtor will notify all Qualified Bidders and counsel to the Committee, if any, whether the Auction will occur and will provide copies of all Qualified Bids. The Auction shall commence at 10:00 a.m. (Prevailing Eastern Time) on Thursday, April 28, 2016 at the offices of Landis Rath & Cobb LLP, Wilmington, Delaware.

At the beginning of the Auction, the Debtor and its professional advisors will announce the highest Qualified Bid received by the Bid Deadline which shall serve as the baseline bid at the Auction (the "Baseline Bid"). Any Qualified Bidder's initial Overbid shall be at least $100,000 in cash (or cash equivalents) in excess of the Baseline Bid, and each subsequent Overbid must be made in increments of at least $100,000 in cash, cash equivalents or such other consideration that the Debtor deems equivalent, in consultation with the Prepetition Secured Noteholders and the Postpetition Lender and Committee, if any, over the previous highest or best bid (the "Minimum Overbid Increment"), but shall not modify the Minimum Initial Bid Requirements without the consent of the Prepetition Secured Noteholders and the Postpetition Lender..

g. Sale Hearing. The Sale Hearing shall be conducted by the Bankruptcy Court on Friday, April 29, 2016.

h. Modifications. The Bid Procedures may be modified by the Debtor with the consent of the Stalking Horse Bidder, Prepetition Secured Noteholders and the Postpetition Lender (in consultation with the Committee, if any); provided that all such modifications are disclosed to all Potential Bidders or Qualified Bidders, as applicable, prior to or during the Auction.

i. Determination and Rejection of Bids. The Debtor, in its reasonable business judgment, after consultation with the Committee, if any, may (a) determine which Qualified Bid, if any, is the highest or otherwise best offer; and (b) reject, at any time before entry of an order of the Bankruptcy Court approving a Qualified Bid, any Bid that is (i) inadequate or insufficient; (ii) not in conformity with the requirements of the Bankruptcy Code, the Bid Procedures, or the terms and conditions of the Sale; or (iii) contrary to the best interests of the Debtor, its estate, its creditors and other stakeholders.

20.    Pursuant to Local Rule 6004-1: (i) each bidder participating at the Auction will be required to make a Non-Collusion Representation; (ii) the Auction will be conducted openly and may be attended by the Debtor, its professionals, the Committee, if any and its professionals and the Auction Participants.    Any creditor wishing to attend the auction may do so by contacting, no later than three (3) business days prior to the start of the Auction, Debtor's counsel at the address and contact information listed below,   Qualified Bidders and their

professionals, and creditors and their respective counsel, financial advisors, and/or other authorized representatives as set forth in the Bid Procedures; (iii) the only persons or entities who will be permitted to Bid at the Auction are the authorized representatives of each Qualified Bidder, including the Stalking Horse Bidder; and (iv) the Auction will be transcribed.  The Bid Procedures are typical for asset sales of this size and nature and require a deposit from Qualified Bidders, other than the Stalking Horse Bidder.

21.    Other than expressly set forth in the Bidding Procedures, the Debtor, with the consultation with the Stalking Horse Bidder, Prepetition Secured Noteholders and the Postpetition Lender, reserves the right to: (a) waive terms and conditions set forth herein with respect to any or all potential bidders, (b) impose additional terms and conditions with respect to any or all potential bidders, (c) extend the deadlines set forth herein or the date for the Auction, (d) cancel or extend the sale of the Purchased Assets and/or Sale Hearing in open court; and (e) amend the Bid Procedures as they may determine to be in the best interests of its estate or to withdraw the Motion at any time with or without prejudice.

22.    The Stalking Horse Bidder is a Qualified Bidder, and the Stalking Horse Bidder's bid is a Qualified Bid.  Notwithstanding any provision contained herein, but subject to the challenge provisions in the DIP Orders, the Stalking Horse Bidder shall be entitled to credit bid, as a Qualified Bid or subsequent Bid, all or a portion of its claims against the Debtor, without otherwise complying with the Bid Procedures, to the fullest extent permissible under Bankruptcy Code section 363(k) and shall get a dollar-for-dollar credit for the maximum amount of the Expense Reimbursement (as defined below).

E.    **Expense Reimbursement**

23.    In order to encourage competitive bidding, the Stalking Horse Bidder has not requested any break-up fee and has limited its bid protections to a modest expense

reimbursement of up to $300,000 of reasonable, documented out-of-pocket costs and expenses in connection with the Sale (the "Expense Reimbursement") payable to the Stalking Horse Bidder upon the terms and conditions set forth in the Asset Purchase Agreement, including in the event that the Stalking Horse Bidder is not the Successful Bidder at the Auction, to partially defray the substantial out-of-pocket costs the Stalking Horse Bidder has and is expected to incur in this process. The Expense Reimbursement is clearly warranted here in consideration of the Stalking Horse Bidder's substantial expenditure of time, energy and resources, and the benefits to the Debtor's estate of securing a "stalking horse" or guaranteed minimum bid and setting a floor price at the Auction.

24.     The Expense Reimbursement shall be an allowed super-priority administrative expense claim under Bankruptcy Code sections 364, 503 and 507(b), senior to all other administrative expense claims of the Debtor (other than any claims arising under the DIP Financing or for the "Carveout" (as defined in the DIP Orders)) and is to be paid directly out of the proceeds of any Alternative Transaction.

**F.     Notice of Auction and Sale**

25.     The Debtor seeks to have the Auction scheduled for Thursday, April 28, 2016. Within two (2) days of the entry of the Bid Procedures Order, the Debtor will serve by first class mail, postage prepaid, copies of: (i) the Bid Procedures Order; and (ii) the Sale Notice upon the following entities: (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to the Postpetition Lender; (c) counsel to the Prepetition Secured Noteholders; (d) counsel to the Committee, if any, or, if none formed, the creditors holding the twenty (20) largest unsecured claims as set forth on the list filed with the Debtor's petition; (e) all taxing authorities having jurisdiction over any of the Purchased Assets subject to the sale, including the Internal Revenue Service; (f) the Environmental Protection Agency; (g) the

Securities Exchange Commission; (h) the state/local environmental agencies in the jurisdictions where the Debtor owns or leases real property; (i) all of the Debtor's known creditors; (j) all parties that have requested special notice pursuant to Bankruptcy Rule 2002 as of the date prior to the date of entry of the Bid Procedures Order; (k) all persons or entities known to the Debtor that have or have asserted a lien on, or security interest in, all or any portion of the Purchased Assets; and (l) any potential bidders previously identified or otherwise known to the Debtor (collectively, the "Sale Notice Parties").[11]    In addition, the Debtor will publish notice of the Sale in the *Wall Street Journal, USA Today* or similar publication.

