## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>JUMIO, INC.,<br><br>Debtor. | : Chapter 11<br>:<br>: Case No. 16-10682 (BLS)<br>:<br>: **Re: Docket No. 15, 49**<br>:<br>: **Hearing: April 12, 2016 @ 1:30 p.m.**<br>: **Objection Deadline: April 5, 2016 @ 4:00 p.m.** |

**OBJECTION AND RESERVATION OF RIGHTS OF AMBERBROOK VI,
LLC, CITIZEN.VC, LLC, JACQUELINE FOX, AND LIBER ARGENTUM
ASSOCS., LLC TO THE DEBTOR'S MOTION FOR ENTRY OF
ORDERS: (A)(I) APPROVING BID PROCEDURES RELATING TO SALE
OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS;
(II) APPROVING CERTAIN BID PROTECTIONS; (III) SCHEDULING A
HEARING TO CONSIDER THE SALE; (IV) APPROVING THE FORM
AND MANNER OF NOTICE OF SALE BY AUCTION;
(V) ESTABLISHING NOTICE AND CONTRACT PROCEDURES FOR
THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND
LEASES; AND (VI) GRANTING RELATED RELIEF; AND
(B)(I) APPROVING ASSET PURCHASE AGREEMENT AND
AUTHORIZING THE SALE OF CERTAIN ASSETS OF DEBTOR
OUTSIDE THE ORDINARY COURSE OF BUSINESS;
(II) AUTHORIZING THE SALE OF ASSETS FREE AND CLEAR OF ALL
LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS;
(III) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF
CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES;
AND (IV) GRANTING RELATED RELIEF**

Amberbrook VI, LLC ("Amberbrook"), Citizen.VC, LLC ("CVC"), Jacqueline Fox ("Fox"), and Liber Argentum Assocs., LLC ("LAA," and collectively with Amberbrook, CVC, and LAA, the "Objecting Parties"), through their undersigned counsel, McCarter & English, LLP, file this objection and reservation of rights (the "Objection") to the above-captioned debtor's (the "Debtor") *Motion for Entry of Orders: (A)(I) Approving Bid Procedures Relating to Sale of Substantially All of the Debtor's Assets; (II) Approving Certain Bid Protections; (III) Scheduling a Hearing to Consider the Sale; (IV) Approving the Form and Manner of Notice of Sale by Auction; (V) Establishing Notice and Contract Procedures for the Assumption and*

*Assignment of Contracts and Leases; and (VI) Granting Related Relief; and (B)(I) Approving Asset Purchase Agreement and Authorizing the Sale of Certain Assets of Debtor Outside the Ordinary Course of Business; (II) Authorizing the Sale of Assets Free and Clear of All Liens, Claims, Encumbrances and Interests; (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (IV) Granting Related Relief* (the "Sale Motion") [ECF Doc. No. 15], and respectfully state as follows:*

## PRELIMINARY STATEMENT

1.      In an effort to highjack the assets of the Debtor, shield himself from any liability, and prevent any adequate review of the alleged prepetition liens that form the majority of the credit bid, Mr. Edwardo Saverin—one of the Debtor's largest equity holders and alleged holder of the Debtor's prepetition secured notes, the Debtor's proposed postpetition lender, the owner of Jumio Acquisition, LLC (the "Stalking Horse Bidder"), and, who just three days before the Petition Date, served on the Debtor's board of directors—has orchestrated an improper sale process that violates the basic tenants of the bankruptcy process.  Given Mr. Saverin's many "hats" and universal control of the sale process and postpetition financing, an expeditious asset sale has been hoisted upon the Debtor.  The only parties to benefit from this accelerated timeline are Mr. Saverin and his controlled entities, at the likely expense of the Debtor's creditors and other shareholders.  As a result, the Debtor's Sale Motion in its entirety, including the proposed bid procedures (the "Bid Procedures"), must be denied.

## RELEVANT BACKGROUND

### A.      General Background

2.      Collectively, the Objecting Parties hold over approximately 5.4 million in shares of the Debtor.

3.      Amberbrook is an equity holder of the Debtor, holding 217,392 in common shares and similar ancillary rights.

4.      CVC is an equity holder of the Debtor, holding 423,261 in common shares and ancillary rights relating to its ownership interest.[1]

5.      LAA is an equity holder of the Debtor, holding 4,547,591 in preferred shares.

6.      Fox is an equity holder of the Debtor, holding 218,000 in common shares.

7.      On March 21, 2016 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (as amended, the "Bankruptcy Code").

8.      The Debtor has not yet filed its schedules of assets and liabilities and statement of financial affairs (together, the "Schedules").

