IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>JUMIO, INC.,[1]<br><br>Debtor. | ) Chapter 11<br>)<br>) Case No. 16-10682 (BLS)<br>)<br>) Re: Docket Nos. 10, 15<br>)<br>) Obj. Deadline: 4/6/16 at 11:00 a.m. (by agreement)<br>) Hearing Date: 4/12/16 at 1:30 p.m. |

**INITIAL OBJECTION OF THE AD HOC EQUITY COMMITTEE TO DEBTOR'S (A) MOTION TO APPROVE POSTPETITION FINANCING AND CASH COLLATERAL USE AND RELATED RELIEF AND (B) MOTION TO APPROVE BID PROCEDURES; REQUEST FOR ADJOURNMENT; AND RESERVATION OF RIGHTS**

The Ad Hoc Equity Committee (the "Ad Hoc Committee") respectfully submits this Initial Objection and reservation of rights to the following:

- *Motion of the Debtor for Interim and Final Orders Authorizing the Debtor to: (A) Incur Postpetition Debt; (B) Provide Adequate Protection; (C) Use Cash Collateral; and (D) Grant Certain Liens and Provide Security and Other Relief to Prepetition Secured Parties* [Docket No. 10] (the "DIP Motion"); and

- *Debtor's Motion for Entry of Orders: (A)(I) Approving Bid Procedures Relating to Sale of Substantially All of the Debtor's Assets; (II) Approving Certain Bid Protections; (III) Scheduling a Hearing to Consider the Sale; (IV) Approving the Form and Manner of Notice of Sale by Auction; (V) Establishing Notice and Contract Procedures for the Assumption and Assignment of Contracts and Leases; and (VI) Granting Related Relief; and (B)(I) Approving Asset Purchase Agreement and Authorizing the Sale of Certain Assets of Debtor Outside the Ordinary Course of Business; (II) Authorizing the Sale of Assets Free and Clear of All Liens, Claims, Encumbrances and Interests; (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (IV) Granting Related Relief* [Docket No. 15] (the "Bid Procedures Motion," and together with the DIP Motion, the "Motions").

---

[1] The last four digits of the Debtor's federal tax identification number are 6822. The Debtor's corporate headquarters and the mailing address is 268 Lambert Avenue, Palo Alto, California 94306.

In support hereof, the Ad Hoc Committee respectfully states as follows:

## INTRODUCTION

1. The Debtor appears to be a thriving, emerging technology company that needs additional investment to continue its operations and realize its potential. It has concluded that it is not possible to obtain additional investment due to pending government investigations. Consequently, it seeks a quick sale to an affiliate of Eduardo Saverin.

2. Mr. Saverin wears many hats, including former director, equity investor, prepetition "lender," and potential purchaser. Unfortunately for Mr. Saverin, he served as a board member when the events occurred that resulted in the pending government investigations. These events included a significant restatement of the Debtor's financials. Mr. Saverin, too, may be a victim of misconduct committed by others. However, by virtue of his board position, Mr. Saverin, along with his fellow board members at the time, also wears the hat of a potential defendant.

3. Rather than seeking to fund a plan, Mr. Saverin seeks to credit bid his purported prepetition debt and to purchase the Debtor's claims against him and the other board members. Mr. Saverin should not be allowed to credit bid and should not be allowed to purchase claims against him and other directors. Alternatively, the process needs to be slowed down to allow for the appointment of an official committee and a meaningful opportunity for the committee to investigate and evaluate these claims. Because Mr. Saverin renounced his U.S. citizenship and resides abroad, there may be no meaningful recourse should he be allowed to credit bid. He should simply bid in cash, and the parties can then properly determine who is entitled to these funds after the sale closes.

## BASIS FOR REQUEST

4. Both the Bid Procedures Motion and final consideration of the DIP Motion should be adjourned for at least a few weeks so that an official equity committee may be formed (an "Official Committee") and have adequate time to evaluate the Motions. The Ad Hoc Committee[2] has requested that the Office of the United States Trustee form an Official Committee and understands that the U.S. Trustee, mindful of the time urgency here, is endeavoring to make a determination on the request by the end of this week. As discussed below, formation of an Official Committee is the only way to ensure that the proposed process is appropriately scrutinized.

5. Judiciously slowing down the sale process does not really change the economics of the proposed purchase. "As an emerging technology company, Jumio has been reliant on continued cash infusions from investors as it has grown its business. Jumio historically has not been, and is not today, able to finance itself solely from its operational cash flows." *Declaration of Stephen Stuut in Support of Chapter 11 Petition and First Day Pleadings* [Docket No. 3] (the "Stuut Declaration") at ¶ 13. Mr. Saverin or the winning bidder will need to continue to fund operations post closing. Consequently, slowing down the sale process simply means that more cash will be invested preclosing and less cash will be invested postclosing.

