**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| JUMIO INC.,[1] | Case No. 16-10682 (BLS) |
| Debtor. | **Hearing Date: April 12, 2016 at 1:30 p.m. (ET)**<br>**Objection Deadline: April 5, 2016 at 4:00 p.m. (ET)**<br><br>**Ref. Nos. 10, 15, 80, 82** |

**OMNIBUS REPLY TO OBJECTIONS OF (A) AD HOC EQUITY COMMITTEE
AND (B) AMBERBROOK, VI, LLC, CITIZENS, LLC, JACQUELINE FOX,
AND LIBER ARGENTUM ASSOCS., LLC TO THE DEBTOR'S
BID PROCEDURES MOTION AND FINAL DIP ORDER**

Jumio, Inc., the above-captioned debtor and debtor-in-possession (the "Debtor") hereby files this reply (the "Reply") to the (A) *Objection and Reservation of Rights of Amber brook VI, LLC, Citizen, VC, LLC, Jacqueline Fox and Liber Argentum Assocs., LLC to the Debtor's Motion for Entry of Orders: (A)(I) Approving Bid Procedures Relating to the Sale of Substantially all of the Debtor's Assets; (II) Approving Certain Bid Protections; (III) Scheduling a Hearing to Consider the Sale; (IV) Approving the Form and Manner of Notice of Sale by Auction; (V) Establishing Notice and Contract Procedures for the Assumption and Assignment of Contracts and Leases; and (VI) Granting Related Relief; and (B)(I) Approving Asset Purchase Agreement and Authorizing the Sale of Certain Assets of Debtor Outside the Ordinary Course of Business; (II) Authorizing the Sale of Assets Free and Clear of all Liens, Claims, Encumbrances and Interests; (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (IV) Granting Related Relief* [D.I. 80] (the "Equity Holders' Objection"); and (B) *Initial Objection of the Ad Hoc Equity Committee to Debtor's (A) Motion to*

---

[1] The last four digits of the Debtor's tax identification number are 6822. The Debtor's corporate headquarters and the mailing address is 268 Lambert Avenue, Palo Alto, California 94306.

*Approve Postpetition Financing and Cash Collateral and Related Relief and (B) Motion to Approve Bid Procedures; Request for Adjournment and Reservation of Rights* [D.I. 82] ("Ad Hoc Committee Objection," together with Equity Holders Objection, the "Objections."). In further support of *Debtor's Motion for Entry of Orders: (A)(I) Approving Bid Procedures Relating to Sale of Substantially all of the Debtor's Assets; (II) Approving Certain Bid Protections; (III) Scheduling a Hearing to Consider the Sale; (IV) Approving the Form and Manner of Notice of Sale by Auction; (V) Establishing Notice and Contract Procedures for the Assumption and Assignmnt of Contracts and Leases; and (V)(I) Granting Related Relief; and (B)(I) Approving the Sale of Certain Assets of Debtor Outside the Ordinary Course of Business; (II) Authorizing the Sale of Assets Free and Clear of all Liens, Claims, Encumbrances and Interests; (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and Granting Related Relief* [D.I. 15] (the "Bidding Procedures Motion")[2] and in response to the Objections, the Debtor respectfully states as follows:

## PRELIMINARY STATEMENT

The Objections are replete with hyperbolic mud-slinging at Mr. Saverin and objections that have nothing to do with the Bidding Procedures Motion and which are properly considered, if at all, at the Sale Hearing. Beyond that rhetoric and those issues for another day, the Objections raise only two main points: (a) that the Stalking Horse Bidder should be denied the right to credit bid the Prepetition Secured Obligations; and (b) the timing of the Auction and Sale Hearing should be delayed (and the consideration of the Bidding Procedures Motion continued) on the basis that certain equity holders have requested the appointment of an official committee of equity security holders. On the first point, the Debtor has negotiated with the Stalking Horse Bidder, resulting in accommodations that preserve the right to challenge the credit bid of the

---

[2] All capitalized terms not herein defined shall same meaning ascribed to them in the Bidding Procedures Motion.

