IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| JMO WIND DOWN, INC.,[1] | Case No. 16-10682 (BLS) |
| Debtor. | |

**DISCLOSURE STATEMENT FOR THE PLAN OF LIQUIDATION OF JMO WIND DOWN, INC. PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

> **THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED ON AN INTERIM BASIS BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR INTERIM APPROVAL BUT HAS NOT BEEN APPROVED, ON AN INTERIM BASIS OR OTHERWISE, BY THE BANKRUPTCY COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES NOR IS IT SOLICITING AN OFFER TO BUY ANY SECURITIES. INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT.**

LANDIS RATH & COBB LLP
Adam G. Landis (No.3407)
Kerri K. Mumford (No. 4186)
Kimberly A. Brown (No. 5138)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email: landis@lrclaw.com
          mumford@lrclaw.com
          brown@lrclaw.com

Dated: August 17, 2016

*Counsel to the Debtor and Debtor-In-Possession*

---

[1] The last four digits of the Debtor's tax identification number are 6822. The Debtor's mailing address is 268 Lambert Avenue, Palo Alto, California 94306.

{1086.002-W0043314.}

# DISCLAIMER

THE DEBTOR IS PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT[2] IN CONNECTION WITH THE PLAN OF LIQUIDATION OF JMO WIND DOWN, INC. (*F/K/A* JUMIO INC.) THAT THE DEBTOR IS SEEKING TO HAVE CONFIRMED BY THE BANKRUPTCY COURT PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE. YOU SHOULD NOT RELY UPON OR USE THE INFORMATION IN THIS DISCLOSURE STATEMENT FOR ANY PURPOSE OTHER THAN MAKING AN INFORMED JUDGMENT ABOUT THE PLAN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED PURSUANT TO BANKRUPTCY CODE SECTION 1125 AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS. THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT MAY CONTAIN "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE" OR "CONTINUE" OR THE NEGATIVE THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY. THE READER IS CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD-LOOKING STATEMENTS. THE LIQUIDATION ANALYSIS, DISTRIBUTION PROJECTIONS AND OTHER INFORMATION CONTAINED HEREIN ARE ESTIMATES ONLY, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED. THEREFORE, ANY ANALYSES, ESTIMATES OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.

NO LEGAL OR TAX ADVICE IS PROVIDED TO YOU BY THIS DISCLOSURE STATEMENT. THE DEBTOR URGES EACH HOLDER OF A CLAIM OR AN INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE DISCLOSURES CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY

---

[2] Unless otherwise defined herein, capitalized terms contained in this Disclosure Statement shall have the same meanings ascribed to them in either the Plan, the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

COURT'S APPROVAL OF THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION OR WAIVER. RATHER, HOLDERS OF CLAIMS OR INTERESTS AND OTHER ENTITIES SHOULD CONSTRUE THIS DISCLOSURE STATEMENT AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS RELATED TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS.

NO RELIANCE SHOULD BE PLACED ON THE FACT THAT A PARTICULAR LITIGATION CLAIM OR POTENTIAL OBJECTION TO A PARTICULAR CLAIM IS, OR IS NOT, IDENTIFIED IN THE DISCLOSURE STATEMENT.  THE DEBTOR OR THE LIQUIDATING TRUSTEE, AS APPLICABLE, MAY SEEK TO INVESTIGATE, FILE AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS BEFORE AND AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.  THE PLAN RESERVES FOR THE LIQUIDATING TRUSTEE THE RIGHT TO BRING CAUSES OF ACTION (DEFINED IN THE PLAN) AGAINST ANY ENTITY OR PARTY IN INTEREST EXCEPT THOSE SPECIFICALLY RELEASED THEREIN OR BY SEPARATE ORDER OF THE BANKRUPTCY COURT.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN EVENTS IN THE DEBTOR'S CHAPTER 11 CASE AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE ATTACHED HERETO AND INCORPORATED HEREIN BY REFERENCE.  ALTHOUGH THE DEBTOR BELIEVES THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THE SUMMARIES DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS.  IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES.  THE DEBTOR DOES NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THE DEBTOR'S MANAGEMENT AND ITS ADVISORS HAVE REVIEWED THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT. ALTHOUGH THE DEBTOR HAS USED ITS REASONABLE BUSINESS JUDGMENT TO ENSURE THE ACCURACY OF THIS FINANCIAL INFORMATION, NO ENTITY HAS AUDITED THE FINANCIAL INFORMATION CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THIS DISCLOSURE STATEMENT.

THE DEBTOR IS MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED.  ALTHOUGH THE DEBTOR MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE

STATEMENT, THE DEBTOR HAS NO AFFIRMATIVE DUTY TO DO SO.  HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THE FILING OF THIS DISCLOSURE STATEMENT. EACH HOLDER OF A CLAIM OR INTEREST MUST RELY ON THEIR OWN EVALUATION OF THE DEBTOR AND THEIR OWN ANALYSIS OF THE TERMS OF THE PLAN, INCLUDING, WITHOUT LIMITATION, ANY RISK FACTORS CITED HEREIN, IN ORDER TO MAKE AN INFORMED JUDGEMENT ABOUT THE PLAN.

THE DEBTOR HAS NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE DEBTOR HAS NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTOR OR THE VALUE OF ITS PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

EACH HOLDER OF A CLAIM OR INTEREST SHOULD CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN GREATER DETAIL HEREIN, IN ORDER TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN.

## TABLE OF CONTENTS

Page

I.  INTRODUCTION. ...................................................................................................... 8

    1.1  PURPOSE OF THE DISCLOSURE STATEMENT. ........................................ 8

    1.2  CONFIRMATION OF THE PLAN. ................................................................. 9

    1.3  VOTING ON THE PLAN. ............................................................................... 10

    1.4  ACCEPTANCE OF THE PLAN. ..................................................................... 12

    1.5  SOURCES OF INFORMATION. ..................................................................... 12

    1.6  ADDITIONAL INFORMATION. .................................................................... 12

II.  THE DEBTOR. ........................................................................................................... 13

    2.1  DESCRIPTION OF THE DEBTOR AND THE DEBTOR'S BUSINESS. .............. 13

    2.2  THE DEBTOR'S PREPETITION CAPITAL STRUCTURE. ....................... 14

    2.3  EVENTS LEADING TO THE BANKRUPTCY FILING. ............................. 15

    2.4  THE DEBTOR'S BANKRUPTCY PROCEEDINGS. .................................... 16

    2.5  SECURED CLAIMS ENCUMBERING THE DEBTOR'S PROPERTY. ................. 21

    2.6  ADMINISTRATIVE CLAIMS. ...................................................................... 22

    2.7  UNSECURED CLAIMS AGAINST THE DEBTOR. ..................................... 22

III.  SUMMARY OF THE PLAN OF LIQUIDATION. ................................................. 23

    3.1  IN GENERAL. ................................................................................................. 23

    3.2  CLASSIFICATION OF CLAIMS AND INTERESTS. .................................. 23

    3.3  TREATMENT OF UNIMPAIRED CLAIMS AND CLASSES. .................... 24

    3.4  TREATMENT OF IMPAIRED CLASSES. .................................................... 26

    3.5  IMPLEMENTATION OF THE PLAN. ........................................................... 26

    3.6  FUNDING AND DISBURSEMENTS. ........................................................... 32

    3.7  EXECUTORY CONTRACTS AND UNEXPIRED LEASES. ....................... 35

    3.8  RESOLUTION OF CLAIMS. .......................................................................... 36

    3.9  SETTLEMENT, RELEASE, INJUNCTION  AND RELATED PROVISIONS. ....... 38

    3.10  CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN. ...................................................................................................... 43

    3.11  MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN. ............ 44

    3.12  RETENTION OF JURISDICTION. ............................................................... 45

    3.13  MISCELLANEOUS PROVISIONS. .............................................................. 47

IV.  POST-CONFIRMATION ISSUES. ......................................................................... 48

    4.1   THE DEBTOR'S CONTINUED EXISTENCE AFTER CONFIRMATION............ 48

V.     FEASIBILITY. ....................................................................................................... 48

    5.1   FINANCIAL FEASIBILITY ANALYSIS. ................................................... 48

VI.    ALTERNATIVES TO THE PLAN. ........................................................................ 49

    6.1   CHAPTER 7 LIQUIDATION. ................................................................... 49

    6.2   CONTINUATION OF THE BANKRUPTCY CASE. .................................. 50

    6.3   ALTERNATIVE PLAN(S). ...................................................................... 50

VII.   RISK FACTORS. ................................................................................................. 50

    7.1   CERTAIN BANKRUPTCY CONSIDERATIONS .................................... 50

    7.2   CLAIMS ESTIMATION & CASH AVAILABLE AFTER DISTRIBUTION.......... 51

    7.3   CERTAIN LITIGATION. ......................................................................... 51

VIII. CONCLUSION..................................................................................................... 52

**EXHIBITS**

EXHIBIT A          Plan of Liquidation

EXHIBIT B          Liquidation Analysis

# EXECUTIVE SUMMARY

JMO Wind Down, Inc. (f/k/a Jumio, Inc.) (the "Debtor") filed a voluntary petition for relief under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as amended or modified, the "Bankruptcy Code") on March 21, 2016 (the "Petition Date") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

Since the Petition Date, the Debtor has sold substantially all of its assets. The Debtor has filed the Plan of Liquidation of JMO Wind Down, Inc. Pursuant to Chapter 11 of the Bankruptcy Code, dated August 17, 2016 (as amended, modified or supplemented, the "Plan"), which provides for the creation of a Liquidating Trust to, among other things, oversee the distribution of assets to holders of Allowed Claims and Allowed Interests and to pursue Causes of Action of the Debtor's Estate. The Debtor believes that the Liquidating Trust provides the most efficient mechanism for distributing the proceeds of the Debtor's assets, evaluating and liquidating the Debtor's remaining assets, including any Causes of Action not sold pursuant to the Sale, and resolving Claims against and Interests in the Debtor's Estate.

On July 25, 2016, the Debtor announced the Global Settlement reached among the Debtor, Mr. Saverin, AH, and the Equity Committee (each a "Party" and together as the "Parties"). The Global Settlement forms the foundation of the fully consensual Plan and each Party is required to support the Plan pursuant to the terms thereof. The Global Settlement provides, among other things, for sufficient funds to consummate the Plan, make timely distributions to holders of Allowed Claims and Allowed Interests and efficiently winddown the Debtor's Estate.

As more fully explained in section 3.9 of this Disclosure Statement and section VIII.B. of the Plan, the Global Settlement provides, among other things, that: (i) any and all distribution on the Saverin Administrative Claim and the Prepetition Secured Notes Claim shall be distributed to holders of Allowed Common Interests (including Preferred Interests converted to Common Interests pursuant to the Plan) who do not opt-out of the Consensual Third Party Releases; (ii) AH shall contribute $750,000 to the Debtor's Estate; (iii) Mr. Saverin shall be deemed to have contributed $750,000 to the Debtor's Estate on account of Mr. Saverin authorizing the Debtor to utilize his cash collateral; (iv) after the conversion of Preferred Interests into Common Interests pursuant to the Certificate of Incorporation and the Plan, AH shall agree that 75% of its Common Interests shall be deemed satisfied and AH's remaining 25% of Common Interests and all of Mr. Saverin's Common Interests existing prior to the Effective Date of the Plan (but excluding Preferred Interests converted to Common Interests, which shall be deemed waived upon such Effective Date) shall share *pari passu* with all other holders of Allowed Common Interests; and (v) all Liquidating Trust Remaining Assets (including the proceeds of any Retained Causes of Action pursued by the Liquidating Trust) shall be distributed as follows: (i) 33 1/3% to AH until $375,000 is paid in full, 33 1/3% to Mr. Saverin to satisfy the DIP Claims and 33 1/3% to the Liquidating Trust for distributions under the Plan; (ii) after the $375,000 is paid in full to AH and until the DIP Claims have been paid in full, 50% to Mr. Saverin to satisfy the DIP Claims and 50% to the Liquidating Trust for distributions under the Plan and (iii) after the DIP Claims are paid in full, 100% to the Liquidating Trust for distributions under the Plan. In return, the Saverin Parties and AH shall receive releases of all (i) claims of the Estate including, but not limited to, derivative claims, (ii) direct claims of Pinnacle Ventures Equity Fund II, L.P. ("Pinnacle") and

137 Ventures II, LP ("137") and (iii) direct claims of all other Common Interest Holders who do not opt-out of the Consensual Third Party Releases. Any Common Interest Holder that desires to be excluded from the Consensual Third Party Releases may exercise the Opt-Out Election on the Opt-Out Election Form. **IF A COMMON INTEREST HOLDER EXERCISES THE OPT-OUT ELECTION, SUCH INTEREST HOLDER WILL NOT SHARE IN THE DISTRIBUTIONS RELATED TO THE SAVERIN ADMINISTRATIVE CLAIM OR THE PREPETITION SECURED NOTES CLAIMS.** Additionally, as discussed in section 3.10 of this Disclosure Statement, it is a condition precedent to the effectiveness of the Plan that neither (i) the Equity Committee members Buttonwood Alpha QP Fund LLC or Turner Investment Fund XI, LLC nor (ii) more than fifteen percent (15%) of the shares owned by holders of Common Interests (including Preferred Interests that are converted to Common Interests under the Plan) calculated without regard to shares owned or held by members of the Equity Committee, Mr. Saverin and AH) exercise their rights to opt-out of the Consensual Third Party Releases. **IF THIS CONDITION PRECEDENT TO THE EFFECTIVENESS OF THE PLAN IS NOT SATISFIED OR WAIVED, THE PLAN MAY NOT BECOME EFFECTIVE AND DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS AND INTERESTS MAY BE DELAYED, SIGNIFICANTLY REDUCED OR ELIMINATED.**

This Disclosure Statement describes the terms of the Plan, including the treatment of Claims against and Interests in the Debtor. This Executive Summary is intended only to be a summary of the distributions of the Plan. **FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THE DISCLOSURE STATEMENT, THE PLAN AND THE EXHIBITS THERETO IN THEIR ENTIRETY.**

Under the Plan, Claims against and Interests in the Debtor are divided into five (5) classes as summarized in the following table. Certain unclassified Claims will be paid in full in Cash to the extent they become Allowed Claims. Allowed Priority Non-Tax Claims, Other Secured Claims, Prepetition Secured Notes Claims, General Unsecured Claims, Preferred Interests, and Common Interests will receive a distribution, if any, as summarized in the following table setting forth the classification and treatment of the prepetition Claims and Interests under the Plan and the estimated percentage of recovery of Allowed Claims and Allowed Interests. The classification and treatment for all Classes is described in more detail in Section III.

Estimated Claim and Interest amounts set forth in the following table constitute the Debtor's current estimate after a preliminary review of certain Proofs of Claims filed against the Debtor and the Debtor's books and records. The current aggregate amount of Administrative Claims, Priority Tax Claims and Other Secured Claims filed against the Debtor or otherwise known, which have not been satisfied, is approximately $302,400. Because the Bar Dates have not expired and the claims reconciliation process is in its earliest stages in this Case, the Debtor has not completed a detailed review of all Claims to determine their validity or any possible legal or equitable defenses, including claims of setoff and recoupment, which are available to the Estate.

The Debtor estimates that the Estate will have Cash in the approximate amount of $780,000 for distributions to holders of Allowed Claims. If less than $200,000 in Cash is

available following satisfaction of all Allowed Claims for transfer to the Liquidating Trust as a Liquidating Trust Asset, a condition precedent to the Effective Date of the Plan will not be satisfied and the Plan may not go effective.

Because of the inherently speculative nature of estimating potential recoveries, the Debtor has not estimated the value of its Causes of Action. **THERE CAN BE NO ASSURANCE THAT THE ACTUAL CLAIM AMOUNTS WILL NOT BE DIFFERENT, AND PERHAPS SIGNIFICANTLY DIFFERENT, FROM THE ESTIMATES SET FORTH HEREIN.** The actual distribution to holders of Allowed Claims and Allowed Interests is dependent on numerous factors, including, without limitation, (i) the success of the Causes of Action, (ii) whether any Contingent or Unliquidated Claims against the Debtor becomes noncontingent or liquidated; and (iii) whether Disputed Claims are resolved in favor of the Estate. Accordingly, no representation can or is being made with respect to the realization of the distributions estimated below.

The table beginning on the following page is only a summary of the classification of treatment of Claims and Interests under the Plan. Reference should be made to the entire Disclosure Statement and Plan for a complete description and understanding of the classification and treatment of Claims and Interests.

