## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| JMO WIND DOWN, INC. | Case No. 16-10682 (BLS) |
| Debtor. | **Re: Docket Nos. 585-86, 596, 610, 614, 618-19, 623** |

## OPINION

Before the Court is a Motion (the "Motion")[1] [Docket No. 585] filed by Eduardo Saverin
("Saverin"), Peng-Tsin Ong ("Ong"), Scott Weiss ("Weiss"), Andreessen Horowitz Capital
Management, LLC ("AH LLC"), Andreessen Horowitz Fund, II, L.P. (together with AH LLC,
the "AH Entities"), and Stephen Stuut ("Stuut") (collectively with Saverin, Ong, Weiss, and the
AH Entities, the "Non-Founder Defendants"). The Non-Founder Defendants are defendants in a
civil action pending in the Delaware Court of Chancery (hereinafter, the "Chancery Action" or
the "Civil Action").[2] They seek relief in this Court under provisions of the Chapter 11 Plan of
Liquidation (the "Plan") [Docket No. 433] confirmed in this case. Specifically, they move (i) to
enforce the Plan, the Confirmation Order (the "Confirmation Order") [Docket No. 482], and the
Sale Order (the "Sale Order") [Docket No. 202], and (ii) to enjoin Bloso Investments, Ltd.
("Bloso" or the "Plaintiff"), the Plaintiff in the pending Civil Action, from prosecuting its

---

[1] Capitalized terms have the meanings assigned to them *infra*.

[2] The Verified Amended Complaint filed in the Court of Chancery [Case No. 12787-VCS] (the
"Complaint") lists 11 defendants (the "Defendants") in total: Daniel Mattes ("Mattes"), Ampalu Investment,
GmbH, Saverin, Ong, Weiss, the AH Entities, Thomas Kastenhofer ("Kastenhofer"), KTI Privatstifung, Stuut, and
Chad Starkey ("Starkey"). This Motion has been filed by the Non-Founder Defendants only. But, the Liquidating
Trust filed a limited joinder, and Mattes, Kastenhofer and Starkey each filed a limited joinder and objection. These
parties will be discussed in greater detail *infra*.

asserted claims and similar claims in other fora against them.  For the reasons that follow, the Court will grant the Motion, with some exceptions.

## I. Background[3]

Bloso's claims stem from a series of investments it made in Jumio, Inc. ("Jumio" or the "Debtor").  Prior to bankruptcy, Jumio operated as an online mobile identity company. Numerous parties invested in and controlled Jumio.  Bloso brings suit against those parties based on their alleged misconduct and interactions with Bloso.

### A. The Parties

To begin, it is beneficial to lay out the various parties involved in this matter.  Jumio was a Delaware corporation founded by Daniel Mattes ("Mattes") in 2010.  It specialized in online and mobile identity management and credentials authentication.  Mattes, Thomas Kastenhofer ("Kastenhofer"), and Chad Starkey ("Starkey") were the founding executives of the company (collectively, the "Officer Defendants").  Mattes is Jumio's former Chief Executive Officer, Kastenhofer is the former Chief Operating Officer, and Starkey is the former Chief Financial Officer and General Counsel.  Each is also a former member of Jumio's board of directors (the "Board").  Stuut replaced Mattes as CEO in 2015 after Mattes resigned, and he continues to serve in that capacity.

Saverin, Ong, and the AH Entities were early investors in Jumio.  They also served, or designated individuals to serve, on the Board.  Bloso alleges that, by March 2011, Saverin owned and controlled 2,885,613 common and 14,514,702 preferred shares of Jumio.  The record reflects that Saverin held significant voting authority in Jumio with that number of shares.  Weiss is a former Jumio director, and he acted on behalf of the AH Entities.  Bloso further alleges that

---

[3] The facts are presented as they are alleged in Bloso's filed complaint (the "Complaint") in the Civil Action, as well as in Stuut's First Day Declaration [Docket No. 3].

Weiss held significant voting power and directly controlled the AH Entities, using them as an alter ego.

KTI Privatstiftung ("KTI"), a foundation organized under the laws of Liechtenstein, was owned and controlled by Kastenhofer.  Together, Kastenhofer and KTI controlled large amounts of Jumio common and preferred stock.  In similar fashion, Mattes owned and controlled Ampalu Investment, GmbH ("Ampalu," and together with KTI, the Officer Defendants, and the Non-Founder Defendants, the "Defendants").  Both Kastenhofer and Mattes utilized their respective companies as personal investment entities.  These parties each held voting power based on the number of shares that they owned and controlled.

Bloso is a British Virgin Islands investment company.  Bloso made stock purchases in Jumio during the time period between July 2011 and May 2012 through a series of stock purchase agreements and convertible term note agreements.

*B.  Jumio's Business Operations, Bloso's Investments and Jumio's Bankruptcy*

As noted, Jumio operated an online mobile identity and credential authentication company.  It provided verification products, software, and services that were designed to reduce fraud and to meet regulatory requirements for their customers.  As an emerging technology company, Jumio relied on continued cash infusions from investors for business growth.  Those early investments were made by, among others, the Non-Founder Defendants.

