# Exhibit A

sale of its assets in a controlled, court-supervised environment would be the best available option for it and its stakeholders. Jumio believes that the Chapter 11 process, including the proposed sale of its assets pursuant to the highest and otherwise best bid (as described below), will be seamless for its customers, result in minimal disruption to its operations, allow the company to strengthen its financial structure, and position it for significant future growth.

### *Legacy Issues*

21.     In 2015, Jumio restated its financial statements for the years of 2013 and 2014 (the "Restated Periods"). The determination to restate the financial statements for the Restated Periods was made after consulting with a third-party consulting firm and Jumio's legal advisors following the identification of errors related to primarily revenue recognition policies adopted by Jumio.

22.     In addition, in March 2015, the Board of Directors engaged special counsel to investigate, among other things, issues related to secondary sales of Jumio's common stock by certain (now former) executives of Jumio, including Mr. Mattes. On April 30, 2015, Mr. Mattes resigned from Jumio and its Board of Directors.

23.     On September 2, 2015, Jumio advised its shareholders it had recently restated its unaudited financial statements for the Restated Period during which prior management had been in place.

24.     As a result of these events, Jumio was subject to a number of additional costs and risks, including unanticipated costs for accounting and legal fees in connection with or related to the restatement, as well as the costs and expenses that could arise in connection with any investor litigation relating to the restatement – thereby making it essentially impossible to secure additional funding as needed.

# Exhibit B



**From: JD** joe@citizen.vc
**Subject:** Re: Draft of Placement Agency Agreement
**Date:** October 8, 2015 at 8:56 PM
**To:** Steve Stuut steve.stuut@jumio.com
**Cc:** Emilio DiSanluciano emilio@citizen.vc

Steve,

I appreciate your concern. Let me attempt to explain our concern.

Absent exclusivity we are competing against the company to raise the funds. If, for example, we had a 10% commissions structure and came up with an offer of $10/share, nothing prevents the company from going to another interested party and saying: $9.50 and it is yours.

Separately, it may be in the board's best interest to have someone incentivized to get the highest price. Given how the bridge was structured the board (as shareholders, not board members) does not have that incentive.

Another alternative is to have multiple agents. My experience as a banker is that that ensures reduced efforts on everyone's part and probably a higher fee structure. You would also be spending time arbitrating disputes between the agents as to whose client a potential investor is. I urge caution with respect to pursuing that route.

I would not want/do not want to reduce the efforts of the company to raise funds — this is critical to the company and impacts peoples' lives. Perhaps,as a way of aligning everyone's interest: we get a lower fee (say, 50%?) if funds are raised from someone contacted by the company during the tenure of our engagement? If we get fired and you subsequently contact someone we don't get paid.

FYI, I have never been fired by a client, don't intend to start now.

I assure you, with exclusivity you get our undivided attention. We have our reputation on the line (on several fronts).

I cannot guarantee success, I can guarantee effort.

Joe

Joe Dempsey
joe@citizen.vc
Office:    (650) 257-0875
Cell:      (973) 715-8330

> On Oct 8, 2015, at 8:21 PM, Stephen Stuut <steve.stuut@jumio.com> wrote:
>
> Joe,
>
> I started to scan the draft and then saw on the first page "exclusive agent." while I haven't actually discussed that term with the board, I don't think it is going to fly.  Emilio and I discussed that exclusivity wasn't going to work, so perhaps that is a vestige of the cloning?
>
> Regards
>
> Steve
>
>
>
> On 10/7/15, 4:22 PM, "JD" <joe@citizen.vc> wrote:
>
>> Hi Steve,
>> Following up on your discussion with Emilio, I have attached a draft of a PAA for your consideration.
>> For what it is worth, I largely cloned (i.e. plagiarized) a PAA we used several years back with Jumio!
>> Please don't worry about the length, a lot of it is reps & warranties. I have not shared this draft with our counsel (most of it is standard, so I am comfortable not doing so yet). I suspect some of the R&Ws might be "delete-able". However, I also suspect some form of those same R&Ws will be required by any professional investor(s), so best to be thinking about them in advance. As always, we are open to discussions about any/all terms in the PAA.
>> Most importantly, we are eager to get fully engaged with Jumio and to deliver the funds you need to grow the business.
>> All the best,
>> Joe
>>
>>
>> Joe Dempsey
>> joe@citizen.vc
>> Office:    (650) 257-0875
>> Cell:      (973) 715-8330

# Exhibit C



**From:** JD joe@citizen.vc
**Subject:** Re: Jumio Representation
**Date:** November 5, 2015 at 2:39 PM
**To:** Chad Starkey chad@jumio.com
**Cc:** Emilio DiSanIuciano emilio@citizen.vc, Glenn Luinenburg Glenn.Luinenburg@wilmerhale.com

Chad
At no point has Citizen.VC discussed an agency agreement with Jumio.
It was Morpheus Securities.
Obviously, it will be difficult for Morpheus to refer anyone Jumio's way without the protection of an agency agreement.
Thank you,
Joe

Joe Dempsey
joe@citizen.vc
Office:    (650) 257-0875
Cell:      (973) 715-8330

On Nov 5, 2015, at 2:35 PM, Chad Starkey <chad@jumio.com> wrote:

Emilio and Joe,

At yesterday's board meeting, the board expressed that it was not interested in executing the Agency Agreement with Citizen.vc at this time.  The company therefore requests that Citizen.vc not indicate, represent or advertise that it is Jumio's agent or representative in any fundraising discussions or otherwise.

If you know of any interested investors, we ask that you refer them directly to Steve Stuut.

Best,
Chad

--
Chad Starkey
General Counsel
Jumio Inc.

# Exhibit D

| | |
|---|---|
| **Subject** 🖈 : ✉ **Fwd: Following up** | |
| **From** 👤 : | ███████████████████ |
| **Date** 📅 : | **2 years ago** Tue, 26 Jan 2016 08:30:05 -0500 |
| **To** 👤 : | Joe Dempsey <joe@citizen.vc>, Emilio DiSanluciano <emilio@citizen.vc>, ████████████ |
| **Folder** 📁 : | Jumio 4.26.2016 ▾ ; Jumio Search 7.12.16 ▾ |

FYI.....they are not making it very easy.  They have not produced a single document that is investor/user friendly.



---------- Forwarded message ----------
From: **Steve Stuut** <steve.stuut@jumio.com>
Date: Tue, Jan 26, 2016 at 11:12 AM
Subject: Re: Following up
To: ████████████████████
Cc: Glenn Luinenburg <Glenn.Luinenburg@wilmerhale.com>, Wendy Hsu <wendy.hsu@jumio.com>


I respect your care in maintaining confidentiality and I appreciate your efforts, also that your ████ contact is close to you.  On the other hand, I learned from the CEO of ████ that they regularly use ████ ████, so we don't want to help ████ with any competitive insights.   Let's leave them out.

Regards

Steve

# Exhibit E

**De:** John Bivona <johnv@bivonalaw.com>
**Enviado:** lunes, 5 de octubre de 2015 08:43 a.m.
**Para:** ████████████████████
**Asunto:** Jumio update.

Dear Jumio Series A Investor,

This email is to give you an update on Jumio, Inc. The company expects to earn about $15 million this year and they will be re-stating their 2013 and 2014 earnings. The re-stated 2013 earnings are about $9 million down from a reported $100 million and the 2014 earnings are about $7 million down from a reported $150 million. Also, Daniel Mattes CEO and Founder is no longer with the company and is no longer on the Board of Directors.

We have been approached by an investor who has indicated that they would purchase all of our Series A shares in Jumio, Inc. at our cost ($0.50).

Please let us know if you want to sell your position in Jumio, Inc. at $0.50 (your cost) or if you do not want to sell we will have your shares registered in your name and sent to you because we are closing the fund they are held in.

Please let us know what your intention is by close of business Thursday October 8, 2015.

Thank you.

John V. Bivona, Esq.