26.    The Debtor further requests, pursuant to Bankruptcy Rule 9014, that objections, if any, to the proposed Sale: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules; (c) be filed with the Clerk of the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 3rd Floor, Wilmington, Delaware 19801; and (d) be served on: (i) the Debtor; (ii) counsel to the Debtor; (iii) counsel to the Postpetition Lender; (iv) counsel to the Prepetition Secured Noteholders; (v) the U.S. Trustee; and (v) counsel to the Committee, if any, in accordance with Local Bankruptcy Rule 2002-1(b) on or before 4:00 p.m. (Prevailing Eastern Time) seven (7) days prior to the Sale Hearing (the "Sale Objection Deadline").

## G.    **Additional Provisions**

*Name Change*

27.    The Debtor hereby requests the authority, upon and in connection with the Closing, to change its corporate names and the caption of this Chapter 11 Case, consistent with applicable law. The Debtor shall file a notice of change of case caption, containing the new caption and the proposed new corporate name of the Debtor, within ten (10) business days of

---

[11] The Sale Notice Parties, with the except of the Debtor's known creditors, received notice of the Motion in connection with the approval of the Bidding Procedures and the scheduling of the hearing on the Motion with respect to approval of the sale and related requests. Thus, although the Sale Notice Parties will not receive the Court-approved Sale Notice twenty-one (21) days prior to the Sale Hearing, adequate notice has been provided pursuant to the Bankruptcy and Local Rules.

the Closing, and the change of case caption for this Chapter 11 Case shall be deemed effective as of the Closing.

**H.    Procedures Relating to Executory Contracts and Unexpired Leases, Including Determination of Cure Payments and Deadlines for Objection to Assumption and Assignment of All Contracts**

28.    Given the number of executory contracts and unexpired leases to which the Debtor is a party, the Debtor seeks to establish (a) procedures for determining the Cure Payments and (b) the deadline for objections to the Cure Payments and/or the proposed assumption and assignment of executory contracts and unexpired leases (collectively, the "Contract Procedures"). Notwithstanding anything to the contrary herein or the Asset Purchase Agreement, the Debtor is not seeking approval of the Contract Procedures with respect to Jumio Austria (rather such entity's contracts shall be assigned pursuant to applicable non-bankruptcy law).

29.    Pursuant to Section 2.5 the Asset Purchase Agreement, within ten (10) days of the Petition Date, the Debtor will provide the Stalking Horse Bidder a schedule (such schedule is referred to herein as the "Contracts Schedule") setting forth (x) each of the Selling Entities Non-Real Property Contracts[12] and Real Property Leases[13] (each, a "Contract") and (y) all Cure Payments (if any) with respect to each such Contract.   The Debtor shall update the Contracts Schedule to the extent any new Contract is entered into postpetition or to include any revised Cure Payment with respect to any Contract listed on the Contracts Schedule.

30.    On or before the date that is fifteen (15) days prior to the Sale Hearing, the Debtor shall serve by mail a notice, substantially in the form annexed hereto as "**Exhibit 3**" to

---

[12] "Non-Real Property Contracts" means the Contracts too which any Selling Entity is a party, other than the Real Property Leases. Asset Purchase Agreement, p. 11. "Contracts" means any lease, contract, deed, mortgage, license or other legally enforcement agreement or instrument." *Id.*, p.5

[13] "Real Property Lease" means all leases, subleases and other occupancy Contracts with respect to real property to which any Selling Entity is a party.

the Bidding Procedures Order (a "Cure Notice") on the non-Debtor counterparties to all Contracts on the Contracts Schedule (collectively, the "Contract Parties"). To the extent the Contracts Schedule is amended after the Sale Order, the Debtor shall promptly file and serve by mail a supplemental Cure Notice (the "Additional Cure Notice") on the affected non-Debtor counterparties, substantially in the form attached hereto as "**Exhibit 4**" to the Bid Procedures Order.

*Contract Objections*

31.     To facilitate a prompt resolution of (i) disputes relating to the Cure Payments and (ii) any other objections relating to the assumption and assignment of the Contracts, the Debtor proposes the following deadlines and procedures:

> The Contract Parties shall have until 4:00 p.m. (Prevailing Eastern Time) on the date that is seven (7) days prior to the Sale Hearing (the "Contract Objection Deadline"), which deadline may be extended in the sole discretion of the Debtor and the Stalking Horse Bidder, to object (a "Contract Objection") to (i) the Cure Payments listed by the Debtor and to propose alternative Cure Payments, and/or (ii) the proposed assumption and assignment of the Contracts in connection with the Sale, including, without limitation, the Debtor's ability to assign the Contracts without the Contract Parties' consent or the adequate assurance of future performance to be provided by the Stalking Horse Bidder (or any Buyer Designee thereof);

> - provided, however, if the Debtor amends the Cure Notice to add a contract or lease, the non-Debtor party to the added contract or lease shall have until the Sale Hearing to submit a Contract Objection with respect to the contract or lease added by the Debtor's amendment (the "Amended Contract Objection Deadline");

> - provided further, that if the Debtor amends the Cure Notice to reduce the Cure Payment of a Contract, except where such reduction was upon mutual agreement of the parties, the non-Debtor party to the reduced Cure Payment contract or lease shall have until the Amended Contract Objection Deadline to object to the Cure Payment with respect to the contract or lease with the Cure Payment that has been reduced by the Debtor's amendment; and