9.      The meeting of creditors under section 341 of the Bankruptcy Code is scheduled for April 25, 2016 [ECF Doc. No. 65], and thus no committee of unsecured creditors has been formed yet.

10.      On the Petition Date, the Debtor filed various "First Day Motions," which included the Sale Motion and the *Motion of Debtor for Interim and Final Orders Authorizing the Debtor to: (A) Incur Postpetition Debt; (B) Provide Adequate Protection; (C) Use Cash Collateral; and (D) Grant Certain Liens and Provide Security and Other Relief to Prepetition Secured Parties* (the "DIP Motion") [ECF Doc. No. 10].

11.      On March 22, 2016, the Court entered an interim order granting the DIP Motion on an interim basis (the "Interim Order") [ECF Doc. No. 45].

---

[1] These rights include, among others common shareholders' entitlement to three seats on the Debtor's board of directors.  As will be detailed further in subsequent pleadings, common shareholders have been prevented from exercising this right.

3

12.     The Interim Order authorizes in part for Mr. Saverin or his designee (the "DIP Lender") to provide debtor-in-possession financing in a maximum principal amount of up to $3.7 million (the "DIP Loan").

13.     Under the budget included in the Interim Order (the "Budget"), the DIP Loan provided to the Debtor by Mr. Saverin runs through the week ending May 6, 2016, or seven weeks after the Petition Date.

14.     The Interim Order establishes April 26, 2016 as the deadline to challenge the amount, validity, and enforceability of the "Prepetition Secured Obligations" and the perfection or priority of the "Prepetition Liens," and for asserting any claims or causes of action on behalf of the Debtor's estate against the "Prepetition Secured Noteholders" and/or the "Prepetition Agent" relating to the Prepetition Secured Obligations or Prepetition Liens (as such terms are defined in the Interim Order)  [ECF Doc. No. 45, ¶ 29].

15.     The Prepetition Liens and underlying notes are allegedly held in part by Mr. Saverin, the owner of the Stalking Horse Bidder, and for which the majority of the Purchase Price (defined below) is being funded, by way of credit bid.

16.     On the Petition Date, the Debtor filed a *Declaration of Stephen Stuut in Support of Chapter 11 Petition and First Day Pleadings* (the "Stuut Declaration) [ECF Doc. No. 3].

17.     The Stuut Declaration provides in part that the Debtor is "thriving from an operational standpoint," but notes that "certain legacy issues combined with related government investigations and proceedings have made it difficult for Jumio to secure necessary funding for its operations."  *Id.* at ¶ 20.

ME1 22271388v.2

18.     Neither the Stuut Declaration nor the Sale Motion provides the details or a general background on such legacy issues or the government investigations and proceedings that the Debtor is facing.

**B.      The Sale Motion and Bid Procedures**

19.     The Sale Motion provides in part that the Debtor is proposing to sell substantially all of its assets, and substantially all the assets of its related entities[2] (collectively, the "Assets"), to the Stalking Horse Bidder, pursuant to a certain asset purchase agreement (the "APA").

20.     As of this filing, the schedules to the APA have not been filed.

21.     The Stalking Horse Bidder is owned by Mr. Saverin, who is also the DIP Lender and alleged holder of the Debtor's prepetition debt.  Mr. Saverin is also a substantial equity holder of the Debtor and, until three days before the Petition Date, a former director.  Stuut Declaration, ¶¶ 14-19; Sale Motion, part B.

22.     The Sale Motion provides that the Stalking Horse Bidder's offer values the Debtor in the approximate amount of $22.6 million (the "Purchase Price"), but this supposed "value" is based on the amount of debt owed to Mr. Saverin, plus additional amounts of operating cash in the form of the DIP Loan.