6. The stated reason for the bankruptcy filing is to facilitate new investment in the company by ridding the operations of "certain legacy issues combined with related government investigations and proceedings [that] have made it difficult for Jumio to secure necessary funding for its operations." *Id.* at ¶ 20. "Legacy issues," however, is a euphemistic reference to

---

[2] The Ad Hoc Committee represents six funds that collectively are out approximately $20,000,000. This compares with total unsecured debt of approximately $400,000. The United States Trustee tried, but was unable, to form a creditors' committee. As such, the formation of an Official Committee is critical to ensuring that an independent fiduciary vets the sale.

3

substantial underlying accounting misconduct discovered last year that necessitated a very significant restatement of the Debtor's financial statements for 2013 and 2014, and which the Debtor recognizes may give rise to liabilities on account of "investor litigation relating to the restatement[.]" *See* Stuut Declaration at ¶¶ 21-24. The Debtor's disclosure of "recent ongoing government investigations related to the restated financials and certain sales of securities to purchasers that may have relied on the original financials" presumably refers to an investigation by the Securities and Exchange Commission. *See* Stuut Declaration at ¶ 25. The members of the Ad Hoc Committee, among others, relied on the false and misleading financial statements. That is how we got here. Understandably, a startup tech company that depends on multiple rounds of new investment to meet its cash needs will face severe liquidity constraints when it wrongs investors.

7. Interestingly, the Debtor does not disclose the *magnitude* of the financial restatements. In fact, the company's revenues had originally been reported as *more than 10 times greater* than its real revenues, with similar-sized misstatements of other metrics. Something really bad happened here. These wildly false and misleading statements were relied upon by investors. Although blame is appropriately laid on former executives who supposedly "resigned" from the Debtor once gross improprieties were finally discovered by the Debtor's board, the directors charged with the stewardship of the company at the time of the wrongdoing may also be culpable.[3] Potential claims here are significant. Upon information and belief, the company has at least one recent (post-restatement) valuation in excess of $100,000,000. Accordingly, it should not be surprising that the Ad Hoc Committee would be suspicious of a

---

[3] It is entirely possible that some of the board members, including Mr. Saverin, may have appropriately carried out their duties. However, the wrongdoing here resulted in significant damage to the company and it is appropriate to have a meaningful investigation before releasing claims.

rushed 363 process geared towards a sale to an insider and potential wrongdoer that will provide little if any recovery for equity holders but that will strip the estate of causes of action against the directors. *See* DIP Motion at pg. 13 (disclosing the purchase of causes of action, including avoidance actions and derivative claims, against the "Buyer Parties," which include, in addition to Mr. Saverin, current Jumio directors some or all of whom were on the board at the time of the issuance of the false and misleading financials).[4] Indeed, the Ad Hoc Committee believes that it would be preferable to convert this case to one under chapter 7 rather than to consummate the proposed sale impetuously and with the transparent aim of inequitably benefitting an insider economically and by relieving him and others of potentially significant liability.

8. The Debtor, on the other hand, extols the purported value of the stalking horse bid because it satisfies all of the Debtor's purported "secured debt" and provides the potential for a distribution to a smattering of trade creditors.[5] *See* Stuut Declaration at ¶ 26. Even assuming that the Debtor does not have offsetting claims against Mr. Saverin, to characterize his cash investments from August 28, 2015 forward as secured loans, elevates form over substance. The initial issuance of "Prepetition Secured Notes" to Mr. Saverin occurred just days prior to the Debtor's formal disclosure of the restatement of its financials for 2013 and 2014 to its stockholders. Furthermore, in light of the Debtor's inability to fund itself through operations, it is disingenuous for Mr. Saverin to say he believed this infusion was a legitimate secured loan that would be satisfied within its six month term. Under the circumstances, this was a text-book

---

[4] As the Court recognized at the first-day hearing, Mr. Saverin wears "a lot of hats" in this case, including: (former) director, equity holder, purported prepetition "lender," DIP lender, and stalking horse purchaser.

[5] There was insufficient interest on the part of trade creditors to form a creditors' committee. *See* Docket No. 68.

"loan-to-own" strategy implemented immediately before the opening of the inevitable fallout from the restatement.