Prepetition Secured Obligations and ensure that, to the extent of a successful challenge to any portion of the credit bid, the Stalking Horse Bidder would substitute cash for that portion of the credit bid. This moots the objection to the credit bid entirely. As to the second point, the Auction and Sale process should not be delayed or modified because it is proceeding successfully: Sagent has made contact with approximately 130 potential purchasers; 50 have executed nondisclosure agreements, 24 have sought additional due diligence and 4 have submitted indications interest with all cash purchase prices above that of the Stalking Horse Bidder. There is no basis for delay, and, in fact, any delay or modifications to the Auction and Sale process could jeopardize this robust auction process and risk profound harm to the estate and all of its stakeholders.

## **BACKGROUND**

1.      On March 21, 2016 (the "Petition Date"), the Debtor filed the Bidding Procedures Motion, which seeks approval of commonplace Bidding Procedures, a modest expense reimbursement for the Stalking Horse Bidder, and related contract assumption and assignment procedures and notices.

2.      Also on the Petition Date, the Debtor filed *Motion of Debtor for Interim and Final Orders Authorizing the Debtor to: (A) Incur Postpetition Debt; (B) Provide Adequate Protection; (C) Use Cash Collateral; and (D) Grant Certain Liens and Provide Security and Other Relief to Prepetition Secured Parties* [D.I. 10] (the "DIP Motion").

3.      On March 22, 2016, Pinnacle Ventures Equity Fund II, L.P., Pinnacle Ventures Equity Fund II-O, L.P., Pinnacle Ventures Debt Fund, III, L.P. and Pinnacle Ventures Debt Fund III-A, L.P (collectively, "Pinnacle") entered their appearances in the Debtor's case, represented by Chipman Brown Cicero & Cole, LLP and Levy, Small & Lallas.

4.    On March 22, 2016, the Court held the "first day hearing" with respect to the Debtor's operational motions and interim approval of the DIP Motion.  Counsel for Pinnacle appeared at the hearing and strenuously (although unsuccessfully) objected to interim approval of the DIP Motion, contending that the Debtor did not require any cash to fund its operations on an interim basis.  *See,* Hr'g Transcript 4/22/19, pp 54-65.  In addition, counsel to 137 Ventures, II, LP ("<u>137</u>") appeared at the first day hearing.  *See,* D.I. 52, noting telephonic appearance of Michael B. Lubic, K&L Gates LLP.

5.    On March 30, 2016, the "Ad Hoc Equity Committee" entered its appearance, by its counsel K&L Gates LLP ("<u>K&L Gates</u>") and Pachulski Stang Ziehl & Jones LLP ("<u>Pachulski</u>"). [D.I. 67].  Although the members of the Ad Hoc Equity Committee are not identified in the entry of appearance, on April 1, 2016, K&L Gates and Pachulski filed a verified a statement pursuant to Bankruptcy Rule 2019 identifying Pinnacle and 137 as the members of the Ad Hoc Equity Committee.

6.    On April 4, 2016, the office of the United States Trustee (the "<u>UST</u>") forwarded an email request from Mr. Lubic of K&L Gates, on behalf of the Ad Hoc Equity Committee requesting the appointment of an official committee of equity security holders (the "<u>April 4th Equity Request</u>").  The UST requested the Debtor respond on or before the close of business on April 7, 2016. The Debtor does not believe that an official equity committee should be appointed in this case because the Debtor's limited number of equity holders are adequately represented, because the Ad Hoc Equity Committee has not demonstrated a substantial likelihood of a meaningful recovery to equity, because the Debtor's business cannot sustain the costs and delays associated with the appoint of an official committee of equity security holders, and for the other

reasons explained by the Debtor to the UST. A copy of the Debtor's response to the April 4th Equity Request is attached hereto as Exhibit "A."

**Marketing Process Update**

7.      As set forth in the Bid Procedures Motion, prior to the Petition Date, the Debtor retained Sagent Advisors, LLC ("Sagent") as its investment banker to market the Debtor's assets. Immediately upon retention, Sagent worked extensively with the company and professionals to prepare and implement a comprehensive marketing strategy, including, but not limited to, the preparation of a confidential information memorandum to provide to potential purchasers who executed a confidentiality agreement.