### SUMMARY OF CLASSIFICATION AND TREATMENT
### OF CLAIMS AND INTERESTS UNDER THE PLAN

| CLAIMS/INTERESTS & DESCRIPTION | ESTIMATED ALLOWED CLAIMS | TREATMENT | ESTIMATED RECOVERY |
|---|---|---|---|
| Administrative Claims (unclassified) | $350,000 | Unimpaired | Estimated Recovery Percentage: **100%** Form of Recovery: Cash |
| Priority Tax Claims (unclassified) | $2,400 | Unimpaired | Estimated Recovery Percentage: **100%** Form of Recovery: Cash in full or in installments, together with interest |
| DIP Claims (unclassified) | $2.3 million | Impaired – pursuant to the Global Settlement, holders of DIP Claims have accepted the Plan | Estimated Recovery Percentage: **Unknown** Form of Recovery: Cash after payment in full of all Allowed Unimpaired Claims pursuant to the Global Settlement. |
| Priority Non-Tax Claims (Class 1) | $0 | Unimpaired | Estimated Recovery Percentage: **100%** Form of Recovery: Cash |
| Other Secured Claims (Class 2) | $0 | Unimpaired | Estimated Recovery Percentage: **100%** Form of Recovery: Cash |
| Prepetition Secured Notes Claims (Class 3) | $16.02 million | Impaired – entitled to vote | Estimated Recovery Percentage: **0%** Form of Recovery:  After payment in full of all Allowed Unimpaired Claims, cash will be distributed to holders of Allowed Class 5 Common Interests (including Preferred Interests converted to Common Interests pursuant to the Plan) who do not opt-out of the Consensual Third Party Releases pursuant to the Global Settlement |
| General Unsecured Claims (Class 4) | $390,000 | Unimpaired | Estimated Recovery Percentage: **100%** Form of Recovery: Cash |
| Common Interests (including converted Preferred Interests) & Subordinated 510(b) Claims (Class 5) | N/A | Unimpaired | Estimated Recovery Percentage: **N/A** Form of Recovery: all remaining Cash after establishment of the Professional Fee Claim Reserve |

# I.    INTRODUCTION.

## 1.1    PURPOSE OF THE DISCLOSURE STATEMENT.

The Debtor provides this Disclosure Statement to the Office of the United States Trustee and to all of the Debtor's known Creditors and Interest Holders pursuant to Bankruptcy Code section 1125(b) for the purpose of seeking confirmation of the Plan.  A copy of the Plan is attached hereto as **Exhibit A**.  By Order dated [_____], 2016, the Disclosure Statement received interim approval by the Bankruptcy Court.  A hearing on the final approval of the Disclosure Statement and confirmation of the Plan will be held on [_____], 2016 at ___:___ __.m. (Eastern Time).

The Debtor strongly urges you to read this Disclosure Statement in its entirety before making any judgment on the Plan because the Disclosure Statement contains a summary of the Plan and important information concerning the Debtor's history and operations.  The Disclosure Statement also provides information as to alternatives to the Plan.  Summaries of the Plan are included herein for the purpose of seeking confirmation of the Plan and soliciting acceptances of the Plan and may not be relied upon for any purpose other than to make a judgment with respect to the Plan and, in the case of Common Interest Holders, to make an informed decision regarding whether to opt-out of the Consensual Third Party Release.

**PLEASE NOTE THAT MUCH OF THE INFORMATION CONTAINED HEREIN HAS BEEN TAKEN, IN WHOLE OR IN PART, FROM INFORMATION CONTAINED IN THE DEBTOR'S BOOKS AND RECORDS.  STATEMENTS MADE IN THE DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, AND THE EXHIBITS ANNEXED TO THE PLAN, ALTHOUGH THE DEBTOR HAS ATTEMPTED TO BE ACCURATE IN ALL MATERIAL RESPECTS, THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THAT ALL OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS WITHOUT ERROR.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.**

**NO REPRESENTATION CONCERNING THE DEBTOR OR THE VALUE OF THE DEBTOR'S ASSETS HAS BEEN AUTHORIZED BY THE BANKRUPTCY COURT OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT OR ANY OTHER DISCLOSURE STATEMENT APPROVED BY THE BANKRUPTCY COURT.  THE DEBTOR IS NOT RESPONSIBLE FOR ANY INFORMATION, REPRESENTATION OR INDUCEMENT MADE TO OBTAIN YOUR ACCEPTANCE, WHICH IS OTHER THAN, OR INCONSISTENT WITH, INFORMATION CONTAINED HEREIN AND IN THE PLAN.**

### 1.2    CONFIRMATION OF THE PLAN.

#### 1.2.1    Requirements.
The requirements for Confirmation of the Plan are set forth in detail in Bankruptcy Code Section 1129. The following summarizes some of the pertinent requirements:

**(a) Acceptance by Impaired Classes.** Except to the extent that the cram down provisions of Bankruptcy Code section 1129(b) may be invoked, each Class of Claims and each Class of Interests must either accept the Plan or be deemed to accept the Plan because the Claims or Interests of such Class are not Impaired.

**(b) Feasibility.** The Bankruptcy Court is required to find that the Plan is likely to be implemented and that parties required to perform or pay monies under the Plan will be able to do so.

**(c) The "Best Interest" Test.** The Bankruptcy Court must find that the Plan is in the "best interest" of all Creditors and Interest holders. To satisfy this requirement, the Bankruptcy Court must determine that each holder of a Claim against, or Interest in, the Debtor: (i) has accepted the Plan; or (ii) will receive or retain under the Plan money or other property which, as of the Effective Date, has a value not less than the amount such holder would receive if the Debtor's property was liquidated under Chapter 7 of the Bankruptcy Code on such date. As described in more detail below, notwithstanding the fact all Classes of Claims and Interests either have accepted the Plan or are deemed to accept the Plan, in considering whether the Plan is in the best interests of Creditors and Interest holders, the Debtor and its professionals created a liquidation analysis (the "Liquidation Analysis"), a copy of which is attached hereto as **Exhibit B**.

**(d) "Cramdown" Provisions.** Under the circumstances which are set forth in detail in Bankruptcy Code section 1129(b), the Bankruptcy Court may confirm the Plan even though a Class of Claims or Interests has not accepted the Plan, so long as one Impaired Class of Claims has accepted the Plan, excluding the votes of insiders, if the Plan is fair and equitable and does not discriminate unfairly against such non-accepting Classes. The Debtor will invoke the "cram down" provisions of Bankruptcy Code section 1129(b) the voting Class fail to accept the Plan.

#### 1.2.2    Procedure.
To confirm the Plan, the Bankruptcy Court must hold a hearing to determine whether the Plan meets the requirements of Bankruptcy Code section 1129. The Bankruptcy Court has set September _____, 2016 at ___: ___.m. (Eastern Time) for the combined hearing for final approval of this Disclosure Statement and confirmation of the Plan (the "Confirmation Hearing").

#### 1.2.3    Objections to Final Approval of the Disclosure Statement and Confirmation of the Plan.
Any party-in-interest may object to the final approval of the Disclosure Statement and the confirmation of the Plan and appear at the Confirmation Hearing to pursue such objection. The Court has set September _____, 2016, at 4:00 p.m. (Eastern Time), as the deadline for filing and serving objections to the final approval of the Disclosure Statement

and confirmation of the Plan. Objections must be electronically filed with the Bankruptcy Court at the following address:

> U.S. Bankruptcy Court for the District of Delaware
> 824 Market Street, Third Floor
> Wilmington, Delaware 19801

With a copy served upon counsel for the Debtor at the following address:

> Adam G. Landis, Esq.
> Kerri K. Mumford, Esq.
> Kimberly A. Brown, Esq.
> LANDIS RATH & COBB LLP
> 919 Market Street, Suite 1800
> Wilmington, DE 19801

      **1.2.4**  **Effect of Confirmation.** Except as otherwise provided in the Plan or in the Confirmation Order, Confirmation vests title to all property of the Debtor's Estate in the Liquidating Trust to the same extent such Assets were held by the Debtor, free and clear of all Claims, Liens, charges, encumbrances, rights and Interests of creditors and interest holders, subject to the provisions of the Plan. Confirmation serves to make the Plan binding upon the Debtor, all Creditors, Interest holders and other parties-in-interest, regardless of whether they cast a ballot ("<u>Ballot</u>") to accept or reject the Plan.

      **1.3**  **VOTING ON THE PLAN.**

      **1.3.1**  **Impaired Claims or Interests.** Pursuant to Bankruptcy Code section 1126, only the holders of Claims or Interests in Classes "Impaired" by the Plan may vote on the Plan. Pursuant to Bankruptcy Code section 1124, a Class of Claims or Interests may be "Impaired" if the Plan alters the legal, equitable or contractual rights of the holders of such Claims or Interests treated in such Class. The holders of Claims or Interests not Impaired by the Plan are deemed to accept the Plan and do not have the right to vote on the Plan. The holders of Claims or Interests in any Class which will not receive any payment or distribution or retain any property pursuant to the Plan are deemed to reject the Plan, unless they have agreed otherwise, and, in either event, do not have the right to vote. This Disclosure Statement is being distributed for informational purposes to all Creditors, the Debtor's Interest holders and parties-in-interest without regard to any such party's right to vote.

      **1.3.2**  **Eligibility.** In order to vote on the Plan, a Creditor or Interest holder must have timely filed or been assigned a timely filed proof of Claim or proof of Interest, unless its Claim or Interest is scheduled by the Debtor and is not identified as disputed, unliquidated or contingent on the Debtor's Schedules of Assets and Liabilities (as amended, the "<u>Schedules</u>"). Creditors or Interest holders having a Claim or Interest in more than one Class that is entitled to vote may vote in each Class in which they hold a separate Claim or Interest by casting a Ballot in each Class.

      **1.3.3**  **Binding Effect.** Whether a Creditor or Interest holder votes on the Plan or not, such Person will be bound by the terms of the Plan if the Plan is confirmed by the

Bankruptcy Court.  Absent some affirmative act constituting a vote, a Creditor or Interest holder will not be included in the vote: (i) for purposes of accepting or rejecting the Plan or (ii) for purposes of determining the number of Persons voting on the Plan.

**1.3.4  Procedure.**  Members of Class 3 (Prepetition Secured Notes Claims) may vote to accept or reject the Plan.  Members of Class 1 (Priority Non-Tax Claims), Class 2 (Other Secured Claims), Class 4 (General Unsecured Claims), and Class 5 (Common Interests & Subordinated 510(b) Claims) are not Impaired by the Plan and are deemed, therefore, to accept the Plan. Accordingly, holders of Claims or Interests in Classes 1, 2, 4, and 5 are not entitled to vote on the Plan.  In order for your vote to count, you must complete, date, sign and properly mail the enclosed Ballot (please note that envelopes have been included with the Ballot) to:

> JMO Wind Down, Inc. Ballot Processing
> c/o Rust Omni
> 5955 DeSoto Ave., Suite 100
> Woodland Hills, CA 91367

**BALLOTS SENT BY FACSIMILE, TELECOPY, ELECTRONIC MAIL OR OTHER FORM OF ELECTRONIC TRANSMISSION ARE NOT ALLOWED AND WILL NOT BE COUNTED.**

Pursuant to Bankruptcy Rule 3017, the Bankruptcy Court has ordered that original Ballots for the acceptance or rejection of the Plan must be received by mail or overnight delivery by Rust/Omni at the address set forth above on or before 11:59 p.m. (Eastern Time) on [_____], 2016.  Once you have delivered your Ballot, you may not change your vote, except for cause shown to the Bankruptcy Court after notice and hearing.

Any Ballot received that is incomplete in anyway shall be deemed to be cast as follows:

(a) Ballots received that do not evidence the amount or evidence an incorrect amount of such Creditor's Claim or Interest holder's Interest, shall be completed or corrected, as the case may be, based upon the Schedules filed by the Debtor if no proof of Claim or proof of Interest has been filed by such Creditor or Interest holder, or based upon timely filed proofs of Claim or proofs of Interest, and counted as a vote to accept or reject the Plan;

(b) Ballots received that do not identify the Creditor or the Interest holder, whether or not signed by the Creditor or Interest holder, shall not be counted as a vote to accept or reject the Plan;

(c) Ballots received that do not reflect in which Class such Ballot is cast or incorrectly classify such Creditor's Claim or Interest holder's Interest and that are otherwise properly completed shall be completed or corrected, as the case may be, based upon the Schedules filed by the Debtor if no proof of Claim or proof of Interest has been filed by such Creditor or Interest holder, or based upon timely filed proofs of Claim or proofs of Interest, and counted as a vote to accept or reject the Plan.

{1086.002-W0043314.}                                   11

## 1.4    ACCEPTANCE OF THE PLAN.

**1.4.1    <u>Creditor and Interest Holder Acceptance</u>.** As a Creditor and/or Interest holder, your acceptance of the Plan is important. In order for the Plan to be accepted by an Impaired Class of Claims, a majority in number and two-thirds in dollar amount of the Claims voting (of each Impaired Class of Claims) must accept the Plan, or the Plan must qualify for cramdown of any non-accepting Class of Claims pursuant to Bankruptcy Code section 1129(b). In order for the Plan to be accepted by a Class of Interests, a two-thirds (2/3) majority in amount of the interests voting must vote to accept the Plan or the Plan must qualify for cramdown pursuant to Bankruptcy Code section 1129(b). In any case, either the Plan must be fully consensual or at least one impaired Class of Creditors or Interest holders, excluding the votes of insiders, must actually vote to accept the Plan. To the extent you hold a claim in Class 3 (Prepetition Secured Notes Claims), you are urged to complete, date, sign and promptly mail the enclosed Ballot. Please be sure to complete the Ballot properly and legibly identify the exact amount of your Claim or Interest and the name of the Creditor or Interest holder.

**1.4.2    <u>Cramdown Election</u>.** If all Classes do not accept the Plan, but at least one Impaired Class votes to accept the Plan, excluding the votes of insiders, the Debtor may attempt to invoke the "cramdown" provisions. Cramdown may be an available remedy, because the Debtor believes that, with respect to each Impaired Class, the Plan is fair and equitable within the meaning of Bankruptcy Code section 1129(b)(2) and does not discriminate unfairly.

## 1.5    SOURCES OF INFORMATION.

The information contained in this Disclosure Statement has been obtained from the Debtor's books and records and from pleadings filed by the Debtor and other parties-in-interest. Every reasonable effort has been made to present accurate information and such information is believed to be correct as of the date hereof. Any value given as to the Assets of the Debtor is based upon an estimation of such value. You are strongly urged to consult with your financial, legal and tax advisors to understand fully the Plan and the Disclosure Statement.

The financial information contained in this Disclosure Statement is given as of the date hereof, unless otherwise specified. The delivery of this Disclosure Statement does not, under any circumstance, imply that there has been no change in the facts set forth herein since such date. This Disclosure Statement is intended, among other things, to summarize the Plan and must be read in conjunction with the Plan and its exhibits, if any. If any conflicts exist between the Plan and the Disclosure Statement, the terms of the Plan shall control.

## 1.6    ADDITIONAL INFORMATION.

Should you have any questions regarding the Plan or this Disclosure Statement, or require clarification of any information presented herein, please contact one of the following attorneys for the Debtor:

Adam G. Landis, Esq.
Kerri K. Mumford, Esq.
Kimberly A. Brown, Esq.
LANDIS RATH & COBB LLP
919 Market Street, Suite 1800
Wilmington, DE 19801
(302) 467-4400

## II.    THE DEBTOR.

### 2.1    DESCRIPTION OF THE DEBTOR AND THE DEBTOR'S BUSINESS.

Prior to selling substantially all of its assets through the Court-approved Sale (as described below), the Debtor was a leading online and mobile identity management and credentials authentication company.    Through its innovative verification products and revolutionary technology, the Debtor assisted its customers in reducing fraud, meeting regulatory requirements and increasing revenue, all while providing a fast, seamless customer experience. The Debtor utilized proprietary computer vision technology and analysis and highly-trained identity experts to reduce user sign-up and checkout friction and verify credentials (such as passports, driver licenses and government issued IDs (each an "ID")) issued by over one hundred and thirty (130) countries in real-time online and mobile transactions through its three (3) primary products – Fastfill, BAM Checkout and Netverify.  These products were available for integration into either mobile applications running on iOS or Android or websites accessible by users with a webcam.