Bloso began investing in Jumio in 2011.  Bloso contends that, at the time it invested in Jumio, Jumio implemented certain accounting practices that resulted in inflated revenue and profit projections.  Based on those erroneous revenue reports, Bloso alleges that Saverin and others made public statements indicating that Jumio would expect $100 million in revenue in 2012, when they knew that the correct amount should have been only $2 million.  The

Defendants continued to make announcements and public representations despite the errors, and they continued to accept additional capital investments.  Based on those public representations, "as well as specific representations and assurances made [by Mattes][4] to Bloso," Bloso elected to invest nearly $5,000,000 in Jumio shares and convertible notes.  Obj. to Mot. of Non-Founder Civil Action Defs., ¶5 (Docket No. 614).

Bloso made investments on ten separate occasions.  In July 2011, Bloso made two separate stock purchases, one from Mattes and Ampalu and one from Kastenhofer through KTI.  In each transaction, Bloso purchased 544,513 shares of common stock for $500,000.  In August 2011, Bloso entered into a Convertible Loan Agreement and Convertible Term Note with Mattes and Ampalu in the principal amount of $500,000.  In October 2011, Bloso made three separate purchases of stock, all from Mattes and Ampalu.  On October 2, Bloso first purchased 1,089,026 shares of common stock for $1,000,000.  That same day, Bloso purchased an additional 544,513 shares of common stock for $500,000.  Then on October 3, Bloso entered into another Convertible Loan Agreement and Convertible Term Note with Mattes and Ampalu in the principal amount of $1,500,000.

In January 2012, Bloso made three additional purchases.  On January 20, Bloso made another purchase for 625,478 shares of common stock from Mattes and Ampalu for $983,822.29 and then made another identical purchase from Kastenhofer through KTI.  Next, on January 25,[5] Bloso entered into another Convertible Loan Agreement and Convertible Term Note with Mattes and Ampalu in principal of $750,000.  And in May 2012, Bloso entered into another Convertible

---

[4] Bloso alleges in the Complaint that Mattes made personal assurances to Bloso on a regular basis. Complaint, ¶ 41.  Bloso does not make any such allegations with respect to the Non-Founder Defendants.

[5] The Complaint contains a discrepancy relating to the January 25th Note.  It states that the transaction took place on January 25, 2015, but the defined term assigned to it defines the transaction as the "January 2012 Note[.]"

Loan Agreement and Term Note with Mattes and Ampalu in the principal amount of $233,753. On October 3, 2012, Bloso elected to convert its four notes into shares of common stock.

Bloso alleges that it made these investments and converted its notes based on the public statements and media reports discussed previously, and that the true nature of Jumio's parlous financial condition was not revealed until March 2015. In addition to those alleged public statements and misrepresentations, Bloso also alleges that Mattes falsely represented to Jumio and the Non-Founder Defendants that he spoke for Bloso and controlled its shares. And, Bloso contends that Mattes secretly sold his "founder shares" while selling Jumio shares to Bloso. Bloso makes no allegations that it had contact with any of the Non-Founder Defendants directly.

In the fall of 2014, Jumio hired a new CFO to replace Starkey. The new CFO resigned days later after discovering the revenue recognition errors. A Board-appointed special committee later found those errors to require a complete review and restatement of Jumio's finances. On April 30, 2015, Mattes resigned from Jumio and its Board, and Stuut became Jumio's CEO the following month. Jumio announced its restated financials to its shareholders in September 2015.[6] As a result, Jumio suffered additional costs for accounting and legal fees, as well as risks associated with potential liability in investor litigation. The additional costs, liabilities, and investigations took their toll on Jumio's ability to attract new investors. As such, it was no longer able to raise funds to continue business operations.[7] With few options remaining, Jumio elected to file for Chapter 11 bankruptcy.

---

[6] In connection with the restated financials, in January 2016, Jumio issued a letter to its shareholders offering each shareholder a warrant to purchase additional shares of common stock in exchange for signing a settlement agreement releasing Jumio of any claims. Complaint, ¶ 94. Bloso and Jumio entered into such an agreement, but it never became effective because it was not ratified by the Board. Complaint, ¶¶ 96, 99.

[7] In August 2015, Saverin and the AH Entities purchased senior secured convertible promissory notes from Jumio that provided Jumio with $15,493,727.74 in order to provide Jumio with additional working capital.

Jumio filed its petition for Chapter 11 relief on March 21, 2016.  That same day, the

Debtor filed a motion to approve the sale of its assets (the "Sale Motion") [Docket No. 15].  The

Court entered an order approving the sale in May 2016 (the "Sale Order") [Docket No. 202] over

objections made by, among others, Bloso.  Under the Asset Purchase Agreement, the buyer

purchased substantially all of the Debtor's assets, including "any rights, Claims, or Actions,

including Avoidance Actions ... to the extent relating to or arising against Transferred

Employees[.]"  Mot. of Non-Founder Civil Action Defs., ¶ 22 (Docket No. 585) (quoting APA,

§§ 2.1(s), 2.2(g), 1.1).  Transferred Employees included Stuut because he functioned as Jumio's

CEO at the time of the sale.  Moreover, the Sale Order barred any party from pursuing claims,

against the buyer or its officers, which were connected to the Debtor or the purchased assets.

The Debtor filed the Plan in August 2016 [Docket No. 318], and an amended version was

filed in October [Docket No. 433].  The Plan established a Liquidating Trust which was

authorized, *inter alia*, to pursue claims against the Officer Defendants and non-released parties.