200 Park Avenue

Suite 1700

New York, NY  10166

Tel. #:  (646) 415-7252

Fax #:  (646) 349-3340

*Exhibit F*

**THE INFORMATION CONTAINED IN THIS LETTER IS <u>CONFIDENTIAL AND PROPRIETARY</u> TO THE COMPANY AND IS BEING SUBMITTED TO YOU SOLELY FOR YOUR CONFIDENTIAL USE, WITH THE EXPRESS UNDERSTANDING THAT, WITHOUT THE PRIOR WRITTEN PERMISSION OF THE COMPANY, YOU WILL NOT RELEASE THIS DOCUMENT OR DISCUSS THE INFORMATION CONTAINED IN THIS DOCUMENT OR MAKE REPRODUCTIONS OF, DISSEMINATE OR USE THIS DOCUMENT FOR ANY PURPOSE. IN ADDITION, THIS OFFER IS MADE ONLY TO STOCKHOLDERS WHO QUALIFY AS "ACCREDITED INVESTORS UNDER REGULATION D PROMULGATED UNDER THE SECURITIES ACT OF 1933, AS AMENDED.**

December 23, 2015

Dear Stockholder:

As you may know, Jumio Inc. (the "**Company**" or "**Jumio**") recently restated its unaudited financial statements for fiscal years ended December 31, 2013, and December 31, 2014 (the "**Restated Financials**"), copies of which were provided to all stockholders that complied with the instructions provided in the Company's stockholder letter dated September 2, 2015. As a result, the Company's valuation may be lower than the implied valuation for the shares of common stock that you purchased. The Board has determined that it is in the best interest of the Company to offer those shareholders who potentially received certain information, including financial data derived from Jumio's 2013 unaudited financial statements (the "**Disclosures**"), in connection with their purchase of Jumio capital stock, a Warrant to address this issue in exchange for signing a Settlement Agreement. The Company does not admit any fault or wrongdoing. However, it believes that it is in the best interest of the Company to resolve any potential issues. Accordingly, the Company is prepared to issue you a warrant to purchase additional shares of common stock of the Company at a price per share of $0.0001 per share, in the form attached as <u>Schedule B</u> to the Settlement Agreement attached hereto as <u>Exhibit A</u> (the "**Warrant**").

*The Warrant*

Subject to its terms and conditions, the Warrant will entitle you to purchase from the Company up to the number of shares of the Company's common stock that equals the Warrant Amount (as defined below) at an exercise price of 0.0001 per share. The purpose of the Warrant is to effectively reprice the shares of common stock you purchased. The repricing will be based upon an independent valuation of the Company, which will be determined by either the lead investor in the Company's next round of financing (which is expected to be its Series D Preferred Stock financing) or by reference to the Company's latest independent valuation of its common stock prepared for the purposes of complying with Section 409A of the Internal Revenue Code, as amended. The formula for the Warrant Amount is provided below along with an example for your reference.

The "**Warrant Amount**" is calculated as the difference between (i) the quotient of the Aggregate Secondary Sale Purchase Amount divided by the Adjusted Price and (ii) the Number of Shares Purchased in Secondary Sales. The term "**Aggregate Secondary Sale Purchase Amount**" means the aggregate purchase price paid for shares of the Company's common stock purchased by you pursuant to the Stock Transfer Agreements by and amongst you, the Company and the Sellers of the common stock listed therein (the "**Stock Transfer Agreements**"). The term "**Adjusted Price**" shall mean (i) ninety percent (90%) of the quotient of the Adjusted Next Equity Financing Price Per Share (as defined in the Warrant), or (ii) if the next equity financing has not occurred prior to May 15, 2016 and/or in the event of a Change of Control (as defined in the Warrant), the Company's latest independent valuation of the Company's

ActiveUS 149028033v.4

<u>CONFIDENTIAL-FRE 408</u>
Stockholders of Jumio, Inc.
December 23, 2015
Page 2

common stock prepared for the purposes of complying with Section 409A of the Internal Revenue Code, as amended.  The term **"Number of Shares Purchased in Secondary Sales"** shall mean the aggregate number of shares of the Company's common stock purchased by you pursuant to the Stock Transfer Agreements.

> For example, the Warrant would be exercisable for 100,000 shares assuming the following facts:

> Aggregate Secondary Sale Purchase Amount = $460,000 ($4.60 per share x 100,000 shares)

> Adjusted Next Equity Financing Price Per Share (as defined in the Warrant) = $2.56

> Adjusted Price = $2.30 (90% of $2.56, the Adjusted Next Equity Financing Price Per Share)

> Number of Shares Purchased in Secondary Sales = 100,000 shares of Common Stock

> Warrant Amount = 100,000 (calculated as $460,000/$2.30) – 100,000 = 100,000 shares

The foregoing description is for illustrative purposes only and is qualified in its entirety by reference to the Warrant attached as <u>Schedule B</u> to the Settlement Agreement, which is attached as <u>Exhibit A</u> to this letter.

*Settlement Agreements*

As a condition of receiving the Warrant, the Company is asking you to sign the Settlement Agreement attached hereto as <u>Exhibit A</u>.  The Company has denied and continues to deny any liability to you or any other Company stockholder in connection with the Restated Financials or the Disclosures, and wants to enter into the Settlement Agreement solely to avoid the expense and distraction of any potential stockholder claim or dispute.  Please note, the Settlement Agreement contains a release of the Released Claims (as defined in the Settlement Agreement) against the Released Parties (as defined in the Settlement Agreement) (the **"Release"**).  You are encouraged to consult with legal counsel prior to executing the Settlement Agreement to understand the implications of Settlement Agreement, including the Release.

The foregoing description is qualified in its entirety by reference to the Settlement Agreement, which is attached as <u>Exhibit A</u> to this letter.

As the issuance of the shares of common stock underlying the Warrant will be dilutive to all other stockholders and option holders (the **"Securityholders"**) of the Company, the Company plans to offer all other Securityholders a "top up" to maintain their *pro rata* ownership (the **"Top-Up"**).  In particular, if the Securityholder holds shares of the Company's capital stock, the Company's plans to issue the Securityholder a number of shares of the Company's common stock and/or preferred stock to substantially maintain such Securityholder's *pro rata* ownership interest in the Company on a fully-diluted, as converted to common stock basis after the issuance of the Warrants.  If the Securityholder holds options to purchase shares of the Company's common stock, the Company plans to grant the Securityholder a new stock option (the **"New Option"**) to purchase shares of the Company's Common Stock under its 2010 Stock Option Plan (the **"Plan"**) at the fair market value of the Company's Common Stock as determined by the Board of Directors on the date the Board approves such grant.  The New Option shall have a vesting schedule substantially identical to the vesting schedule in the Securityholder's existing stock option(s) (the **"Existing Options"**).  The number of shares of Common Stock underlying

ActiveUS 149028033v.4

<u>CONFIDENTIAL-FRE 408</u>
Stockholders of Jumio, Inc.
December 23, 2015
Page 3

the New Option in addition to the number of shares underlying the Existing Options shall substantially maintain such Securityholder's pro rata equity interest in the Company on a fully-diluted, as converted to common stock basis after the issuance of the Warrants.  The dilutive impact of the Top-Up will be factored into the calculation of the Warrant Amount so that you will receive anti-dilution protection for the Top-Up issuances.  As a condition of receiving the Top-Up, the Company is asking each Securityholder to also sign the Settlement Agreement.

The acceptance of all the Settlement Agreements by the Company will be determined by the Board of Directors of the Company, in its sole discretion, after considering, in part, the number of stockholders (including the Securityholders) that have agreed to the terms and conditions of the Settlement Agreements.  At such time, the Company will either (i) accept the Settlement Agreements, at which time they shall become binding on all the parties thereto, or (ii) not accept the Settlement Agreements, at which time they shall be of no further force and effect.  The Warrant will not be issued until the Settlement Agreements are accepted by the Board of Directors.  In addition, the Warrant will not be exercisable until the Company has amended its Amended and Restated Certificate of Incorporation as described below (the **"Certificate of Incorporation"**), which will require the prior consent of the stockholders of the Company.   By agreeing to the Settlement Agreement, you are also agreeing to vote or cause to be voted all shares of capital stock owned by you, or over which you have voting control, as shall be necessary to amend the Certificate of Incorporation to increase the number of authorized shares of Common Stock to ensure that there will be sufficient shares of Common Stock available for issuance of the shares underlying the Warrant as well as the issuance of shares to other Securityholders of the Company, and to effect any additional changes, modifications, or amendments that may be required to in order to effectuate the consummation of the recapitalization of the Company or to otherwise carry out the intent of the parties under the Settlement Agreements.

*What You Should Do Now*

The Company has prepared a secure data room which contains the Company's restated financial statements, additional information about the Company and its operations, a set of risk factors associated with a potential investment in the Company, and other information.  To the extent that you have not already been granted access to the data room, please contact Investor Relations at Jumio to request access at the following email address:  investorrelations@jumio.com/.  Upon receipt of your request, the Company will contact you with instructions on how to enter the secured data room.