> - provided further, that in the event the Auction results in a Successful Bidder other than the Stalking Horse Bidder, the Contract Parties shall have until the Amended Contract Objection Deadline to object to the

assignment of Contracts to such Successful Bidder, other than to the Cure Payment which shall be subject to the Contract Objection Deadline, with any such objection being heard at the Sale Hearing or at a later-scheduled hearing as the Court deems appropriate.

b. The Debtor, the Contract Party, and the Successful Bidder may consensually resolve the Contract Objection prior to the Sale Hearing.   In the event the Contract Objection is not resolved, such Contract Objection will be heard at the Sale Hearing or thereafter.   To the extent it is determined that the Cure Amount exceeds the amount set forth in the Contract Schedule, the Successful Bidder may determine to not have assumed and assigned to it such Assigned Contract.

c. Unless a Contract Objection is filed and served before the Contract Objection Deadline or the Amended Contract Objection Deadline, as applicable, all Contract Parties shall be:

- forever barred from objecting to the proposed Cure Payments and from asserting any additional cure or other amounts (other than as may be asserted in an Additional Cure Notice (as defined below)), and the Debtor and the Buyer shall be entitled to rely solely upon the proposed Cure Payments set forth in the Cure Notices;

- deemed to have consented to the assumption and assignment of the Contracts;

- forever barred and estopped from asserting or claiming against the Debtor or the Buyer that any additional amounts are due or other defaults exist (other than as may be asserted in an Additional Cure Notice), that conditions to assignment must be satisfied under such Contracts, including, without limitation, any consent rights, or that there is any objection or defense to the assumption and assignment of such Contracts, including without limitation, adequate assurance of future performance;

- precluded from objecting to the Cure Payment (if any) and the assumption and assignment; and

- barred and estopped from asserting or claiming that their Contract contains an enforceable consent right.

*Designation by the Stalking Horse or other Qualified Bidder*

32.    Prior to the Bid Deadline, the Stalking Horse Bidder shall, by delivering written notice to the Debtor, designate each Contract on the Contracts Schedule it wishes to become an Assigned Contract.   The Stalking Horse Bidder may remove any Assigned Contract from such schedule prior to the Closing.

{1086.001-W0041190.}                                    25

33.    Each Qualified Bidder, other than the Stalking Horse Bidder, shall, by delivering written notice to the Debtor on the Bid Deadline, designate each Contract on the Contracts Schedule it wishes to be an Assigned Contract.

34.    Immediately prior to the Sale Hearing, the Debtor shall file the list of Assigned Contracts as of such date.

35.    The Debtor requests the Sale Order, among other things:

    a.    authorize and approve the assumption and assignment of the Assigned Contracts upon the Closing, without the need for any further action by any party, pursuant to Bankruptcy Code section 365;

    b.    provide that where the Debtor is unable to establish that a default exist under a Contract, the Cure Payment relating to such Assigned Contract shall be set at $0.00; and

    c.    find that the Buyer has established adequate assurance of future performance necessary to satisfy the requirements of Bankruptcy Code section 365 in respect of the assignment to the Buyer of the Assigned Contracts.

## **RELIEF REQUESTED**

36.    By this Motion, the Debtor seeks the entry of two orders of this Court: (a) the Bid Procedures Order (i) approving the Bid Procedures in connection with the solicitation and acceptance of higher and better bids, including the Expense Reimbursement, with respect to the Sale of the Purchased Assets, (ii) scheduling the Sale Hearing and setting objection deadlines with respect to the Sale, (iii) approving the form and manner of notice of the Sale and related Auction, (iv) establishing procedures to determine Cure Payments and deadlines for objections to the potential assumption and assignment of executory contracts and unexpired leases, and (v) granting related relief; and (b) the Sale Order (i) authorizing and approving the Asset Purchase Agreement, (ii) authorizing the Sale free and clear of liens, claims, encumbrances, and interests, pursuant to the Asset Purchase Agreement, (iii) authorizing the assumption and assignment of the Assigned Contracts, and (iv) granting related relief.

37.    The Debtor believes that the proposed Sale will maximize the value of the Debtor's assets for all stakeholders.  The Prepetition Secured Noteholders and the Postpettiion Lender have agreed to support the Debtor in this process, both through the provision of DIP Facility and through a negotiated sale of the Debtor's assets to the Stalking Horse Bidder through the credit bid of the Prepetition Secured Obligations and the Postpetition Obligations, subject to the terms and conditions set forth in the DIP Orders and the Asset Purchase Agreement.  The Debtor and the Stalking Horse Bidder negotiated the terms of the Asset Purchase Agreement, including the credit bid, at arm's length, subject to higher or otherwise better offers.

## BASIS FOR RELIEF REQUESTED

### A.    The Bid Procedures are Fair and Reasonable And Designed Not to Chill Bidding

38.    Maximization of proceeds received by the estate is one of the dominant goals of any proposed sale of estate property.  *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004) (debtor-in-possession "had a fiduciary duty to protect and maximize the estate's assets").  In the hope of maximizing the value received by the estate, courts typically establish procedures that are intended to enhance competitive bidding by, among other things, setting forth the rules that will govern the auction process.  *See, e.g., In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets ... [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates"); *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) (bid procedures should allow for "an open and fair public sale designed to maximize value for the estate").

39.    The Debtor believes that the Bid Procedures are designed to maximize the value received for the Purchased Assets and prevent any chilling of potential bids by establishing a

competitive and fair bidding process. The process set forth in the Bid Procedures allows for a timely and efficient auction process given the circumstances facing the Debtor, while providing bidders with ample time and information to submit a timely bid and perform diligence. The Bid Procedures are designed to ensure that the Purchased Assets will be sold for the highest or otherwise best possible purchase price by subjecting the value of the Purchased Assets to market testing and permitting prospective Buyers to bid on the Purchased Assets. Accordingly, the Debtor and all parties in interest can be assured that the consideration received for the Purchased Assets will be fair and reasonable and that the proposed Bid Procedures will not chill bidding by any Potential Bidders.