23.     Specifically, the Purchase Price for the Assets consists mostly of a credit bid by the Stalking Horse Bidder of (i) the prepetition notes (the "Prepetition Notes") allegedly held by Mr. Saverin and Andreesen Horowitz Fund, II, L.P. (together, the "Noteholders"), in the approximate amount of $15.5 million, which Prepetition Notes are purportedly secured by the Prepetition Liens, and (ii) approximately $3.6 million for the DIP Loan to be advanced by Mr. Saverin.  The Purchase Price also includes $3.2 million in cash.

---

[2] The related entities include: (i) a wholly owned Austrian subsidiary, Jumio Austria; (ii) a wholly owned direct Irish subsidiary, Jumio Holdings; (iii) Jumio Ireland, a wholly owned entity of Jumio Holdings; and (iv) a 51% interest in Jumio India Private Limited.

24.     Under the APA, the Debtor is proposing to transfer to the Stalking Horse Bidder, among others, all of the Debtor's rights and causes of action relating to or arising against the "Buyer Parties" (the "Releases"), which include (among others) the Stalking Horse Bidder, the Noteholders (*i.e.*, Mr. Saverin) and its agents (defined in the APA as the "Investors").  APA, §§ 2.1.

25.     The APA provides for an excessive $300,000 expense reimbursement (the "Expense Reimbursement") to the Stalking Horse Bidder if it is not the ultimate purchaser of the Assets.

26.     In conjunction with the self-imposed time constraints from the Budget, the Debtor proposes closing under the APA with the Stalking Horse Bidder by May 2, 2016.

27.     The Debtor represents that, immediately before the Petition Date, its investment banker, Sagent Advisors, LLC ("Sagent"), spent three weeks in marketing the Assets.  Sale Motion, ¶ 14.

28.     Sagent "contacted" 104 potential purchasers and, of those, 32 have signed confidentiality agreements.  *Id.*

29.     The Sale Motion provides no evidence or additional background on Sagent's marketing process, no details on what is meant by "contact[ing]" potential purchasers, and no insight on the marketability or valuation of the Assets.

30.     The Bid Procedures require in part that a "Potential Bidder" submit a "Qualified Bid" no later than April 26, 2016 (the "Bid Deadline"), the same deadline to challenge the validity, extent, and perfection of the Prepetition Liens.

31.     A Qualified Bid must not include any financial contingencies and must include a $1 million deposit.

32.     If the Debtor receives at least one Qualified Bid within this limited period, the Debtor will conduct an auction (the "<u>Auction</u>").

33.     In determining whether a Qualified Bid should be accepted as the successful bid, the Debtor will be consulting with the Noteholders and the DIP Lender, which in effect is Mr. Saverin, the individual behind the Stalking Horse Bidder.

<strong><u>ARGUMENT</u></strong>

**A.     <u>The Sale Motion Should be Denied in Its Entirety</u>**

34.     Between Mr. Saverin's connection to virtually all sides of the proposed sale, the apparent lack of any meaningful prepetition marketing process, the Stalking Horse Bidder's attempt to credit bid against the value of the prepetition liens (without affording a sufficient challenge period in conjunction with the Sale), the "Releases" being purchased (without sufficient information to determine the value of same), and the Stalking Horse Bidder's protections and overarching control of the Auction, the Sale Motion should be denied.  By denying the Sale Motion, the Objecting Parties, and the Court, can ensure that the Debtor's "thriving" business is not undervalued and is ultimately sold for the highest and best offer.

**B.     <u>The Debtor's Proposed Bid Procedures Should Not Be Approved</u>**

35.     "The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate." *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998); *see also Siddiqui v. Gardner (In re Williamson)*, 327 B.R. 578, 581 (Bankr. E.D. Va. 2005) ("This is accomplished, in part, by assuring that the marketing is full, fair and complete and that all prospective purchasers have a fair opportunity to participate in the process.").

36.     Here, while the Sale Motion should be denied in its entirety, in the event that the Bid Procedures are approved, they must be modified to allow a fair and open bidding process.

ME1 22271388v.2

The Bid Procedures are unreasonable, unfair, and designed to chill the bidding process. While creditors and stakeholders will be prejudiced by the unnecessarily hurried sale process, the Prepetition Lender/Stalking Horse Bidder/DIP Lender (*i.e.,* Mr. Saverin) would not be prejudiced by a modest extension of the proposed sale timeline. A reasonable extension of the Bid Deadline and the Auction would foster a more fulsome, robust, and fair auction process, allow for the full investigation and due diligence necessary for third parties to submit competing bids, and help the Debtor to achieve the highest and best offer for the Assets.