9. Mr. Saverin may say that he has no interest in funding the Debtor past his proposed timeline. But that concern rings hollow considering that he would have to continue funding the negative cash-flow operations postclosing (*i.e.*, an extension of time here does not materially harm Mr. Saverin). The Ad Hoc Committee is not concerned by threats to pull the plug. To the contrary, the Ad Hoc Committee would prefer conversion to chapter 7 (and the preservation of causes of actions) over a process that seeks to steamroll investors, including the investors that were defrauded as a result of the failure of management and the board adequately to do their jobs.

## ARGUMENT

### A. The Proposed Sale Calls for a High Level of Scrutiny.

10. The Court must scrutinize the sale proposed by the Debtor more critically than it would a normal 363 sale because the proposed purchaser in this case is an insider. *See e.g., In re Family Christian, LLC*, 533 B.R. 600, 622 (Bankr. W.D. Mich. 2015) (stating that sales to insiders are subject to heightened scrutiny); *In re Bidermann Indus. U.S.A., Inc.*, 203 B.R. 547, 551 (Bankr. S.D.N.Y. 1997). Furthermore, where there is a proposed sale of substantially all of the debtor's property without the creditor protections of the disclosure statement and plan process, as here, the transaction must be closely scrutinized. *See In re Channel One Commc'ns, Inc.*, 117 B.R. 493, 496 (Bankr. E.D. Mo. 1990) (citing *In re Indus. Valley Refrigeration & Air Conditioning Supplies, Inc.*, 77 B.R. 15, 17 (Bankr. E.D. Pa. 1987)); *see also In re CGE Shattuck, LLC*, 254 B.R. 5, 12 (Bankr. D.N.H. 2000) ("The closer a proposed transaction gets to the heart of the reorganization process, the greater scrutiny the Court must give to the matter.").

11. In *In re Family Christian*, the bankruptcy court denied the debtors' request for approval of a 363 sale of substantially all of the debtors' assets to an insider. *In re Family Christian, LLC*, 533 B.R. at 631. In denying the sale, the court relied in part on the fact that the debtors did not account for the value of insider releases and avoidance actions being sold, and did not articulate a basis for such releases. The court viewed this as "unacceptable given the insider relationship between [the purchaser] and the Debtors," and concluded that the auction was flawed as a result. *Id.* at 625-26. The court also concluded that the debtors had not articulated a sound business justification for the sale, despite the facts that it was uncontroverted that the debtors' assets were diminishing and that the major stakeholders supported the sale. *Id.* at 626-28. The court reasoned, in part, that the sale dictated the terms of a future plan of liquidation. In light of the broad releases for officers, directors, and insiders the court "would have had difficulty approving the proposed transaction . . . without more significant disclosure and justification for the releases being granted by the Debtors." *Id.* at 629.

12. Here, the proposed sale cannot be approved for many of the same reasons as articulated by the court in *Family Christian*. The Debtor should not be able to effectuate a comprehensive sale of all of its assets (including claims against insiders), while avoiding the protections afforded to parties in interest by the plan confirmation requirements of the Bankruptcy Code. As argued in more detail below, the "sale" of the claims against insiders operates as a *de facto* release. Such a release of insider claims should not occur outside the context of a chapter 11 plan.

13. In *Family Christian*, the court noted that in the event that the debtors' assets could not be sold soon, it was unlikely that the debtors would be "able to continue as a going concern." *Id.* at 627. Still, an impending liquidating crisis was not sufficient to outweigh the court's

concerns with the sale process. Similarly, any "melting ice cube" argument asserted by the Debtor in this case to support a truncated process outside the context of a chapter 11 plan should be rejected in light of the concerns set forth in this Initial Objection. Indeed, any "melting ice cube" argument is belied by the fact that the Debtor will continue to be cash-flow negative even if the stalking horse deal closes when proposed in early May 2016.

14. The Debtor and Mr. Saverin are seeking an accelerated process that provides no time for a yet to be appointed Official Committee (and yet to be retained financial advisors) to evaluate the sale process and bid procedure terms (*i.e.*, the appropriateness of the marketing process, timing, *etc.*) or the proposed financing (*i.e.*, cash collateral needs, business terms of the financing, *etc.*). The April 26, 2016 challenge period deadline provides no realistic opportunity for an investigation of the matters that will be raised in the challenge, which will go far beyond the standard review of security agreements and UCC-1s.[6] Moreover, the proposed deadlines will necessarily force an Official Committee to solely focus on preparing for litigation when perhaps the initial focus should be on at least exploring a consensual resolution with the Debtor and Mr. Saverin. Therefore, the Ad Hoc Committee respectfully requests that the Court adjourn the Bid Procedures Motion and final consideration of the DIP Motion for a sufficient period of time to allow for the formation of an Official Committee, the engagement of professionals, and the requisite work to be done.