8.      In February, Sagent began actively marketing the Debtor by sending out a teaser to one hundred and four (104) potential purchasers prior to the Petition Date. In addition, Sagent began working with the Debtor to populate a data room for interested parties to conduct due diligence. These initial steps allowed Sagent to "hit the ground running" when the Debtor's Chapter 11 Case was commenced.

9.      Since the marketing began, Sagent has contacted (or been contacted by) no less than 130 financial and strategic potential purchasers. Of these potential purchasers, 50 have executed a nondisclosure agreement and received the confidential information presentation. In addition, at least 24 potential purchasers have sought additional due diligence beyond the confidential information presentation.

10.      Although the Bidding Procedures had not been approved, in order to ensure that interested parties were aware of the Debtor's proposed sale process, on March 21st Sagent began sending potential bidders a "First Round Process Letter" describing the Debtor's proposed

bidding procedures and time table. Pursuant to that process letter, potential purchasers were requested to provide initial indications of interest by March 30th.

11.     To date, 4 potential purchasers have provided indications of interest, with all cash purchase prices in excess of Stalking Horse Bidder's purchase price of $22.7 million. Sagent continues to solicit additional interest from other potential bidders, and it is the hope and expectation of Sagent and the Debtor that the forthcoming Auction will be well-attended by multiple Qualified Bidders.

**The Objections**

12.     On April 5, 2016, Amberbrook VI, LLC, Citizens VC, LLC, Jacqueline Fox and Liber Argentum Assocs., LLC (collectively, the "Equity Objectors") filed the Equity Holders' Objection. The Equity Holders' Objection raises a number of objections to the sale (not the Bidding Procedures) that the Debtor will address to the extent necessary prior to the Sale Hearing. With respect to the Bid Procedures Motion, the Equity Objectors contend: (a) there should be a "reasonable extension" of the bid deadline and investigation deadline; (b) Mr. Saverin should not be entitled to credit bid the Prepetition Secured Obligations until a complete and thorough investigation is conducted; (c) Mr. Saverin's consultation rights should be eliminated; and (d) the Expense Reimbursement is grossly excessive.

13.     On April 6, 2016, the Ad Hoc Equity Committee filed the Ad Hoc Committee Objection. Similar to the Equity Objection, the Ad Hoc Committee Objection raises a number of objections to the sale, which the Debtor will address prior to the Sale Hearing. With respect to the Bid Procedures Motion and final order on the DIP Motion, the Ad Hoc Equity Committee argues: (a) the sale process must be extended to allow for the appointment of an official committee of equity holders and to allow such committee to investigate and evaluate any

potential challenge to the Prepetition Secured Notes; (b) Mr. Saverin should not be entitled to credit bid the Prepetition Secured Obligations; and (c) the final DIP order should confer standing upon any official committee and allow it to "conduct broad discovery under Bankruptcy Rule 2004." Ad Hoc Committee Objection, ¶21.

## REPLY

14.    The Debtor is a venture-financed business whose business model runs on a cash-flow-negative basis as it pursues a path to profitability. As set forth in the First Day Declaration, although the Debtor is thriving from an operational standpoint, the Debtor was unable to continue to raise necessary funding for operations, in large part due to certain legacy issues and related governmental investigations. *First Day Declaration*, ¶20. After thoroughly reviewing all of its options, the Debtor determined that filing for bankruptcy protection and pursuing the orderly sale of its assets in a controlled, court-supervised environment was the best way to maintain the Debtor as a going concern, preserve jobs, provide its customers with continued service, and maximize value for all of its stakeholders. *Id.*

15.    In connection therewith, after extensive arm's length, good faith negotiations and numerous concessions by Mr. Saverin, the Debtor entered into the Asset Purchase Agreement and DIP Facility. Not surprisingly, the DIP Facility and the Asset Purchase Agreement are intertwined, with funding conditioned on the negotiated milestones and requirements set forth in the Asset Purchase Agreement. The DIP Facility provides the Debtor with liquidity only through May 2nd and the Debtor cannot operate on cash collateral alone. *See*, Exhibit B to DIP Motion, attached hereto as Exhibit "B."