The Debtor's products were utilized across the globe by a wide range of customers, including start-ups, leading internet companies and Fortune 500 and FTSE 350 organizations in the financial services, sharing economy, retail, travel, and online gaming industries.  Its products were used by some of the most recognizable brands and companies in the world including, among others, Airbnb, United Airlines, WorldRemit, EasyJet, and Duolingo. The Debtor sold its products and services to its customers through negotiated, term contracts and provided around-the-clock customer service and data verification services, seven (7) days a week.  The Debtor received numerous domestic and international awards for innovation from leading industry associations.

Headquartered in Palo Alto, California, the Debtor had operations in the United States, Europe and India.  As of the Petition Date, the Debtor employed forty-three (43) individuals, twenty-nine (29) of who worked in the Debtor's Palo Alto office and fourteen (14) of whom worked in the Debtor's London office.  The Debtor's research and development was sourced from its wholly-owned, Austrian non-debtor subsidiary, Jumio Software Development GmbH ("JSD"), which employed approximately fifty (50) employees as of the Petition Date.  JSD provided services at the Debtor's direction on a cost-plus basis.  All intellectual property developed or produced by JSD was owned by the Debtor.  The Debtor's round-the-clock customer service and data verification operations were provided by Jumio India Private Limited ("Jumio India"); an Indian joint venture that was majority owned by the Debtor and had over five hundred (500) employees as of the Petition Date.

The Debtor is a privately-held corporation formed under the laws of Delaware in 2010. In addition to JSD, the Debtor directly owned Jumio Holdings,[3] an entity organized under the laws of Ireland, which directly owned Jumio Ireland, an entity organized under the laws of Ireland, neither of which had any offices, operations, assets, or liabilities. The Debtor also owned 51% of Jumio India, a privately held corporation organized under the laws of India.[4] The Debtor had no domestic subsidiaries or interests in any joint ventures or other enterprises.

While the Debtor directly owned the majority of its assets, including its intellectual property, some important assets were held by its wholly-owned subsidiary JSD. Specifically, the Debtor's engineering, research and development teams and certain other employees with institutional knowledge of the Debtor's products were employed by JSD. JSD also was the signatory on certain contracts for the Debtor's products with foreign customers, whose internal policies prohibited them from contracting directly with a US entity.

## 2.2    THE DEBTOR'S PREPETITION CAPITAL STRUCTURE.

### *Prepetition Secured Debt*

As an emerging technology company, the Debtor's operational cash flows were insufficient to finance its business needs. The Debtor relied on continued cash infusions from investors as it grew its business.

Pursuant to that certain Note Purchase Agreement dated as of August 28, 2015 (as amended, the "NPA"), Jumio was authorized to issue from time to time senior secured convertible promissory notes (the "Prepetition Secured Notes" and the holders thereof from time to time, the "Prepetition Secured Noteholders"), and Mr. Saverin and AH purchased the following Prepetition Secured Notes in the aggregate original principal amount of $15,493,727.74:

- Note No.: CPN-1 dated August 28, 2015 in the original principal amount of $4,000,000.00 owed to Mr. Saverin;

- Note No.: CPN-2 dated August 28, 2015 in the original principal amount of $1,509,780.82 owed to Mr. Saverin;

- Note No.: CPN-3 dated August 28, 2015 in the original principal amount of $2,005,041.10 owed to Mr. Saverin;

- Note No.: CPN-4 dated August 28, 2015 in the original principal amount of $1,509,780.82 owed to AH, which was transferred to Mr. Saverin on or about March 18, 2016;

---

[3] For Irish legal reasons, one (1) share of each Irish entity was owned by the Debtor's then current President, Chief Executive Officer and Chairman of the Board - Daniel Mattes. Mr. Mattes had transferred his rights to the Debtor. The Debtor owned the other share of each entity and was the controlling shareholder of each of these entities.

[4] The other 49% of Jumio India was owned by Goyanka Ltd., an entity unrelated to the Debtor.

- Note No.: CPN-5 dated October 23, 2015 in the original principal amount of $4,000,000.00 owed to Mr. Saverin; and

- Note No.: CPN-6 dated February 26, 2016 in the original principal amount of $2,469,125.00 owed to Mr. Saverin.

Pursuant to, among other things, that certain Security Agreement dated as of August 28, 2015 (as amended, the "Security Agreement") by and between the Debtor, as borrower, and Christopher Joseph Clower, as security agent pursuant to the NPA and under the Prepetition Secured Notes (the "Prepetition Agent") and the other Security Perfection Documents (as defined in the NPA), the Prepetition Secured Notes are secured by liens on and security interests in substantially all of the Debtor's assets, including its cash (the "Cash Collateral").

The Prepetition Secured Notes bear interest at four percent (4%) per annum and are due and payable six (6) months after the issuance of the applicable Prepetition Secured Note (or before upon a Change of Control or Event of Default (each as defined in the Prepetition Secured Notes)). As of the Petition Date, $15,765,819 in principal and accrued interest was outstanding under the Prepetition Secured Notes (the "Prepetition Secured Notes Claims").

In accordance with the terms of the NPA, the Debtor also notified all holders of the Debtor's capital stock that were accredited investors that they could also purchase Prepetition Secured Notes on the same terms offered to Mr. Saverin and AH. No other equity holders elected to purchase any such Prepetition Secured Notes.

***Unsecured Debt***

As of the Petition Date, the Debtor estimated that its unsecured debt aggregated approximately $440,000, consisting primarily of accounts payable to trade vendors.

***Equity***

As of the Petition Date, the Debtor had twenty-eight (28) preferred equity holders and sixty-six (66) common equity holders, with several equity holders holding stock in both levels. The Debtor had 44,075,498 shares of preferred stock and 43,533,609 shares of common stock issued and outstanding on the Petition Date.

## 2.3    EVENTS LEADING TO THE BANKRUPTCY FILING.

While Jumio was thriving from an operational standpoint, certain legacy issues combined with related government investigations and proceedings made it difficult for it to secure necessary funding for its operations outside of the Chapter 11 process. Following a rigorous evaluation of all available options, Jumio ultimately determined that filing for Chapter 11 protection and pursuing an orderly sale of its assets in a controlled, court-supervised environment would be the best available option for it and its stakeholders.

In 2015, Jumio restated its financial statements for the years of 2013 and 2014 (the "Restated Period"). The determination to restate the financial statements for the Restated Periods was made after consulting with a third-party consulting firm and Jumio's legal advisors

following the identification of errors related to primarily revenue recognition policies adopted by Jumio.  The following individuals served as Jumio's directors and officers with oversight authority during the Restated Period: (i) Daniel Mattes – founder, President, Chief Executive Officer and Chairman of the Board; (ii) Thomas Kastenhofer – Chief Operating Officer; (iii) Chad Starkey – Chief Financial Officer; (iv) Michael Orlando – Chief Sales Officer; (v) Marc Barach – Chief Marketing Officer; (vi) Scott Weiss – director; and (vii) Mr. Saverin – director. In addition, Liza Cuevas joined as the Vice President of Human Resources in April 2014 and Peng Ong was seated as a director in June 2014.

In March 2015, the Board of Directors engaged special counsel to investigate, among other things, issues related to secondary sales of Jumio's common stock by certain former executives of Jumio, including Messrs. Mattes, Kastenhofer and Starkey.  On April 30, 2015, Mr. Mattes resigned from Jumio and its Board of Directors.  On September 2, 2015, Jumio advised its shareholders it had recently restated its unaudited financial statements for the Restated Period during which prior management had been in place.  Messrs. Kastenhofer and Starkey resigned in October and November 2015 respectively.

As a result of these events, Jumio was subject to a number of additional costs and risks, including unanticipated costs for accounting and legal fees in connection with or related to the restatement, as well as the costs and expenses that could arise in connection with any investor litigation relating to the restatement – thereby making it essentially impossible to secure additional funding as needed.

In addition, Jumio was and continues to be subject to ongoing government investigations related to the restated financials and certain sales of securities to purchasers that may have relied on the original financials, as described above.  The Debtor continues to cooperate fully with the government investigations.

As noted above, historically, Jumio was reliant on cash infusions from investors to fund its operations and grow its business.  In light of the government investigations and restatement of financials, Jumio was unable to raise additional funds through either equity or third-party debt raises.  Jumio, in the exercise of its reasonable business judgment, determined that the most effective way to maximize value of its Estate for the benefit of all of its constituents and to preserve its business was to seek bankruptcy protection in order to sell substantially all of its assets as a going concern through a sale pursuant to Bankruptcy Code section 363.

## 2.4    THE DEBTOR'S BANKRUPTCY PROCEEDINGS.

**2.4.1    The Petition Date.**  On March 21, 2016 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

**2.4.2    The First Day Operational Orders.**  On the Petition Date, the Debtor filed several motions seeking certain operational relief by virtue of so-called first day orders. The first day orders assisted the Debtor in transitioning into operating as a debtor-in-possession by approving certain regular business practices that may not be specifically authorized under the

Bankruptcy Code or as to which the Bankruptcy Code requires prior court approval. The first day orders in the Chapter 11 Case authorized, among other things:

- the continued maintenance of the Debtor's bank accounts, continued use of existing business forms and continued use of the Debtor's existing cash management system;
- the appointment of Rust Consulting/Omni Bankruptcy as the noticing agent in this case;
- continued utility service during the pendency of the chapter 11 case;
- continued operation under the Debtor's prepaid contracts in the ordinary course of business;
- continued maintenance of existing insurance policies, continued payment of premiums and renewal of insurance policies and entrance into new policies, as necessary; and
- payments to employees of accrued prepetition wages, salaries and benefits.

### 2.4.3    The DIP Orders, Related Financing and the Equity Committee's DIP Objection.
On the Petition Date, the Debtor filed a motion (the "DIP Motion") seeking Bankruptcy Court approval for the Debtor to utilize cash collateral from the Prepetition Secured Noteholders and to borrow up to $3.7 million (the "DIP Facility") from Mr. Saverin or his designee(s) (the "Postpetition Lender" and together with the Prepetition Secured Noteholders, the "Secured Parties"). On March 22, 2016, the Court granted the DIP Motion [D.I. 45] (the "Interim DIP Order") authorizing the Debtor to borrow $1.4 million on an interim basis under the DIP Facility from Mr. Saverin.

As set forth in the Interim DIP Order, the Secured Parties agreed to "carve-out" from their collateral certain amounts (the "Carve-Out"), including (i) $1,539,250[5] for the payment of fees and expenses of Landis Rath & Cobb LLP ("LRC"), bankruptcy counsel to the Debtor; Ernst & Young, LLP ("EY"), financial advisor to the Debtor; Wilmer Hale, LLP ("WH"), special corporate counsel to the Debtor; and Cooley LLP ("Cooley"), special litigation counsel to the Debtor and (ii) $50,000 for the payment of fees for an official committee of unsecured creditors, from the Petition Date through May 6, 2016. In addition, as customary in Chapter 11 cases, the Interim DIP Order provides that the Carve-Out is senior in priority to, among other things, the Secured Parties' liens and the rights of any successor trustee or estate representative in the Chapter 11 Case or any subsequent chapter 7 proceeding if the Case is converted to a case under chapter 7 of the Bankruptcy Code.

On April 19, 2016, the Equity Committee filed the *Omnibus Response of the Official Committee of Equity Security Holders to Debtor's (A) Motion to Approve Postpetition Financing and Cash Collateral Use and Related Relief and (B) Motion to Approve Bid Procedures* [D.I. 137] (the "EC DIP Objection"), which, among other things, raised concerns regarding the amount budgeted for Equity Committee's professional fees.

On April 21, 2016, with the consent of the Equity Committee and the Secured Parties, the Court entered the *Second Interim Order (I) Authorizing the Debtor to Obtain Post-Petition*

---

[5] This figure excludes amounts budgeted for the Debtor's investment banker, Sagent Advisors, LLC, and Notice, Claims and Balloting Agent.

*Secured Financing Pursuant to 11 U.S.C. § 364, (II) Authorizing the Debtor's Limited Use of Cash Collateral Pursuant to 11 U.S.C. §§ 361, 362, 363 and 364 and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001* [D.I. 154] (the "<u>Second Interim DIP Order</u>"). The Second Interim DIP Order increased the Debtor's authorization to borrow under the DIP Facility to $2.4 million and extended various deadlines and milestones for the conduct of the Sale and related matters.

On April 29, 2016, with the consent of the Equity Committee and the Secured Parties, the Court entered the *Third Interim Order (I) Authorizing the Debtor to Obtain Post-Petition Secured Financing Pursuant to 11 U.S.C. § 364, (II) Authorizing the Debtor's Limited Use of Cash Collateral Pursuant to 11 U.S.C. §§ 361, 362, 363 and 364 and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001* [D.I. 180] (the "<u>Third Interim DIP Order,</u> together with the Interim DIP Order and the Second Interim DIP Order, the "<u>Interim DIP Orders</u>"). The Third Interim DIP Order extended various deadlines and milestones under the DIP Facility and in connection with the Sale.

In total, the Debtor borrowed approximately $2.3 million from the Postpetition Lender under the DIP Facility, as approved by the Interim DIP Orders. The Debtor was permitted to utilize the proceeds thereof for general corporate purposes, including the payment of professional fees and DIP Facility expenses in accordance with the budget for the Debtor's receipts and disbursements during the Chapter 11 Case (as amended, updated or modified, the "<u>DIP Budget</u>"), which is attached to the Interim DIP Order as **Exhibit A**. The Interim DIP Orders expired pursuant to their terms on May 6, 2016. The Debtor had no authority to utilize the Secured Parties' cash collateral outside of the DIP Budget following the expiration of the Interim DIP Orders. The Equity Committee never prosecuted the EC DIP Objection.

      **2.4.4**   **The Pursuit of a Sale Transaction.** As explained above, the Debtor filed its Chapter 11 Case to engage in a process to sell substantially all of its assets so that it could maximize the value of its Estate for the benefit of all of its constituents and preserve its ongoing business. To that end, on the Petition Date, the Debtor filed the *Debtor's Motion for Entry of Orders: (A)(I) Approving Bid Procedures Relating to Sale of Substantially All of the Debtor's Assets; (II) Approving Certain Bid Protections; (III) Scheduling a Hearing to Consider the Sale; (IV) Approving the Form and Manner of Notice of Sale by Auction; (V) Establishing Notice and Contract Procedures for the Assumption and Assignment of Contracts and Leases; and (VI) Granting Related Relief; and (B)(I) Approving Asset Purchase Agreement and Authorizing the Sale of Certain Assets of Debtor Outside the Ordinary Course of Business; (II) Authorizing the Sale of Assets Free and Clear of All Liens, Claims, Encumbrances and Interests; (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (IV) Granting Related Relief* [D.I. 15] (the "<u>Sale Motion</u>"). Through the Sale Motion, the Debtor sought Bankruptcy Court approval of the sale of substantially all of its assets (the "<u>Sale</u>") to the entity determined to have submitted the highest or otherwise best bid in accordance with the bid procedures and the approval of the proposed stalking horse bid in the amount of $22.7 million (the "<u>Stalking Horse Bid</u>") by an entity formed by Mr. Saverin, Jumio Acquisition, LLC (the "<u>Stalking Horse Bidder</u>").

On April 21, 2016, the Bankruptcy Court entered the *Order (A) Approving Bid Procedures and Expense Reimbursement Relating to the Sale of the Debtor's Assets; (B) Scheduling a Hearing to Consider the Sale; (C) Approving the Form and Manner of Notice of Contract Procedures for the Assumption and Assignment of Contracts and Leases; and (E) Granting Related Relief* [D.I. 155] (the "Bid Procedures Order"). The Bid Procedures Order approved, among other things, (i) the procedures for the Debtor to solicit and obtain the highest or otherwise best bid for its assets through an auction process and (ii) the Stalking Horse Bidder's requested reimbursement of documented, out-of-pocket expenses in an amount up to $300,000 in the event it was not the successful bidder following the auction, subject to the terms of the Stalking Horse Bid (the "Expense Reimbursement").

On May 4, 2016, the Equity Committee filed the *Objection of the Official Committee of Equity Security Holders to Sale of Substantially All of the Debtor's Assets* [D.I. 191] (the "Sale Objection") objecting on the grounds that, among other things, the proposed Sale included a release of certain claims against the Stalking Horse Bidder and other entities.

On May 5, 2016, the Debtor conducted an auction in connection with the Sale (the "Auction"). The Debtor and the Stalking Horse Bidder could not resolve the Equity Committee's Sale Objection at the Auction and the Stalking Horse Bidder withdrew its bid. The Debtor and its professionals worked with other interested parties at the Auction and were able to negotiate another bid with an entity formed by Centana Growth Partners, Jumio Buyer Inc. (the "Buyer").