The Plan granted the "exclusive right" to pursue those causes of action to the Liquidating

Trustee.  Plan, Art. IV.C (Docket No. 433).  The Plan proposed to release Saverin, Ong, Weiss,

and the AH Entities of all claims or liabilities, either direct or derivative.  Importantly, the Plan

also contained an opt-out provision for holders of common or preferred interests, whereby they

could opt-out of the aforementioned releases.

Bloso exercised its opt-out on September 30, 2016, thus preserving its individual or direct

causes of action.  The Court subsequently confirmed the Plan on October 21, 2016 over Bloso's

objections [Docket No. 482].  But the Court acknowledged on the record in confirming the Plan

that shareholders had "the opportunity ... to opt out and pursue their own claims if they wish[ed]

to do so." Transcript re: Ruling (Docket No. 479), at 17:4-5.  Bloso had already filed its Opt-out

Election Form [Docket No. 350-1] prior to that date.

   *C.  The Civil Action in the Court of Chancery*

   Bloso filed its original complaint against the Defendants in the Court of Chancery shortly

before Confirmation.  That Complaint was amended in December 2016 (the "Complaint")

[Docket No. 585-3].  Bloso made the following claims in the Complaint:

- Count I: Civil Conspiracy against the Defendants, alleging that Mattes, Saverin, Ong, Weiss, the AH Entities, Kastenhofer, KTI, and Starkey conspired to deprive Bloso of the value of its Jumio shares by, among other things, making false statements and reports, and secretly operating Jumio without qualified financial and accounting management.
- Count II: Fraud against Mattes and Ampalu, alleging that Mattes falsely entered agreements on Bloso's behalf and repeatedly claimed that he spoke for and controlled Bloso's shares and notes.
- Count III: Breach of Fiduciary Duty against the Defendants, alleging that they breached their fiduciary duties by failing to disclose Jumio's financial and accounting position, failing to disclose that Mattes was secretly selling his founder shares, failing to disclose Jumio's impending bankruptcy, and failing to deal fairly with Bloso.
- Count IV: Fraud against the Defendants, alleging that the Defendants committed fraud by making false representations to Bloso, through actions and inactions, regarding the business and Jumio's financial condition.
- Count V: Equitable Fraud against the Defendants, alleging that the Defendants breached their duty of accurate and timely disclosure regarding Jumio's financial condition by failing to require Jumio to produce audited financial statements, failing to disclose to Bloso Jumio's financial and accounting condition, and by condoning past and continued misrepresentations.
- Count VI: Unjust Enrichment and Constructive Trust against the Defendants, alleging that they actively took steps to retain and improve their positions in Jumio to Bloso's detriment after learning of the financial fraud that took place.  Bloso further contends that the Defendants allowed Jumio to run out of money so they could force the company into bankruptcy, thereby attempting to release themselves from liability.  As a result, they were unjustly enriched by Bloso's investments in Jumio.
- Count VII: Fraud in the Inducement against the Defendants, alleging that they are liable to Bloso as a result of their breach of fiduciary duties, fraud, and misrepresentations.  Bloso contends that it relied upon those misrepresentations and invested as a result of those misrepresentations.
- Counts VIII and IX: Fraudulent Transfer under 6 Delaware Code §§ 1304-05 against Saverin, Ong, Weiss, Kastenhofer, Starkey, and Stuut.  Bloso alleges that the reclassification of unsecured, previously-issued notes into secured Saverin Notes represents a fraudulent transfer.

7

Soon after Bloso filed its Complaint, the Defendants filed motions to dismiss in the Court of Chancery.  The Non-Founder Defendants subsequently filed this Motion to enjoin Bloso from pursuing the Chancery Action.  Specifically, the Non-Founder Defendants seek to enjoin Bloso from pursuing Counts I, III, IV, V, VI, VII, VIII, and IX of the Complaint against them,[8] arguing that those claims are derivative claims that belong to the Liquidating Trust under the Plan. Moreover, the Non-Founder Defendants argue that the claims cannot be pursued against them because the parties are released from liability under the Plan.  The Liquidating Trustee, Kastenhofer, Starkey, and Mattes each filed a limited joinder to the Motion.  Kastenhofer, Starkey, and Mattes each argue that the arguments presented by the Non-Founder Defendants pertain to them as well.  Furthermore, the Liquidating Trust has also commenced a proceeding in this Court pursuing similar claims to those in Bloso's Complaint against Mattes, Kastenhofer, Starkey, Ampalu, and KTI.  [Docket No. 1, AP Case No. 17-51042].

Bloso contends that the gravamen of the Complaint is a "pattern of misrepresentations and non-disclosures designed to induce Bloso's purchase and retention of shares where it would not have otherwise acted, and then deprive Bloso as an outside shareholder of its rights to be informed and vote and its ability to seek to exit the investment."  Obj. to Mot. of Non-Founder Civil Action Defs., ¶39 (Docket No. 614). Bloso thus argues that its claims are direct under Delaware law and pursuable as filed in the Court of Chancery.

---

[8] The Non-Founder Defendants acknowledge that Bloso can potentially assert certain claims against Mattes and Kastenhofer based on misrepresentations made directly by them to Bloso because Bloso opted out of the third-party releases.  Thus, they do not seek to enjoin Count II of the Complaint.  Reply, ¶ 6.