After you have reviewed the Settlement Agreement, the Warrant and the information in the secured data room, if you decide to execute the Settlement Agreement and receive the Warrant, please **kindly execute and return the Settlement Agreement by PDF or FAX to:**

Samantha Sotto | WilmerHale
950 Page Mill Road
Palo Alto, CA 94304 USA
+1 650 858 6100 (fax)
Samantha.Sotto@wilmerhale.com

If you execute the Settlement Agreement, the Company will issue to you a Warrant in the form attached as <u>Schedule B</u> to the Settlement Agreement promptly after the Settlement Agreements have been accepted by the Board of Directors.

ActiveUS 149028033v.4

CONFIDENTIAL-FRE 408
Stockholders of Jumio, Inc.
December 23, 2015
Page 4

If you have any questions regarding the foregoing information contained in this letter, please send all questions and inquiries to investorrelations@jumio.com.

Thank you for your prompt attention to this matter.

Very truly yours,

Stephen Stuut
Chief Executive Officer

ActiveUS 149028033v.4

**Exhibit G**

significant portion of the assets of the Debtor. The Debtor submits that a successful Sale is the best way to maximize the value of the Debtor's estate.

<u>Sagent's Qualifications</u>

15.      The Debtor chose Sagent to act as its investment banker because Sagent is a leading independent investment bank focused on providing strategic and financial advice on mergers, acquisitions, sales, divestitures and private capital solutions. Sagent has (i) extensive knowledge of potential strategic and financial buyers interested in the Debtor's industry internationally and (ii) substantial sell-side investment banking experience including the recent bankruptcy case in the Third Circuit *inter alia*: *In re Haggen Holdings, LLC*, Case No. 15-11874 (KG) (Bankr. D. Del. Oct. 8, 2015). Sagent Advisors' Financial Technology & Services Investment Banking practice maintains relationships with numerous technology firms and private equity firms focused on technology and service investments. Sagent's bankers have worked on various sales, mergers, and acquisitions involving financial technology and services firms in recent years including advising Blackbaud on its acquisition of Smart Tuition in 2015, advising i-transfer on its sale to Unidos Financial Services in 2014, advising Pegasus Solutions on the sales of its Distribution Services business to H.I.G Capital in 2014, its Reservation Services business to Regent Equity Partners in 2014, and its Financial Services business to H.I.G. Capital in 2013, and advising FFastfill on its sale to a subsidiary of Ion Trading Ireland in 2013. As a result, the Debtor believes that Sagent is well qualified to perform these services and represent the Debtor's interest in this Chapter 11 Case.

<u>Pre-Petition Services Provided</u>

16.      Before the Petition Date, the Debtor engaged Sagent, pursuant to the engagement letter dated December 21, 2015 (the "Prior Engagement Agreement"), to provide advisory

services in connection with a potential sale of the Debtor. The Engagement Agreement, which includes additional advisory services relating to a potential recapitalization, supersedes and replaces the Prior Engagement Agreement in its entirety.

17.    In rendering these prepetition services to the Debtor, Sagent worked closely with the Debtor's management team and has, therefore, become well-acquainted with the Debtor's business operations and capital structure. Accordingly, Sagent has developed significant expertise regarding the Debtor that will assist it in providing effective and efficient investment banking services during this Chapter 11 Case.

### Sagent's Disinterestedness

18.    To the best of the Debtor's knowledge, information and belief, and based entirely and in reliance upon the Epstein Declaration: (a) Sagent is a "disinterested person" within the meaning of Bankruptcy Code section 101(14) and as required by Bankruptcy Code section 327(a), and holds no interest materially adverse to the Debtor, its creditors and shareholders for the matters for which Sagent is to be employed; and (b) Sagent has no connection to the Debtor, its creditors, shareholders or related parties herein except as disclosed in the Epstein Declaration. Moreover, the retention and employment of Sagent is necessary and in the best interests of the Debtor, its estate, creditors and equity interest holders.

19.    Furthermore, to the best of the Debtor's knowledge, information and belief, and based entirely and in reliance upon the Epstein Declaration, none of Sagent's past or current engagements would or do appear to create an interest materially adverse to the interests of the Debtor, creditors or equity security holders in this Chapter 11 Case. As such, the Debtor believes that Sagent is disinterested and holds no materially adverse interest as to the matters upon which it is to be retained. To the extent that Sagent discovers any facts bearing on the

Exhibit H

THE INFORMATION CONTAINED IN THIS LETTER IS CONFIDENTIAL AND PROPRIETARY TO THE COMPANY AND IS BEING SUBMITTED TO YOU SOLELY FOR YOUR CONFIDENTIAL USE, WITH THE EXPRESS UNDERSTANDING THAT, WITHOUT THE PRIOR WRITTEN PERMISSION OF THE COMPANY, YOU WILL NOT RELEASE THIS DOCUMENT OR DISCUSS THE INFORMATION CONTAINED IN THIS DOCUMENT OR MAKE REPRODUCTIONS OF, DISSEMINATE OR USE THIS DOCUMENT FOR ANY PURPOSE. IN ADDITION, THIS OFFER IS MADE ONLY TO STOCKHOLDERS WHO QUALIFY AS "ACCREDITED INVESTORS" UNDER REGULATION D PROMULGATED UNDER THE SECURITIES ACT OF 1933, AS AMENDED.

January 14, 2016

Dear Securityholder:

As you may know, Jumio Inc. (the "**Company**" or "**Jumio**") recently restated its unaudited financial statements for fiscal years ended December 31, 2013, and December 31, 2014 (the "**Restated Financials**"), copies of which were provided to all stockholders that complied with the instructions provided in the Company's stockholder letter dated September 2, 2015. The Board of Directors of the Company (the "**Board**") recently determined that it is in the best interest of the Company to offer certain stockholders who may have reviewed financial data derived from Jumio's 2013 unaudited financial statements (the "**Disclosures**") in connection with their purchase of Jumio capital stock, a warrant to purchase additional shares of common stock of the Company (the "**Warrants**") in exchange for signing a settlement agreement. As the issuance of the shares of common stock underlying the Warrants may be dilutive to all other stockholders, option holders and warrant holders (the "**Securityholders**") of the Company, the Company also plans to offer you a potential "top up" to maintain your *pro rata* ownership (the "**Top-Up**"), as provided in more detail below, in exchange for signing a Settlement Agreement attached hereto as Exhibit A. The Company does not admit any fault or wrongdoing. However, it believes that it is in the best interest of the Company to resolve any potential issues with the holders of its securities.

### *The Warrant*

Subject to its terms and conditions, the Warrants will entitle the holders to purchase from the Company up to the number of shares of the Company's common stock that equals the Warrant Amount (as defined in the Warrants) at an exercise price of $0.0001 per share. The purpose of the Warrant is to effectively reprice the shares of common stock that the stockholder had purchased. The repricing will be based upon an independent valuation of the Company (the "**Independent Valuation**"), which will be determined by either the lead investor in the Company's next round of financing (which is expected to be its Series D Preferred Stock financing) or by reference to the Company's latest independent valuation of its common stock prepared for the purposes of complying with Section 409A of the Internal Revenue Code, as amended. At this time, the Company cannot determine the aggregate number of shares of common stock that the holders of the Warrants will receive upon exercise of the Warrants because the formula for calculating that number of shares is based upon the Independent Valuation.

Certain stockholders of the Company, and their affiliates, that sold shares of common stock of the Company in the secondary market (the "**Selling Stockholders**") have agreed to contribute to the Company their remaining shares of common stock of the Company to offset the dilutive impact of the issuance of the common stock underlying the Warrants. The total number of shares of common stock to be contributed by these Selling Stockholders is equal to approximately 15.4 million shares of common

CONFIDENTIAL-FRE 408
Stockholders of Jumio, Inc.
January 14, 2016
Page 2

stock (the "**Contributed Shares**"), which currently represents approximately 14.5% of the Company's fully diluted capitalization.

If the Company is required to issue less than 15.4 million shares of common stock to cover the exercise of the Warrants, the contribution of the Contributed Shares by the Selling Stockholders will be accretive to all stockholders. However, if the Company needs to issue more than 15.4 million shares of common stock of the Company to cover the exercise of the Warrants, the shares issued in excess of the Contributed Shares will be dilutive to all Securityholders.

### *The Top-Up*

As mentioned above, the Company plans to offer all Securityholders (other than the Selling Stockholders) a "top up" to maintain their *pro rata* ownership interest on a fully-diluted basis (the "**Top-Up**") to offset this potential dilution. In particular:

- If the Securityholder holds shares of the Company's capital stock, the Company's plans to issue the Securityholder a number of shares of the Company's common stock and/or preferred stock to substantially maintain such Securityholder's *pro rata* ownership interest in the Company on a fully-diluted, as converted to common stock basis after the issuance of the Warrants.