40. Procedures to dispose of assets, similar to the proposed Bidding Procedures have been approved in other large, complex chapter 11 cases in this District. *See, e.g., In re City Sports, Inc.*, Case No. 15-12054 (KG) (Bankr. D. Del. Oct. 23, 2015); *Saladworks*, Case No. 15-10327 (LSS) (Bankr. D. Del. Mar. 11, 2015); *In re iGPS Co. LLC*, Case No. 13-11459 (KG) (Bankr. D. Del. July 31, 2013); Tri-*Valley Corp.*, Case No. 12-12291 (MFW) (Bankr. D. Del. Sep. 5, 2012); *WP Steel Venture LLC*, Case No. 12-11661 (KJC) (Bankr. D. Del. June 21, 2012) *Capitol Infrastructure, LLC*, Case No. 12-11362 (KG) (Bankr. D. Del. May 15, 2012); *Traffic Control And Safety Corp.*, Case No. 12-11287 (KJC) (Bankr. D. Del. May 14, 2012); *Contract Research Solutions, Inc.*, Case No. 12-11004 (KJC) (Bankr. D. Del. April 12, 2012); *Delta Petroleum Corp.*, Case No. 11-14006 (KJC) (Bankr. D. Del. January 11, 2012); *Dallas Stars, L.P.*, Case No. 11-12935 (PJW) (Bankr. D. Del. September 22, 2011). In sum, the Debtor believes that the proposed Bidding Procedures provide an appropriate framework for expeditiously establishing that the Debtor is receiving the best and highest offer for the Purchased Assets. Accordingly, the proposed Bidding Procedures are reasonable, appropriate and within the Debtor's sound business judgment under the circumstances.

**B.**    <u>The Expense Reimbursement is Reasonable and Appropriate</u>

41.    A bid incentive such as the Expense Reimbursement encourages a potential buyer to invest the time, money and effort required to negotiate with a debtor, and perform the necessary due diligence attendant to the acquisition of a debtor, despite the inherent risks and uncertainties of the chapter 11 process.  The Debtor submits that approval of the Expense Reimbursement is justified by the facts and circumstances of this case, whether considered under the business judgment rule or as an administrative expense of the estate.

42.    Moreover, the Expense Reimbursement is a material inducement for, and condition of, the Buyer's entry into the Asset Purchase Agreement.  The Debtor believes that the Expense Reimbursement is fair and reasonable in view of (a) the analysis and negotiation undertaken by the Buyer in connection with the transaction and (b) the fact that, if the Expense Reimbursement is triggered, the Buyer's efforts will have influenced the chances that the Debtor will receive the highest or otherwise best offer for the Purchased Assets to the benefit of all of the Debtor's stakeholders.

43.    Approval of the Expense Reimbursement is governed by standards for determining the appropriateness of bidding incentives in the bankruptcy context established by the Third Circuit in *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527 (3d Cir. 1999).  In *O'Brien*, the Third Circuit concluded that "the determination whether bidding incentives are allowable under section 503(b) must be made in reference to general administrative expense jurisprudence.  In other words, the allowability of [these fees] . . . depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." *O'Brien*, 181 F.3d at 535.  In *O'Brien*, the Third Circuit identified two instances in which such a benefit to the estate may be found.  First, a benefit may be found if the bidding incentive promotes a more competitive bidding process,

"such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id.* at 537.  Second, "if the availability of . . . [reimbursement of] expenses were to induce a bidder to research the value of the debtor and convert that value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.*

44.    In recognition of the expenditure of time, energy and resources as well as the benefits to the Debtor's estate of securing a "stalking horse" or minimum bid and setting a floor price at the Auction, promoting additional competitive bidding and by increasing the likelihood that the ultimate sale price will reflect the true value of the Purchased Assets, the Debtor submits that approval of the Expense Reimbursement is warranted for the Stalking Horse Bidder.  The Debtor's ability to offer the Expense Reimbursement enables the Debtor to ensure the sale of the Purchased Assets to a contractually-committed bidder at a price the Debtor believes to be fair while, at the same time, providing the Debtor with the potential of a greater return to the estate.  Moreover, the Stalking Horse Bidder has spent, and likely will continue to spend, considerable time, money and energy pursuing the Sale and has engaged in extended and lengthy good faith negotiations under extremely stressful time pressures.  The Debtor and the Stalking Horse Bidder each has acted in good faith throughout this process.  The amount of the Expense Reimbursement, $300,000, represents approximately 1.4% of the Total Deemed Value of the Purchase Price, is not so high that it would cause any chilling effect on other prospective Buyers, and will have no adverse effect on any creditors.  Pursuant to Section 7.3(c) of the Asset Purchase Agreement, the Expense Reimbursement "shall be paid directly out of the proceeds of any Alternative Transaction" – in which case the Stalking Horse Bidder's participation will have necessarily created value for the Debtor's estate in excess of the amount

of the Expense Reimbursement. Absent authorization of the payment of the Expense Reimbursement, the Debtor might lose the opportunity to obtain the highest and best available offer for the Purchased Assets and the downside protection that will be afforded by the Asset Purchase Agreement.

45. The Stalking Horse Bidder has provided a material benefit to the Debtor and its creditors by increasing the likelihood that the Debtor will receive the best possible price for the Purchased Assets. Moreover, the Debtor's customers and employees will take comfort that the Stalking Horse Bidder's bid will ensure the continuation of the Debtor's business. Furthermore, approval of the Bid Procedures, including the Expense Reimbursement, is required by the Asset Purchase Agreement as a condition to the Stalking Horse Bidder's obligation to proceed with the transaction contemplated in the Asset Purchase Agreement. *See In re Reliant Energy Channelview, L.P.*, 594 F.3d 200 (3d Cir. 2010).

46. In light of the benefit to the Debtor's estate that will be realized by having a signed purchase agreement, enabling the Debtor to preserve the value of its estate and promote more competitive bidding, ample support exists for the approval of the Expense Reimbursement. The Debtor's payment of the Expense Reimbursement under the circumstances described herein is (i) an actual and necessary cost and expense of preserving the Debtor's estate, within the meaning of Bankruptcy Code section 503(b); (ii) of substantial benefit to the Debtor's estate; and (iii) reasonable and appropriate in light of the efforts and the significant due diligence costs and expenses that have been and will be expended by the Stalking Horse Bidder. Notably, the Stalking Horse Bidder could have, but did not, request any break-up fee over and above the Expense Reimbursement. Thus, the Debtor requests that this Court approve and authorize payment of the Expense Reimbursement pursuant to the terms of the Asset Purchase Agreement.