      **i.**        **The Sale Timeline Proposed By the Debtor Is Unfair and Unreasonable.**

37.      The proposed timeline of five weeks for submitting Qualified Bids is inadequate and will chill the bidding process to the detriment of creditors, equity holders, and Potential Bidders. The Bid Procedure portion of the Motion should therefore not be approved in its present form.

38.      The Debtor notes in the Sale Motion that Sagent conducted only three weeks of "marketing" prior to the Petition Date. Sale Motion, ¶ 14. This "marketing" consisted of "contact[ing]" 104 potential purchasers, but no further information or details has been provided. At this time, there is an insufficient level of disclosure and evidence to support the Debtor's marketing process, which might include nothing more than "email blasts."

39.      Moreover, a five-week marketing period for soliciting competing bids is unreasonably short and self-imposed by the DIP Lender (*i.e.*, Mr. Saverin). Although the Debtor represents a desire to have competing bids submitted, based on Mr. Saverin's universal control and the timing and terms of the DIP Loan, the Debtor is affording potential purchasers only five weeks to vet, explore, and analyze the market value of the Assets and the events leading up to the Petition Date, and to confer with the Debtor and its agents and other contingencies on the same.

ME1 22271388v.2

This extremely tight timetable is likely to create an atmosphere that discourages competing bids and allows Mr. Saverin to take control of what the Debtor's management calls a "thriving," emerging company without the full vetting and marketing of the Debtor's assets.

40.     Further, the Debtor indicates its difficulty in obtaining financing, because it had to restate its financial statements and is subject to government investigations and proceedings, but provides no further information on the underlying issues behind the same.   These vague representations appear designed to give the impression that "very bad things" have happened, but yet provides no related information or any semblance on how such conduct may have, if at all, impacted the Debtor's market valuation or its ability to raise funds—and yet then proposes to sell those causes of action to Mr. Saverin's entity, without any indication of their value.

41.     Moreover, in view of the limited marketing efforts for the Debtor's Assets, it is more than likely that any due diligence by the Stalking Horse Bidder was done in connection with Mr. Saverin providing the DIP Loan, along with Mr. Saverin's institutional knowledge as an equity holder and former director of the Debtor.   Of course, then, with this knowledge, the Debtor and the Stalking Horse Bidder could believe that five weeks for the sale process is reasonable.

42.     Also, while the supposed marketing of the Debtor's Assets began shortly before the Petition Date, the Debtor is now in bankruptcy, which creates a very different dynamic than a non-bankruptcy sale process.   Parties that may previously have been reluctant to submit a bid for various reasons may express renewed interest in acquiring the Assets now that the Debtor has the rights and protections of a debtor in bankruptcy.

43.     The Sale Motion thus does not contain any business justification or sufficient information for the truncated sale process, the prepetition marketing efforts, why the DIP

Lender/Stalking Horse Bidder is requiring such a short postpetition marketing process (other than for obvious reasons), or an ability for Potential Bidders to have commensurate time and access as the Stalking Horse Bidder has had to conduct due diligence.

44.    Given the haste with which the Sale Motion was filed and the purported Auction process has been assembled, coupled by (i) the lack of disclosures on the restated financial statements and government investigations (and the Debtor's Schedules and the schedules to the APA), (ii) Mr. Saverin's many roles as one of the Noteholders, the DIP Lender, an equity holder, the owner of the Stalking Horse Bidder, and a former director, and (iii) the Stalking Horse Bidder's ability to credit bid nearly $16 million based on the Noteholder's security interests and liens, which have not yet been analyzed by any committee or a party seeking standing to challenge same, the Sale Motion should be denied in its entirety, or, alternatively, any sale timeline approved by this Court should provide the maximum amount of time and flexibility so that the Debtor can achieve the highest and best offer for the Assets and to ensure that the ultimate sale is consistent with the Bankruptcy Code, applicable nonbankruptcy law, and principles of equity.