15. The remainder of this Initial Objection discusses additional aspects of the Motions which concern the Ad Hoc Committee and which need to be fully vetted by an Official Committee. This Initial Objection, however, is not intended to be exhaustive or otherwise

---

[6] True to its aggressive form, the DIP Motion's budget allocates a mere $50,000 to the professional fees of a committee, which is slightly more than the line item for "Key executive/professional travel to DE." This is strikingly disparate in light of the $1.5 million allocated to the Debtor's professionals and $250,000 allocated to Mr. Saverin's professionals.

limiting[7] on the Ad Hoc Committee or any Official Committee. The Ad Hoc Committee reserves the right to further address the Motions and other ancillary issues and to respond to any reply of the Debtor, Mr. Saverin, or any other party, either by further submission to this Court, oral argument, or testimony to be presented at hearing.

### B. The Court Should Not Allow Mr. Saverin to Credit Bid.

16.     Because Mr. Saverin may be subject to claims against him as a board member, and because it appears that Mr. Saverin's "loans" were in actuality equity investments, the Court should not permit Mr. Saverin to credit bid his alleged secured claim under section 363(k) of the Bankruptcy Code. The right to credit bid is not absolute. First, the right to credit bid only extends to a creditor with an allowed claim. *See* 11 U.S.C. § 363(k) (referring to the holder of an *allowed* claim). Here, we posit that an objection may be made to Mr. Saverin's claim and that he will not have a claim that has been allowed by this Court prior to an auction. Further, the "loans" that form the basis for his claim should be properly characterized as equity investments that do not form the basis for any credit bid. The Court's ability to recharacterize debt as equity is an equitable remedy of the Court. It ensures "that substance will not give way to form [and] that technical considerations will not prevent substantial justice from being done." *In re SubMicron Sys. Corp.*, 432 F.3d 448, 454 (3d Cir. 2006) (quoting *Pepper v. Litton*, 308 U.S. 295, 305 (1939)). The recharacterization inquiry is "a court's attempt to discern whether the parties called an instrument one thing when in fact they intended it as something else. That intent may

---

[7] The DIP Motion's disclosures pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2(a)(i) set forth a number of controversial aspects of the proposed financing and adequate protection package. For example, the DIP Motion seeks to have Mr. Saverin's superpriority administrative claims be payable from avoidance actions, including from assets as to which liens are avoided (which presumably would include *his* purported prepetition liens if avoided).

be inferred from what the parties say in their contracts, from what they do through their actions, and from the economic reality of the surrounding circumstances." *Id.* at 456.

17. "When a corporation is undercapitalized, a court is more skeptical of purported loans made to it because they may in reality be infusions of capital." *In re AutoStyle Plastics, Inc.*, 269 F.3d 726, 747 (6th Cir. 2001). Additional factors the court may consider when assessing whether debt is, in fact, equity include, among others, the "source of repayments; . . . identity of interest between the creditor and the stockholder; . . . the corporation's ability to obtain financing from outside lending institutions; . . . and . . . the presence or absence of a sinking fund to provide repayments." *In re SubMicron Sys. Corp.*, 432 F.3d at 456 n.8 (citing *Roth Steel Tube Co. v. Comm'r*, 800 F.2d 625, 630 (6th Cir. 1986)). Here, the initial issuance of "Prepetition Secured Notes" to Mr. Saverin occurred just days prior to the Debtor's formal disclosure of the restatement of its financials for 2013 and 2014 to its stockholders, and there was no plausible way the Notes could have been satisfied within their six month term.

18. Even if the Court were to determine that Mr. Saverin holds a valid claim, the Court may preclude his ability to credit bid "for cause" under 11 U.S.C. § 363(k). "Cause" may include the inequitable conduct of the bidder. *See In re Aloha Airlines*, No. 08-00337, 2009 WL 1371950, at *8 (Bankr. D. Hawaii May 14, 2009). In addition, "[a] court may deny a lender the right to credit bid in the interest of any policy advanced by the Code, such as to ensure the success of the reorganization or to foster a competitive bidding environment." *In re Philadelphia Newspapers, LLC*, 599 F.3d 298, 329 n.14 (3d Cir. 2010). While perhaps unintended, Mr. Saverin is inexorably conflicted in his relationships to the company. With hindsight, he would have been better off not serving on the board. But he did. And with rights comes responsibility. In light of these conflicts, he chose to embark on the "loan-to-own" strategy prior to the filing of

the bankruptcy and before he, along with the other directors and officers, could be investigated with respect to the events requiring the restatements. His actions evidence a deliberate attempt to strategically position himself, chill the bidding from third parties, and allow him to purchase the claims against insiders to the disadvantage of creditors. Under the circumstances, "cause" exists to preclude Mr. Saverin from credit bidding in the Debtor's asset sale. *See In re Fisker Automotive Holdings, Inc.*, 510 B.R. 55, 60-61 (Bankr. D. Del. 2014) (cause existed under 363(k) where bidding was chilled by creditor who pursued "loan-to-own" strategy prior to bankruptcy and then rushed to accomplish sale in bankruptcy prior to determination of its secured status).[8]