## A. The Challenge Deadline Has Been Modified

16.    In connection with the concerns raised in the Objections, and to resolve the tension between the Challenge Deadline and the credit bid rights in connection with the Prepetition Secured Notes, the Debtor has re-opened negotiations with the Stalking Horse Bidder to modify the Bidding Procedures Order. After substantial back and forth between the parties, and to resolve these concerns, the parties have revised the Bidding Procedures Order and Final DIP Order. These changes include meaningful concessions by the Stalking Horse Bidder and Postpetition Lender – (1) extending the Challenge Deadline to seventy-five (75) days from the Petition Date; and (2) to backstop any credit bid of the Prepetition Secured Obligations with cash to the extent of any successful challenge to those obligations. These changes make the Stalking Horse Bid as good as a cash bid and relieves any alleged time pressure or risk on preparing raising a challenge to the Prepetition Secured Obligations. *See e.g.*, Final DIP Order, ¶29; Revised Order, ¶10. The revised Bidding Procedures Order and related blackline is attached hereto as Exhibit "C," (the "Revised Order"); and the proposed Final DIP Order, blacklined against the Interim Order, is attached hereto as Exhibit "D."

17.    Paragraph 10 of the Revised Order provides the following:

(a)    to the extent that there is no Qualified Bid other than the Asset Purchase Agreement by the Bid Deadline, the Asset Purchase Agreement shall be deemed modified to remove the credit bid of the Prepetition Secured Obligations, the Prepetition Secured Noteholders shall be deemed to waive the Prepetition Secured Obligations and any distribution or other rights with respect thereto, thereby mooting any challenge to the Prepetition Secured Obligations. Revised Order, ¶10(b).

(b)    If a Qualified Bid other than the Asset Purchase Agreement is submitted by the Bid Deadline, then the Stalking Horse Bidder (or Prepetition Secured Noteholders or Prepetition Agent) shall be permitted to credit bid the Prepetition Secured Obligations subject to the following conditions:

(i)    If the Prepetition Secured Obligations are credit bid as part of the Successful Bid and the Successful Bid closes, and (x)

any party in interest with standing has timely filed a complaint and commenced an adversary proceeding challenging the Prepetition Secured Obligations and (y) it is determined by final order of the court of competent jurisdiction that any portion of the Prepetition Secured Obligations that were credit bid were not eligible to be included and the result of such challenge would affect the challenging parties (or its constituents) distributions under the Bankruptcy Code, then Successful Bidder will make a cash payment equal to the amount of Prepetition Secured Obligations found to be ineligible;

(ii)    If the Prepetition Secured Obligations are not credit bid as part of the Successful Bid and the Successful Bid closes, then the sale proceeds shall be transferred to an interest bearing escrow pending the expiration of the Challenge Deadline and resolution of any timely challenge to the Prepetition Secured Obligations. Revised Order, ¶10(c).

18.    Thus, pursuant to the Revised Order, the issues raised with respect to the proposed shortening of the Challenge Deadline have been resolved.   And, although the Prepetition Secured Noteholders (or the Stalking Horse Bidder or Prepetition Secured Agent, as applicable) are permitted to credit bid the Prepetition Secured Obligations at the Auction, to the extent that it is determined at a later date that such credit bid was not appropriate, the Prepetition Secured Noteholders will pay the estate cash equal to the amount determined to be invalid.  To the extent there is no other Qualified Bid and, hence, no Auction, no investigation would be necessary because the Prepetition Secured Obligations are waived pursuant to a deemed-amended asset purchase agreement.

19.    This resolution strikes a delicate balance to preserve potential claims in connection with the Prepetition Secured Obligations while maintaining the Debtor's critical timeline to preserve and maximize the value of its ongoing operations.  Notably, the Stalking Horse Bidder has advised the Debtor that if the Challenge Deadline were extended by the Court in a manner other than these agreed changes (or if the Sale process were subject to delay beyond

the agreed milestones), the Stalking Horse Bidder would withdraw or decrease the amount of its bid. Such a withdrawal or decrease would put the entire Sale at risk and could reduce the value of the Debtor's assets in the Sale process to an amount substantially below the $22.7 million amount of the Stalking Horse Bid. That would benefit no one – including the parties filing the Objections.