On May 6, 2016, the Court entered an order approving the Sale Motion [D.I. 202] (the "Sale Order"). The Sale Order authorized, among other things, the Debtor to sell substantially all of its assets to the Buyer pursuant to that certain Asset Purchase Agreement dated May 6, 2016, by and between the Debtor, as the seller, and the Buyer, as the buyer, (the "APA"). Pursuant to the APA, the Buyer was obligated to pay cash equal to $850,000 less certain agreed cure costs totaling no more than $300,000 and assume all liabilities of operating the business from and after May 9, 2016. In addition, the Sale preserved for the benefit of the Debtor's Estate potential claims against the Secured Parties, certain then-current members of the Debtor's board of directors and others (the "Preserved Claims"), including those that initially had been proposed to be purchased by the Stalking Horse Bidder. The Preserved Claims include, without limitation, potential claims against Mr. Saverin as prepetition lender, equity holder and former member of the Debtor's board of director; AH, as prepetition lender, equity holder and board member-designee; Scott Weiss and Peng T. Ong, as members of the Debtor's board of directors; and all other current and former officers and directors including, but not limited to, Mattes, Kastenhofer and Starkey.

The Sale Order provides, among other things, that notwithstanding anything to the contrary in the Third Interim DIP Order, the Debtor may use the cash from the Sale and any other cash in the Debtor's Estate to pay all accrued outstanding obligations in the DIP Budget through May 6, 2016. The Sale Order also required the transfer of all amounts in the DIP Budget for accrued professional fees and expenses of the Debtor's professionals, which are to be paid upon interim and/or final approval of all such fees and expenses by the Bankruptcy Court.

At the May 6, 2016 hearing, following further negotiations between the Equity Committee, the Secured Parties and the Debtor, the Secured Parties agreed that the line item in the DIP Budget for a $50,000 Carve-Out in favor of an official committee of unsecured creditors could be used for the Equity Committee's professionals. The Equity Committee requested the Debtor use this $50,000 to pay for the preservation of the Debtor's records and electronic data.

On May 9, 2016, the sale to the Buyer closed (the "Closing"). At Closing, and pursuant to the terms of the APA, the Buyer paid to the Estate $610,196.16 in cash. Pursuant to the Sale Order, the Secured Parties' liens and secured claims (including the Postpetition Lenders' claims in connection with the DIP Facility) attached to the cash sale proceeds.

Following the Closing and in accordance with the Sale Order, all accrued professional fees and expenses of the Debtor's professionals were wired to LRC's client trust account to be paid upon approval of such fees and expenses.

   2.4.5   **The Motion to Convert**.   After the Closing of the Sale, the Debtor worked quickly to reconcile the Debtor's pre-closing financial records in order to determine cash on hand and its future cash needs. In addition, the Debtor analyzed its post-petition obligations and claims that would need to be satisfied in connection with a potential plan of liquidation. In connection therewith, the Debtor prepared a liquidating plan term sheet (the "Plan Term Sheet"), which would resolve the Preserved Claims, provide cash collateral use sufficient for the Debtor to propose and confirm a liquidating plan, and provide "seed money" for an estate representative to pursue the claims and causes of action that remain in the Estate. The Debtor discussed with counsel to the Secured Parties, AH and the Equity Committee the potential consensual resolution of the case and the Plan Term Sheet. Despite the Debtor's efforts, however, the parties were unable to reach agreement. Accordingly, without the use of cash collateral or cash sufficient to confirm a liquidating plan, the Debtor had no alternative other than to seek conversion of this case to Chapter 7 so that a trustee could determine how best to monetize and distribute the Preserved Claims and other assets remaining in the Estate. To that end, on May 27, 2016, the Debtor filed the *Debtor's Motion to Convert this Case to Chapter 7 of the Bankruptcy Code* [D.I. 236] (the "Motion to Convert").

The Motion to Convert originally was scheduled to be heard by the Bankruptcy Court on June 20, 2016. It was continued by the Bankruptcy Court to July 25, 2016. While the Motion to Convert was pending, the parties continued to negotiate a consensual resolution of this Chapter 11 Case and, ultimately, the Global Settlement was reached. Accordingly, the Motion to Convert has been continued indefinitely while the Debtor proceeds with seeking confirmation of the Plan and approval of the Global Settlement contained therein.

   2.4.6   **The Bar Date Motion.**   On August 15, 2016, the Bankruptcy Court entered the *Order Granting Motion of the Debtor for* Entry *of an Order (A) Establishing Bar Dates for Filing Proofs of Claim; (B) Approving the Form and Manner for Filing Proofs of Claim; and (C) Approving Notice Thereof* [D.I. 316] (the "Bar Date Order"). Pursuant to the Bar Date Order, each person or Entity asserting (i) a Claim against the Debtor that arose (or was deemed to have arisen) before the Petition Date and/or (ii) any right to payment constituting a cost or expense of administration of the Debtor's Chapter 11 Case under Bankruptcy Code

sections 503(b) and 507(a)(2) against the Debtor that arose, accrued, or otherwise became due and payable or may have arisen, accrued or otherwise become due and payable at any time during the period from the Petition Date through and including July 31, 2016, are required to file proofs of claim against the Debtor on or before September 16, 2016 at 4:00 p.m. (Eastern Time). Additionally, pursuant to the Bar Date Order, the Bankruptcy Court has established September 19, 2016 at 4:00 p.m. (Eastern Time) as the deadline for all governmental units holding claims (whether secured, unsecured priority or unsecured non-priority) that arose (or are deemed to have arisen) before the Petition Date to file proofs of claim, including claims for unpaid taxes, whether such claims arise from prepetition tax periods or prepetition transactions to which the Debtor was a party.

To date, twelve (12), Claims (including Administrative Claims) have been filed.

      **2.4.1**   **Schedules and SOFAs.**   On April 20, 2016, the Debtor filed its *Statements of Financial Affairs* [Docket No. 146; 148] and *Schedule of Assets and Liabilities* [Docket No. 147; 149] (as amended or modified and together as, the "Schedules and Statements").

      **2.4.2**   **The Equity Committee.**   On April 15, 2016, the Office of the United States Trustee (the "U.S. Trustee") appointed the Official Committee of Equity Security Holders in the Chapter 11 Case (the "Equity Committee") consisting of: Buttonwood Alpha QP Fund LLC ("Buttonwood"); Turner Investment Fund XI, LLC ("Turner"); 137 Ventures II, LP; Pinnacle Ventures Equity Fund II, L.P.; and City Ventures, Inc. [D.I. 132].   The Equity Committee engaged the law firms K&L Gates LLP ("KL") and Pachulski Stang Ziehl & Jones LLP ("PSZY") as its counsel and EisnerAmper LLP ("EA") as its financial advisor.

On May 11, 2016, the Equity Committee filed the following retention applications: (a) *Application of the Official Committee of Equity Security Holders for Entry of an Order Authorizing the Employment and Retention of K&L Gates LLP as its General Bankruptcy Counsel Nunc Pro Tunc to April 15, 2016* [D.I. 209]; (b) *Application of Official Committee of Equity Security Holders for Order, Pursuant to 11 U.S.C. §§ 328 and 1103, Fed. R. Bankr. P. 2014, and Local Rules 2014-1, Authorizing and Approving the Employment and Retention of Pachulski Stang Ziehl & Jones LLP as Co-Counsel to the Official Committee of Equity Security Holders Nunc Pro Tunc to April 15, 2016* [D.I. 210] and (c) *Application of the Official Committee of Equity Security Holders for an Order Approving the Employment and Retention of EisnerAmper LLP as Financial Advisor to the Official Committee of Equity Security Holders Nunc Pro Tunc to April 16, 2016* [D.I. 211] (collectively, the "EC Retention Applications").

### 2.5   SECURED CLAIMS ENCUMBERING THE DEBTOR'S PROPERTY.

      **2.5.1**   **The Prepetition Secured Notes Claims**. As explained above, prior to the Petition Date, the Debtor issued six (6) Prepetition Secured Notes to the Prepetition Secured Noteholders that totaled $15,493,727.74 in the aggregate. As of the Petition Date, the Debtor owed the Prepetition Secured Noteholders $15,765,819 on account of the Prepetition Secured Notes and the interest accrued thereon (the "Prepetition Secured Notes Claims"). The Prepetition Secured Notes are secured by liens on and security interests in substantially all of the Debtor's assets, including Cash Collateral.

2.5.2    **The DIP Claims**.  In addition to the Prepetition Secured Notes Claims, the Debtor owes the Postpetition Lender $2,328,538, plus additional interest accrued since the Closing under the DIP Facility (the "DIP Claims").  The DIP Claims are secured by perfected first priority, senior priming liens on all of the property of the Debtor's property, subject to the Carve-Out.

## 2.6    ADMINISTRATIVE CLAIMS.

2.6.1    **Administrative Claims**. Administrative Claims are Claims that are incurred in the ordinary course of the business during the pendency of the Debtor's case on or before the Effective Date.  The Debtor estimates such Administrative Claims, excluding Fee Claims and the Expense Reimbursement, as of the date hereof, to be approximately $50,000.00.

2.6.2    **The Saverin Administrative Claim**.  As explained above, pursuant to the Bid Procedures Order, Jumio Acquisition, LLC holds a superpriority administrative claim in the amount of all reasonable, documented out-of-pocket expenses incurred in connection with the Sale up to $300,000 on account of the court-approved Expense Reimbursement (the "Saverin Administrative Claim").

2.6.3    **Fee Claims.** Fee Claims are Administrative Claims for the compensation of the Debtor's or the Equity Committee's professionals or other entities for professional services rendered or expenses incurred in the Debtor's case on or before the Effective Date.  All payments to Professionals for Fee Claims will be made in accordance with the procedures established in the Bankruptcy Code, the Bankruptcy Rules, the United States Trustee Guidelines and the Bankruptcy Court relating to the payment of interim and final compensation for services rendered and reimbursement of expenses, subject to the terms of the Global Settlement as discussed below in Section 3.9 of this Disclosure Statement. The Bankruptcy Court will review and determine all applications for compensation for services rendered and reimbursement of costs.

## 2.7    UNSECURED CLAIMS AGAINST THE DEBTOR.

2.7.1    **Unsecured Priority Claims.** According to the Debtor's Schedules and certain Claims filed to date, the Debtor allegedly owes approximately $2,400 on account of tax Claims entitled to priority pursuant to Bankruptcy Code Section 507(a)(8).  The Debtor believes that there are no valid Priority Claims outstanding for employee wages and benefits.

2.7.2    **Unsecured Nonpriority Claims.** The Debtor's Schedules reflect unsecured nonpriority Claims against the Debtor in the approximate amount of $543,000, plus certain unknown amounts scheduled as contingent, unliquidated and disputed.  Additionally, pursuant to the Sale, the Buyer satisfied approximately $150,000 of Claims asserted against the Debtor.  In light of this and based on the Debtor's preliminary review of the remaining scheduled and filed Claims, the Debtor estimates General Unsecured Claims total approximately $390,000.

III.    **SUMMARY OF THE PLAN OF LIQUIDATION.**

3.1    **IN GENERAL.**

The Plan provides for the liquidation and distribution of all of the Debtor's Assets to all holders of Allowed Claims and Allowed Interests pursuant to the terms of the Plan and the Liquidating Trust Agreement.  The distributions contemplated under the Plan will be derived from the proceeds of the Sale, the Global Settlement and the Causes of Action to be pursued by the Liquidating Trustee.

If the Plan is confirmed by the Bankruptcy Court and consummated, except with respect to Administrative Claims that are Fee Claims, the Saverin Administrative Claim or DIP Claims, and except to the extent a holder of an Allowed Administrative Claim and the Debtor agree to less favorable treatment, Allowed Administrative Claims and any statutory fees due and owing to the U.S. Trustee at the time of Confirmation (the "Statutory Fees") will be paid in full in Cash on the Effective Date or as soon thereafter as practicable.

Pursuant to the Global Settlement, Mr. Saverin has agreed to defer payment on the Saverin Administrative Claim until payment in full of Allowed Unimpaired Claims. Additionally, Mr. Saverin has agreed that any distribution made on account of the Saverin Administrative Claim shall be distributed *pro rata* to holders of Common Interests (including Preferred Interests converted to Common Interests pursuant to the Plan) who do not opt-out of the Consensual Third Party Releases.  The Allowed Saverin Administrative Claims shall be paid in full, to the extent funds are available therefor, from Liquidating Trust Net Distributable Assets, after payment in full of the Allowed Prepetition Secured Notes Claims and prior to any distributions on account of Common Interests (including Preferred Interests converted to Common Interests pursuant to the Plan).  Additionally, pursuant to the Global Settlement, Mr. Saverin has agreed to defer payment on the DIP Claims, which shall be allowed in the full principal amount thereof (including applicable accrued interest and any fees and expenses arising under the DIP Facility through the date of full payment on the DIP Claims), until the payment in full of all Allowed Unimpaired Claims.  The Allowed DIP Claims shall be paid in the manner set forth in the Global Settlement explained below in section 3.9.2.

With respect to holders of Allowed Priority Tax Claims, such holders will receive, on the Distribution Date, at the option of the Debtor, either: (i) Cash in full, plus interest; (2) Cash in installment payments over a period of time not to exceed five years after the Petition Date in the total amount of such Claim, plus interest; or (3) such other treatment as may be agreed upon between the holder and the Debtor or as determined by the Bankruptcy Court.

All other Allowed Claims and Allowed Interests will receive a distribution as set forth below in sections 3.2, 3.3 and 3.4.

3.2    **CLASSIFICATION OF CLAIMS AND INTERESTS.**

3.2.1    **Class 1: Priority Non-Tax Claims.**  This Class consists of all Priority Non-Tax Claims, which are any Claim against the Debtor, other than an Administrative Claim, Saverin Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under Bankruptcy Code section 507(a).  Class 1 is Unimpaired by the Plan, and each holder of a

Class 1 Priority Non-Tax Claim is conclusively presumed to have accepted the Plan pursuant to Bankruptcy Code section 1126(f).

**3.2.2    Class 2: Other Secured Claims.**  This Class consists of all Secured Claims that are not DIP Claims or Prepetition Secured Notes Claims, which are either (i) secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to Bankruptcy Code section 553, to the extent of the value of the creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to Bankruptcy Code section 506(a) or (ii) Allowed as such pursuant to the Plan.  Class 2 is Unimpaired by the Plan, and each holder of a Class 2 Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to Bankruptcy Code section 1126(f).

**3.2.3    Class 3: Prepetition Secured Notes Claims.**  This Class consists of all Claims arising under or related to the Prepetition Secured Notes.  Class 3 is Impaired by the Plan and the Global Settlement.

**3.2.4    Class 4: General Unsecured Claims.**  This Class consists of all Allowed Claims that (i) are neither Secured nor entitled to priority under the Bankruptcy Code or an order of the Bankruptcy Court and (ii) are not an Administrative Claim, a Fee Claim, a Saverin Administrative Claim, a DIP Claim a Priority Tax Claim, a Priority Non-Tax Claim, an Other Secured Claim, or a Prepetition Secured Notes Claim.  Class 4 is Unimpaired by the Plan, and each holder of a Class 4 General Unsecured Claim is conclusively presumed to have accepted the Plan pursuant to Bankruptcy Code section 1126(f).

**3.2.5    Class 5: Common Interests & Subordinated 510(b) Claims.**  This Class consists of (i) interests related to Common Stock (as defined in the Certificate of Incorporation), (ii) all Preferred Stock (as defined in the Certificate of Incorporation) converted to Common Stock pursuant to the Plan and (iii) all Subordinated 510(b) Claims.  Class 5 is Unimpaired by the Plan, and each holder of a Class 5 Allowed Common Interest and Allowed Subordinated 510(b) Claim is conclusively presumed to have accepted the Plan pursuant to Bankruptcy Code section 1126(f).

**3.3    TREATMENT OF UNIMPAIRED CLAIMS AND CLASSES.**

**3.3.1    Administrative Claims.**  Except with respect to Administrative Claims that are Fee Claims, Saverin Administrative Claims or DIP Claims, and except to the extent that a holder of an Allowed Administrative Claim and the Debtor agree to less favorable treatment with respect to such holder, each holder of an Allowed Administrative Claim shall be paid in full in Cash.  Such Claims shall be paid on the earlier of (a) the Effective Date if such Administrative Claim is Allowed as of the Effective Date or (b) on or as soon as reasonably practicable after the date such Administrative Claim is Allowed, if such Administrative Claim is not Allowed as of the Effective Date.