## II. Jurisdiction

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and

157(b).  *See Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.)*, 372 F.3d

154, 168-69 (3d Cir. 2004) ("[T]he jurisdiction of the non-Article III bankruptcy courts is

limited after confirmation of a plan.  But where there is a close nexus to the bankruptcy

plan or proceeding, as when a matter affects the interpretation, implementation,

consummation, execution, or administration of a confirmed plan or incorporated litigation

trust agreement, retention of post-confirmation bankruptcy court jurisdiction is normally

appropriate."); *see also In re SemCrude, L.P.*, Nos. 08-11525 (BLS), 8811, 8829, 8836,

8872, 8875, 2011 WL 4711891, at *4 (Bankr. D. Del. Oct. 7, 2011), *rev'd in part on*

*other grounds sub nom. Cottonwood P'ship, LLP v. Kivisto (In re SemCrude L.P.)*, No.

11-1174-SLR, 2012 WL 5554819 (D. Del. Nov. 15, 2012), *subsequently rev'd on other*

*grounds*, 796 F.3d 310 (3d Cir. 2015) ("The Court agrees ... that it has, at a minimum,

related-to jurisdiction over the Motion to Enjoin.  The motion affects the interpretation

and administration of the Plan because it requires the Court to determine if the Plan

meant to, and did, transfer the claims asserted in the Oklahoma Litigation to the

Litigation Trust.").

Furthermore, the Motion is a core matter as it requires a declaration "that the

claims alleged [in the Court of Chancery] were once property of [Jumio's] estate and now

belong to the [Liquidating] Trust under the Plan and Confirmation Order."  *In re*

*SemCrude, L.P.*, 2011 WL 4711891, at *5; *see also Williams v. McGreevey (In re Touch*

*Am. Holdings, Inc.)*, 401 B.R. 107, 117 (Bankr. D. Del. 2009) ("Various courts have

concluded that matters requiring a declaration of whether certain property comes within

the definition of 'property of the estate' as set forth in Bankruptcy Code § 541 are core

proceedings.") (citations omitted).  Venue is proper in this Court under 28 U.S.C. §§

1408 and 1409.

## III. Discussion[9]

With jurisdiction and venue established, "the Court must [now] determine whether the

claims asserted by [Bloso] in the state court action are derivative of [the Liquidating Trust's]

claims and whether injunctive relief is an appropriate remedy."  *In re SemCrude, L.P.*, 2011 WL

4711891, at *1.  That is the central issue before the Court in this Motion.

### a.  Derivative Claims under Delaware Law

"After a company files for bankruptcy, 'creditors lack standing to assert claims that are

property of the estate.'"  *In re Emoral, Inc.*, 740 F.3d 875, 879 (3d Cir. 2014) (quoting *Bd of Trs.*

*of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 169 (3d Cir. 2002)).  The

Third Circuit has clarified when causes of action are considered "property of the estate:"

> In order for a cause of action to be considered property of the estate, the claim must
> be a general one, with no particularized injury arising from it.  On the other hand,
> if the claim is specific to the creditor, it is a personal one and is a legal or equitable
> interest only of the creditor.  A claim for an injury is personal to the creditor if other
> creditors generally have no interest in that claim.

*In re Emoral*, 740 F.3d at 879 (internal quotations omitted).  In corporate law parlance,

those "general" claims that belong to the estate can be restated as falling under "[t]he

derivative injury rule[, which] holds that a shareholder ... may not sue for personal

injuries that result directly from injuries to the corporation."  *In re SemCrude, L.P.*, 796

---

[9] "To evaluate a request to enjoin litigation pending in a different forum under 11 U.S.C. § 105, [c]ourts
often use traditional preliminary injunction standards, although such standards may be adapted to the bankruptcy
context.  Courts have applied the traditional preliminary injunction standard as modified to fit the bankruptcy
context to determine whether an injunction should issue pursuant to 11 U.S.C. § 105(a)."  *Buke, LLC v. Eastburg (In
re Eastburg)*, 440 B.R. 864, 871 (D. N.M. 2010) (internal quotations and citations omitted); *see also Am. Film
Techs., Inc. v. Taritero (In re Am. Film Techs., Inc.)*, 175 B.R. 847, 854-55 (Bankr. D. Del. 1994) (enjoining
litigation against directors and officers of a debtor-corporation).

F.3d at 316 (quoting *In re Kaplan*, 143 F.3d 807, 811-12 (3d Cir. 1998) (applying Illinois

law)); *see also Kennedy v. Venrock Assocs.*, 348 F.3d 584, 589 (7th Cir. 2003) ("When a

corporation is injured by a wrongful act but the board of directors refuses to seek legal

relief, a shareholder can sue the wrongdoer on behalf of the corporation.  Such a suit is

known as a derivative suit, and is an asset of the corporation—which means that if ... the

corporation is in bankruptcy, the suit is an asset of the bankruptcy estate.") (citations

omitted).  In this case, if Bloso's claims constitute derivative claims, which are "property

of the estate," they then belong to the estate and may only be pursued by the Liquidating

Trustee.[10]

"Whether an action is characterized as direct or derivative is a question of state

law."[11]  *In re SemCrude, L.P.*, 2011 WL 4711891, at *5 (internal quotations omitted).