- If the Securityholder holds options to purchase shares of the Company's common stock, the Company plans to grant the Securityholder a new stock option (the "**New Option**") to purchase shares of the Company's common stock under its 2010 Stock Option Plan (the "**Plan**") at the fair market value of the Company's common stock as determined by the Board of Directors on the date the Board approves such grant. The New Option shall have a vesting schedule substantially identical to the vesting schedule in the Securityholder's existing stock option(s) (the "**Existing Options**"). The number of shares of common stock underlying the New Option in addition to the number of shares underlying the Existing Options shall substantially maintain such Securityholder's *pro rata* equity interest in the Company on a fully-diluted, as converted to common stock basis after the issuance of the Warrants.

- If the Securityholder holds warrants to purchase shares of the Company's capital stock (an "**Existing Warrant**"), the Company plans to amend the Existing Warrant to increase the number of shares of capital stock that the Securityholder has a right to purchase and also decrease the per share exercise price of the warrant (such amended warrant to be referred to herein as the "**Amended Warrant**"). The Amended Warrant shall have the same aggregate exercise price as the Existing Warrant, but the number of shares underlying the Amended Warrant shall substantially maintain such Securityholder's *pro rata* equity interest in the Company on a fully-diluted, as converted to common stock basis after the issuance of the Warrants.

The net result of the Top-Up is that, if the Company needs to issue more than 15.4 million shares of common stock of the Company to cover the exercise of the Warrants, all Securityholders (other than Selling Stockholders) will receive additional shares of capital stock of the Company (or rights to acquire additional shares of capital stock of the Company) to maintain their current ownership on a fully-diluted basis. The Company estimates that it will be required to issue more than the 15.4 million shares of common stock of the Company to cover the exercise of the Warrants if the Independent Valuation is lower than $190 million.

ActiveUS 151421598v.2

<u>CONFIDENTIAL-FRE 408</u>
Stockholders of Jumio, Inc.
January 14, 2016
Page 3

*Settlement Agreements*

As a condition of receiving the Top-Up, the Company is asking you to sign the Settlement Agreement attached hereto as <u>Exhibit A</u>. The Company has denied and continues to deny any liability to you or any other holder of the Company's securities in connection with the Restated Financials or the Disclosures, and wants to enter into the Settlement Agreement solely to avoid the expense and distraction of any potential stockholder claim or dispute. Please note, the Settlement Agreement contains a release of the Released Claims (as defined in the Settlement Agreement) against the Released Parties (as defined in the Settlement Agreement) (the "**Release**"). You are encouraged to consult with legal counsel prior to executing the Settlement Agreement to understand the implications of Settlement Agreement, including the Release.

The foregoing description is qualified in its entirety by reference to the Settlement Agreement, which is attached as <u>Exhibit A</u> to this letter.

The acceptance of all the Settlement Agreements by the Company will be determined by the Board of Directors of the Company, in its sole discretion, after considering, in part, the number of Securityholders that have agreed to the terms and conditions of the Settlement Agreements. At such time, the Company will either (i) accept the Settlement Agreements, at which time they shall become binding on all the parties thereto, or (ii) not accept the Settlement Agreements, at which time they shall be of no further force and effect. The Warrants will not be issued until the Settlement Agreements are accepted by the Board of Directors. In addition, the Warrants will not be exercisable until the Company has amended its Amended and Restated Certificate of Incorporation as described below (the "**Certificate of Incorporation**"), which will require the prior consent of the stockholders of the Company. By agreeing to the Settlement Agreement, you are also agreeing to vote or cause to be voted all shares of capital stock owned by you, or over which you have voting control, as shall be necessary to amend the Certificate of Incorporation to increase the number of authorized shares of common stock to ensure that there will be sufficient shares of common stock available for issuance of the shares underlying the Warrant as well as the issuance of shares or other securities to Securityholders of the Company in the Top-Up, and to effect any additional changes, modifications, or amendments that may be required to in order to effectuate the consummation of the recapitalization of the Company or to otherwise carry out the intent of the parties under the Settlement Agreements.

*What You Should Do Now*

The Company has prepared a secure data room which contains the Company's restated financial statements, additional information about the Company and its operations, a set of risk factors associated with a potential investment in the Company, and other information. To the extent that you have not already been granted access to the data room, please contact Investor Relations at Jumio to request access at the following email address: investorrelations@jumio.com. Upon receipt of your request, the Company will contact you with instructions on how to enter the secured data room.

CONFIDENTIAL-FRE 408
Stockholders of Jumio, Inc.
January 14, 2016
Page 4

For your convenience, the Company will be sending you a personalized copy of the Settlement Agreement and your signature pages via Docusign, which will enable you to electronically sign the Settlement Agreement.  After you have reviewed the Settlement Agreement and the information in the secured data room, if you decide to execute the Settlement Agreement and receive the Top-Up, please **kindly electronically sign the Settlement Agreement via Docusign on or prior to January 22, 2016.**

Alternatively, you may complete and sign the signature page on page 9 of the Settlement Agreement attached as Exhibit A to this letter and return by PDF or FAX to:

Samantha Sotto | WilmerHale
950 Page Mill Road
Palo Alto, CA 94304 USA
+1 650 858 6100 (fax)
Samantha.Sotto@wilmerhale.com

If you have any questions regarding the foregoing information contained in this letter, please send all questions and inquiries to investorrelations@jumio.com.

Thank you for your prompt attention to this matter.

Very truly yours,

Stephen Stuut
Chief Executive Officer

**From:** **JD** joe@citizen.vc 📎
**Subject:** Clarifying the Warrant / Top-Up scheme
**Date:** January 18, 2016 at 4:29 PM
**To:** James Cook james.cook@jumio.com
**Cc:** investorrelations@jumio.com


# Exhibit I

James,
I have attached a letter outlining my confusion regarding the Warrant / Top-Up scheme.
Prior to learning your contact information I have discussed some of this with Glenn Luinenburg and have, therefore, cc'ed him.
Would greatly appreciate it if you could help me to understand this.
It is quite likely I am simply dense, in which case I apologize in advance.
There are also a few due diligence type questions.
In either case I appreciate your help.
I can be reached at any time on the numbers below,
Joe



**Ltr to James
Cook o...h.docx**

Joe Dempsey
joe@citizen.vc
Office:    (650) 257-0875
Cell:      (973) 715-8330

On Jan 14, 2016, at 11:09 PM, James Cook <james.cook@jumio.com> wrote:

CONFIDENTIAL COMMUNICATION

Dear Securityholder of Jumio, Inc.

As you may know, Jumio Inc. (the "Company" or "Jumio") recently restated its unaudited financial statements for fiscal years ended December 31, 2013, and December 31, 2014. The Board of Directors of the Company recently determined that it was in the best interest of the Company to offer certain shareholders who received financial data derived from Jumio's 2013 unaudited financial statements in connection with their purchase of Jumio capital stock a Warrant in exchange for signing a settlement agreement. As the issuance of the shares of common stock underlying these Warrants could be dilutive to all other stockholders, option holders and warrant holders of the Company, the Company also plans to offer you a potential "top up" to maintain your current *pro rata* ownership (the "Top-Up"). More detail is provided in the attached letter, along with a Settlement Agreement which you need to sign and return in order to participate in the Top-Up. The Company does not admit any fault or wrongdoing. However, it believes that it is in the best interest of the Company to resolve any potential issues with the holders of its securities.

You will shortly receive a personalized version of the Settlement Agreement via Docusign. Please sign and return prior to Friday, January 22, 2016 if you wish to participate in the Top-Up.

Kind regards
James Cook

James,

We received the letter of January 14, 2016 describing, among other things, The Top-Up. Attached thereto was a Settlement Agreement. Considered in conjunction with the letters of December 23, 2015 (which included a different Settlement Agreement) and January 10, 2015 I am confused. Given that we have members of our fund that holds the underlying shares of Jumio that lead to us receiving the letters, we need to be certain we understand the letters and the two Settlement Agreements before signing one, the other or both.

The letters of 12/23 and 1/14 are consistent in their definition of Securityholders. Citizen.VC, LLC is not a Securityholder as defined in those letters. Therefore, I am confused as to why we are being asked to sign the Jan 14th Settlement Agreement. Can you explain?

I am further confused after reading the Jan 14th Settlement Agreement. For example, paragraph I.C. states that the issuance of the Warrants could potentially be dilutive to us. Not sure how that could possibly happen purely by the issuance of the Warrants. Can you explain and/or give an example (which might be the best way to explain)?