**C.**    **The Overbid Protections Are Appropriate Under the Circumstances**

47.    The Minimum Overbid Increment is appropriate under the circumstances and will enable the Debtor to simultaneously maximize value while limiting the chilling effect in the marketing process.  This provision also is consistent with the overbid increments previously approved by courts in this District.  *See, e.g., Saladworks*, Case No. 15-10327 (LSS) (Bankr. D. Del. Mar. 11, 2015); *Tri-Valley Corp.*, Case No. 12-12291 (MFW) (Bankr. D. Del. Sep. 5, 2012); *WP Steel Venture LLC*, Case No. 12-11661 (KJC) (Bankr. D. Del. June 21, 2012); *Solar Trust of Am., LLC*, Case No. 12-11136 (KG) (Bankr. D. Del. May 11, 2012); *Contract Research Solutions, Inc.,* Case No. 12-11004 (KJC) (Bankr. D. Del. April 12, 2012); *Delta Petroleum Corp.*, Case No. 11-14006 (KJC) (Bankr. D. Del. January 11, 2012).

**D.**    **The Proposed Sale Notice, the Proposed Date for the Sale Objection Deadline, the Cure Objection Deadline and the Sale Hearing Are Appropriate**

48.    The Debtor submits that the Sale Objection Deadline is reasonable and appropriate under the circumstances.  Pursuant to Local Rule 9006-1(c)(ii), "[w]here a motion is filed and served in accordance with Local Rule 9006-1(c)(i), the deadline for objection(s) shall be no later than seven (7) days before the hearing date."  Del. Bankr. L.R. 9006-1(c)(ii).  As noted above, the Sale Hearing Date is more than twenty-one (21) days from notice of this Motion and the Sale Objection Deadline has been scheduled seven (7) days in advance thereof. As such, the Debtor submits that the proposed Sale Objection Deadline meets the requirements of the Bankruptcy Rules and the Local Rules.

49.    The Debtor submits that the notice to be provided through the Sale Notice and the method of service proposed herein fully complies with the requirements set forth in Bankruptcy Rule 2002 and constitute good and adequate notice of the Bid Procedures and the subsequent proceedings related thereto, including the proposed dates for (a) the Bid Deadline; (b) the Sale Objection Deadline; (c) the Contract Objection Deadline; and (d) the Sale Hearing.

Therefore, the Debtor respectfully requests this Court to approve the proposed notice procedures.

E.      **The Contract Procedures Provide Adequate Notice**
        **and Opportunity to Object and Should be Approved**

50.      Bankruptcy Code section 365(a) provides, in pertinent part, that a debtor-in-possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor." 11 U.S.C. § 365(a). As discussed in greater detail below, the standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection. *See, e.g., In re Stable Mews Assoc., Inc.,* 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984).

51.      The Debtor respectfully submits that the proposed Contract Procedures are appropriate and reasonably tailored to provide the Contract Parties with adequate notice of the proposed assumption and assignment of the applicable Contract, as well as proposed Cure Payments, if applicable. Such Contract Parties will then be given an opportunity to object to such notice. The Contract Procedures further provide that, in the event an objection is not resolved, the Court will determine related disputed issues (including any adequate assurance of future performance issues). Accordingly, the Debtor submits that implementation of the proposed Contract Procedures is appropriate in this Chapter 11 Case.

52.      The Contract Procedures comport with the requirements of Bankruptcy Code section 365 (as described fully below) and Bankruptcy Rule 6006, and the non-Debtor contract counterparties' rights to adequate assurance are unaffected and fully preserved. The Debtor respectfully submits that the notices required by the Contract Procedures are sufficient to assume and assign the Assigned Contracts because they are reasonably tailored to provide

notice and an opportunity to object to the proposed assumption and assignment. Thus, the Debtor submits that the Contract Procedures should be approved.

F.    **The Sale is Within the Sound Business Judgment**
      **of the Debtor and Should Be Approved**

53.    The Debtor submits that ample authority exists for approval of the proposed Sale to the Buyer. Bankruptcy Code section 363(b)(1) provides, in relevant part, that a debtor-in-possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Bankruptcy Code section 363 does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets prior to confirmation of a plan. However, courts in this Circuit and others have required that the decision to sell assets outside the ordinary course of business be based upon the sound business judgment of the debtor. *See In re Abbotts Dairies of Pennsylvania, Inc.,* 788 F.2d 143 (3d Cir. 1986); *see also Myers v. Martin (In re Martin),* 91 F.3d 389, 395 (3d Cir. 1996); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),* 722 F.2d 1063, 1071 (2d Cir. 1983); *Dai-Ichi Kangyo Bank, Ltd v. Montgomery Ward Holding Corp., (In re Montgomery Ward Holding Corp.),* 242 B.R. 147, 153 (D. Del. 1999); *In re Delaware & Hudson Ry. Co.,* 124 B.R. 169, 176 (D.D.C. 1991).

54.    The "sound business judgment" test requires a debtor to establish four elements in order to justify the sale or lease of property outside the ordinary course of business, namely, (a) that a "sound business purpose" justifies the sale of assets outside the ordinary course of business; (b) that adequate and reasonable notice has been provided to interested persons; (c) that the debtor has obtained a fair and reasonable price; and (d) good faith. *Abbotts Dairies,* 788 F.2d 143; *Titusville Country Club v. Pennbank (In re Titusville Country Club),* 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *In re Sovereign Estates, Ltd,* 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989). A debtor's showing of a sound business purpose need not be unduly exhaustive but,

rather, a debtor is "simply required to justify the proposed disposition with sound business reasons." *In re Baldwin United Corp.,* 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984). Whether or not there are sufficient business reasons to justify a transaction depends upon the facts and circumstances of each case. *Lionel,* 722 F.2d at 1071; *Montgomery Ward,* 242 B.R. at 155 (approving funding of employee incentive and severance program and holding that the business purpose requirement was fulfilled, because stabilizing turnover rate and increasing morale were necessary to successful reorganization).