**ii.    The Sale Timeline Proposed By the Debtor Provides No Realistic Means to Investigate the Prepetition Liens and the Attendant Credit Bid.**

45.    While a secured lien holder is entitled to credit bid its secured debt, here, the Debtor has proposed a sale process to an entity controlled by an insider that would authorize a stalking horse bid and the commencement of a sale process *before* the proposed expedited lien review deadline has even expired.  If the Stalking Horse Bidder's prepetition claims are challenged and ultimately deemed invalid, the entire sales process would result in an enormous administrative waste in a case where the Debtor has asserted that they have insufficient cash to survive for two weeks postpetition.  The procedural process set forth by the Debtor is

10

intentionally flawed to allow Mr. Saverin the ability to essentially steal the Debtor's Assets while shielding himself from any liability, and, as thus, must be denied.

46.    The Debtor has argued, and will likely continue to argue, that the proposed sales process allows the market to speak.   But here, by allowing in excess of $15 million in alleged secured debt to be used as a credit bid before any challenge period has expired, has the inevitable result of chilling the bidding process.   Setting the Bid Deadline as the same deadline for challenging the Prepetition Liens does not encourage bidding.   Any secured debt in a credit bid process must be verified before the bid-solicitation process commences.   Under the proposed truncated sale process, however, there is a woefully insufficient period to review, analyze, and, if warranted, commence an action (and obtain standing) to challenge the Prepetition Liens.   This is especially true where, as here, the Prepetition Liens are held in part by Mr. Saverin (an insider of the Debtor and the Stalking Horse Bidder) and before any statutory committee is formed or other interested parties are given a reasonable amount of time to review and challenge (if warranted) the validity, extent, amount, and perfection of the Prepetition Liens.

47.    Allowing the Stalking Horse Bidder to credit bid against the approximately $15.6 million from the Prepetition Notes undoubtedly chills the bidding process, tilts the playing field in favor of the Stalking Horse Bidder, and sets the path for the Stalking Horse Bidder to acquire the Assets by credit bid almost upon the deadline for challenging the Prepetition Liens.   By extending the marketing process and Auction by a reasonable period to incorporate a full, meaningful, and reasonable period to review and challenge the Prepetition Liens, interested parties and Potential Bidders will have sufficient time to conduct the necessary due diligence and clarity on the scope of the Prepetition Liens.

iii.      **Without Sufficient Disclosures, There is No Basis to Value the "Releases" Being Purchased Under the APA.**

48.      The Debtor's attempt to obtain a release under the guise of selling any claims that the Debtor may hold against the Stalking Horse Bidder and its members (*i.e.*, Mr. Saverin) is equally offensive and must be struck from the APA.  *See* APA, §§ 1.1 and 2.1; Sale Motion, n.3. To allow the sale of claims against the "Buyer Parties" (which expressly includes Mr. Saverin, a former director), current directors and officers, and other parties, in the infancy stages of this bankruptcy, in which it appears that serious misconduct may have occurred, will result in significant harm to all allowed creditors.

49.      If during the course of this bankruptcy it is determined that an action exists against the current and/or former directors and officers, the APA will have forever closed such pursuit.  It is no secret that appropriate actions against a debtor's board members are often a significant source of recovery for allowed creditors.  Simply stated, this case requires, and outwardly contemplates, an investigation into the actions and/or inactions of all members of the Board of Directors, both former and present.  As such, and to meaning for any investigation being conducted or contemplated, the "Release" provisions for the purchase of claims against certain former board members in the APA must be denied.

50.      Moreover, there is no evidence, disclosure, or detail to provide this Court or third parties with information to determine the value and extent of such rights and causes of action being sold.  The Schedules have not been filed, the schedules to the APA have not been filed, and the Stuut Declaration simply states that the Debtor's financial statements had to be restated and that there are government investigations.

51.      This lack of information and background, along with the scant information on the Debtor's prepetition marketing process, prohibits both Potential Bidders and this Court from

analyzing the merit and value of the Stalking Horse Bidder's Purchase Price and the means by which Potential Bidders can construct competing bids.

      **iv.**      **The Sale Process and Auction Appear to Be Controlled by Mr. Saverin.**

52.      In their current form, the Bid Procedures contemplate conducting the Auction whereby the Stalking Horse Bidder, based on its identity with Mr. Saverin, is permitted to consult with the Debtor in evaluating the "highest and best" components of competing bids.