### C. The Proposed Sale Provides Impermissible Releases to Insiders.

19. Mr. Saverin is seeking to acquire the Debtor's causes of action against him as well as the other current directors, without any discussion or valuation of the claims. In effect, Mr. Saverin and the directors are obtaining *de facto* releases. Such extraordinary relief is inappropriate, especially outside of a chapter 11 plan. *See, e.g., In re Family Christian, LLC*, 533 B.R at 630 (stating that absent a significant narrowing of the proposed releases to directors, officers, and insiders of the debtors, "the court doubts that it could approve them outside a plan").

20. Some courts have permitted, *as a part of a chapter 11 plan*, the release of claims against a non-debtor under certain circumstances. The release of claims against non-debtors is extraordinary relief that should only be considered in the context of a chapter 11 plan and its

---

[8] Another problem here is that a credit bid coupled with collection complications presented by Mr. Saverin's foreign domicile would effectively provide him with a section 506(c) surcharge waiver even if an explicit waiver is not included in the DIP order.

attendant protections. Factors that courts have considered in allowing a release of a third party as part of a plan of reorganization include the following:

> (1) an identity of interest between the debtor and the third party, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate; (2) substantial contribution by the non-debtor of assets to the reorganization; (3) the essential nature of the injunction to the reorganization to the extent that, without the injunction, there is little likelihood of success; (4) an agreement by the substantial majority of creditors to support the injunction, specifically if the impacted class or classes "overwhelmingly" votes to accept the plan; and (5) provision in the plan for payment of all or substantially all of the claims of the class or classes affected by the injunction.

*In re Zenith Electronics Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999) (considering release of debtor's claims against, *inter alia*, its directors and officers). These factors, of course, assume that the release of non-debtor parties is taking place in the context of a plan. Regardless, the Debtor cannot satisfy this burden even if the analysis is applied to the proposed sale. At the end of the day, Mr. Saverin's efforts in this case are only for his own benefit at the expense of defrauded equity holders. He is getting everything and offering a pittance.

### D. The DIP Order Should Confer on an Official Committee Standing and Authority to Conduct Discovery.

21. In light of the accelerated timing and the brevity of the challenge period under the proposed DIP order, an Official Committee should not have to waste time engaging in motion practice for the routine matters of discovery and standing to challenge Mr. Saverin's lien (which may effectively require the Official Committee to assert the derivative claims that he seeks to purchase). Although the Ad Hoc Committee does not believe the Debtor and Mr. Saverin would require an Official Committee to jump through unnecessary hoops, in the interest of efficiency the DIP order should expressly: (i) authorize the Official Committee to conduct broad discovery under Bankruptcy Rule 2004; and (ii) confer standing on the Committee to initiate an adversary proceeding to challenge Mr. Saverin's lien. *See Official Comm. of Unsecured Creditors of*

*Cybergenics Corp. v. Chinery*, 330 F.3d 548, 568 (3d Cir. 2003) (en banc) (the "ability to confer derivative standing upon creditors' committee is a straightforward application of bankruptcy court's equitable powers").

WHEREFORE, the Ad Hoc Committee respectfully requests an adjournment of the hearings on the Motions.

Dated: April 6, 2016                                PACHULSKI STANG ZIEHL & JONES LLP

/s/ Peter J. Keane
Laura Davis Jones (DE Bar No. 2436)
Jeffrey N. Pomerantz (CA Bar No. 143717)
Peter J. Keane (DE Bar No. 5503)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899-8705 (Courier 19801)
Telephone:    (302) 652-4100
Facsimile:    (302) 652-4400
Email:        ljones@pszjlaw.com
              jpomerantz@pszjlaw.com
              pkeane@pszjlaw.com

and

K&L GATES LLP
Michael B. Lubic (CA Bar No. 122591)
John H. Culver III (NC Bar No. 17849)
Sven T. Nylen (IL Bar No. 6278148)
10100 Santa Monica Blvd., 8th Floor
Los Angeles, CA 90067
Telephone:    (310) 552-5000
Facsimile:    (310) 552-5001
Email:        michael.lubic@klgates.com
              john.culver@klgates.com
              sven.nylen@klgates.com

Counsel to the Ad Hoc Equity Committee