### B. The Proposed Timeline is Sufficient to Maximize Value

20.    The Objectors cavalierly demand more time without any acknowledgment of the potentially damaging effect a delay will have on the Debtor's operations. First, as mentioned above, the Debtor only has funding through May 2nd. The Postpetition Lender is unwilling to fund a longer process. The Ad Hoc Equity Committee's posits that because the future owner of Jumio also will have to fund operating losses, the Postpetition Lender, as a potential purchaser, should want to do so in the context of an extended sale process. This is pure conjecture, and makes no sense. Although it is accurate that additional capital will be required post-closing, this does not require the Postpetition Lender to fund losses during the Chapter 11 case. The Chapter 11 expenses, of course, are not limited to operational costs; they include professional fees, independent director fees, UST fees, ongoing reporting requirements, and Court approval and oversight regarding the Debtor's operations. This is not the bargain Mr. Saverin struck by offering to purchase the assets. Moreover, any bidder other than Mr. Saverin will be required to increase its cash purchase price to match any additional financing that might be provided by Mr. Saverin in his discretion. Such an addition to the purchase price will provide no incremental value to any other bidder, and therefore any delay, and its corresponding cost, will tend to dull the appetite of competing bidders and reduce the potential value of the estate at any Auction.

21.    In addition, the testimony at the hearing to approve the Bidding Procedures will conclusively establish that the bidding procedures and proposed timeline are sufficient for interested parties to conduct due diligence and submit bids prior to the bid deadline.  The Debtor's operations are not complex; there is no inventory or similar physical assets to be inspected in multiple locations; the data room contains all the Debtor's customer and supplier agreements; and the Debtor's management is standing by to conduct management presentations as may be requested by prospective bidders.

22.    Finally, the testimony at the hearing will establish that in addition to the substantial out-of-pocket costs associated with any extension of the sale process, any delay will have a potentially devastating effect on the Debtor's relationships with its customers and vendors, many of which are foreign, do not understand the bankruptcy process in the United States, and may leave the Debtor for one of its competitors.  In addition, the Debtor's employees loyally have remained with the company through this transition period, but their patience is not unlimited.  Delay only will erode the value of the Debtor's estate that its officers, directors and employees are working hard to protect.

C.    **The Expense Reimbursement is Appropriate**

23.    As set forth in detail in the Bid Procedures Motion, the expense reimbursement of $300,000 of reasonable, documented out-of-pocket expenses is warranted under the circumstances and applicable case law.  Notwithstanding Mr. Saverin's connections with the Debtor, there were significant costs associated with the negotiation and documentation of the Asset Purchase Agreement.  The Asset Purchase Agreement provides a floor for bidding (especially in light of the concessions on credit bidding set forth above) and allows its bid to be shopped for a higher offer. *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl.*

*Energy, Inc.*), 181 F.3d 527, 5375 (3d Cir. 1999). The Expense Reimbursement does not "chill bidding." Moreover, the Stalking Horse Bidder's expenses are likely to be far in excess of the Expense Reimbursement, and the Debtor has successfully limited the amount of the Expense Reimbursement. And, any delay in the Sale process, as proposed by the Objections, would only increase the expense of the Stalking Horse Bidder and incentivize the Stalking Horse Bidder to return to the negotiating table with request for a higher Expense Reimbursement amount. Testimony at the hearing will support this contention.

### D. The Consultation Rights are Appropriate

24.     The Equity Objection suggests the sale process is "controlled by" Mr. Saverin. Equity Objection, ¶52. As the Court is well aware, it is standard to allow senior secured parties consultation rights in connection with a sale. And that is all Mr. Saverin has in this process – consultation rights. Decision rights remain in the Debtor's sole and exclusivity authority. *See, Bid Procedures,* p.7. The Debtor has an independent director who has been involved in every step of the Sale process; its investment banker, Sagent, has been running the Sale process and is the primary contact for potential bidders; and the Debtor's management has been focused on maximizing the value of the Debtor's business both in the ordinary operations and in the Sale process. There are no facts to support the Objections in this regard.