**3.3.2    Priority Tax Claims.**  Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in exchange for full and final

satisfaction, settlement, and release of each Allowed Priority Tax Claim, each holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive, on the Distribution Date, at the option of the Debtor, one of the following treatments: (i) Cash in an amount equal to the amount of such Allowed Priority Tax Claim, plus interest at the rate determined under applicable non-bankruptcy law and to the extent provided for by Bankruptcy Code section 511; (2) Cash in an aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period of time not to exceed five years after the Petition Date, pursuant to Bankruptcy Code section 1129(a)(9)(C), plus interest at the rate determined under applicable non-bankruptcy law and to the extent provided for by Bankruptcy Code section 511; or (3) such other treatment as may be agreed upon by such holder and the Debtor or otherwise determined upon an order of the Bankruptcy Court.

   **3.3.3   Class 1: Priority Non-Tax Claims.**  Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, and release of each Allowed Priority Non-Tax Claim, each holder of such Allowed Priority Non-Tax Claim shall be paid in full in Cash.  Allowed Priority Non-Tax Claims shall be paid on or as reasonably practicable after the later of (i) the Effective Date, (ii) the date on which such Priority Non-Tax Claim against the Debtor becomes an Allowed Priority Non-Tax Claim or (iii) such other date as may be ordered by the Bankruptcy Court.

   **3.3.4   Class 2: Other Secured Claims.**  Except to the extent that a holder of an Allowed Other Secured Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, and release of each Allowed Other Secured Claim, each holder of an Allowed Other Secured Claim shall either (a) be paid in full in Cash on the later of the Effective Date or the date such Claim becomes an Allowed Claim; (b) receive all Collateral in possession of the Debtor securing the respective holder's Allowed Other Secured Claim or (c) such other treatment as the Liquidating Trustee or Debtor and such Creditor agree to in writing.

   **3.3.5   Class 4: General Unsecured Claims.**  Except to the extent that a holder of an Allowed General Unsecured Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, and release of each Allowed General Unsecured Claim, each holder of such Allowed General Unsecured Claim shall be paid in full, plus the applicable interest, on the Effective Date or soon thereafter as reasonably practicable.

   **3.3.6   Class 5: Common Interests & Subordinated 510(b) Claims.**  Pursuant to the Global Settlement, section IV.E of the Plan and pursuant to Section 4(ii) of the Certificate of Incorporation, on the Effective Date, all Preferred Interests, shall be deemed converted to Common Interests, and all Common Interests resulting from the conversion of such Preferred Interests shall be entitled to the same treatment as holders of other Allowed Common Interests under the Plan.  Holders of Allowed Common Interests (including Preferred Interests converted to Common Interests pursuant to the Plan) who do not opt-out of the Consensual Third Party Releases shall be entitled, to the extent of Liquidating Trust Net Distributable Assets, to a *pro rata* share of any distributions made on account of the Allowed Saverin Administrative Claim and/or the Allowed Prepetition Secured Notes Claims.  Additionally, holders of Allowed Common Interests (including Preferred Interests converted to Common Interests pursuant to the Plan) and Allowed Subordinated 510(b) Claim, regardless of whether such holder opts-out of the Consensual Third Party Releases, shall be entitled to a *pro rata* share of all Liquidating Trust Net

Distributable Assets remaining after full and indefeasible payment of the Allowed Prepetition Secured Notes Claims and Allowed Saverin Administrative Claim; provided, however, that Common Interests (including Preferred Interests converted to Common Interests pursuant to the Plan) of Mr. Saverin and AH that are waived pursuant to the Global Settlement shall not participate in such distributions.

### 3.4    TREATMENT OF IMPAIRED CLASSES.

**3.4.1    Saverin Administrative Claim.**  Pursuant to the Global Settlement and with the consent of Mr. Saverin, payment on the Allowed Saverin Administrative Claim shall be deferred until payment in full of Allowed Unimpaired Claims.  In addition, pursuant to the Global Settlement and with the consent of Mr. Saverin, any distribution made on account of the Allowed Saverin Administrative Claim shall be distributed *pro rata* to holders of Common Interests (including Preferred Interests converted to Common Interests pursuant to the Plan) who do not opt-out of the Consensual Third Party Releases.  The allowed Saverin Administrative Claims shall be paid in full, to the extent funds are available therefor, from Liquidating Trust Net Distributable Assets, after payment in full of the Allowed Prepetition Secured Notes Claims and prior to any distributions on account of Common Interests (including Preferred Interests converted to Common Interests pursuant to the Plan).

**3.4.2    DIP Claims.**  Pursuant to the Global Settlement, (a) the DIP Claims are allowed in the full principal amount thereof, including accrued interest at the rate provided for in the applicable documents through the date on which the DIP Claims are paid in full and  all fees and expenses arising under such documents; (b) the Allowed DIP Claims shall be paid after the payment in full of all Allowed Unimpaired Claims and (c) all distributions on account of such Allowed DIP Claims shall be made as set forth in Article III of the Plan.

**3.4.3    Class 3: Prepetition Secured Notes Claims.**  Pursuant to the Global Settlement, Mr. Saverin has agreed to subordinate payment of the Allowed Prepetition Secured Notes Claims to payment in full of all Allowed Unimpaired Claims.  After satisfaction of all Allowed Unimpaired Claims, the Allowed Prepetition Secured Notes Claims shall be entitled to full payment from the Liquidating Trust Net Distributable Assets, to the extent funds are available therefor, prior to any distributions on account of the Allowed Saverin Administrative Claim and prior to any distributions on account of Common Interests (including Preferred Interests converted to Common Interests pursuant to the Plan), provided that any distributions on account of the Allowed Prepetition Secured Notes Claims shall be made to holders of Allowed Common Interests (including Preferred Interests converted to Common Interests pursuant to the Plan) that do not opt-out of the Consensual Third Party Releases.

### 3.5    IMPLEMENTATION OF THE PLAN.

#### 3.5.1    Liquidating Trust.

**(a) Creation of Liquidating Trust.**  On the Effective Date, the Liquidating Trust shall be created in accordance with the Liquidating Trust Agreement and funded by the Debtor's transfer to the Liquidating Trust of the Liquidating Trust Assets.  The Liquidating Trust

shall be a newly-formed Delaware trust with no prior assets or liabilities. The Liquidating Trustee shall serve as the trustee of the Liquidating Trust.

(b) **Transfers to the Liquidating Trust.** On the Effective Date, the Debtor and its Estate shall transfer and shall be deemed to have irrevocably transferred to the Liquidating Trust, the Liquidating Trust Assets, which transfer shall be free and clear of Claims and Liens and contractually imposed restrictions except as otherwise provided in the Plan.

(c) **The Liquidating Trustee.** From and after the Effective Date, the Liquidating Trust Board shall appoint the Liquidating Trustee pursuant to the Liquidating Trust Agreement, Plan, and Confirmation Order, until death, resignation or discharge and the appointment of a successor Liquidating Trustee in accordance with the terms of the Liquidating Trust Agreement. The Liquidating Trustee shall be the exclusive trustee of the Debtor's Estate under Title 11 for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 601(b)(3).

(d) **Responsibilities of the Liquidating Trustee.** The responsibilities of the Liquidating Trustee under the Liquidating Trust Agreement and the Plan shall include those set forth in the Liquidating Trust Agreement, including, without limitation, the following (a) the receipt of the Liquidating Trust Assets; (b) the establishment and maintenance of such operating, reserve and trust account(s) as are necessary and appropriate to carry out the terms of the Liquidating Trust; (c) the investment of Cash; (d) the pursuit of objections to, estimation of and settlements of Claims and Interests, regardless of whether such Claim or Interest is listed on the Debtor's Schedule, other than the Claims or Interests that are Allowed pursuant to the Plan; (e) the prosecution of any cause of action of the Debtor's Estate not otherwise released under the Plan; (f) unless otherwise provided in the Plan, the calculation and distribution of all distributions to be made under the Plan to holders of Allowed Claims and Allowed Interests; (g) the payment of fees pursuant to 28 U.S.C. § 1930 incurred after the Effective Date until the closing of the Chapter 11 Case; (h) to respond to reasonable requests for information regarding the administration of the Liquidating Trust made by parties in interest; and (i) such other responsibilities as may be vested in the Liquidating Trustee pursuant to the Plan, the Liquidating Trust Agreement, the Confirmation Order, other Bankruptcy Court Orders, or as otherwise may be necessary and proper to carry out the provisions of the Plan. The Liquidating Trustee shall be responsible for the filing of all required tax returns and operating reports and paying of taxes due from the Debtor's Estate or the Liquidating Trust and all other obligations on behalf of the Liquidating Trust, if any.

(e) **Powers of Liquidating Trustee.** The powers of the Liquidating Trustee, as set forth in the Liquidating Trust Agreement shall include, without limitation and without further Bankruptcy Court approval, each of the following:

    i.    To exercise in a manner not inconsistent with the Plan all power and authority that may be or could have been exercised, commence all proceedings that may be or could have been commenced and take all actions that may be or could have been taken by any member, officer, director or shareholder of the Debtor with like effect as if authorized, exercised and taken by unanimous action of such officers, directors and shareholders, including, without limitation, the dissolution of the Debtor;

ii.    To maintain accounts, to make distributions to holders of Allowed Claims and Allowed Interests provided for or contemplated in the Plan; and take other actions consistent with the Plan and the implementation thereof, including the establishment, re-evaluation, adjustment and maintenance of appropriate reserves, in the name of the Liquidating Trustee;

iii.    Except to the extent set forth in the Plan, to object to any Claims or Interests, other than Fee Claims, to compromise or settle any Claims or Interests prior to objection without supervision or approval of the Bankruptcy Court, free of any restriction of the Bankruptcy Code, the Bankruptcy Rules, the local rules of the Bankruptcy Court, and the guidelines and requirements of the United States Trustee, other than those restrictions expressly imposed by the Plan, the Confirmation Order or the Liquidating Trust Agreement;

iv.    To make decisions, without further Bankruptcy Court approval, regarding the retention or engagement of professionals, employees and consultants by the Liquidating Trust and the Liquidating Trustee on the Estate's behalf and to pay the fees and charges incurred by the Liquidating Trustee on the Liquidating Trust's behalf on or after the Effective Date for fees and expenses of professionals (including those retained by the Liquidating Trustee), disbursements, expenses or related support services relating to the winding down of the Debtor and implementation of the Plan without application to the Bankruptcy Court;

v.    To (i) file, if necessary, any and all tax and information returns required with respect to the Liquidating Trust as a grantor trust pursuant to Treas. Reg. 1.671-4(a) or otherwise, (ii) make tax elections by and on behalf of the Liquidating Trust and (iii) pay taxes, if any, payable by the Liquidating Trust;

vi.    To take all other actions not inconsistent with the provisions of the Plan which the Liquidating Trustee deems reasonably necessary or desirable with respect to administering the Plan;

vii.    To collect any accounts receivable or other claims of the Debtor or Estate not otherwise disposed of pursuant to the Plan or the Confirmation Order, or sold to the Buyer pursuant to the Sale Order;

viii.    To implement and/or enforce all provisions of the Plan, including entering into any agreement or executing any document required by or consistent with the Plan, the Confirmation Order and the Liquidating Trust Agreement, and perform all of the Debtor's obligations thereunder;

ix.    To abandon in any commercially reasonable manner, including abandonment or donation to a charitable organization of its choice, any Liquidating Trust Asset if the Liquidating Trustee concludes they are no benefit to the Estate;

x.    Except as otherwise set forth in the Plan, to prosecute and/or settle Claims, without approval of the Bankruptcy Court, including Causes of Action and exercise, participate in or initiate any proceeding before the Bankruptcy Court or any other court of appropriate jurisdiction and participate as a party or otherwise in any administrative, arbitrative or other nonjudicial proceeding and pursue to settlement or judgment such actions;

xi.    To purchase or create and carry all insurance policies and pay all insurance premiums and costs the Liquidating Trustee deems necessary or advisable;

xii.    To collect and liquidate and/or distribute all Liquidating Trust Assets pursuant to the Plan, the Confirmation Order and the Liquidating Trust Agreement and administer the winding down of the Debtor's affairs;

xiii.    To hold any legal title to any and all of the Liquidating Trust Assets;

xiv.    If any of the Liquidating Trust Assets are situated in any state or other jurisdiction in which the Liquidating Trustee is not qualified to act as trustee, to nominate and appoint a Person duly qualified to act as trustee in such state or jurisdiction and require from each such trustee such security as may be designated by the Liquidating Trustee in its discretion; confer upon such trustee all the rights, powers, privileges and duties of the Liquidating Trustee hereunder, subject to the conditions and limitations of the Liquidating Trust Agreement, except as modified or limited by the Liquidating Trustee and except where the conditions and limitations may be modified by the laws of such state or other jurisdiction (in which case, the laws or the state or jurisdiction in which the trustee is action shall prevail to the extent necessary); require such trustee to be answerable to the Liquidating Trustee for all monies, assets and other property that may be received in connection with the administration of all property; and remove such trustee, with or without cause, and appoint a successor trustee at any time by the execution by the Liquidating Trustee of a written instrument declared such trustee removed from office, and specifying the effective date and time of removal;

xv.    Retain any and all Insurance Policies of the Debtor providing coverage with respect to Claims; and

xvi.    Exercise such other powers as may be vested in or assumed by the Liquidating Trustee pursuant to the Plan, the Liquidating Trust Agreement, the Confirmation Order, other orders of the Bankruptcy Court, or as may be necessary and proper to carry out the provisions of the Plan.

The Liquidating Trustee shall stand in the same position as the Debtor with respect to any claim the Debtor may have to an attorney-client privilege, the work-product doctrine, or any other privilege, and the Liquidating Trustee shall succeed to all of the Debtor's rights to preserve, assert or waive any such privilege.

(f) **Unclaimed Property of the Liquidating Trust.** The Liquidating Trustee shall establish the Unclaimed Property Reserve for all Unclaimed Property. Such Unclaimed Property shall be in held in a reserve, for a period of thirty (30) days, for the recipients of the beneficial interests in the Liquidating Trust entitled thereto under the terms of the Plan and the Confirmation Order. Once the distribution to Creditors or Interest holders becomes Unclaimed Property, the Liquidating Trustee shall, subject to the limitations set forth herein, (a) hold such Unclaimed Property in the Unclaimed Property Reserve solely for the benefit of such holder or holders which have failed to claim such Unclaimed Property; and (b) release the Unclaimed Property from the Unclaimed Property Reserve and deliver to the holder entitled thereto upon

presentation of proper proof by such holder of its entitlement thereto.  After the expiration of thirty (30) days, the holders of Allowed Claims or Allowed Interest theretofore entitled to such Unclaimed Property shall cease to be entitled thereto and shall be entitled to no further distribution under the Plan, and such Claims or Interests shall be deemed disallowed and expunged in their entirety and the funds shall be redistributed to the other holders of Allowed Claims and Allowed Interests in accordance with the terms of the Plan, the Confirmation Order and the Liquidating Trust Agreement.  Such funds shall not be subject to the escheat laws of any state.

(g) **Compensation of the Liquidating Trustee.**  The Liquidating Trustee shall be compensated as agreed upon by the Liquidating Trustee and the Liquidating Trust Board, pursuant to the terms of the Liquidating Trust Agreement.  Any professionals retained by the Liquidating Trustee shall be entitled to reasonable compensation for services rendered and reimbursement of expenses incurred, subject to approval by the Liquidating Trustee.  The payment of fees and expenses of the Liquidating Trustee and its professionals shall be made in the ordinary course of business and shall not be subject to Bankruptcy Court approval.

(h) **Sale Free and Clear of Liens.**  The sale or other disposition of any Liquidating Trust Assets by the Liquidating Trustee in accordance with the Plan and the Liquidating Trust Agreement shall be free and clear of any and all liens, claims, interests and encumbrances pursuant to Bankruptcy Code section 363(f).

(i) **Transfer Taxes.**  Any transfer of all or any portion of the Liquidating Trust Assets pursuant to the Plan shall constitute a "transfer under a plan" within the purview of Bankruptcy Code section 1146(c) and shall not be subject to any stamp tax or similar tax.

(j) **Causes of Action.**  The Liquidating Trustee shall have the sole right to pursue any existing or potential Cause of Action, except those previously waived or released by the Debtor or released pursuant to the Plan, by informal demand and/or commencement of litigation.

(k) **Effective Date.**  On the Effective Date, the Liquidating Trustee shall have the rights and powers set forth in the Plan in order to carry out and implement the purposes and intent of the Plan.