Here, the parties do not dispute that Delaware law governs this analysis.  Under Delaware

law, the Court should "look to the nature of the wrong and to whom the relief should go"

in a derivative claim analysis.  *Tooley v. Donaldson, Lufkin, & Jenrette, Inc.*, 845 A.2d

1031, 1039 (Del. 2004).  The determination of whether claims are derivative or direct

"turn[s] *solely* on the following questions: (1) who suffered the alleged harm (the

corporation or the suing stockholders, individually); and (2) who would receive the

benefit of any recovery or other remedy (the corporation or the stockholders,

---

[10] *See also Reliance Acceptance Grp., Inc. v. Levin (In re Reliance Acceptance Grp., Inc.)*, 235 B.R. 548, 554 (D. Del. 1999) ("Where a corporation has suffered an injury from actionable wrongs committed by its officers and directors, the remedy under a state's corporation laws is a suit on behalf of the corporation.  Such a suit may be brought by the corporation, or, in some circumstances, can be brought by the shareholders or creditors on its behalf. Regardless of who initiates the suit, the recovery goes to the corporation.  When the action is brought on behalf of the corporation, it is referred to as a derivative action.")

[11] "[W]hether a suit is derivative or direct is drawn from the face of the complaint[.]"  *In re Semcrude, L.P.*, 796 F.3d 310, 317 (3d Cir. 2015) (citation omitted).

individually)?" *Id.* at 1033 (emphasis in original).  Moreover, "[t]he stockholder's claimed direct injury must be independent of any alleged injury to the corporation.  The stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation." *Id.* at 1039.[12] That "simple analysis is well imbedded in [Delaware] jurisprudence[.]" *Id.* at 1035.

 "Equity dilution claims are typically viewed as derivative under Delaware law." *Feldman v. Cutaia*, 956 A.2d 644, 655 (Del. Ch. 2007), *aff'd*, 951 A.2d 727 (Del. 2008).  In that same vein, "Delaware courts have long recognized that actions charging mismanagement which depress the value of stock allege a wrong to the corporation; *i.e.*, the stockholders collectively, to be enforced by a derivative action." *Kramer v. W. Pac. Indus., Inc.*, 546 A.2d 348, 353 (Del. 1988) (internal quotation omitted); *see also In re RNI Wind Down Corp.*, 348 B.R. 286, 293 (Bankr. D. Del. 2006) (citations omitted) ("Upon the filing of a bankruptcy petition ... any claims for injury to the debtor from actionable wrongs committed by the debtor's officers and director become property of the estate under 11 U.S.C. § 541 and the right to bring a derivative action asserting such claims vests exclusively to the trustee.").  With respect to the *Tooley* analysis, "the alleged injury is to the corporation because 'it falls upon all shareholders equally and falls only upon the individual shareholder in relation to his proportionate share of stock as a result of the direct injury being done to the corporation.'" *Feldman*, 956 A.2d at 655 (quoting *In re Berkshire Realty Co., Inc.*, 2002 WL 31888345, at *4 (Del. Ch. Dec. 18, 2002)); *see also Moore v. Paladini (In re CD Liquidation Co., LLC)*, 462 B.R. 124, 132 (Bankr. D. Del. 2011) ("[Plaintiff's] claim that [the transactions] devalued his shares is a classic derivative claim.  It flows from harm to the corporation.") (citation omitted).

---

[12] Put another way, "to determine if a claim is derivative or direct requires the usual examination of who owns the claim." *El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, 152 A.3d 1248, 1251 (Del. 2016).

Director mismanagement claims are "derivative in nature." *Thornton v. Bernard Techs., Inc.*, No. 962-VCN, 2009 WL 426179, at *3 (Del. Ch. Feb. 29, 2009). "When *Tooley* has been applied to situations similar to those presented by the Plaintiffs[, which are "quintessential director mismanagement claims[,]"] comparable management claims have been found to be derivative instead of direct in nature." *Id.* (citing *Albert v. Alex. Brown Mgmt. Servs.*, 2005 WL 2130607, at *13 (Del. Ch. Aug. 26, 2005)); *see also Kramer*, 546 A.2d at 353 ("[W]here a plaintiff shareholder claims that the value of his stock will deteriorate and that the value of his proportionate share of the stock will be decreased as a result of alleged director mismanagement, his cause of action is derivative in nature."). Similarly, claims of waste are "derivative as well." *Thornton*, 2009 WL 426179, at *3. "[Delaware] case law finds allegations of waste and self-dealing transactions generally to be derivative instead of direct. When a director engages in self-dealing or commits waste, he takes from the corporate treasury and any recovery would flow directly back into the corporate treasury." *Id.*

Delaware case law is scarce when it comes to whether fraudulent transfer claims are derivative or direct. However, the Court has observed that such claims are "derivative in nature[.]" *Astropower Liquidating Tr. v. Xantex Tech., Inc. (In re Astropower Liquidating Tr.)*, 335 B.R. 309, 328 (Bankr. D. Del. 2005) (citation omitted). Sections 1304 and 1305 under Title 6 of the Delaware Code both center on the protection of creditors against fraudulent transfers of a debtor's assets. In the bankruptcy context, the Bankruptcy Code expressly grants to the trustee rights and powers to avoid fraudulent transfers as a representative of creditors generally. 11 U.S.C. §§ 544, 548. Any recovery from the pursuit of such claims reverts back to the estate. As such, the Court finds that fraudulent transfer claims constitute derivative claims because the alleged injury is to the general creditor body and the recovery returns to the estate. *See*

*Thornton*, 2009 WL 426179, at *3 (discussing the derivative nature of self-dealing or waste claims when the recovery from such claims would flow back to the corporate treasury).

      b.  *Bloso's Claims under Delaware Law*

After review, the Court concludes that Bloso's claims, with the exception of Count II, are all derivative, meriting an injunction.