Paragraph II.1. is further confusing. Specifically, it states that we will be issued common shares to maintain our pro rata ownership _after_ the issuance of the Warrants. The issuance of the Warrants will in and of itself define our ownership after the issuance. Why is there any need to issue shares to maintain our ownership? If the intent is to issue shares to all Securityholders (per page 2 of the Jan 14th letter) to maintain their pro rata ownership prior to the Warrant Issuance, the Top-Up completely counter-acts the issuance of any Warrants above and beyond 15.4 million.

Your email of Jan 14th is even further confusing. The statement the Company also plans to offer you a potential "top up" to maintain your current _pro rata_ ownership would suggest that, in our case, the Top-Up would completely reverse the purported benefit of the Warrant.

Trying to reconcile all of the above, I believe the net result is that the Warrant issuance has an effective floor price. If I am correct, that should be easy to calculate. Can you tell me what it is?

I have a few other due diligence type questions:

1. Schedule B to the Warrant attached to the Dec 23rd letter (i.e. the actual warrant) lists 98,666,521 fully-diluted shares outstanding. The letter of Jan 14th states that the 15.4 million shares contributed by the Selling

Stockholders represents approximately 14.5% of the Company. Am I correct that the fully diluted share count is now approximately 106.2 million?

2. Are there any criteria for the Next Equity Financing (as defined in the Warrant)? For example, could it be satisfied by a small issuance at a lofty Pre-Money Valuation? (Granted this is only theoretical.)

3. If the Adjusted Price of the Warrant is determined by the 409A valuation, do you know that number and, if so, what is it?

4. If the 409A valuation has been determined, was it determined based upon the restated financials?

5. If it has not been determined, do you have an estimate for the date at which it will be determined?

I appreciate your patience in helping me to understand this. Recognizing the timeframe for resolving signatures, I will make myself available as best possible to discuss this.

Thank you in advance.

**Exhibit J** 

**From:** Joe Dempsey joe@citizen.vc
**Subject:** Follow Up to our call
**Date:** February 8, 2016 at 1:50 PM
**To:** Glenn Luinenburg Glenn.Luinenburg@wilmerhale.com
**Cc:** John Demeter John.Demeter@wilmerhale.com

Glenn,
At the risk of sounding repetitive, I apologize for making your life more difficult as I parse through the Settlement Agreement and, specifically, the Warrant structure.
I am hoping that the attached note, which summarizes the drill I walked you through on the call, can help you (or John) guide me to what I am missing.
Please let me know.
Thanks in advance,
Joe

Glenn,

First of all, I apologize if I have come across as an obstacle or made your life more difficult as you work Jumio through this challenging situation. That is not my intent at all. We (Citizen VC) have a duty to our investors to assure that we understand the terms of a complex offering before accepting it. Second, as both a friend to you and Jumio I want to be sure that the waivers you receive stand up to scrutiny and do not fail because of disclosure.

As I tried to explain, I have yet to understand the scheme. Here is the arithmetic we walked through on the call. You previously corrected my understanding with respect to the Deemed Issuance of Additional Shares of Common Stock and I am hopeful you can do so again, at which point we will sign the Settlement Agreement.

1. The Secondary Market Purchasers purchased 6,034,552 shares of common at $4.60 per share for of $27.578MM.
2. The number of Warrants the Secondary Market Purchasers should receive equals Aggregate Secondary Sale Purchase Amount divided by the Adjusted Price less 6,034,552.
3. The Adjusted Price = 90% of the Adjusted Next Equity Financing Price per Share. (Let's put aside the 409A option).
4. The Adjusted Next Equity Financing Price per Share = Pre-Money Valuation divided by the Adjusted Fully-Diluted Capitalization.
5. The Adjusted Fully-Diluted Capitalization = (in our case) 98,666,521 plus any Deemed Issuance of Additional Shares of Common Stock.
6. Shares issued for the Top-Up are considered Deemed Issuance of Additional Shares of Common Stock.
7. In the spreadsheet you provided, on the first tab (With Contribution), in that scenario, the number of Deemed Issuance of Additional Shares of Common Stock = Approximately 256MM (Row 25, Columns K through N).
8. Adding the 256MM to our 98MM results in an Adjusted Fully-Diluted Capitalization of approximately 354MM.
9. In the scenario in tab With Contribution, with a Pre-Money Valuation of $60MM and Adjusted Fully-Diluted Capitalization of approximately 354MM, the Adjusted Next Equity Financing Price per Share would be ~$0.17 and the Adjusted Price would be ~$0.15.
10. The Warrant Amount for the Secondary Market Purchasers would therefore be: $27.578MM divided by $0.15 less 6,034,552 = ~174MM.
11. The spreadsheet shows in Cell D30 of the tab Contribution Amount the Warrant Amount = 87.8MM.

I don't know if it is coincidence or not, but the number I calculate is essentially 2x the number in the spreadsheet. I am wondering if I am missing something obvious?

Again, I know you are dealing with a lot but I hope you appreciate the spirit in which I am asking these questions.  Let me know what you think.  Hopefully I am simply wrong, in which case my apology will become meaningfully stronger but no less meant.



Dilutive Impact
of Repr...(1).xlsx

Joe Dempsey
joe@citizen.vc
Office:    (650) 257-0875
Cell:      (973) 715-8330

**From: Luinenburg, Glenn** Glenn.Luinenburg@wilmerhale.com
**Subject:** RE: Follow Up
**Date:** January 12, 2016 at 6:01 PM
**To:** JD joe@citizen.vc



Exhibit K

#1 – True.  They have surrendered all of their shares in return for a release.

#2 – True.  They will not be returned.

#3 – Yes, but some of the holders don't know what a stock split is – and they will, in fact, receive additional shares.  It' just that their relative ownership on a fully –diluted basis will not change.

**Glenn J. Luinenburg | WilmerHale**
950 Page Mill Road
Palo Alto, CA 94304 USA
+1 650 858 6075 (t)
+1 650 858 6100 (f)
glenn.luinenburg@wilmerhale.com

**Please consider the environment before printing this email.**

---

**From:** JD [mailto:joe@citizen.vc]
**Sent:** Tuesday, January 12, 2016 2:57 PM
**To:** Luinenburg, Glenn
**Subject:** Re: Follow Up

Glenn,
Sorry to be a pest.
Is the letter inaccurate?
Perhaps I still do not understand the proposal?

See these two extracts:

1.  (the "**Selling Stockholders**") have agreed to contribute to the Company their remaining shares of common stock of the Company to offset the dilutive impact of the issuance of the common stock underlying the Warrants

2.  the contribution of the Contributed Shares by the Selling Stockholders will be accretive to all stockholders.

#1 would suggest that, for example, Daniel/Ampalu will no longer have a stake in the Company. Is that true?
#2 would suggest that if the Company does not use all of the Contributed Shares that they will not be returned to the Selling Stockholders.  Otherwise, how would it be accretive to, for example, Series A Preferred holders?  My understanding was that up until 15.4MM shares it was effectively a transfer to the folks who bought from the Selling Stockholders.

Finally, as i understand it, when the letter says

 all Securityholders will receive additional shares of capital stock of the Company (or rights to acquire additional shares of capital stock of the Company), but their ownership on a fully-diluted basis will remain constant

It might be more accurate to say that the percentage ownership achieved upon distribution of

**From:** Joe Dempsey joe@citizen.vc 
**Subject:** Series D
**Date:** February 10, 2016 at 12:21 PM
**To:** Glenn Luinenburg Glenn.Luinenburg@wilmerhale.com
**Bcc:** michael@foxpointcap.com, emilio@citizen.vc

# Exhibit L

Hi Glenn,
First, in case I was not clear, based on our discussion yesterday I will have Zain release his signature on the Settlement Agreement. I appreciate your patience and help on the matter. I am not, as you know, a fan of the Top-Up, but that train has left the station.

With respect to the Series D, we believe we might generate some interest but it will be a challenge given the limited timeframe.
It might facilitate matters (i.e. increase the likelihood of success) if we could preempt the dance between investor and the company, recognizing that (in my opinion) a structured deal has the best chance of success.
I would like, therefore, to offer a straw man idea of a deal structure we might use with potential investors. Your feedback on how it might play would be very helpful.
Here is my idea:
1. Have the investor buy out ████████. This would require shares from DM, which I understand he is and has been prepared to give up. Moreover, I understand he has been willing to offer a very attractive price. A question for you: where do these shares actually come from if DM is contributing all of his shares to the Settlement scheme?
2. The investor buys a series D security that is 1) super senior to all other Series D and 2) has 2x liquidation preference. This way, absent a complete wipeout scenario he recoups all of his investment. This also reduces his sensitivity to the ultimate share price.