55.    Additionally, Bankruptcy Code section 105(a) provides a bankruptcy court with broad powers in the administration of a case under the Bankruptcy Code. Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper. *In re Fesco Plastics Corp.,* 996 F.2d 152, 154 (7th Cir. 1993); *Pincus v. Graduate Loan Ctr. (In re Pincus),* 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002). Pursuant to section 105(a), a court may fashion any order or decree that helps preserve or protect the value of a debtor's assets. *See, e.g., Chinichian v. Campolongo (In re Chinichian),* 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); *In re Cooper Props. Liquidating Trust, Inc.,* 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that a bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.").

56.    As noted in the First Day Declaration, the Stalking Horse Bidder (or its affiliate) is a major (but never a controlling) shareholder of the Debtor, the Prepetition Secured Noteholders, and the Postpetition Lender.    On March 18, 2018, Mr. Saverin resigned as a member of the Debtor's board or directors.    The Stalking Horse Bidder is seeking a determination in the Sale Order that it is not an "insider" of the Debtor as defined in Bankruptcy Code section 101(31).

57.    Nevertheless, even if the Court were to determine the Stalking Horse Bidder was an insider, nothing in the Bankruptcy Code prohibits section 363 sales to insiders, nor is such status any indication of "bad faith" in the transaction.    *In re Gekas v. Pipin (In re Met-L-Wood Corp.)*, 861 F.2d 1012 (7th Cir. 1988); *Andy Frain Servs., Inc.*, 798 F.2d 1113, 1125 (7th Cir. 1986) (stating that even if the buyer "were a fiduciary, a sale to him without more would not suffice to show a lack of good faith.") (citing *In re Exennium, Inc.*, 715 F.2d 1401, 1404-05 (9th Cir. 1983)).    However, courts usually view such sales with stricter scrutiny, due to the potential conflicts of interest in such transaction.    *Abbotts Dairies*, 788 F.2d at 147-49; *In re W.A. Mallory Co., Inc.*, 214 B.R. 834, 837 (Bankr. E.D. Va., 1997) ("The Court concludes ... that under [the circumstances where the Buyer is an insider], the proposed sale must face a higher scrutiny.").    For this reason, courts generally require additional disclosure before approving a sale to an insider.    *See In re Wild Horse Enters., Inc.*, 146 B.R. 830 (Bankr. C.D. Cal. 1991).

58.    However, even under a stricter standard, the Sale is entitled to this Court's approval, and the Successful Bidder, whether it be the Stalking Horse Bidder or otherwise, is entitled to the good faith finding under Bankruptcy Code section 363(m).

### A "Sound Business Purpose" Supports the Sale

59.    As set forth above and in the First Day Declaration, prior to the petition date, the Debtor was plagued by certain legacy issues, the SEC Investigation and a correlating inability to

obtain necessary funding to operate and grow its business. In light of its deteriorating cash position and lack of realistic stand-alone restructuring options, the Debtor has determined, in the exercise of its reasonable business judgment, that the most effective way to maximize the value of its estate for the benefit of its constituents is to sell the Purchased Assets pursuant to Bankruptcy Code section 363 to the highest or otherwise best bid.

60.    The Asset Purchase Agreement establishes a floor price for what the Debtor anticipates will be a robust Auction. The Asset Purchase Agreement and the Bid Procedures permit the Debtor to seek out higher or otherwise better offers at Auction. This will ensure that the market sets the value for the Purchased Assets and that the Sale will maximize value of the Debtor's business for the benefit of all of the Debtor's stakeholders. Accordingly, the Debtor has provided a sound business purpose in pursuing the approval of the Sale.

### *Sufficient Notice of the Proposed Sale Has Been Provided to Interested Parties*

61.    Pursuant to the Bid Procedures and the notice procedures set forth herein, the Debtor will employ various methods of notification to ensure that all interested and potentially affected parties will be informed of the Sale. In order to generate the greatest number of bidders possible for the Sale and to satisfy the requirements of Bankruptcy Rule 2002, the Debtor will serve the Sale Notice upon the Sale Notice Parties.

62.    Additionally, the Debtor will file and serve the Cure Notice on all non-Debtor counterparties to the Contracts providing them with notice of this Motion, the potential assumption and assignment of their Contract and the Debtor's proposed Cure Payment.

63.    Finally, as explained above, the Debtor and its professionals also have reached out to over one hundred (100) potential purchasers regarding a potential transaction. The Debtor submits that more than ample notice of the Sale has been provided to interested parties under the facts and circumstances of this Chapter 11 Case.

### *The Proposed Sale is for a Fair and Reasonable Price*

64.    The Debtor submits that the purchase price is fair and reasonable for the Purchased Assets.  The Purchase Price set forth in the Asset Purchase Agreement is the result of numerous rounds of arms' length, good faith negotiations with the Buyer.  As explained above, the Purchase Price in the Asset Purchase Agreement will serve as the floor price for competing bids.

65.    The Bid Procedures have been designed to ensure that the highest or otherwise best offer for the Purchased Assets will be attained.  With the assistance of Sagent, the Debtor continues to (i) conduct a comprehensive marketing process in order to maximize value, (ii) solicit the interest of various potential strategic and financial buyers and (iii) entertain offers for a sale transaction that will maximize the value of the Debtor's business.  The Debtor expects that its continued marketing efforts will result in the submission of one or more competing bids prior to the proposed April 26, 2016 Bid Deadline.  In the event Qualified Bids other than the Asset Purchase Agreement are received, the Bid Procedures provide that an Auction will be held to determine the highest or otherwise best bid.