53.      Due to the numerous hats worn by Mr. Saverin, as presently proposed, the Bid Procedures give the impression that the Auction is not fully open and free of any undue influence.  Accordingly, this Objection challenges the proposed Auction and the Debtor's proposal for the selection of successful bids.

      **v.**      **The Stalking Horse Bidder Is an Insider and the Expense Reimbursement Is Not Justified.**

54.      This Objection further raises issues to the Stalking Horse Bidder's Expense Reimbursement of $300,000—which, along with the fees proposed in the Budget, is grossly excessive.  Given Mr. Saverin's numerous identities and capacities in this case, the Expense Reimbursement is not reflective of the Stalking Horse Bidder's efforts in connection with the Asset sale.  *See In re Metaldyne Corp.*, 409 B.R. 661, 670 (Bankr. S.D.N.Y. 2009) (bidder protections should only be granted "when a bidder provides a floor for bidding by expending resources to conduct due diligence and allowing its bid to be shopped around for a higher offer").

55.      The Expense Reimbursement also chills the bidding process by requiring other bids to include the Expense Reimbursement of $300,000 in the valuation of the Debtor's Assets (and the Purchase Price), and exceed the Stalking Horse Bidder's offer by $200,000.

56.      The Stalking Horse Bidder is in effect made by an insider of the Debtor (among other connections).  The Stalking Horse Bidder therefore likely had conducted significant due

diligence in connection with such financing, was readily knowledgeable about the Debtor's business, "legacy issues," and governmental investigations, and had other institutional information that other Potential Bidders may not have—nor the time to uncover and analyze such information.  The Expense Reimbursement to the Stalking Horse Bidder is thus unwarranted and should not be approved.

57.    Relatedly, this Objection objects to the Debtor's request for a finding that the Stalking Horse Bidder is not an "insider" of the Debtor, as that term is defined by the section 101(31) of the Bankruptcy Code.

## RESERVATION OF RIGHTS

58.    The Objecting Parties hereby reserve their respective rights to supplement this Objection in response to any responsive pleading filed by the Debtor or any interested party, as well as to raise additional objections to the Bid Procedures.  The Objecting Parties further reserve their respective rights to object to other aspects of the Sale Motion, including (without limitation) all aspects of the Debtor's proposed sale of its Assets.  The Objecting Parties further reserve the right to include other interested parties to this Objection.

## CONCLUSION

59.    For the reasons outlined above, the Sale Motion should be denied in its entirety. Alternatively, the Bid Procedures should not be approved, as they are not designed to create a fair opportunity for all interested parties to qualify and generate the highest and best bid for the Assets; rather, they are designed to create a mechanism for Mr. Saverin to take over the Debtor. Between the many hats worn by Mr. Saverin, the scant disclosures in the Sale Motion and Stuut Declaration, the Stalking Horse Bidder's ability to credit bid on the Prepetition Notes and acquire the Assets before the deadline for the Prepetition Liens to be challenged, the Releases,

and the short timeline for the sale process imposed by Mr. Saverin, the Bid Procedures should not be approved.

     **WHEREFORE**, the Objecting Parties respectfully request that the Court deny the Bid Procedures and grant such other relief as this Court deems just and proper.

Dated:  April 5, 2016
        Wilmington, Delaware

                                        **McCARTER & ENGLISH, LLP**

                                        By:  */s/ William F. Taylor, Jr.*
                                        William F. Taylor, Jr. (DE #2936)
                                        Kate Roggio Buck (DE #5140)
                                        Renaissance Centre
                                        405 N. King Street, 8th Floor
                                        Wilmington, DE 19801
                                        Telephone 302.984.6300
                                        Facsimile 302.984.6399
                                        wtaylor@mccarter.com
                                        kbuck@mccarter.com

                                                 *-and-*

                                        Charles A. Stanziale, Jr.
                                        Jeffrey T. Testa
                                        Matthew B. Heimann
                                        Four Gateway Center
                                        100 Mulberry Street
                                        Newark, New Jersey 07102
                                        Telephone: (973) 622-4444
                                        Fax: (973) 624-7070

                                        *Counsel to Amberbrook VI, Ctizen.VC, LLC, LLC, Jacqueline Fox, and Liber Argentum Assocs., LLC*

ME1 22271388v.2