### E. The Bid Procedures Motion and DIP Motion Should Not be Continued

25.     The Ad Hoc Committee Objection contains a procedurally improper[3] request for an "adjournment of at least a few weeks" so that if an official committee is formed it can get up to speed. Ad Hoc Committee Objection, ¶ 4-5. The Ad Hoc Equity Committee blithely states that "[j]udiciously slowing down the sale process does not really change the economics of the

---

[3] Local Rule 9013-1(b) provides that no request for relief may be made to the Court expect by written motion.

proposed purchase." *Id.*, ¶5. This completely (and perhaps purposefully) ignores the negative impact an extended process will have on the Debtor's customers and vendors – relationships that are critical to the Debtor's success and enterprise value. Likewise, as mentioned above, it suggests that although there is no guaranty it will be the Successful Bidder, the DIP Lender should fund millions of additional dollars simply because additional capital post-closing will be required.

26.    Putting aside the important facts surrounding the very real dangers the Debtor faces if the process is extended, the fact of the matter is that there is no official committee of equity security holders. There has been no commitment by the UST that one will be formed or if the request is granted, how long such formation will take. Putting this case on hold for a "what if" scenario would severely impact the Debtor, its operations and ability to maximize value for all stakeholders.

27.    In addition, it is important to note that the Ad Hoc Equity Committee unreasonably delayed its request seeking the appointment of an official committee. Pinnacle and 137 were heavily involved with the Debtor prepetition. Both attended the first day hearing and Pinnacle immediately entered its appearance in the case. Counsel for the Ad Hoc Equity Committee has been in contact with Debtor's counsel and the Stalking Horse Bidder as early as the first day hearing. Nonetheless, they waited until April 4th - two weeks after the case was filed and one (1) day before the objection deadline - to send an email request to the UST for the appointment of an official committee. There is no justifiable explanation for this delay and the Debtor's creditors, customers, vendors, and employees should not suffer as a result of it. In essence, the objecting equity holders are gambling with other people's money in a manner that risks harm to the Debtor's creditors.

28.    Finally, as set forth in Debtor's response to the request for an equity committee, and despite their allegations that they relied on the Debtor's restated financials, both Pinnacle and 137 acquired their equity in unusual ways.  In addition, Pinnacle was engaged in extensive negotiations prepetition with the Debtor regarding an additional investment and resolution of claims, which belies Pinnacle's claims of theoretical value being lost in the Debtor's proposed process.  Consequently, the Debtor questions any statement by a party that prefers liquidation to a robust sale process that would maximize the value for all stakeholders.  *See*, Ad Hoc Equity Objection, ¶7.

## F.  An Equity Committee Should Not Be Permitted to Take Extensive 2004 Discovery

29.    The Ad Hoc Equity Committee further demands in its objection that the final DIP order grant the yet-to-be formed equity committee standing and allow it "to conduct broad discovery under Bankruptcy Rule 2004."  Ad Hoc Equity Committee Objection, ¶21. To the extent an official committee is appointed, the Debtor undoubtedly will cooperate with any reasonable information requests that they may have.  However, as set forth herein, the Debtor's immediate focus is on a robust sale process.  To request that an order permit unfettered "broad" discovery without any indication of the scope and extent of such discovery is inappropriate. Likewise, to the extent an official committee is appointed, the extent to which it automatically has standing to pursue any estate claims should be determined at a later date, in connection with an appropriate request.

30.    For all the reasons set forth in the Bidding Procedures Motion and in this Reply, the Debtor submits that the proposed timeline, the Bidding Procedures, and related contract procedures are a sound exercise of the Debtor's business judgment and reasonably tailored to

ensure that the Debtor's assets are marketed in order to obtain the highest and best value for its stakeholders and thus, should be approved.

WHEREFORE, the Debtor respectfully requests that the Court enter the Revised Order and grant such other and further relief as the Court may deem just and proper.

Dated: April 7, 2016
Wilmington, Delaware

**LANDIS RATH & COBB LLP**

Adam G. Landis (No. 3407)
Kerri K. Mumford (No. 4186)
Kimberly A. Brown (No. 5138)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email: landis@lrclaw.com
   mumford@lrclaw.com
   brown@lrclaw.com

*Proposed Counsel to the Debtor*
*and Debtor-in-Possession*