(l) **Records.**  On or prior to the Effective Date, the Debtor shall transfer to the Liquidating Trust all originals and/or copies of available documents and business records of the Debtor, to the extent they exist and are in the Debtor's possession.  The Liquidating Trustee shall uphold all of the Debtor's obligations under the Asset Purchase Agreement with respect to the documents transferred hereunder.  Except as provided in the Asset Purchase Agreement, the Liquidating Trust shall maintain such records until the earlier of: (a) the entry of a Final Decree in this Chapter 11 Case; or (b) five years from the filing of the Debtor's final tax returns.  Thereafter, said records may be destroyed or otherwise disposed of.  If the Liquidating Trustee seeks to destroy or otherwise dispose of any records of the Debtor's Estate prior to the time periods set forth in the Plan, the Liquidating Trustee shall be entitled to do so upon Final Order of the Bankruptcy Court after notice and a hearing.

(m) **Resignation of Officers and Directors**.   On the Effective Date, the members of the board of directors and officers of the Debtor shall be deemed to have resigned.

3.5.2   **Cancellation of Existing Securities**.   Except as otherwise provided in the Plan or any agreement, instrument or other document incorporated in the Plan, on the Effective Date, the obligations of the Debtor pursuant, relating or pertaining to any agreements, indentures, certificates of designation, bylaws or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtor (except such agreements, certificates, notes or other instruments evidencing indebtedness or obligations of the Debtor that are specifically Reinstated pursuant to the Plan) shall be released and discharged; provided, however, notwithstanding Confirmation or the occurrence of the Effective Date, any such indenture or agreement that governs the rights of the holder of a Claim against any Debtor or Interests shall continue in effect solely for purposes of enabling holders of Allowed Claims or Interests to receive distributions under the Plan as provided therein; *provided, further, however,* that the preceding provision shall not result in any expense or liability to the Debtor, except to the extent set forth in or provided for under the Plan.

3.5.3   **Preservation of Causes of Action**.   In accordance with Bankruptcy Code section 1123(b), the Liquidating Trustee may pursue the Causes of Action in its discretion, other than those released under the Plan.   The Liquidating Trustee expressly reserves all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.   Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Bankruptcy Court order, the Liquidating Trust expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to the Causes of Action upon, after or as a consequence of the Confirmation or Consummation.   In accordance with Bankruptcy Code section 1123(b)(3), the Liquidating Trustee may exclusively enforce any and all Causes of Action that are not released under the Plan.   The Liquidating Trustee shall have the exclusive right, authority and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw or litigate to judgment any Cause of Action and to decline to do any of the foregoing without further notice to or action, order or approval of the Bankruptcy Court.   Nothing in Article IV.C. shall be deemed to permit the commencement or prosecution of any cause of action that is released under the terms of the Plan.

Without limiting the breadth and generality of the foregoing paragraph, the Causes of Action set forth on Exhibit B to the Plan are expressly preserved for prosecution by the Liquidating Trust.

3.5.4   **Vesting of Assets**.   Except as otherwise explicitly provided in the Plan, on the Effective Date all property comprising the Debtor's Estate shall vest in the Liquidating Trust to the same extent such Assets were held by the Debtor, free and clear of all Claims, Liens, charges, encumbrances, rights and Interests of creditors and Interest holders, but subject to the terms of the Plan.   As of the Effective Date, the Liquidating Trustee may use, acquire and dispose of property and settle and compromise Claims and Interests subject only to the

restrictions expressly imposed by the Plan, the Liquidating Trust Agreement and the Confirmation Order.

### 3.5.5    Conversion of Preferred Interests.

On the Effective Date, and as part of the Global Settlement, Mr. Saverin as the majority holder of Series A Preferred Interests, AH as the majority holder of Series B Preferred Interests, and Mr. Saverin as the majority holder of Series C Preferred Interests shall be deemed to have voted to convert all Preferred Interests to Common Interests pursuant to the Certificate of Incorporation.   The Preferred Interests shall be converted pursuant to the restrictions and conditions of the Certificate of Incorporation.

### 3.6    FUNDING AND DISBURSEMENTS.

**3.6.1    No Separate Disbursing Agent.** The Liquidating Trustee shall make all distributions under the Plan on account of Allowed Claims against, and Allowed Interests in, the Debtor; provided, however, that all Allowed Fee Claims shall be paid out of the Professional Fee Claim Reserve.  Except as otherwise expressly set forth in the Plan, on the Effective Date, or as soon thereafter as practicable, the Liquidating Trustee shall make all distributions required pursuant to the Plan.   All other distributions or payments under the Plan shall be made by the Liquidating Trustee pursuant to the terms of the Plan, Confirmation Order and the Liquidating Trust Agreement.

**3.6.2    Reserves - Payment of Disputed Claims and Interests.** The Liquidating Trustee shall establish appropriate reserves, which shall be segregated and held by the Liquidating Trustee on and after the Effective Date for the payment of Disputed Claims to the extent they become Allowed Claims.   The Liquidating Trustee shall establish appropriate reserves, which shall be segregated and held by the Liquidating Trustee on and after the Effective Date for distributions on account of any Disputed Interests to the extent they become Allowed Interests.

**3.6.3    Cash Payments.** Cash payments made pursuant to the Plan shall be in U.S. funds, by the means agreed to by the payor and payee, including by check or wire transfer or, in the absence of an agreement, such commercially reasonable manner as the Liquidating Trustee shall determine in his or her sole discretion.

**3.6.4    Distribution for Allowed Claims and Allowed Interests.** Except as otherwise provided in the Plan or the Confirmation Order, or as otherwise ordered by the Bankruptcy Court, distributions to Allowed Claims or Allowed Interests shall be made on the Distribution Date, or as soon after as practicable.

No holder of a Disputed Claim shall have any Claim against the applicable Reserved Funds, the Liquidating Trustee, the Liquidating Trust, the Debtor or the Estate with respect to such Disputed Claim until such Disputed Claim becomes an Allowed Claim, and no holder of a Disputed Claim shall have any right to interest on such Disputed Claim except as provided in the Plan.  No holder of a Disputed Interest shall have any Claim against the applicable Reserved Funds, the Liquidating Trustee, the Liquidating Trust, the Debtor or the Estate with respect to such Disputed Interest until such Disputed Interest becomes an Allowed

Interest.

      **3.6.5**  **Interest and Charges**. Postpetition interest shall accrue and be paid on Allowed Claims. Unless otherwise set forth in any applicable contract, interest shall be at the Federal Judgment Rate. All interest earned on the funds held by the Liquidating Trust in any account shall be distributed with the distributions provided in the Plan.

      **3.6.6**  **Compliance with Tax Requirements**. In connection with the Plan, to the extent applicable, the Liquidating Trust shall comply with all tax withholding and reporting requirements imposed on it by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Liquidating Trust shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, including, without limitation, requiring that the holder of an Allowed Claim or Interest complete the appropriate IRS Form W-8 or IRS Form W-9, as applicable to each holder or establishing any other mechanisms they believe are reasonable and appropriate. The Liquidating Trust reserves the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support and other spousal awards, liens and encumbrances.

      The Liquidating Trust shall not be required to make distributions on any Allowed Claim or Allowed Interest if the holder thereof has not provided all documentation necessary to determine all tax withholding and reporting requirements for such Allowed Claim or Allowed Interest. To the extent such documentation is not provided within thirty (30) days of the respective Distribution Date, the distribution on such Allowed Claim or Allowed Interest shall be deemed Unclaimed Property.

      **3.6.7**  **Allocations**. Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

      **3.6.8**  **Fractional Dollars: *De Minimis* Distributions**. Notwithstanding any other provision of the Plan, the Liquidating Trustee shall not be required to make distributions or payments of fractions of dollars, and whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment made shall reflect a rounding down of such fraction to the nearest whole dollar. In addition, the Liquidating Trustee shall not be required to may any distribution in an amount less than $50.00. To the extent that such a distribution shall be called for as part of any interim distribution, the Liquidating Trustee shall establish a reserve for all distributions in the amount of less than $50.00 and shall, when and if the holder of a Claim or Interest is entitled to a distribution of $50.00 or more, make such distribution at such time. The Liquidating Trustee shall not be required to make any Final Distribution of less than $50.00 and all monies otherwise payable in such amount shall be paid to the other holders of Allowed Claims and Allowed Interests, in accordance with the terms of the Plan, the Confirmation Order and the Liquidating Trust Agreement.

**3.6.9   Delivery of Distributions to Holders of Allowed Claims and Allowed Interests.**  Distributions to holders of Allowed Claims and Allowed Interests shall be made at the address set forth in the Schedules unless such addresses are superseded by proofs of claim or interest or transfers of claims filed pursuant to Bankruptcy Rule 3001 or at the last known address of such holders if the Liquidating Trustee has been notified in writing of a change of address.  If the distribution to any holder of an Allowed Claim or Interest is returned to the Liquidating Trustee as undeliverable or otherwise unclaimed, such Unclaimed Property shall be held in a reserve as set forth in Section IV.6 of the Plan.

If there are any residual Unclaimed Property at the time of the dissolution of the Liquidating Trust, such residual Unclaimed Property shall be available for a subsequent Distribution or donated to a charitable organization at the sole discretion of the Liquidating Trustee.

**3.6.10   No Penalty Claims.**  Unless otherwise specifically provided for in the Plan or the Confirmation Order, no holder of any Claim will be entitled to allowance of, or to receive any payment on account of, any penalty arising with respect to or in connection with such Claim and any such penalty shall be deemed disallowed and expunged.

**3.6.11   Setoffs and Recoupment.**  The Liquidating Trust may, but shall not be required to, setoff against or recoup from any Claims of any nature whatsoever that the Debtor may have against the claimant pursuant to Bankruptcy Code section 558 or otherwise, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor or the Liquidating Trust of any such Claim it may have against the holder of such Claim.

Unless otherwise authorized by a Final Order, any holder of a Claim, other than a holder of a Governmental Claim, must assert any setoff rights against a Claim by the Debtor against such Entity by filing an appropriate motion seeking authority to setoff on or before the Confirmation Date or will be deemed to have waived and be forever barred from asserting any right to setoff against a Claim by the Debtor or Liquidating Trust, notwithstanding any statement to the contrary in a Proof of Claim or any other pleading or document Filed with the Bankruptcy Court or delivered to the Debtor.

**3.6.12   Distributions by the Liquidating Trust.**  The Liquidating Trustee shall not be obligated to make a distribution that would impair the ability of the Liquidating Trust to pay the expenses incurred by the Liquidating Trust.

**3.6.13   Claims Paid or Payable by Third Parties.**

**(a)   Claims Paid by Third Parties.**  The Liquidating Trust shall reduce in full a Claim, and such Claim shall be disallowed without a Claim objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not the Debtor or Liquidating Trust.  Subject to the last sentence of this paragraph, to the extent a holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not the Debtor or Liquidating Trust on account of such

Claim, such holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the Liquidating Trust, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such holder to timely repay or return such distribution shall result in the holder owing the Liquidating Trust annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen (14) day grace period specified above until the amount is repaid.

(b)     **Claims Payable by Third Parties.** No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to the Debtor's Insurance Policies until the holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Policy. To the extent that one or more of the Debtor's insurers agrees to satisfy in full or in part a Claim, then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

(c)     **Applicability of Insurance Policies.** Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable Insurance Policy.

### 3.7     EXECUTORY CONTRACTS AND UNEXPIRED LEASES.

**3.7.1     Assumption and Rejection of Executory Contracts and Unexpired Leases.** On the Effective Date, and except for Insurance Policies assumed hereunder, all Executory Contracts and Unexpired Leases shall be deemed rejected as of the Effective Date, unless such Executory Contract or Unexpired Lease: (i) was assumed or rejected previously by the Debtor; (ii) previously expired or terminated pursuant to its own terms; or (iii) is the subject of a motion to assume Filed on or before the Effective Date.

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the rejection of such Executory Contracts or Unexpired Leases pursuant to Bankruptcy Code sections 365(a) and 1123. Unless otherwise indicated, rejection of Executory Contracts and Unexpired Leases pursuant to the Plan shall be effective as of the Effective Date.

**3.7.2     Claims Based on Rejection of Executory Contracts or Unexpired Leases.** Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be Filed with the Bankruptcy Court within 30 days after the date of entry of an order of the Bankruptcy Court (including, but not limited to, the Confirmation Order) approving such rejection. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within such time will be automatically disallowed, forever barred from assertion and shall not be enforceable against the Debtor, the Debtor's Estate, its property or Liquidating Trust without the need for any objection by the Liquidating Trust or further notice to, or action, order or approval of the Bankruptcy Court. Claims arising from the rejection of the Debtor's Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Class 3 of the Plan.

**Rejection Claims for which a Proof of Claim is not timely Filed will be forever barred from assertion against the Debtor, its Estate, its property and the Liquidating Trust unless otherwise ordered by the Bankruptcy Court. Such Rejection Claims shall, as of the Effective Date, be subject to the permanent injunction set forth in Article VIII.H of the Plan.**

3.7.3   **Insurance Policies.**   All of the Debtor's Insurance Policies and any agreements, documents or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan. On the Effective Date, the Debtor shall be deemed to have assumed all Insurance Policies and any agreements, documents and instruments related thereto and assigned them to the Liquidating Trust.

3.7.4   **Indemnification Obligations.**   Except as otherwise provided in the Plan, the Confirmation Order, any and all Indemnification Obligations that the Debtor has pursuant to a contract, instrument, agreement, certificate of incorporation, by-law, comparable organizational document, including the Certificate of Incorporation, or other document or applicable law shall be rejected as of the Effective Date of the Plan, to the extent necessary.

## 3.8     RESOLUTION OF CLAIMS.

3.8.1   **Allowance of Claims and Interests.**   After the Effective Date, the Liquidating Trust shall have and retain any and all rights and defenses the Debtor had with respect to any Claim or Interest immediately before the Effective Date.

3.8.2   **Claims Administration Responsibilities.**   Except as otherwise specifically provided in the Plan, after the Effective Date, the Liquidating Trust shall have the sole authority: (i) to File, withdraw or litigate to judgment objections to (a) Claims and Interests; (b) to settle or compromise any Claim or Interest, that is a Disputed Claim or Interest without any further notice to or action, order or approval by the Bankruptcy Court; and (ii) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order or approval by the Bankruptcy Court.

3.8.3   **Estimation of Claims.**   Before or after the Effective Date, the Debtor or Liquidating Trust, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim or Interest that is contingent or unliquidated pursuant to Bankruptcy Code section 502(c) for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the Liquidating Trust may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

**3.8.4    Adjustment to Claims or Interests Without Objection.**  Any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, cancelled or otherwise expunged (including pursuant to the Plan), or any Claim or Interest whose treatment has been deemed modified by the Plan, or any Claim or Interest whose treatment has been agreed to by the Holder of such Claim or Interest, may be adjusted or expunged (including on the Claims Register, to the extent applicable) by the Liquidating Trust, without a Claims objection or any other notice or motion having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

**3.8.5    Time to File Objections to Claims.**  Any objection to Claims against the Debtor shall be Filed on or before the Claims Objection Deadline, which is defined in the Plan as the later of (a) 180 days after the Effective Date or (b) such other period of limitation as may be fixed by an order of the Bankruptcy Court for objecting to Claims against the Debtor.

**3.8.6    Disallowance of Claims.**  Except as provided herein or otherwise agreed, any and all Proofs of Claim or Interest Filed after the Claims Bar Date or Administrative Claims Bar Dates, as applicable, shall be deemed disallowed and expunged as of the Effective Date without any further notice to or action, order or approval of the Bankruptcy Court, and holders of such Claims may not receive any distributions on account of such Claims, unless on or before the Confirmation Hearing such late Claim has been deemed timely Filed by a Final Order.

**3.8.7    Amendments to Claims.**  On or after the Effective Date, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Liquidating Trust, unless the proposed amended Claim is for a lesser amount than the original Claim.  Absent such authorization, any new or amended Claim Filed shall be deemed disallowed in full and expunged without any further action.

**3.8.8    Alternative Claim Resolution Procedures.**  The Debtor may file, as part of the Plan Supplement, alternative dispute resolution-based claim resolution procedures applicable to certain contingent, unliquidated or disputed claims (which are disputed on grounds other than the amount of the Claim), which shall become part of the Plan and effective on the Effective Date.

**3.8.9    Tax Implications for Recipients of Distributions.**  Notwithstanding any other provision of the Plan, each Entity receiving a distribution of Cash or other consideration pursuant to the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on it by any Governmental Unit on account of the distribution, including income, withholding and other tax obligations.