Count I alleges that the Defendants conspired to deprive Bloso of the value of its Jumio shares. Specifically, Bloso alleges that "multiple unlawful acts" were conducted by the Defendants in furtherance of the conspiracy, such as, among other allegations, making false reports to the media, false statements regarding Jumio's income made to Bloso to induce Bloso's investments, hiding Jumio's true financial condition from Bloso, and operating Jumio without adequate financial and accounting management. Those allegations are derivative claims under Delaware law. Even if they were true, the actions harmed the corporation in general, as opposed to Bloso individually. Essentially, those mismanagement claims would constitute derivative claims because they fall upon all shareholders equally. Furthermore, as noted above, equity dilution claims are typically derivative under Delaware law. Thus, they belong to the Liquidating Trust.

Count III alleges breach of fiduciary duty against the Defendants, alleging specifically that they misled Bloso and failed to remedy prior misrepresentations to Bloso by failing to disclose Jumio's true financial condition, failing to disclose that Mattes had sold his founder shares, failing to disclose Jumio's impending bankruptcy, and failing to deal fairly with Bloso. Those claims fail for the same reasons as does Count I. Any breach of fiduciary duty harms the

corporation as well as all of the shareholders together; they do not impact or harm Bloso alone. As such, those claims belong to the Liquidating Trustee to pursue.[13]

Count IV is a fraud claim against the Defendants. Bloso points to the Defendants' duty of accurate and timely disclosure regarding Jumio's financial condition that was owed to Bloso. Bloso alleges that the Defendants committed fraud by their actions, inactions, statements, misstatements, their failure to correct those misstatements, and by allowing Jumio to operate without adequate management and financial controls. Again, none of those claims are direct claims owned by Bloso. If such actions occurred, they harmed the corporation and all shareholders alike.[14] Furthermore, Bloso never contends that the Non-Founder Defendants defrauded it directly; those direct allegations are tied to Mattes and his direct representations to Bloso, as alleged in Count II. Similarly, Count V, which sounds in equitable fraud, is derivative rather than direct for the same reasons.[15]

Count VI is a claim for unjust enrichment and constructive trust.[16] Bloso contends that the Defendants took steps to retain and improve their financial positions to Bloso's detriment,

---

[13] *See SemCrude*, 796 F.3d at 318-19 ("[T]he course of conduct underlying the Oklahoma Plaintiffs' alleged loss—i.e., Kivisto's failure to disclose his risky trades or self-dealing or actively misrepresenting SemCrude's trading positions—is the exact same conduct underlying the alleged cause of SemCrude's bankruptcy and, therefore, the Litigation Trust's released claims against Kivisto. ... Thus, the Bankruptcy Court got it right the first time it passed on the issue: The injury suffered by the Oklahoma Plaintiffs is no different from the injury suffered by SemCrude as a result of Kivisto's wrongful conduct. Indeed, the Oklahoma Plaintiffs' alleged loss of capital went hand-in-hand with the titanic losses that SemCrude suffered in the run-up to its bankruptcy filing. The Oklahoma Plaintiffs' alleged injury therefore derives from SemCrude's injury.") (internal quotations and citations omitted).

[14] *See also id.* at 318 ("[T]o the extent the ... claims are masked claims for diminution in value of their limited partner units as a result of ... mismanagement, [the] claims are derivative[.]") (citation omitted).

[15] The Court's injunction of these claims applies to the Non-Founder Defendants, Starkey, and Kastenhofer. It does not apply, however, to Mattes. Bloso's alleged facts of fraud based on direct communications from Mattes are sufficient to constitute direct claims against him. As such, these claims are derivative to the Defendants with the exception of Mattes.

[16] Under Delaware law, "[t]he doctrine of constructive trust ... is an equitable remedy of great flexibility and generality, and is viewed as a remedial and not a substantive institution." *Hogg v. Walker*, 622 A.2d 648, 652 (Del. 1993) (internal quotations and alterations omitted). Furthermore, "[a] constructive trust is a remedy, and [a]

and they essentially forced Jumio into bankruptcy in order to evade liability through releases.[17]

Those accusations are accusations of self-dealing, which are derivative claims. Those actions, if true, show a taking from the corporate treasury, and any recovery would revert back to the corporate treasury. Thus, Count VI is derivative and Bloso's claim for unjust enrichment belongs to the estate.

Count VII is a claim for fraud in the inducement. Bloso alleges that the Defendants acted as direct agents on behalf of parties from whom Bloso acquired its shares. As such, Bloso argues that they are directly liable to it. Again, these claims are general to all shareholders and the corporation alike. Bloso does not contend that the Non-Founder Defendants fraudulently induced Bloso to acquire shares through direct communication. Rather, Bloso alleges that they are directly liable because they acted as agents for other parties. The specific facts alleged in this case show that the Non-Founder Defendants' actions were, if anything, harmful to the corporation and shareholders together, not to Bloso individually, and thus this claim is derivative.[18]

---

claim for one is secondary to, and derivative of, [the] underlying unjust enrichment claim. Because the success of the constructive trust remedy turns entirely on the success of the unjust enrichment claim, the Court's analysis at this procedural stage will address only the latter, not the former." *VTB Bank v. Navitron Projects Corp.*, 2014 WL 1691250, at *6 (Del. Ch. Apr. 28, 2014). Here, because the Court finds Bloso's unjust enrichment claim to be derivative, there is no need to delve into the constructive trust analysis.