I have attached a spreadsheet with multiple tabs. The tabs "████████ Analysis", "Series D Analysis" and "Preference Summary" lay out how this might look. If the idea has any merit/chance I would like to get actual numbers so we have something to show a prospect.

If the idea is a non-starter, please let me know the problem points so we might go back to the drawing board.

Please note that I believe a critical issue will be the price vis-a-vis ES's convertible note. While I believe a higher price per share for the Series D has many merits, it would reduce his conversion shares. (See bottom of Series D Analysis)

Let me know your thoughts.

All the best,
Joe



**Jumio**
Settle...sis.xlsx

Joe Dempsey
joe@citizen.vc
Office:    (650) 257-0875
Cell:      (973) 715-8330

**Exhibit M**

From: **Joe Dempsey** joe@citizen.vc
Subject: **Bridge**
Date: February 1, 2016 at 2:52 PM
To: Steve Stuut steve.stuut@jumio.com, Glenn Luinenburg Glenn.Luinenburg@wilmerhale.com
Bcc: emilio@citizen.vc

S & G,
Believe it or not, on Friday we had a call with the investor who had previously expressed interest in the bridge. On the call was the investor's tax counsel who had questions we resolved.
They told us they are ready to wire funds (they have previously indicated $750K).
We told him that that with the passage of time we were unsure whether the opportunity could be resuscitated, that we would check with you and get back to him.
Shall we move forward?
Joe

Joe Dempsey
joe@citizen.vc
Office:    (650) 257-0875
Cell:      (973) 715-8330

Exhibit N 

**From:** Joe Dempsey joe@citizen.vc
**Subject:** Fwd: Series D
**Date:** March 28, 2016 at 3:25 PM
**To:** Arun Ramamoorthy aramamoorthy@pinnacleventures.com

I neglected to mention in my previous email, it was in response to this email that Glenn told me there was a meeting upcoming with you (i.e. Pinnacle) regarding a term sheet.

Joe Dempsey
joe@citizen.vc
Office:    (650) 257-0875
Cell:      (973) 715-8330

Begin forwarded message:

**From:** Joe Dempsey <joe@citizen.vc>
**Subject:** Fwd: Series D
**Date:** March 28, 2016 at 3:22:23 PM EDT
**To:** Arun Ramamoorthy <aramamoorthy@pinnacleventures.com>

Arun
I am hereby forwarding the email from me to Glenn and his repose to me.  Please note that in the body of my email he added some words that stand out by their larger/different font.
Also, this was not just an exercise, we had had discussions with investors that made us believe - combining the proposed terms and the support of the company (i.e. Stuut helping to sell the deal) - that a deal could be done
Joe

Joe Dempsey
joe@citizen.vc
Office:    (650) 257-0875
Cell:      (973) 715-8330

Begin forwarded message:

**From:** "Luinenburg, Glenn" <Glenn.Luinenburg@wilmerhale.com>
**Subject:** RE: Series D
**Date:** February 11, 2016 at 11:16:16 AM EST
**To:** Joe Dempsey <joe@citizen.vc>

## Joe, I will call you today.

## Glenn J. Luinenburg | WilmerHale
**950 Page Mill Road**
**Palo Alto, CA 94304 USA**
**+1 650 858 6075 (t)**
**+1 650 858 6100 (f)**
**glenn.luinenburg@wilmerhale.com**

## Please consider the environment before printing this email.

---

**From:** Joe Dempsey [mailto:joe@citizen.vc]
**Sent:** Wednesday, February 10, 2016 9:21 AM
**To:** Luinenburg, Glenn
**Subject:** Series D

Hi Glenn,
First, in case I was not clear, based on our discussion yesterday I will have Zain release his signature on the Settlement Agreement.  I appreciate your patience and help on the matter.  I am not, as you know, a fan of the Top-Up, but that train has left the station.

With respect to the Series D, we believe we might generate some interest but it will be a challenge given the

Exhibit O

March 21, 2016

Dear Security Holder of Jumio, Inc.:

I am writing to inform you that earlier today Jumio commenced voluntary Chapter 11 proceedings in the U.S. Bankruptcy Court for the District of Delaware.

As you know, in December 2015 and January 2016, Jumio made a settlement offer to its Security Holders in connection with potential issues arising from the restatement of its financial statements for fiscal years 2013 and 2014 (the "Restated Financials"). For several reasons, including that not all Security Holders were willing to participate in the proposed settlement, Jumio was unable to proceed with the settlement.

Jumio believes it cannot secure viable funding for its operations for several reasons, including the legacy issues related to the company's restatement of its financial statements for fiscal years 2013 and 2014. After a rigorous evaluation of all available options, the Board determined that a voluntary Chapter 11 filing and subsequent sale of the business through a court-supervised process would be in the best interests of all of Jumio's stakeholders. As is common in this process, Jumio has negotiated an agreement to sell the business and substantially all of its assets to a "stalking horse bidder" in order to solicit higher and better offers as part of a court-supervised auction process. Jumio is hopeful that an orderly and competitive auction process will maximize value for all of its stakeholder groups.

We recognize that you may have questions about what this process means for you and your investment in Jumio. As we are still very early in the sale process, there is little to update you on. However we plan to keep you informed of any developments that may affect you during this process.

Sincerely,

James Cook
Secretary
Jumio, Inc.

**Exhibit P**

(a)   <u>General Voting Rights.</u>   Except as otherwise required by law or by this Amended and Restated Certificate of Incorporation and subject to Section 7, each share of Common Stock issued and outstanding shall have one vote and each share of Preferred Stock issued and outstanding shall be entitled to the number of votes equal to the number of shares of Common Stock into which such share of Preferred Stock could be converted in accordance with the terms of this Amended and Restated Certificate of Incorporation at the record date for determination of the stockholders entitled to vote or consent on such matters, such votes or consents to be counted together with all other shares of stock of the Corporation having general voting power and not separately as a class.   Holders of Common Stock and Preferred Stock shall be notified of any stockholders' meeting or consent in accordance with the Bylaws of the Corporation.   Fractional votes by the holders of Preferred Stock shall not, however, be permitted and any fractional voting rights shall (after aggregating all shares into which shares of Preferred Stock held by each holder and its affiliates could be converted) be rounded to the nearest whole number.

(b)   <u>Voting for the Election of Directors.</u>   As long as at least 1,000,000 shares of Series A Preferred Stock remain outstanding, the holders of such shares of Series A Preferred Stock shall be entitled to elect one (1) director of the Corporation (the "**Series A Director**") at any election of directors.   As long as at least 1,000,000 shares of Series B Preferred Stock remain outstanding, the holders of such shares of Series B Preferred Stock shall be entitled to elect one (1) director of the Corporation (the "**Series B Director**") at any election of directors.   As long as at least 1,000,000 shares of Series C Preferred Stock remain outstanding, the holders of such shares of Series C Preferred Stock shall be entitled to elect one (1) director of the Corporation (the "**Series C Director**" and together with the Series A Director and Series B Director, the "**Preferred Directors**") at any election of directors.   <u>The holders of outstanding Common Stock shall be entitled to elect three (3) directors of the Corporation at any election of directors.</u>   The holders of Preferred Stock and Common Stock (voting together as a single class and not as separate series, and on an as-converted basis) shall be entitled to elect any remaining directors of the Corporation.

Notwithstanding the provisions of Section 223(a)(1) and 223(a)(2) of the GCL, any vacancy, including newly created directorships resulting from any increase in the authorized number of directors or amendment of this Amended and Restated Certificate of Incorporation, and vacancies created by removal or resignation of a director, may be filled by a majority of the directors then in office, though less than a quorum, or by a sole remaining director, and the directors so chosen shall hold office until the next annual election and until their successors are duly elected and shall qualify, unless sooner displaced; <u>provided, however,</u> that where such vacancy occurs among the directors elected by the holders of a class or series of stock, the holders of shares of such class or series may override the Board of Directors' action to fill such vacancy by (i) voting for their own designee to fill such vacancy at a meeting of the Corporation's stockholders or (ii) written consent, if the consenting stockholders hold a sufficient number of shares to elect their designee at a meeting of the stockholders. Any director may be removed during his or her term of office, either with or without cause, by, and only by, the affirmative vote of the holders of the shares of the class or series of stock entitled to elect such director or directors, given either at a special meeting of such stockholders duly called for that purpose or pursuant to a written consent of stockholders, and any vacancy thereby created may be filled by the holders of that class or series of stock represented at the meeting or pursuant to written consent.

5

Lyon - Cross                                        89

1  Q     Okay.  There's been much discussion throughout your

2  proffer, as the term was used, and the like about the

3  certificate of incorporation of the corporation, correct?