66.    Because the ultimate purchase price for the Purchased Assets will be determined in accordance with the Court-approved Bid Procedures at an Auction, it will be fair and reasonable as contemplated by Bankruptcy Code section 363.  *See, e.g.*, *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d at 149 (finding that "[g]enerally speaking, an auction may be sufficient to establish that one has paid 'value' for the assets of a bankrupt"); *In re Nat'l Health & Safety Corp.*, 1999 WL 703208, at *2 (Bankr. E.D. Pa. Sept. 2, 1999) (citing *Abbotts Dairies* for the proposition that an auction may be sufficient to establish that one has paid value for the assets of a debtor, and relying upon auction results to verify that the purchase price represented value).

### *The Proposed Sale Has Been Negotiated at Arm's Length and in Good Faith*

67.     The "good faith" prong of the *Abbotts Dairies* standard is also satisfied.  The

Debtor requests that the Court find that the Stalking Horse Bidder or the Successful Bidder, as

applicable, is entitled to the benefits and protections provided by Bankruptcy Code section

363(m) in connection with the Sale.  Bankruptcy Code section 363(m) provides, in pertinent

part:

> The reversal or modification on appeal of an authorization under
> subsection (b) . . . of this section of a sale . . . of property does not
> affect the validity of a sale . . . under such authorization to an
> entity that purchased . . . such property in good faith, whether or
> not such entity knew of the pendency of the appeal, unless such
> authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).

68.     Bankruptcy Code section 363(m) thus protects the buyer of assets sold pursuant

to Bankruptcy Code section 363 from the risk that it will lose its interest in the purchased assets

if the order allowing the sale is reversed on appeal.  By its terms, Bankruptcy Code section

363(m) applies to sales of interests in tangible assets, such as the Purchased Assets.

69.     The Debtor submits, and will present evidence at the Sale Hearing, if necessary,

that as set forth above, the Asset Purchase Agreement was an arm's-length transaction, in which

the Successful Bidder acted in good faith.  The Debtor and the Stalking Horse Bidder negotiated

the Asset Purchase Agreement in good faith and without collusion or fraud of any kind.  The

Stalking Horse Bidder has not engaged in collusion or any conduct that would otherwise control

or tend to control the sale price as between or among potential bidders.  The Bid Procedures are

designed to maximize rather than chill competitive bidding and the Auction promotes an open

and competitive sale process.  The Debtor has had its own separate legal counsel in negotiations

over the Asset Purchase Agreement and will have its own separate legal counsel to negotiate on

its behalf throughout the Auction and the Sale.  Accordingly, the Debtor requests that the Court

make the finding at the Sale Hearing that the Successful Bidder, including, if applicable, the Stalking Horse Bidder, has purchased the Purchased Assets in good faith within the meaning of Bankruptcy Code section 363(m).

*All Pertinent Information Regarding the Proposed Sale Has Been Fully Disclosed*

70.     The Debtor has presented the proposed asset sale openly and in good faith.  The Stalking Horse Bidder's identity and affiliation with the Debtor has been fully disclosed in this and other pleadings filed with this Court.  The Debtor has fully disclosed and requested the Court's approval of all of the terms and conditions of the proposed Sale.  Sufficient and adequate notice of this Motion has been provided to interested parties and such parties will receive further notice of the Sale and all relevant dates and deadlines related thereto through the Court-approved Sale Notice.

71.     The Debtor will be prepared to introduce evidence at the Sale Hearing regarding the arm's-length, good faith nature of the Auction and the negotiation of the Asset Purchase Agreement.  Indeed, the Debtor will be able to demonstrate that the Asset Purchase Agreement with the Stalking Horse Bidder or the Successful Bidder, as applicable, represents the highest or otherwise best bid available to the Debtor for the Purchased Assets following a robust marketing and competitive bidding process.  Accordingly, the Sale pursuant to the Asset Purchase Agreement has been proposed and fully disclosed in good faith and represents the sound business judgment of the Debtor; and, as such, is entitled to this Court's approval.

G.     **The Sale Satisfies the Requirements of Bankruptcy Code Section 363(f)**

72.     Under Bankruptcy Code section 363(f), a debtor-in-possession may sell all or any part of its property free and clear of any and all liens, claims or interests in such property if: (i) such a sale is permitted under applicable non-bankruptcy law; (ii) the party asserting such a lien, claim or interest consents to such sale; (iii) the interest is a lien and the purchase price for

the property is greater than the aggregate amount of all liens on the property; (iv) the interest is the subject of a *bona fide* dispute; or (v) the party asserting the lien, claim or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest. 11 U.S.C. § 363(f); *Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot),* 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that Bankruptcy Code section 363(f) is written in the disjunctive; therefore, a court may approve a sale "free and clear" provided at least one of the subsections is met).

73.     The Sale satisfies the criteria set forth in Bankruptcy Code section 363(f). The Debtor believes that, at a minimum, it satisfies the second prong of section 363(f) because it has obtained consent from the Investors – one of whom is also the Debtor's proposed postpetition lender under the DIP Facility and who is the sponsor of the Stalking Horse Bidder – to sell the Purchased Assets free and clear of all liens, claims or interests. Second, the Debtor submits that holders of any liens, claims, encumbrances, or interests could be compelled, in a legal or equitable proceeding, to accept a monetary satisfaction equal to the amount of their lien, claim, encumbrance, or interest.

**H.     The Assumption and Assignment of Executory Contracts and Unexpired Leases Should Be Authorized.**

74.     As explained above, Bankruptcy Code section 365(a) provides, in pertinent part, that a debtor-in-possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor." 11 U.S.C. § 365(a). The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection. *See, e.g., Stable Mews,* 41 B.R. at 596. If the debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract. *See Group of Institutional Investors v. Chicago M St. P. & P.R.R. Co.,*

318 U.S. 523 (1943); *Sharon Steel Corp.*, 872 F.2d 36, 39-40 (3d Cir. 1989). The business judgment test "requires only that the trustee [or debtor-in-possession] demonstrate that [assumption or] rejection of the contract will benefit the estate." *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (quoting *Stable Mews Assoc.*, 41 B.R. at 596). Any more exacting scrutiny would slow the administration of a debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially. *See Richmond Leasing Co. v. Capital Bank, NA.*, 762 F.2d 1303, 1311 (5th Cir. 1985). Moreover, pursuant to Bankruptcy Code section 365(b)(1), for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for any "actual pecuniary loss" relating to such default. 11 U.S.C. § 365(b)(1).