**3.8.10    No Levy.**  Except as otherwise provided herein, distributions under the Plan on account of Allowed Claims or Allowed Interests shall not be subject to levy, garnishment, attachment or like legal process, so that each holder of an Allowed Claim or Allowed Interest shall have and receive the benefit of the distributions in the manner set forth in the Plan.

**3.8.11    Offer of Judgment.**  The Liquidating Trust is authorized to serve upon a holder of a Claim or Interest an offer to allow judgment to be taken on account of such Claim,

and pursuant to Bankruptcy Rule 7068 and 9014, Federal Rule of Civil Procedure 68 shall apply to such offer of judgment.  To the extent the holder of a Claim must pay the costs of the Liquidating Trust, after making of such offer, the Liquidating Trust is entitled to setoff such amounts against the amount of any distribution to be paid to such holder without any further notice or action, order or approval of the Bankruptcy Court.

      **3.8.12  Release of Liens Securing Disputed Claims.**  If a Secured Claim is a Disputed Claim, the holder of such claim shall be deemed to have released any Lien on its collateral, if any, pending determination of its Allowed Secured Claim, upon: (i) payment to the holder of such Disputed Claim the undisputed portion of such Secured Claim; and (ii) the placement of the disputed portion thereof into escrow.

      **3.8.13  No Distributions Pending Allowance.**  If an objection to a Claim or Interest or portion thereof is Filed, no payment or distribution provided under the Plan shall be made on account of such Claim or Interest or portion thereof unless and until such Disputed Claim becomes an Allowed Claim or Allowed Interest.

      **3.8.14  Distributions After Allowance.**  To the extent that a Disputed Claim or Disputed Interest ultimately becomes an Allowed Claim or Allowed Interest, distributions (if any) shall be made to the holder of such Allowed Claim or Allowed Interest in accordance with the provisions of the Plan.  As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Disputed Interest becomes a Final Order, the Liquidating Trust shall provide to the holder of such Claim or Interest the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim or Interest unless required under applicable bankruptcy law.

    **3.9**      **SETTLEMENT, RELEASE, INJUNCTION
AND RELATED PROVISIONS.**

      **3.9.1  Compromise and Settlement of Claims, Interests and Controversies.** Pursuant to Bankruptcy Code sections 363 and 1123 and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests and controversies relating to the contractual, legal and subordination rights that a holder of a Claim against or Interest in the Debtor may have against the Debtor with respect to any Allowed Claim or Interest or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtor, its Estate and holders, and is fair, equitable and reasonable.  In accordance with the provisions of the Plan, pursuant to Bankruptcy Code section 363 and Bankruptcy Rule 9019(a), without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date, the Liquidating Trust may compromise and settle Claims against the Estate and any Causes of Action against Entities that are Retained Causes of Action.

      **3.9.2  The Global Settlement.**  Pursuant to Bankruptcy Code sections 363 and 1123 and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits

provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of the claims and Causes of Action asserted or that could have been asserted by the Debtor and/or the Equity Committee (including but not limited to the Preserved Claims *solely* as against AH and the Saverin Parties) against AH and the Saverin Parties.  After extensive negotiations among the Debtor, the Equity Committee, AH, and Mr. Saverin, the parties reached an agreement resolving the aforementioned issues, approval of which is being sought pursuant to the Plan.  The terms of the Global Settlement are as follows:

- The Equity Committee, AH and Mr. Saverin agree to the treatment of the Claims and Interests as further set forth in the Plan, including, but not limited to, the treatment of the Allowed Saverin Administrative Claim, Allowed DIP Claims, and Allowed Prepetition Secured Notes Claims, Preferred Interests, and Common Interests.

- On the Effective Date, AH shall contribute $750,000 to the Debtor's Estate.

- On the Effective Date, Mr. Saverin shall be deemed to have contributed $750,000 to the Debtor's Estate on account of the Debtor's use of Mr. Saverin's cash collateral (for avoidance of doubt no additional contribution from Mr. Saverin is required under the Plan).

- Following the conversion of Preferred Interests into Common Interests, as further set forth in Article IV.E of the Plan, AH agrees that 75% of its Common Interests shall be deemed satisfied.  AH's remaining 25% of Common Interests and all of Mr. Saverin's Common Interests existing prior to the Effective Date (but excluding any Preferred Interests converted to Common Interests, which shall be deemed waived upon the occurrence of the Effective Date) shall share *pari passu* with all other Allowed Common Interests.

- All Liquidating Trust Remaining Assets, including the proceeds of any Retained Cause of Action asserted, brought or settled by the Liquidating Trust shall be distributed as follows: (i) until AH has been fully and indefeasibly paid $375,000, 33 1/3% to AH, 33 1/3% to Mr. Saverin to be applied to the DIP Claims, and 33 1/3% to the Liquidating Trust to be distributed pursuant to the Plan; (ii) after AH has been fully and indefeasibly paid $375,000 and until the DIP Claims have been fully and indefeasibly paid, 50% to Mr. Saverin to be applied to the DIP Claims, and 50% to the Liquidating Trust to be distributed pursuant to the Plan; and (iii) after the DIP Claims have been fully and indefeasibly paid, 100% to the Liquidating Trust to be distributed pursuant to the Plan.  Distributions of Liquidating Trust Net Distributable Assets shall be distributed: first, to fully and indefeasibly pay the Allowed Prepetition Secured Notes Claims, which shall be distributed to holders of Common Interests (including Preferred Interests converted to Common Interests pursuant to the Plan) that do not opt-out of the Consensual Third Party Releases; second, to fully and indefeasibly pay the Allowed Saverin Administrative Claim, which shall be distributed to holders of Common Interests (including Preferred Interests converted to Common Interests pursuant to the Plan) that do not opt-out of the Consensual Third Party Releases;

and third, distributed *pro rata* to holders of Common Interests (including Preferred Interests converted to Common Interests pursuant to the Plan) and Allowed Subordinated 510(b) Claims.

- It is a condition to the Global Settlement that AH and the Saverin Parties shall be released from all: (i) direct and derivative claims of the Debtor and its Estate, (ii) direct claims of Pinnacle and 137 Ventures and (iii) direct claims of all other holders of Unimpaired Claims and holders of Common Interests (including any holders of Preferred Interests that convert to Common Interests pursuant to the Plan) who do not timely exercise their opt-out rights with respect to the Consensual Third Party Releases.  It is a further condition to the Global Settlement that (a) Buttonwood and Turner shall not opt-out of the Consensual Third Party Releases and (b) no more than 15% of the shares owned by holders of Common Interests (including Preferred Interests that are converted to Common Interests under the Plan), calculated without regard to shares owned or held by members of the Equity Committee, AH and Mr. Saverin, shall opt-out of the Consensual Third Party Releases.

- The Debtor, the Liquidating Trust, AH, Saverin and the Equity Committee and its members agree that at no time shall any of them make, publish or communicate, or encourage any other person or entity to make, publish or communicate, any Disparaging remarks, comments, or statements concerning the one another or their Affiliates, or any of their respective directors, officers, employees, representatives, agents, or affiliates. "*Disparaging*" remarks, comments or statements are those that impugn the character, honesty, integrity, morality, or business acumen, business strategy, or abilities, or reflect negatively upon, the individual or entity being disparaged.  Nothing in this provision shall be construed to preclude truthful disclosures in response to lawful process as required by applicable law, regulation, or order or directive or authority of a court, governmental agency, or regulatory organization.

- The Liquidating Trust shall not interfere, nor shall it have any input or control over any of Mr. Saverin's or AH's direct claims against any third-party, provided, however, to the extent that AH, Mr. Saverin or the Liquidating Trust anticipates pursuing any against any other Entity, such parties agree to discuss in good faith a potential cooperation agreement.

- The Debtor shall make good faith efforts to obtain the consent of the insurer for the Debtor's director and officer insurance policy, UVA1466319.15 to the Global Settlement and the terms and conditions of the Plan.

- The Professionals all agree that all Allowed Fee Claims shall be satisfied as follows (and any Fee Claims in excess of such amounts – including an Fee Claims for services rendered before, on, or after the Effective Date – shall be deemed waived by the holders thereof):

- The Debtor's Allowed Fee Claims (LRC, EY, WH and Cooley) and the Equity Committee's Allowed Professional Fee Claims (KL, EA and PSZY) for allowed fees and expenses from the Petition Date through July 23, 2016 shall be paid out of the LRC Fee Escrow and $450,000 of Estate Cash (together with the cash sufficient to satisfy the Allowed Professional Fee Claims as identified and subject to the Winddown Budget (defined below), the "Professional Fee Funds"). To the extent not already transferred, all Professional Fee Funds shall be transferred to LRC's escrow account on the Effective Date.

- LRC's Allowed Fee Claim shall not exceed $650,000 for fees and expenses incurred from the Petition Date through July 23, 2016.

- The Equity Committee's Allowed Fee Claims (KL, EA and PSZY) shall not exceed $530,000 for allowed fees and expenses incurred from the Petition Date through July 23, 2016.

- The Debtor's Allowed Fee Claims (LRC, EY, WH and Cooley) for allowed fees and expenses from July 24, 2016 through the Effective Date shall be capped pursuant to the line item amounts identified the Winddown Budget attached as **Exhibit A** to the Plan (the "Winddown Budget").

- The Equity Committee's Allowed Fee Claims (KL, EA and PSZY) for allowed fees and expenses from July 24, 2016 through the Effective Date shall be capped at $25,000, as further set forth in the Winddown Budget.

- The Equity Committee, AH and Mr. Saverin shall take all actions reasonably necessary to support confirmation of the Plan.

- The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval and implementation of the Global Settlement, as well as a finding by the Bankruptcy Court that such compromise and settlement is in the best interests of the Debtor, its Estate and stakeholders, and is fair, equitable and reasonable.

- In the event of any conflict between Article VIII.B and any other provision of the Plan, the provisions of Article VIII.B shall govern and control.

The Debtor believes that the Global Settlement embodied in the Plan is fair and reasonable and in the best interests of the Debtor's Estate. It is the product of extensive, arms' length negotiations between the Debtor, the Equity Committee, AH, and Mr. Saverin. The Plan takes into account the impact litigation would be expected to have on the value of the Debtor's Estate and Claim and Interest holders' recoveries. Unbounded litigation on all conceivable claims would necessarily expand the scope of such litigation, and with it the costs, complexities and delay attendant thereto. In light of the parties' view of the litigation uncertainties and the clear and substantial savings in terms of cost and time value of money that will be realized for the Estate and ultimately its creditors through a prompt resolution of the issues, the Debtor has

concluded that the Global Settlement is in the best interests of all parties in interest in this Chapter 11 Case. Accordingly, the Debtor submits that the Global Settlement, embraced by the Equity Committee, embodies a fair and reasonable compromise that will mitigate these potential negative effects and speed-up recoveries to Creditors and Interest holders.

   **3.9.3    Binding Effect.**  The Plan shall be binding upon and inure to the benefit of the Debtor, all present and former holders of Claims and Interests, and their respective successors and assigns.

   **3.9.4    Release of Liens.**  Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estate shall be fully released and discharged, and all of the right, title and interest of any holder of such mortgages, deeds of trust, Liens, pledges or other security interests shall revert to the Liquidating Trustee.

   **3.9.5    Liabilities to, and Rights of Governmental Units.**  Nothing in the Plan or Confirmation Order shall discharge, release, or preclude: (1) any liability to a Governmental Unit that is not a Claim; (2) any Claim of a Governmental Unit arising on or after the Confirmation Date; (3) any liability to a Governmental Unit on the part of any Entity other than the Debtor or Liquidating Trust; (4) any valid right of setoff or recoupment by a Governmental Unit; or (5) any criminal liability.  Nothing in the Plan or Confirmation Order shall enjoin or otherwise bar any Governmental Unit from asserting or enforcing, outside the Bankruptcy Court, any liability described in the preceding sentence.  The Plan and Confirmation Order are not intended and shall not be construed to bar any Governmental Unit from, after the Confirmation Date, pursuing any police or regulatory action.

   ***3.9.6    Exculpation.***  ***None of the Exculpated Persons shall have or incur any liability to any holder of a Claim or Interest for any Exculpated Claim, except for actual fraud, willful misconduct or gross negligence, and in all respects, the Exculpated Person shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.***

   ***3.9.7    Releases.***

   ***(a)    Releases by the Debtor.***  ***As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtor and the Liquidating Trustee, and any Person seeking to exercise the rights of the Debtor's Estate, shall be deemed to forever release, waive, and discharge the Released Parties of all claims, obligations suits, judgments, damages, demands, debts, rights, remedies, Causes of Action and liabilities of any nature whatsoever, whether direct or derivative, including, without limitation, any of the foregoing in connection with or related to the Debtor, the Chapter 11 Case, or the Plan, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or hereafter arising, in law, equity, or otherwise, that are or may be based in whole or in part upon any act, omission, transaction, event or other occurrence taking place or existing on or prior to the Effective Date.***

    **(b)**    *__Consensual Third Party Releases__. As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, (a) all holders of Claims and (b) all holders of Common Interests and/or Preferred Interests (including any holders of Preferred Interests that convert to Common Interests pursuant to the terms of the Plan) who do not timely exercise their right to opt-out of such release in accordance with the terms of the Plan, shall be deemed to forever release, waive, and discharge the Released Parties of all claims, obligations suits, judgments, damages, demands, debts, rights, remedies, Causes of Action and liabilities of any nature whatsoever, whether direct or derivative, including, without limitation, any of the foregoing in connection with or related to the Debtor, the Chapter 11 Case, or the Plan, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or hereafter arising, in law, equity, or otherwise, that are or may be based in whole or in part upon any act, omission, transaction, event or other occurrence taking place or existing on or prior to the Effective Date.*

    **3.9.8**    *__Injunction__. Except as otherwise provided in the Plan or the Confirmation Order, as of the Confirmation Date, all Entities that have held, hold or may hold a Claim or other debt or liability against the Debtor or Interest in the Debtor are (a) permanently enjoined from taking any of the following actions against the Debtor or the Liquidating Trust or any of their property on account of such Claims or Interests and (b) permanently enjoined from taking any of the following actions against any of the Released Parties or their property with respect to any claims, obligations, suits, judgments, damages, demands, debts, rights, remedies, Causes of Action or liabilities released pursuant to the Plan: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any lien or encumbrance; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation; and (c) commencing or continuing in any manner or in any place, any action that does not comply with or is inconsistent with the provision.*

    **3.9.9**    **Term of Injunctions or Stays.**  Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Case pursuant to Bankruptcy Code section 105 or 362 or any order of the Bankruptcy Court, and existent on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

## 3.10   CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN.

    **3.10.1 Conditions Precedent to the Effective Date.** The following are conditions precedent to the occurrence of the Effective Date, each of which must be waived or satisfied in accordance with Article IX of the Plan: (i) the Confirmation Order, the Plan, the Disclosure Statement, the Liquidating Trust Agreement, the Plan Supplement documents, and all other documents related to the implementation of the Plan, shall have been duly entered and be a Final Order and shall be in form and substance reasonably acceptable to the Debtor, the Equity

Committee, AH and Mr. Saverin; (ii) after payment in full of all Administrative Claims, Fee Claims, Priority Tax Claims, Priority Non-Tax Claims, Other Secured Claims, and General Unsecured Claims, the Liquidating Trust Assets shall include at least $200,000 of cash; (iii) Buttonwood and Turner shall have not opted-out of the Consensual Third Party Releases; (iv) no more than 15% of the shares owned by holders of Common Interests (including Preferred Interests that are converted to Common Interests under the Plan) calculated without regard to shares owned or held by members of the Equity Committee, AH and Mr. Saverin, shall have opted-out of the Consensual Third Party Releases; (v) Pinnacle and 137 shall provide releases of all claims, obligations, suits, judgments, damages, demands, debts, rights, remedies, Causes of Action and liabilities of any nature whatsoever, whether direct or derivative, including, without limitation, any of the foregoing in connection with or related to the Debtor, the Chapter 11 Case, or the Plan to the Released Parties in form and substance reasonably acceptable to AH and Mr. Saverin in their discretion; and (vi) all actions, documents, certificates and agreements necessary to implement the Plan shall have been effected or executed and delivered to the required parties and, to the extent required, Filed with the applicable Governmental Units in accordance with applicable laws.