[17] To the extent that these allegations present a challenge to the bankruptcy process and confirmed Plan, the Court will not entertain such arguments. The Court confirmed the Plan over Bloso's objections over a year ago. That confirmation order is final and non-appealable.

[18] Bloso states in its objection that its claim for fraudulent inducement "is not a 'fraud on the market' claim dependent on a presumption of reliance by all shareholders, because there were direct statements to Bloso by Mattes *that were merely reinforced by published reports of statements by Saverin and Weiss which confirm that they were acting with Mattes to perpetuate the claims of exaggerated revenue of Jumio.*" Obj. to Mot. of Non-Founder Civil Action Defs., ¶42 n. 4 (Docket No. 614) (emphasis added). The Court disagrees. Bloso alleges that Mattes made direct representations to Bloso that induced its investments. That direct communication may be enough to pursue a fraudulent inducement claim against Mattes, but that connection is too attenuated when it comes to the Non-Founder Defendants. The alleged representations made by the Non-Founder Defendants were public, not individualized to any particular shareholder. As such, this argument is unconvincing when it comes to showing that Count VII is a direct rather than a derivative claim when it comes to all Defendants. The Court thus finds that this Count is derivative to the Defendants with the exception of Mattes, as found previously with Counts IV and V.

Counts VIII and IX are for fraudulent transfers under the Delaware Code.  These counts are brought against Saverin, Ong, Weiss, Kastenhofer, Starkey and Stuut.  As discussed previously, these Counts are derivative because the Liquidating Trustee is acting on the creditors behalf generally, and any recovery that is obtained from these claims would return to the estate. As such, they are derivative claims and belong to the Liquidating Trust.[19]

Because the Court finds that the aforementioned claims are derivative and belong to the Liquidating Trust, Bloso is enjoined from pursuing them in the Court of Chancery.  Furthermore, Saverin, Ong, Weiss, and the AH Entities were released of all claims or liabilities under the Plan, thus precluding suit against them.[20]  Stuut, however, was not released under the Plan.  But, because Stuut is a transferred employee under the Plan, only the buyer of the claims would have standing to bring them against him.  Moreover, the Plan provided an exculpation provision whereby all officers would not "incur any liability to any holder of a Claim or Interest for any Exculpated Claim,[21] except for actual fraud, willful misconduct or gross negligence ... ."  Plan, Art. VIII.G (Docket No. 433).  That would include Stuut, the current CEO.

Kastenhofer, Starkey, and Mattes, each filed a joinder and limited objection to the Motion, arguing that the claims are derivative with respect to them as well, and the proposed order should be modified accordingly (Docket Nos. 596, 610, and 623 respectively).  The Court

---

[19] The Plan also states that the Liquidating Trustee will have the exclusive right to pursue any causes of action that are not waived or released by the Debtor or released pursuant to the Plan.  "Causes of Action" includes "any state law fraudulent transfer claim."  Plan, Art. I.A.18. (Docket No. 433).  Thus, under the Plan, the Liquidating Trustee has the sole right to pursue the asserted claims in Counts VIII and IX.

[20] The Liquidating Trustee agrees that all estate claims were released or are vested in the Liquidating Trust under the Plan.  *See* Limited Joinder of Liquidating Trust to Mot. of Non-Founder Civil Action Defs., ¶ 2 (Docket No. 586).

[21] The Plan defines "Exculpated Claim" as "any Cause of Action related to any act or omission derived from, based upon, related to or arising from (a) the Chapter 11 Case; (b) formulation, preparation ... negotiation ... the Plan; (c) the filing of the Chapter 11 Case ... and (f) the administration and implementation of the Chapter 11 Case and the Plan."  Plan, Art. I.A.49 (Docket No. 433).

agrees, and thus the injunction applies to them as well.[22]  The success of any claims against them will be determined in the already-filed adversary proceeding filed by the Liquidating Trust.

## IV.  Conclusion[23]

For the foregoing reasons, the Court will grant the Motion and Counts I, III, VI, VIII, and XI in the Complaint will be enjoined with respect to the Defendants.  Counts IV, V, and VII will also be enjoined with respect to the Defendants, with the exception of Mattes.  The parties are to confer regarding an appropriate form of order and to submit that proposed order under certification of counsel within 14 days of the date hereof.

Dated:  Wilmington, Delaware
     April 13, 2018

Brendan Linehan Shannon
Chief United States Bankruptcy Judge

---

[22] The injunction applies with the exception of Mattes under Counts IV, V, and VII, as discussed previously.  *See supra* notes 15, 18.

[23] A portion of Bloso's argument focuses on so-called "holder" claims.  Bloso relies on *Citigroup Inc. v. AHW Investment Partnership* for its reasoning.  140 A.3d 1125 (Del. 2016).  In that case, the Delaware Supreme Court answered a certified question from the United States Court of Appeals for the Second Circuit.  The court answered whether "claims of a plaintiff against a corporate defendant alleging damages based on the plaintiff's continuing to hold the corporation's stock in reliance on the defendant's misstatements as the stock diminished in value [are] properly brought as direct or derivative claims."  *Id.* at 1126.