4  A     Yes, there has been.

5  Q     There's been much reliance upon it.  Okay.  And I

6  believe that companies don't have the ability to pick and

7  choose which aspects of their certificate of incorporation

8  they're going to honor, correct?

9  A     You're into an area that I'm not qualified to speak on.

10 Q     Well, let me get into the specific area.  The

11 certificate of incorporation provides for the common

12 shareholders to have three directors on the board.  Where

13 were those three directors during all of this meltdown of

14 Jumio?  Where were those three common directors?

15 A     Is there a timeframe you're referring to specifically?

16 Q     Well, let's start about a year before the filing when

17 the preferred shareholders stared to take a collateral

18 interest in the assets of the company.  Where were those

19 common directors at that point in time?

20 A     I don't know because I wasn't involved until February.

21 Q     Okay.  When you became involved as the sole independent

22 director what steps did you take to have the company fulfill

23 its obligations under the certificate of incorporation and

24 have the common shareholders represented in the deliberations

25 about how to handle this?

Lyon - Cross                              90

1          MS. MUMFORD:  Your Honor, I don't wish to keep

2    objecting or interrupt, but I think we need to count these as

3    hypotheticals because I'm not sure that the conclusion that's

4    being made is actually true that that is a requirement.  So

5    if he wants to ask it hypothetically that's fine; otherwise,

6    I think its legal argument.

7          THE COURT:  All right.  I'll allow the question if

8    you want to examine on redirect Mr. Lyon and demonstrate

9    whether or not there is or isn't a requirement under the

10   certificate.

11         MR. DEMPSEY:  Well, the certificate of

12   incorporation was filed as an exhibit.  You can just pull it

13   out if you wish.

14         THE COURT:  Let's proceed.

15   BY MR. DEMPSEY:

16   Q    Did you make any effort to have the common shareholders

17   get their seats on the board while you sat on the board?

18   A    No.

19   Q    Okay.  All right.  In addition to the reliance on the

20   certificate of incorporation there's also been, through your

21   proffer, some reliance upon the offer that was made to all

22   stakeholders to participate in the secured notes.  That offer

23   was made in September of 2015.  Okay.  Why was there no offer

24   made to common shareholders to help bail the company out as

25   it was getting ready to file for bankruptcy?

Lyon - Cross                                      91

1  A      In terms of additional equity?

2  Q      Yes.

3  A      If I remember correctly there was -- I'm reaching back

4  now almost a year because I haven't really focused on this

5  issue is there were offers made to participate in the notes

6  which was about a year before.

7  Q      It was September.  That offer was made in September.

8  A      Okay.  I don't recall any offers being made to equity

9  to satisfy at the time one way or the other.  I don't know if

10 there were prior to my involvement and I came in a month

11 before the bankruptcy.

12 Q      Well --

13 A      So I can't -- what I'm trying to remember is if there

14 were offers made to participate in the DIP financing.  If you

15 tell me there wasn't then I don't refute that, but I do

16 remember some discussion about offering that up.

17 Q      Was it ever considered at the board level to go back to

18 shareholders and say we're about to file bankruptcy unless we

19 get some cash, would you like to help the situation?

20 A      I don't remember one way or the other because we were

21 specifically dealing with the DIP loan financing needs

22 because of how quickly we needed the cash and that's my

23 testimony.  I don't remember if equity was invited to

24 participate in the DIP.

25 Q      So you were brought in as an independent director when

Lyon - Cross                                    92

1   there was virtually no options left for the company?

2   A       There were very few.

3   Q       Okay.  All right.  Now let me ask you another question.

4   There has been much said, in my opinion and this is only my

5   opinion, there seems to be a lot of back and forth between

6   Mattes accusing Saverin of bad behavior and Saverin accusing

7   Mattes of bad behavior.  The general or the Equity Committee

8   has asserted and the Debtor has taken issue with the fact

9   that they haven't explained what the bad actions of Saverin

10  have been.  I get it.  That's fine.  Okay.  The flip side of

11  it is to date I have not heard anything with respect to what

12  the board believes Mattes bad actions were.  Can you

13  elaborate on what you learned about what Mattes bad actions

14  were?

15  A       Well, what I do know is who was the target of the SEC

16  investigation.

17  Q       That's all you know?

18  A       I do know that -- you're asking now what the bad

19  actions, potential bad actions of the Mattes side are?

20  Q       Correct.

21  A       Okay.  So I'm aware of the SEC investigation.  Hang on,

22  let me finish.  I also am aware that as part of this plan a

23  trust is set up to pursue those causes of action and that

24  approximately $6 to $700,000.00 dollars will be funded into

25  the trust to determine those.  So part of the reason of the

# Exhibit R

14

```
 1  who are the release parties in this case, were not targets of
 2  this investigation.  Mr. Lyon would testify that based on his
 3  discussion with current board members and management and his
 4  review of the Debtor's books and records he determined that
 5  none of these parties, the release parties, participated or
 6  sold stock in a secondary market.
 7          Mr. Lyon would testify that he reviewed the
 8  Debtor's various organizational pleadings and documents,
 9  included the amended and restated certificate of
10  incorporation of Jumio Inc.  Pursuant to his review of the
11  certification of incorporation Mr. Lyon would testify that
12  the directors of Jumio cannot be personally liable for money
13  damages, for breach of fiduciary duty or care as a director.
14  In addition the Debtor's officers -- I'm sorry, directors
15  were entitled to indemnification pursuant to the
16  certification of incorporation.
17          Mr. Lyon would testify that during his due
18  diligence he also noted that the Debtors had purchased an
19  insurance policy covering current and former directors,
20  himself included, and that policy was up to $5 million
21  dollars which we'll refer to as the D&O policy.  Mr. Lyon
22  would testify that he also reviewed the various pleadings to
23  be filed in connection with the bankruptcy including the
24  first day declaration of Steven Stuut the Debtor's former
25  CEO.
```

# Exhibit S

*Secured Debt*

14.    Pursuant to that certain Note Purchase Agreement dated as of August 28, 2015 (as amended, the "NPA"), Jumio was authorized to issue from time to time senior secured convertible promissory notes (the "Prepetition Secured Notes" and the holders thereof from time to time, the "Prepetition Secured Noteholders"), and Eduardo Saverin ("Mr. Saverin") and Andreessen Horowitz Fund, II, L.P. ("AH") purchased the following Prepetition Secured Notes in the aggregate original principal amount of $15,493,727.74:

- Note No.: CPN-1 dated August 28, 2015 in the original principal amount of $4,000,000.00 owed to Mr. Saverin;

- Note No.: CPN-2 dated August 28, 2015 in the original principal amount of $1,509,780.82 owed to Mr. Saverin;

- Note No.: CPN-3 dated August 28, 2015 in the original principal amount of $2,005,041.10 owed to Mr. Saverin;

- Note No.: CPN-4 dated August 28, 2015 in the original principal amount of $1,509,780.82 owed to AH, which was transferred to Mr. Saverin on or about March 18, 2016;

- Note No.: CPN-5 dated October 23, 2015 in the original principal amount of $4,000,000.00 owed to Mr. Saverin; and

- Note No.: CPN-6 dated February 26, 2016 in the original principal amount of $2,469,125.00 owed to Mr. Saverin.

15.    Pursuant to, among other things, that certain Security Agreement dated as of August 28, 2015 (as amended, the "Security Agreement") by and between Jumio, as borrower, and Christopher Joseph Clower, as security agent pursuant to the NPA and under the Prepetition Secured Notes (the "Prepetition Agent") and the other Security Perfection Documents (as defined in the NPA), the Prepetition Secured Notes are secured by liens on and security interests in substantially all of Jumio's assets, including its cash (the "Cash Collateral").

Exhibit T

sale of its assets in a controlled, court-supervised environment would be the best available option for it and its stakeholders. Jumio believes that the Chapter 11 process, including the proposed sale of its assets pursuant to the highest and otherwise best bid (as described below), will be seamless for its customers, result in minimal disruption to its operations, allow the company to strengthen its financial structure, and position it for significant future growth.

### *Legacy Issues*

21.    In 2015, Jumio restated its financial statements for the years of 2013 and 2014 (the "Restated Periods"). The determination to restate the financial statements for the Restated Periods was made after consulting with a third-party consulting firm and Jumio's legal advisors following the identification of errors related to primarily revenue recognition policies adopted by Jumio.

22.    In addition, in March 2015, the Board of Directors engaged special counsel to investigate, among other things, issues related to secondary sales of Jumio's common stock by certain (now former) executives of Jumio, including Mr. Mattes. On April 30, 2015, Mr. Mattes resigned from Jumio and its Board of Directors.