75.     Once an executory contract is assumed, the trustee or debtor-in-possession may elect to assign such contract. *See In re Rickel Home Centers, Inc.*, 209 F.3d 291, 299 (3d Cir. 2000) ("[t]he Code generally favors free assignability as a means to maximize the value of the debtor's estate"); *see also In re Headquarters Dodge, Inc.*, 13 F.3d 674, 682 (3d Cir. 1994) (noting purpose of section 365(f) is to assist trustee in realizing the full value of the debtor's assets).

76.     Bankruptcy Code section 365(f) provides, in pertinent part, that a trustee may assign an executory contract or unexpired lease of a debtor only if:

> (A) the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

77.     Bankruptcy Code section 365(a) provides that a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).  Moreover, Bankruptcy Code section 365(b) codifies the requirements for assuming an executory contract of a debtor.  This provision provides that:

> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee –
>
> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default ... ;
>
> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

78.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.),* 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *see also In re Natco Indus., Inc.,* 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *Accord In re Bygaph, Inc.,* 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from debtors has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

79.     As set forth in the Asset Purchase Agreement, to the extent any defaults exist under any Assigned Contract sought to be assumed by the Debtor and assigned to the Buyer such defaults are required to be cured as required under Bankruptcy Code section 365(b)(1).

80.     Based on the Buyer's principals, the Debtor believes that the Buyer has the financial capability to satisfy any and all obligations it will incur in connection with the Assigned Contracts.  In addition, to be a Qualified Bid, any Qualified Bidder must also establish it has the financial capability to satisfy any and all obligations it will incur in connection with the Assigned Contracts.  Additionally, facts will be further adduced at the Sale Hearing to show the financial credibility of the Buyer, its experience in the industry and its willingness and ability to perform under the Assigned Contracts.  Because the Sale Hearing will provide the Court with an opportunity to evaluate the ability of the Buyer to provide adequate assurance of future performance under the Assigned Contracts, as required by Bankruptcy Code section 365(b)(1)(C), the Debtor submits that the Court should authorize the assumption and assignment of the Assigned Contracts by the Debtor, effective upon the Closing of the proposed Sale.

81.     Additionally, the contract procedures set forth herein provide that all of the counterparties to Contracts with the Debtor will be given notice of this Sale Motion and through the Cure Notice and any Additional Cure Notice have been provided with notice of the potential assumption and assignment of their Contract and the Debtor's proposed Cure Payments associated therewith.  Based on the foregoing, the Debtor respectfully submits that its assumption and assignment of the Assigned Contracts satisfies the requirements under Bankruptcy Code section 365(f)(2)(A) and (B).

I.    **Relief from the Fourteen Day Waiting Period Under**
      **Bankruptcy Rules 6004(h) and 6006(d) Is Appropriate**

82.    The Debtor seeks a waiver of any stay of the effectiveness of the order approving this Motion.  Pursuant to Bankruptcy Rule 6004(h), "[an] order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of fourteen (14) days after entry of the order, unless the court orders otherwise."  As set forth above, the relief requested herein is essential to maximize the value of the Debtor's business for the benefit of all stakeholders.

83.    Pursuant to Bankruptcy Rule 6004(h), unless the court orders otherwise, all orders authorizing the sale of property pursuant to Bankruptcy Code section 363 are automatically stayed for fourteen (14) days after entry of the order.  *See* Fed. R. Bankr. P. 6004(h).  The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to request a stay pending appeal before the order can be implemented.  *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(g).

84.    Similarly, Bankruptcy Rule 6006(d) stays all orders authorizing a debtor to assign an executory contract or unexpired lease pursuant to Bankruptcy code section 365(f) for fourteen (14) days, unless the court orders otherwise.  *See* Fed. R. Bankr. P. 6006(d).

85.    To preserve the value of the Purchased Assets and limit the costs of administering and preserving such assets, it is critical that the Debtor close the Sale as soon as possible after all closing conditions have been achieved or waived.  Additionally, the Asset Purchase Agreement requires the Closing to occur on or before May 2, 2016.  Accordingly, the Debtor hereby requests that the Court waive the fourteen (14) day stay periods under Bankruptcy Rules 6004(h) and 6006(d)

86.    Based upon the foregoing, the Debtor submits that the relief requested herein is necessary and appropriate, is in the best interests of the Debtor and its estates, and should be granted in all respects.

## NO PRIOR REQUEST

87.    No prior Motion for the relief requested herein has been made to this or any other court.

## NOTICE

88.    Notice of this Motion as it relates to approval of the Bid Procedures has been given to the Sale Notice Parties, but excluding the Debtor's known creditors.  Notice of the Motion as it relates to the approval of the Sale and related requests will be given to the Sale Notice Parties.  In light of the nature of the relief requested herein, the Debtor submits that no other or further notice is necessary.

**[REMAINDER OF PAGE LEFT BLANK INTENTIONALLY]**

WHEREFORE, the Debtor respectfully requests (i) entry of the proposed Bid Procedures Order; (ii) entry of the proposed Sale Order; and (iii) such other and further relief as the Court deems just and proper.

Dated: March 21, 2016
        Wilmington, Delaware

**LANDIS RATH & COBB LLP**

Adam G. Landis (No. 3407)
Kerri K. Mumford (No. 4186)
Kimberly A. Brown (No. 5138)
Anne M. Steadman (No. 6221)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email: landis@lrclaw.com
       mumford@lrclaw.com
       brown@lrclaw.com
       steadman@lrclaw.com

*Proposed Counsel to the Debtor and
Debtor-In-Possession*

and

George W. Shuster, Jr.
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
7 World Trade Center
New York, NY 10007
Telephone: (212) 937-7232
Facsimile: (617) 526-6000
Email: george.shuster@wilmerhale.com

*Proposed Special Corporate Counsel to
the Debtor and Debtor-In-Possession*