> **3.10.2  <u>Waiver of Conditions</u>.**  Waiver of the conditions to the Effective Date set forth (a) in 3.10.1(i) and (vi) above (sections IX.A.1 and IX.A.6 of the Plan) shall require the written consent of the Debtor, the Equity Committee, AH, and Mr. Saverin, (b) in 3.10.1(ii) (Section IX.A.2 of the Plan) shall require the written consent of the Equity Committee, and (c) in 3.10.1(iii), (iv) and (v) (Sections IX.A.3, IX.A.4 and IX.A.5 of the Plan) shall require the written consent of Mr. Saverin and AH.   No waivers shall require notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.

> **3.10.3  <u>Effect of Failure of Conditions</u>.**  Unless expressly set forth in the Plan, if the Consummation of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims by the Debtor, any holders or any other Entity; (2) prejudice in any manner the rights of the Debtor, any holders or any other Entity; or (3) constitute an admission, acknowledgment, offer or undertaking by the Debtor, any holder of any Claim or any other Entity in any respect.

## 3.11    MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN.

> **3.11.1  <u>Modification and Amendments</u>.**    Except as otherwise specifically provided in the Plan, the Debtor reserves the right to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code.  Subject to certain restrictions and requirements set forth in Bankruptcy Code section 1127 and Bankruptcy Rule 3019 (as well as those restrictions on modifications set forth in the Plan), the Debtor expressly reserves its right to revoke or withdraw, to alter, amend or modify the Plan, or remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, in such manners as may be necessary to carry out the purposes and intent of the Plan.

**3.11.2 <u>Effect of Confirmation on Modifications</u>.** Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to Bankruptcy Code section 1127(a) and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

**3.11.3 <u>Revocation or Withdrawal of Plan</u>.** The Debtor reserves the right to revoke or withdraw the Plan before the Confirmation Date and to file a subsequent plan. If the Debtor revokes or withdraws the Plan, or if Confirmation or Consummation does not occur, then: (l) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of the Claims or Interests or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claim or Interest; (b) prejudice in any manner the rights of the Debtor, the Liquidating Trustee, any holder of a Claim or Interest, or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtor, any holder of a Claim or Interest or any other Entity.

**3.12    RETENTION OF JURISDICTION.**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Case and the Plan pursuant to Bankruptcy Code sections 105(a) and 1142, including jurisdiction to:

a.    allow, disallow, determine, liquidate, classify, estimate or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount or allowance of Claims or Interests;

b.    decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals (including Fee Claims) authorized pursuant to the Bankruptcy Code or the Plan;

c.    resolve any matters related to: (a) the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which the Debtor is a party or with respect to the Debtor may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Debtor amending, modifying or supplementing, after the Effective Date, the Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory, expired or terminated;

d.    ensure that distributions to holders of Allowed Claims and Allowed Interests are accomplished pursuant to the provisions of the Plan;

e.  adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters, and grant or deny any applications involving the Debtor that may be pending on the Effective Date;

f.  adjudicate, decide or resolve any and all matters related to Bankruptcy Code section 1141;

g.  enter and implement such orders as may be necessary or appropriate to execute, implement or consummate the provisions of the Plan and all contracts, instruments, releases, indentures and other agreements or documents created in connection with the Plan, the Plan Supplement or this Disclosure Statement;

h.  enter and enforce any order for the sale of property pursuant to Bankruptcy Code sections 363, 1123 or 1146(a);

i.  resolve any cases, controversies, suits, disputes or Causes of Action that may arise in connection with Consummation, including interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

j.  issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

k.  resolve any cases, controversies, suits, disputes or Causes of Action with respect to the releases, injunctions, and enter such orders as may be necessary or appropriate to implement such releases, injunctions and other provisions;

l.  resolve any cases, controversies, suits, disputes or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interests for amounts not timely repaid;

m.  enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

n.  determine any other matters that may arise in connection with or related to the Plan, the Disclosure Statement or the Confirmation Order;

o.  enter an order or final decree concluding or closing the Chapter 11 Case;

p.  adjudicate any and all disputes arising from or relating to distributions under the Plan;

q.  consider any modifications of the Plan, to cure any defect or omission or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

r.  determine requests for the payment of Claims entitled to priority pursuant to Bankruptcy Code section 507;

s.      hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents or instruments executed in connection with the Plan;

t.      hear and determine matters concerning state, local and federal taxes in accordance with Bankruptcy Code sections 346, 505 and 1146;

u.      hear and determine all disputes involving the existence, nature, scope or enforcement of any exculpations, discharges, injunctions and releases granted in connection with and under the Plan;

v.      enforce all orders previously entered by the Bankruptcy Court; and

w.      the Bankruptcy Court shall retain non-exclusive jurisdiction to hear any other matter not inconsistent with the Bankruptcy Code.

### 3.13    MISCELLANEOUS PROVISIONS.

**3.13.1 <u>Immediate Binding Effect</u>.** Notwithstanding Bankruptcy Rules 3020(e), 6004(h) or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtor, the Liquidating Trust and any and all holders of Claims or Interests (irrespective of whether their Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges and injunctions described in the Plan, each Entity acquiring property under the Plan and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtor.

**3.13.2 <u>Statutory Committee and Cessation of Fee and Expense Payment</u>.** On the Effective Date, the Equity Committee shall dissolve and all of its members, Professionals and agents shall be deemed released of their duties, responsibilities and obligations, and shall be without further duties, responsibilities and authority in connection with the Debtor, the Chapter 11 Case, the Plan or its implementation, except with respect applications for Fee Claims. The Liquidating Trust shall not be responsible for paying any fees or expenses incurred by the Equity Committee before or after the Effective Date.

**3.13.3 <u>Reservation of Rights</u>.** Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur. None of the Filing of the Plan, any statement or provision contained in the Plan or the taking of any action by the Debtor, with respect to the Plan, the Disclosure Statement or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any of their respective rights with respect to the holders of Claims and Interests or each other before the Effective Date.

**3.13.4 <u>Closing of Chapter 11 Case</u>.** The Liquidating Trustee shall promptly after the full administration of the Chapter 11 Case, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order necessary to close the Chapter 11 Case that has been fully administered.

**3.13.5 No Admission Against Interest.**   Neither the filing of the Plan, the Disclosure Statement, nor any statement contained therein, is or shall be deemed an admission against interest.  In the event that the Plan is not consummated, neither the Plan, the Disclosure Statement nor any statement contained therein may be used or relied upon in any manner in any suit, action, proceeding or controversy within or outside the Bankruptcy Court involving the Debtor.

**3.13.6 No Waiver.**   Except as otherwise specifically provided in the Plan, nothing set forth in the Plan or this Disclosure Statement shall be deemed a waiver or release of any claims, rights or Causes of Action against any Person other than the Debtor.

**3.13.7 Headings.**   The article and section headings used in the Plan are inserted for convenience and reference only and neither constitutes a part of the Plan nor any manner affects the terms, provisions or interpretation of the Plan.

**3.13.8 Governing Law.**   Except to the extent the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent otherwise provided in the Plan, the rights and obligations arising under the Plan, shall be governed by, and construed and enforced in accordance with the laws of Delaware, without giving any effect to the principles of conflicts of law or such jurisdiction.

**3.13.9 Conflicts.**   Except as set forth in the Plan, to the extent that any provisions of the Disclosure Statement, the Plan Supplement or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Confirmation Order shall govern and control and then the Plan.

**IV.    POST-CONFIRMATION ISSUES.**

**4.1    THE DEBTOR'S CONTINUED EXISTENCE AFTER CONFIRMATION.**

**4.1.1    Wind-Up of Affairs.**   Upon the Effective Date, the Liquidating Trust shall wind-up the affairs of the Debtor, including, without limitation, making distributions pursuant to the Plan and consummating the terms of the Plan.  The Debtor shall not exist for the purpose of continuing business except insofar as necessary for the winding up of such company.

**4.1.2    Role of the Equity Committee.** From and after the Effective Date, as set forth above, the Equity Committee will be disbanded and the appointment of its members will be terminated.

**V.    FEASIBILITY.**

**5.1    FINANCIAL FEASIBILITY ANALYSIS.**

**5.1.1    The Bankruptcy Code Standard.** The Bankruptcy Code requires that, in order to confirm the Plan, the Bankruptcy Court must find that Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor unless contemplated by the Plan.

**5.1.2    No Need for Further Reorganization of the Debtor.**  The Plan provides for the liquidation or distribution of all of the Debtor's Assets.  Accordingly, the Debtor believes that all Plan obligations will be satisfied without the need for further reorganization of the Debtor.

## VI.    ALTERNATIVES TO THE PLAN.

### 6.1    CHAPTER 7 LIQUIDATION.

**6.1.1    The Bankruptcy Code Standard.**  Notwithstanding acceptance of the Plan by the requisite number of Creditors and Interest holders of any Class, the Bankruptcy Court must still independently determine that the Plan provides each member of each Impaired Class of Claims and Interests a recovery that has a value at least equal to the value of the distribution that each such Person would receive if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code on the Effective Date.

In chapter 7 liquidation cases, unsecured creditors and interest holders of a debtor are paid from available assets generally in the following order, with no junior Class receiving any payments until all amounts due to senior Classes have been paid fully or any such payment is provided for: (i) Secured creditors (to the extent of the value of their collateral); (ii) Administrative and other priority creditors; (iii) Unsecured creditors; (iv) Debt expressly subordinated by its terms or by order of the Bankruptcy Court; and (v) Interest holders.

**6.1.2    The Plan is in the Best Interests of Creditors.**  The Debtor believes that the Plan satisfies this standard because the Plan provides for an orderly, consensual liquidation of the Debtor's Assets.  Furthermore, the Debtor believes that the Plan also provides Creditors with a degree of certainty that would not exist if the Debtor's Assets were subject to liquidation outside of the Plan, includes the benefits of the Global Settlement and eliminates all risks and expenses of the marketplace and continual administration of the Debtor.  In this regard, in the event of liquidation under Chapter 7, Creditors will not receive as great and as prompt payment of their Allowed Claims and Allowed Interests as they would under the Plan and the following is likely to occur: (i) additional administrative expenses, including trustee's commissions, fees for the trustee's accountant, attorneys and other professionals likely to be retained, would be incurred with priority over general unsecured claims under Bankruptcy Code section 507(a)(1) and (ii) final distribution of the Assets would likely be substantially delayed.  Accordingly, the Debtor believes that the Plan is in the best interests of Creditors and Interest holders.

**6.1.3    Liquidation Analysis.**  As noted above, in considering whether the Plan is in the best interests of Creditors and Interest holders, the Debtor and its professionals created a Liquidation Analysis, a copy of which is attached hereto as **"Exhibit C"**.  The Debtor believes its Liquidation Analysis, and the conclusions set forth herein are fair and accurate, and represent the Debtor's best judgment with regard to the results of a chapter 7 liquidation of the Debtor.  The Liquidation Analysis was prepared by the Debtor with the assistance of EY and is based on the Debtor's unaudited balance sheets as of June 30, 2016 and projected available cash.

The Liquidation Analysis reflects the estimated cash proceeds, net of liquidation-related costs, which would be available to the Debtor's creditors if they were to be liquidated in a chapter 7 case. Underlying the Liquidation Analysis are a number of estimates and assumptions regarding liquidation proceeds that, although developed and considered reasonable by the Debtor's management and professionals, are inherently subject to significant business, economic and competitive uncertainties, and contingencies beyond the control of the Debtor and its management.

THERE CAN BE NO ASSURANCE THAT THE VALUES REFLECTED IN THE LIQUIDATION ANALYSIS WOULD BE REALIZED IF THE DEBTOR WERE, IN FACT, TO UNDERGO SUCH A LIQUIDATION, AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE SHOWN HERE.

THE STATEMENTS IN THE LIQUIDATION ANALYSIS, INCLUDING ESTIMATES OF ALLOWED CLAIMS, WERE PREPARED SOLELY TO ASSIST THE BANKRUPTCY COURT IN MAKING THE FINDINGS REQUIRED UNDER SECTION 1129(a)(7) AND THEY MAY NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE.

### 6.2    CONTINUATION OF THE BANKRUPTCY CASE.

If the Debtor remains in Chapter 11, it can continue to operate its business and manage its property as a debtor-in-possession, but it would remain subject to the restrictions imposed by the Bankruptcy Code. The Debtor is not a going concern.

### 6.3    ALTERNATIVE PLAN(S).

If the Plan is not confirmed, the Debtor or other Persons could attempt to formulate and propose a different plan. The Debtor believes that the Plan, as described herein, enables holders of Claims or Interests to realize the greatest possible value under the circumstances, and that is compared to any alternative plan, the Plan has the greatest chance to be confirmed and consummated.

## VII.    RISK FACTORS.

**Holders of Claims or Interests should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement, before making a judgment with respect to the Plan and, in the case of Interest Holders, the Consensual Third Party Releases.**

### 7.1    CERTAIN BANKRUPTCY CONSIDERATIONS

Even if all Impaired voting classes vote to accept the Plan and the requirements for "cramdown" are met; the Court may exercise substantial discretion and may choose not to confirm the Plan. Bankruptcy Code section 1129 requires, among other things, that the value of distributions to dissenting holders of Claims or Interests may not be less than the value such holders would receive if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code. Although the Debtor believes that the Plan will meet such requirement, there can be no assurance that the Court will reach the same conclusion.

Any objection to the Plan by a member of a class of Claims or Interests could also prevent confirmation of the Plan or delay such Confirmation for a significant period of time.

Additionally, if (i) Buttonwood or Turner or (ii) more than 15% of the shares owned by holders of Common Interests (including Preferred Interests that are converted to Common Interests under the Plan) calculated without regard to shares owned or held by members of the Equity Committee, AH and Mr. Saverin, opt-out of the Consensual Third Party Releases, conditions precedent to the Effective Date of the Plan will not be satisfied. If these conditions are not waived, the Plan will not go effective.

If the Plan were not to be confirmed or is confirmed but does not go effective, it is unclear what distribution, if any, holders of Allowed Claims and Allowed Interests ultimately would receive with respect to their Claims and Interests. Absent confirmation of the Plan and the effectiveness thereof, the Global Settlement will be null and void and Holders of Claims and Interests will not receive the benefits thereunder. Moreover, if an alternative plan could not be agreed to, it is likely that the Debtor would have no option other than to seek conversion of this Chapter 11 Case to Chapter 7 pursuant to the Motion to Convert. Once converted, the Chapter 7 fees and expenses would be senior to and, thus, paid prior to the Chapter 11 administrative expenses, general unsecured claims and Interests. As such, it is highly likely that holders of Allowed Claims and Allowed Interests would receive less than they would have received pursuant to the Plan.

## 7.2    CLAIMS ESTIMATION & CASH AVAILABLE AFTER DISTRIBUTION.

There can be no assurance that the estimated amount of Claims and Interests set forth herein are correct, and the actual allowed amounts of Claims and Interests may differ from the estimates. The estimated amounts are subject to certain risks, uncertainties and assumptions, including, without limitation, that unanticipated proofs of claim are filed against the Estate prior to the Bar Dates and such Claims are either not subject to a valid objection by the Debtor or such objections are overruled by the Bankruptcy Court. Moreover, to the extent such Claims are filed and valid, following distributions thereon, the Debtor may not have sufficient Cash available to meet the condition precedent to the Effective Date of the Plan that at least $200,000 in Cash be available for transfer to the Liquidating Trust as a Liquidating Trust Asset.

## 7.3    CERTAIN LITIGATION.

The Liquidating Trust is retaining the right to pursue certain Causes of Action, except those previously waived or released by the Debtor, by informal demand and/or commencement of litigation. If the Liquidating Trust is unsuccessful in prosecuting such Causes of Action, the Liquidating Trust may not recover related assets for distribution under the Plan. Litigation is inherently uncertain and there can be no guarantee of any outcome. The Liquidating Trustee, pursuant to the terms of the Liquidating Trust Agreement, may decide to settle Causes of Action and such settlements may be significantly less than the damages which were caused and/or the transfers to be recovered. Additionally, there also are other claims, lawsuits, disputes with third parties, investigations and administrative proceedings against the Debtor relating to matters in the ordinary course of its business which could materially adversely affect the Debtor's liquidation.

**THE DEBTOR RECOMMENDS THAT YOU SUPPORT THE PLAN AND, TO THE EXTENT YOU ARE AN INTEREST HOLDER, DO NOT OPT-OUT OF THE CONSENSUAL THIRD PARTY RELEASES.**

VIII.    <u>**CONCLUSION**</u>.

It is important that you exercise your right to vote on the Plan.  It is the Debtor's belief and recommendation that the Plan fairly and equitably provides for the treatment of all Claims against the Debtor.