The court first recognized that Delaware law did not apply, but that the laws of either New York or Florida governed the claims.  *Id.*  Despite that fact, the court held that such claims are recognized under the law of those two states, and they constitute direct claims "because they belong to the holders and are ones that only the holders can assert, not claims that could plausibly belong to the issuer corporation ... ."  *Id.* at 1138.  That determination was independent of any analysis under *Tooley* because "*Tooley* and its progeny do not, and were never intended to, subject commercial contract actions to a derivative suit requirement.  That body of case law was intended to deal with a different subject: determining the line between direct actions for breach of fiduciary duty suits by stockholders and derivative actions for breach of fiduciary duty suits ... ."  *Id.* (quoting *NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*, 118 A.3d 175, 179 (Del. 2015)).  As such, *Tooley's* test did not apply.  *Id.* at 1139.

While the court reaffirmed its explanation set forth in *NAF Holdings* pertaining to the narrow scope of *Tooley*, it stopped short of directly recognizing such claims under Delaware law.  *Citigroup Inc.*, 140 A.3d at 1134 ("In that case ... Delaware law would apply to the merits and we would have to decide whether that holder claim was cognizable at all and, if so, whether it was derivative or not.").  Thus, the question remains unclear as to whether such claims are recognized and how analyzed under Delaware law.  As one author noted, "the Delaware Supreme Court did not address directly [in *Citigroup*] the legal cognizability of holder claims.  As of today, no Delaware court has ever done so ... [and as such,] [h]older claims have an unsettled status in Delaware and many other states.  There is also no consensus on the legal viability of such claims in those states whose courts have considered them."  Edward T. McDermott, *Holder Claims--Potential Causes of Action in Delaware and Beyond?*, 41 Del. J. Corp. L. 933, 933, 935 (2017).

The Court will not wade into these uncharted waters here, to opine on an issue of state law that the state courts have yet to address.  Accordingly, the Court will not recognize such claims under Delaware law before Delaware does.

## COUNSEL TO THE PARTIES

Michael R. Nestor, Esq.
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 N. King Street
Wilmington, DE 19801

Peter M. Gilhuly, Esq.
LATHAM & WATKINS LLP
355 S. Grand Avenue, Suite 100
Los Angeles, CA 90071

Andrew R. Gray, Esq.
LATHAM & WATKINS LLP
650 Town Center Drive
20th Floor
Costa Mesa, CA 92626-1925

*Attorneys for Eduardo Saverin and Jumio Acquisition, LLC*

Adam G. Landis, Esq.
LANDIS RATH & COBB LLP
919 N. Market Street
Suite 1800, P.O. Box 2087
Wilmington, DE 19899

Shanti M. Katona, Esq.
POLSINELLI PC
222 Delaware Avenue
Suite 1101
Wilmington, DE 19801

George W. Shuster, Jr., Esq.
WILMER CUTLER PICKERING HALE AND DORR
7 World Trade Center
250 Greenwich Street
New York, NY 10007

*Attorneys for Debtor and Liquidating Trustee*

Leo D. Plotkin, Esq.

Bryan L. Bates, Esq.
Gary W. Marsh, Esq.
DENTONS US LLP
303 Peachtree Street, NE
Suite 5300
Atlanta, GA 30308

Charles E. Dorkey, III, Esq.
DENTONS US LLP
1221 Avenue of the Americas
New York, NY 10020

*Attorneys for Ampalu Investment GMBH and Samirana Investment Corp.*

Thomas F. Driscoll, III, Esq.
Ian C. Bifferato, Esq.
Kimberly Gattuso, Esq.
The Bifferato Firm PA
1007 N. Orange Street
4th Floor
Wilmington, DE 19801

*Attorneys for Daniel Mattes, Ampalu Investment GMBH, KTI Investment Foundation (Thomas Kastenhofer), and Samirana Investment Corp.*

Todd Charles Schiltz, Esq.
DRINKER BIDDLE & REATH LLP
222 Delaware Avenue
Suite 1410
Wilmington, DE 19801

*Attorney for Thomas Kastenhofer*

Michael L. Bernstein, Esq.
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001

William P. Bowden, Esq.

LEVY, SMALL & LALLAS
815 Moraga Drive
Los Angeles, CA 90049-1633

*Attorneys for Pinnacle Ventures Debt and Equity Funds*

Andrew John Roth-Moore, Esq.
MORRIS NICHOLS ARSHT & TUNNELL LLP
1201 N. Market Street
Wilmington, DE 19801

*Attorneys for James Cook and Stephen Stuut*

Christopher C. Cooke, Esq.
Patrick Murphy, Esq.
Murphy Cooke Kobrick LLP
177 Bovet Road
Suite 600
San Mateo, CA 94402

Michael G. BusenKell, Esq.
Gellert Scali Busenkell & Brown, LLC
1201 N. Orange Street
Wilmington, DE 19801

*Attorneys for Chad Starkey*

ASHBY & GEDDES
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19801

*Attorneys for AH Capital Management, LLC, Andreessen Horowitz Fund, II, LP, and Scott Weiss*

Matthew B. Heimann, Esq.
Charles A. Stanziale, Jr., Esq.
Steven A. Beckelman, Esq.
Jeffrey T. Testa, Esq.
MCCARTER & ENGLISH, LLP
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102

Kate Roggio Buck, Esq.
MCCARTER & ENGLISH, LLP
Renaissance Centre
405 N. King Street
8th Floor
Wilmington, DE 19801

*Attorneys for Bloso Investments, Ltd.*

"J" Jackson Shrum, Esq.
JACK SHRUM, P.A.
One Commerce Center
1201 N. Orange Street, Suite 502
Wilmington, DE 19801

*Attorneys for Peng-Tsin Ong*