23.    On September 2, 2015, Jumio advised its shareholders it had recently restated its unaudited financial statements for the Restated Period during which prior management had been in place.

24.    As a result of these events, Jumio was subject to a number of additional costs and risks, including unanticipated costs for accounting and legal fees in connection with or related to the restatement, as well as the costs and expenses that could arise in connection with any investor litigation relating to the restatement – thereby making it essentially impossible to secure additional funding as needed.



ANDREESSEN HOROWITZ      Exhibit U      🔍
*Software Is Eating the World*

MARKETPLACES

# 16 Startup Metrics

*by* Jeff Jordan, Anu Hariharan, Frank Chen, and Preethi Kasireddy

We have the privilege of meeting with thousands of entrepreneurs every year, and in the course of those discussions are presented with all kinds of numbers, measures, and metrics that illustrate the promise and health of a particular company. Sometimes, however, the metrics may not be the best gauge of what's actually happening in the business, or people may use different definitions of the same metric in a way that makes it hard to understand the health of the business.

So, while some of this may be obvious to many of you who live and breathe these metrics all day long, we compiled a list of the most common or confusing ones. Where appropriate, we tried to add some notes on why investors focus on those metrics. Ultimately, though, good metrics *aren't* about raising money from VCs — they're about running the business in a way where founders know how and why certain things are working (or not) ... and can address or adjust accordingly.

## *Business and Financial Metrics*

## #1 Bookings vs. Revenue

A common mistake is to use bookings and revenue interchangeably, but they aren't the same thing.

🔁

**Bookings** is the value of a contract between the company and the customer. It reflects a contractual obligation on the part of the customer to pay the company.

**Revenue** is recognized when the service is actually provided or ratably over the life of the subscription agreement. How and when revenue is recognized is governed by GAAP.

Letters of intent and verbal agreements are neither revenue nor bookings.

# #2 Recurring Revenue vs. Total Revenue

Investors more highly value companies where the majority of total revenue comes from product revenue (vs. from services). Why? Services revenue is non-recurring, has much lower margins, and is less scalable. Product revenue is the what you generate from the sale of the software or product itself.

**ARR (annual recurring revenue)** is a measure of revenue components that are recurring in nature. It should exclude one-time (non-recurring) fees and professional service fees.

**ARR per customer:** Is this flat or growing? If you are upselling or cross-selling your customers, then it should be growing, which is a positive indicator for a healthy business.

**MRR (monthly recurring revenue):** Often, people will multiply one month's all-in bookings by 12 to get to ARR. Common mistakes with this method include: (1) counting non-recurring fees such as hardware, setup, installation, professional services/ consulting agreements; (2) counting bookings (see #1).

# #3 Gross Profit

While top-line bookings growth is super important, investors want to understand *how profitable* that revenue stream is. Gross profit provides that measure.

What's included in gross profit may vary by company, but in general all costs associated with the manufacturing, delivery, and support of a product/service should be included.

So be prepared to break down what's included in — and excluded — from that gross profit figure.

# #4 Total Contract Value (TCV) vs. Annual Contract Value (ACV)

**TCV (total contract value)** is the total value of the contract, and can be shorter or longer in duration. Make sure TCV also includes the value from one-time charges, professional service fees, and recurring charges.

**ACV (annual contract value),** on the other hand, measures the value of the contract over a 12-month period. Questions to ask about ACV:

*What is the size?* Are you getting a few hundred dollars per month from your customers, or are you able to close large deals? Of course, this depends on the market you are targeting (SMB vs. mid-market vs. enterprise).

*Is it growing* (and especially not shrinking)? If it's growing, it means customers are paying you more on average for your product over time. That implies either your product is fundamentally doing more (adding features and capabilities) to warrant that increase, or is delivering so much value customers (improved functionality over alternatives) that they are willing to pay more for it.

See also this post on ACV.

# #5 LTV (Life Time Value)

Lifetime value is the present value of the future *net profit* from the customer over the duration of the relationship. It helps determine the long-term value of the customer and how much net value you generate per customer after accounting for customer acquisition costs (CAC).

A common mistake is to estimate the LTV as a *present value of revenue* or even *gross margin of the customer* instead of calculating it as *net profit of the customer* over the life of the relationship.

Reminder, here's a way to calculate LTV:

> **Revenue per customer (per month)** = average order value multiplied by the number of orders.
>
> **Contribution margin per customer (per month)** = revenue from customer minus variable costs associated with a customer. Variable costs include selling, administrative and any operational costs associated with serving the customer.
>
> **Avg. life span of customer (in months)** = 1 / by your monthly churn.
>
> **LTV** = Contribution margin from customer multiplied by the average lifespan of customer.

Note, if you have only few months of data, the conservative way to measure LTV is to look at historical value to date. Rather than predicting average life span and estimating how the retention curves might look, we prefer to measure 12 month and 24 month LTV.

Another important calculation here is **LTV as it contributes to margin**. This is important because a revenue or gross margin LTV suggests a higher upper limit on what you can spend on customer acquisition. **Contribution Margin LTV to CAC ratio** is also a good measure to determine CAC payback and manage your advertising and marketing spend accordingly.

See also Bill Gurley on the "dangerous seductions" of the lifetime value formula.

# #6 Gross Merchandise Value (GMV) vs. Revenue

In marketplace businesses, these are frequently used interchangeably. But GMV does not equal revenue!

**GMV (gross merchandise volume)** is the total sales dollar volume of merchandise transacting through the marketplace in a specific period. It's the real top line, what the consumer side of the marketplace is spending. It is a useful measure of the size of the marketplace and can be useful as a "current run rate" measure based on annualizing the most recent month or quarter.

**Revenue** is the portion of GMV that the marketplace "takes". Revenue consists of the various fees that the marketplace gets for providing its services; most typically these are transaction fees based on GMV successfully transacted on the marketplace, but can also include ad revenue, sponsorships, etc. These fees are usually a fraction of GMV.

# #7 Unearned or Deferred Revenue … and Billings



**Exhibit V**

Joe Dempsey <joe@citizen.vc>

## please call
1 message

JD <joe@citizen.vc>                                                              Mon, May 2, 2016 at 2:10 PM
To: John Bivona <johnv@bivonalaw.com>

Do you know something that I do not?

# Jumio Delays Auction For Talks With Multiple Bidders

Share us on: By **Vince Sullivan**

Law360, Wilmington (April 29, 2016, 2:45 PM ET) -- The sale of software developer Jumio Inc. has been delayed by a week so the bankrupt company can continue talks with multiple potential bidders, an attorney said on Friday at a status conference on the company's Chapter 11 case.

During the hearing in Wilmington, Delaware, Adam Landis of Landis Rath & Cobb LLP said on behalf of Jumio that the company needs more time because an unexpectedly large number of bidders have shown interest in buying the company. Facebook co-founder and former Jumio board member Eduardo Saverin is the "white knight" stalking horse bidder in the case, with a $22.7 million offer.

"We are very thrilled," Landis said after the hearing in front of U.S. Bankruptcy Judge Brendan L. Shannon. "We have a lot of bidders."

An auction for Jumio's assets was scheduled for earlier this week, but has been moved to next week to allow for the talks with potential bidders. Saverin remains as the stalking horse bidder and Landis said last week that there are at least seven other bidders with interest in the company. The sale hearing is now set for next Friday.

"At that hearing, we intend to come to court with the highest bidder, whether it be a third-party bidder ... or the bid of Mr. Saverin," Landis told Judge Shannon.

The extension was agreed to by the company, the official committee of equity holders and Saverin, who is also serving as the debtor-in-possession financing lender by providing $3.7 million to fund the case. The interim DIP has been extended by mutual agreement until next Friday as well.

Saverin's stalking horse bid will consist of $3.2 million in cash and credit for the $3.7 million DIP loan and $15.8 million in prepetition notes that he holds. His ability to credit bid in the auction has been challenged by the equity committee, which **agreed to hold off** on deciding the issue until the sale hearing. If Saverin is not the winning bidder of the auction, the issue over his credit bidding will be moot.

Representatives for Saverin said last week that he is happy to see an active bidding environment because he is interested in seeing the company succeed whether he is the new owner or not. Saverin's attorney, Peter Gilhuly of Latham & Watkins LLP, said earlier in the case that Saverin may very well overbid other bidders in the auction in an effort to win. Judge Shannon said that he will likely require Saverin to provide some kind of security, whether it be cash or a letter of credit, to secure his credit bid in the case that his note claim is successfully challenged by the equity committee post-sale.

The case has already **been delayed twice** as the United States Trustee's representative contemplated the